## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

Jill Swenson, Melody McCurtis, Maria Nelson, Black Leaders Organizing for Communities, Disability Rights Wisconsin,

        Plaintiffs,

    v.

Marge Bostelmann, Julie M. Glancey, Ann S. Jacobs, Dean Knudson, Robert F. Spindell, Jr., and Mark L. Thomsen, *Commissioners of the Wisconsin Elections Commission*; Meagan Wolfe, *Administrator of the Wisconsin Elections Commission*,

        Defendants.

Case No. 3:20-cv-459-wmc

## THE WISCONSIN LEGISLATURE'S MEMORANDUM IN SUPPORT OF ITS PROPOSED MOTION TO DISMISS THE COMPLAINT

MISHA TSEYTLIN
(State Bar No. 1102199)
KEVIN M. LEROY
(State Bar No. 1105053)
SEAN T.H. DUTTON
TROUTMAN SANDERS LLP
227 W. Monroe Street, Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com

*Attorneys for the Wisconsin Legislature*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 1

    A.  Wisconsin's Regulation Of Elections ................................................. 1

    B.  The April 7, 2020 Election .................................................................. 5

    C.  Post-April 7 Developments ................................................................. 7

    D.  Plaintiffs' Complaint ......................................................................... 10

ARGUMENT ......................................................................................................... 14

  I.  This Court Lacks Jurisdiction Over Plaintiffs' Complaint ............................. 14

    A.  Plaintiffs' Attacks On The Now-Past April 7 Election Are Moot .............. 14

    B.  Plaintiffs' Challenge To The Future Elections In 2020 Is Unripe ............ 15

    C.  Much Of Plaintiffs' Complaint Seeks Relief Against Local Election
       Officials, Whom Plaintiffs Decided Not To Sue ......................................... 20

  II.  *Burford* Abstention Requires The Court To Dismiss Or, At A Minimum,
     Stay, This Case ......................................................................................... 21

  III. Plaintiffs' Claims For Relief Fail To State A Claim .......................................... 24

    A.  Plaintiffs Have Not Stated A Claim For Voter Intimidation Under
       Section 11(b) Of The Voting Rights Act ..................................................... 25

    B.  Plaintiffs Have Not Stated A *Bush v. Gore* Equal Protection Claim ........ 27

    C.  Plaintiffs Have Not Stated A First And Fourteenth Amendment
       Right-To-Vote Claim .................................................................................... 30

    D.  Plaintiffs Have Not Stated A Substantive-Due-Process Claim ................. 46

    E.  Plaintiffs Have Not Stated A Procedural-Due-Process Claim .................. 47

    F.  Plaintiffs Have Not Stated A Claim For Relief Under Title II Of The
       Americans With Disabilities Act ................................................................ 49

CONCLUSION ...................................................................................................... 52

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) ................................................................ 15, 16, 19

*Adkins v. VIM Recycling, Inc.,*
644 F.3d 483 (7th Cir. 2011) .......................................................... 21, 23

*Albright v. Oliver,*
510 U.S. 266 (1994) ..................................................................... 46, 47

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) ...................................................................... *passim*

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................. 25, 28, 42

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................. 24, 25, 39

*Bible v. United Student Aid Funds, Inc.,*
799 F.3d 633 (7th Cir. 2015) .................................................. 25, 28, 42

*Blanchette v. Conn. Gen. Ins. Corps.,*
419 U.S. 102 (1974) ............................................................................ 15

*Bowes v. Ind. Sec'y of State,*
837 F.3d 813 (7th Cir. 2016) ........................................................... 23

*Burdick v. Takushi,*
504 U.S. 428 (1992) ...................................................................... *passim*

*Burford v. Sun Oil Co.,*
319 U.S. 315 (1943) .......................................................................... 21

*Bush v. Gore,*
531 U.S. 98 (2000) ....................................................................... *passim*

*Califano v. Sanders,*
430 U.S. 99 (1977) ........................................................................... 15

*Cochran v. Ill. State Toll Highway Auth.,*
828 F.3d 597 (7th Cir. 2016) ........................................................... 44

*Conyers v. Abitz,*
416 F.3d 580 (7th Cir. 2005) ...................................................... 46, 47

*Crawford v. Marion Cty. Election Bd.,*
553 U.S. 181 (2008) ...................................................................... *passim*

*Dadian v. Village of Vilmette,*
269 F.3d 831 (7th Cir. 2001) ........................................................... 52

*Democratic Nat'l Comm. v. Bostelmann,*
   No. 20-1539 (7th Cir. Apr. 3, 2020) ................................................... 35, 37, 52

*Denius v. Dunlap,*
   330 F.3d 919 (7th Cir. 2003) ............................................................... 1

*E & E Hauling v. Forest Preserve Dist.,*
   821 F.2d 433 (7th Cir. 1987) ............................................................... 21

*Elonis v. United States,*
   135 S. Ct. 2001 (2015) ......................................................................... 26

*Eu v. San Francisco Cty. Democratic Cent. Comm.,*
   489 U.S. 214 (1989) ........................................................... 41, 43, 45, 48

*Frank v. Walker,*
   768 F.3d 744 (7th Cir. 2014) ................................................... *passim*

*Frank v. Walker,*
   819 F.3d 384 (7th Cir. 2016) ............................................ 31, 34, 37, 42

*Griffin v. Roupas,*
   385 F.3d 1128 (7th Cir. 2004) ................................................. *passim*

*Hennings v. Grafton,*
   523 F.2d 861 (7th Cir. 1975) ........................................................ 46, 47

*Henson v. CSC Credit Servs.,*
   29 F.3d 280 (7th Cir. 1994) ................................................................ 2

*Hildreth v. Butler,*
   ___ F.3d ___; 2020 WL 2536620 (7th Cir. May 19, 2020) ................... 49, 51, 52

*Jefferson v. Dane Cty.,*
   2020AP557-OA (Wis. Mar. 31, 2020) ............................................... 24

*League of Women Voters of Ohio v. Brunner,*
   548 F.3d 463 (6th Cir. 2008) ........................................................ 46, 47

*Lehn v. Holmes,*
   364 F.3d 862 (7th Cir. 2004) ............................................................. 15

*Lemons v. Bradbury,*
   538 F.3d 1098 (9th Cir. 2008) ..................................................... 27, 47

*Love v. Westville Corr. Ctr.,*
   103 F.3d 558 (7th Cir. 1996) ....................................................... 49, 52

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ............................................................. 20, 21, 29

*Mathews v. Eldridge,*
   424 U.S. 319 (1976) ......................................................... 11, 47, 48

*Nader v. Keith*,
    385 F.3d 729 (7th Cir. 2004) ....................................................... 37, 52

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
    491 U.S. 350 (1989) ........................................................... 21, 22, 23

*Oconomowoc Residential Programs v. City of Milwaukee*,
    300 F.3d 775 (7th Cir. 2002) ............................................................ 49

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) ........................................................................ 15

*Olagues v. Russoniello*,
    770 F.2d 791 (9th Cir. 1985) ........................................................... 26

*P.F. by A.F. v. Taylor*,
    914 F.3d 467 (7th Cir. 2019) ........................................................... 49

*Parson v. Alcorn*,
    157 F. Supp. 3d 479 (E.D. Va. 2016) .......................................... 25, 26

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) (per curiam) .................................................. 37, 52

*Renne v. Geary*,
    501 U.S. 312 (1991) ........................................................................ 15

*SKS & Assocs., Inc. v. Dart*,
    619 F.3d 674 (7th Cir. 2010) ........................................................... 24

*Stone v. Bd. of Election Comm'rs*,
    643 F.3d 543 (7th Cir. 2011) ..................................................... 14, 15

*Stone v. Bd. of Election Comm'rs.*,
    750 F.3d 678 (7th Cir. 2014) ........................................................... 31

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ...................................................... 16, 17, 19, 20

*Tennessee v. Lane*,
    541 U.S. 509 (2004) ........................................................................ 49

*Texas v. United States*,
    523 U.S. 296 (1998) ........................................................................ 15

*Tobin for Governor v. Ill. State Bd. of Elections*,
    268 F.3d 517 (7th Cir. 2001) ..................................................... 14, 15

*Toeller v. Wis. Dep't of Corr.*,
    461 F.3d 871 (7th Cir. 2006) ..................................................... 50, 51

*United States v. McLeod*,
    385 F.2d 734 (5th Cir. 1967) ........................................................... 26

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) (en banc) .............................................................. 37

*W. Bend Mut. Ins. Co. v. Schumacher,*
    844 F.3d 670 (7th Cir. 2016) ............................................................. 25, 35, 36

*Wagoner v. Lemmon,*
    778 F.3d 586 (7th Cir. 2015) ........................................................................ 49, 50

*Wis. Cent., Ltd. v. Shannon,*
    539 F.3d 751 (7th Cir. 2008) .............................................................................. 15

*Wis. Legislature v. Palm,*
    2020 WI 42 ....................................................................................... 8, 17, 24

*Wis. Right to Life State Political Action Comm. v. Barland,*
    664 F.3d 139 (7th Cir. 2011) ..................................................................... 16, 17

**Statutes And Rule**

42 U.S.C. § 12132 ........................................................................................... 11, 49

52 U.S.C. § 10307 ............................................................................................ *passim*

Fed. R. Evid. 201 ..................................................................................................... 1

Wis. Stat. § 5.05 ..................................................................................................... 5

Wis. Stat. § 5.25 ............................................................................. 3, 5, 33, 43

Wis. Stat. § 6.55 ..................................................................................................... 3

Wis. Stat. § 6.77 ..................................................................................................... 3

Wis. Stat. § 6.78 ..................................................................................................... 3

Wis. Stat. § 6.82 ........................................................................................... 3, 4, 51

Wis. Stat. § 6.85 ..................................................................................................... 2

Wis. Stat. § 6.855 ....................................................................................... 3, 32, 40

Wis. Stat. § 6.86 ............................................................................................ *passim*

Wis. Stat. § 6.87 ............................................................................................ *passim*

Wis. Stat. § 6.88 ............................................................................. 13, 23, 33, 45

Wis. Stat. § 7.10 ............................................................................................ *passim*

Wis. Stat. § 7.15 ............................................................................................ *passim*

Wis. Stat. § 7.30 ............................................................................................ *passim*

Wis. Stat. § 7.51 ............................................................................. 13, 23, 33, 45

Wis. Stat. § 7.52 ............................................................................. 13, 23, 33, 45

**Regulation**

28 C.F.R. § 35.130 ................................................................................ 49, 52

**Other Authority**

City of Madison, *CORRECTED Polling Place Listing for April 7* ............................. 7

Emergency Order #12, Safer At Home Order (Mar. 24, 2020) .................................... 8

Emergency Order #28, Safer At Home Order (Apr. 16, 2020) .................................... 8

Memo of Administrator Meagan Wolfe to Members of the Wisconsin Elections
   Commission, Summary of April 7, 2020 Election (Apr. 2020) ............... *passim*

Memo of Administrator Meagan Wolfe, Absentee Ballot Return
   Options - COVID-19 (Mar. 31, 2020) ................................................. 40

Memo of Administrator Meagan Wolfe, Absentee Witness Signature
   Requirement Guidance (Mar. 29, 2020) ........................................ 2, 51

Memo of Administrator Meagan Wolfe, Hospitalized Electors And Public
   Health Guidance (Mar. 29, 2020) ................................................. 4, 51

MyVote Wisconsin, *My Voter Info* ............................................................ 40

MyVote Wisconsin, *Photo ID Required* ..................................................... 36

Statement From The [White House] Press Secretary (Apr. 27, 2020) ........................ 7

The White House, CDC, & FDA, *Testing Blueprint: Opening Up America
   Again* (Apr. 27 2020) ........................................................... 7, 17

The White House, CDC, & FDA, *Testing Overview: Opening Up America
   Again* (Apr. 27, 2020) .......................................................... 7, 17

Wis. Dep't of Health Servs., *Public Notice: Withdrawal of Scope Statement SS
   040-20* (May 18, 2020) ............................................................. 8

Wis. Elections Comm'n *April 7, 2020 Absentee Voting
   Report* (May 15, 2020) ..................................................... 5, 6, 9, 20

Wis. Elections Comm'n, *7th Congressional District Special Election* ........................ 8

Wis. Elections Comm'n, *Absentee Ballot Report – May 12, 2020 Special
   Election for Congressional District 7* (May 18, 2020) .................................. 8, 9

Wis. Elections Comm'n, *Absentee Ballots* ............................................. 2, 39

Wis. Elections Comm'n, *Absentee Witness Signature Requirement Guidance
   COVID-19* ........................................................................... 35

Wis. Elections Comm'n, April 7, 2020 Absentee Voting Report ......................... 38, 41

Wis. Elections Comm'n, *Are Municipal Clerks Required To Be Available On
   Registration, Absentee, And Provisional Deadlines?* .................................... 40

Wis. Elections Comm'n, *Canvass Results for 2020 Spring Election and Presidential Preference Vote – 4/7/2020* (May 4, 2020) ................................... 5

Wis. Elections Comm'n, *Curbside Voting* .............................................. 4, 51

Wis. Elections Comm'n, *Election Day Manual* (Jan. 2020) ................................. 3, 41

Wis. Elections Comm'n, *I Want To Vote Absentee*..................................... 2, 3, 36, 39

Wis. Elections Comm'n, *May 1, 2020 Voter Registration Statistics* (May 1, 2020) ........................................................................................ 8

Wis. Elections Comm'n, *More Than 69,000 Absentee Ballots Already Returned for May 12 Special Election* (May 8, 2020) ......................... 9

Wis. Elections Comm'n, *Special Teleconference Meeting* ............................ 6

Wis. Elections Comm'n, *Unofficial Spring Election Turnout-34.3%-4/14/2020* (Apr. 14, 2020) .................................................................. 6

Wis. Elections Comm'n, *Update on Commission Actions 5/27- COVID-19* (May 27, 2020) ............................................................. *passim*

Wis. Elections Comm'n, *WEC Prepares For Fall Elections By Approving Block Grants To Municipalities and Mailing to Voters - COVID-19* (May 29, 2020) ............................................................. *passim*

## INTRODUCTION

This is another addition to the growing line of meritless lawsuits asking the federal courts to rewrite Wisconsin's longstanding election laws.   Plaintiffs' Complaint suffers from numerous fatal defects, including: (1) most of the allegations in the Complaint relate only to the April 7 Election, which election is over, meaning that any issues relating to that election are now moot; (2) the actual injunctive relief that Plaintiffs seek is plainly unripe, as it depends upon speculation as to Wisconsin's election administration, the state of medical developments, and the COVID-19 situation months from now; (3) many of Plaintiffs' claims seek relief against local election officials, whom Plaintiffs have chosen not to name as defendants; and (4) Plaintiffs' constitutional and statutory claims do not state a claim, as a matter of law; for example, their voter-intimidation claim under Section 11(b) of the Voting Rights Act ("VRA") fails because Plaintiffs do not allege that any person has taken, or will take, action with the specific intent to intimidate Wisconsin voters, while their *Anderson/Burdick* claim fails because, *inter alia*, Plaintiffs do not account for the numerous options that all voters have under the law to vote with reasonable effort.

## BACKGROUND[1]

### A.    Wisconsin's Regulation Of Elections

1. Wisconsin makes voting easy and readily available to all qualified electors. *See Frank v. Walker*, 768 F.3d 744, 748 (7th Cir. 2014) ("*Frank I*").  To vote absentee,

_____

[1] The Court should take judicial notice of publicly available government websites, *see Denius v. Dunlap*, 330 F.3d 919, 926–27 (7th Cir. 2003); *see generally* Fed. R. Evid. 201,

any registered voter, Wis. Stat. § 6.85(1), need only request an absentee-ballot by mail, fax, or online by "the 5th day immediately preceding the election," or make such a request in person by "the Sunday preceding the election," Wis. Stat. § 6.86(1)(ac),(b); Wis. Elections Comm'n, *I Want To Vote Absentee*.[2]  For the upcoming August and November 2020 Elections, voters wishing to vote absentee may make such a request *immediately*, and municipal clerks must begin delivering the requested absentee ballots well over a month before the elections.  *See* Wis. Stat. § 7.15(1)(cm); Wis. Elections Comm'n, *Absentee Ballots*.[3]

To complete an absentee-ballot request, a voter must submit a copy of their photo ID, which may be done with a smart phone or scanner if the request is made online.  Wis. Stat. §§ 6.86(1), 6.87(1).  Then, after receiving the ballot, the voter need only fill it out; obtain the signature of a witness, Wis. Stat. § 6.87(4), who may observe the absentee voter through a window or over FaceTime or Skype, *see* Memo of Administrator Meagan Wolfe, Absentee Witness Signature Requirement Guidance at 2 (Mar. 29, 2020);[4] and then ensure its return by 8:00 p.m. on Election Day, Wis. Stat. § 6.87(6).  Alternatively, a voter may complete an "in-person absentee ballot" up until

---

which is proper at the motion-to-dismiss stage, *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994).  This Background section borrows heavily from the Legislature's recent filing in *Democratic National Committee v. Bostelmann*, No. 3:20-cv-249-wmc, Dkt. 200 at 3–15 (W.D. Wis. May 11, 2020).

[2] Available at https://elections.wi.gov/voters/absentee (all websites last accessed June 7, 2020.).

[3] Available at https://elections.wi.gov/clerks/guidance-absentee.

[4] Available at https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Absentee%20Witness%20Guidance_0.pdf.

"the Sunday preceding the election," Wis. Stat. § 6.86(1)(b), which allows the voter to both request and cast an absentee ballot at the "municipal clerk's office, or another designated location," Wis. Elections Comm'n, *I Want To Vote Absentee*, *supra*; *see* Wis. Stat. §§ 6.855, 6.86(1)(a)2.  If an absentee ballot is deficient, a poll worker will "[s]et [it] aside" and only "process [it] after 8 p.m. on Election Day to give the voter an opportunity to correct the[ ] errors."  Wis. Elections Comm'n, *Election Day Manual* 89 (Jan. 2020).[5]  Aside from absentee voting, voters may also cast a ballot in person at their polling places on Election Day.  *See* Wis. Stat. §§ 6.77–78, 6.80; *see generally* Wis. Stat. § 6.55 (allowing for same-day voter registration at the polling place).

2. Wisconsin's election law contains numerous special provisions that allow disabled and hospitalized voters to vote more easily, even beyond the standard absentee-voting procedures just described.  Each polling place and the "voting system used at each polling place" must be accessible to individuals with disabilities, Wis. Stat. § 5.25(4)(a), and "[e]ach municipal clerk shall make reasonable efforts to comply with requests for voting accommodations made by individuals with disabilities whenever feasible," Wis. Stat. § 7.15(14).  Disabled voters may also vote in-person at a polling place from their vehicle with the assistance of a polling-place inspector, through a procedure known as "curbside voting."[6]  Wis. Stat. § 6.82(1); Wis. Elections

---

[5] Available at https://elections.wi.gov/clerks/education-training/election-day-manual.

[6] Municipalities may also use the related "Drive-through voting" procedure for all electors, regardless of disability, or even "mov[e] [their] polling place operations outside," so long as these methods "substantially meet the procedures normally reserved for voting in a traditional 'brick and mortar' polling location."  Memo of Administrator Meagan Wolfe, Curbside Voting, Drive-Through Voting And Outdoor Polling Places at 2–5 (Mar. 29, 2020),

Comm'n, *Curbside Voting*.[7]  If a voter "is indefinitely confined because of age, physical illness or infirmity or is disabled for an indefinite period," the voter may elect to "automatically" receive absentee ballots "for every election," Wis. Stat. § 6.86(2)(a), and may submit a signed witness statement that "verifies" the voter's name and address "in lieu of [the voter] providing proof of identification," Wis. Stat. § 6.87(4)(b)2.   And hospitalized electors—which "include[s] voters who are quarantined" due to COVID-19, *see* Memo of Administrator Meagan Wolfe, Hospitalized Electors And Public Health Guidance at 1 (Mar. 29, 2020)[8]—may receive assistance from an agent to vote via absentee ballot, Wis. Stat. § 6.86 (3)(a)(1)–(2).[9]

3. Wisconsin has "the most decentralized" approach to regulating elections in the country.  *See* Memo of Administrator Meagan Wolfe to Members of the Wisconsin Elections Commission, Summary of April 7, 2020 Election at 1 (Apr. 2020) ("Wolfe Memo");[10] Wis. Elections Comm'n *April 7, 2020 Absentee Voting Report* 10 (May 15,

---

available at https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Clerk%20comm%20re%20Curbside%2C%20Drive-Through%2C%20Outdoors%203.29.20_0.pdf.

[7] Available at https://elections.wi.gov/voters/accessibility/curbside-voting.

[8] Available at https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Hospitalized%20Electors.pdf.

[9] Easy registration is also readily available to disabled and hospitalized voters in Wisconsin.  Disabled voters complete same-day registration at the entrance to the polling place—such as from a parked vehicle—with the assistance of a polling-place inspector.  Wis. Stat. § 6.82 (1); Wis. Elections Comm'n, *Curbside Voting*, *supra*.  Hospitalized voters may register to vote by agent and, "at the same time," apply for an "official ballot by agent."  Wis. Stat. § 6.86 (3)(a)(1)–(2).

[10] Available at https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/April%207%20Election%20Summary%20and%20Next%20Steps.pdf.

- 4 -

2020)[11] ("WEC Absentee Voting Report").   The Wisconsin Elections Commission ("Commission")—a state agency—has the general "responsibility for the administration" of the State's "laws relating to elections and election campaigns," and thus oversees elections statewide.   Wis. Stat. § 5.05(1).   To conduct these statewide elections, however, Wisconsin law empowers "1,850 municipal election officials and 72 county election officials" throughout the State.   Wolfe Memo at 1; *see* Wis. Stat. §§ 7.10, 7.15.   These local officials have the duty to "provide [the] ballots" for elections, Wis. Stat. § 7.10 (1)(a); "establish[ ]" the "polling place[s]" for elections, Wis. Stat. § 5.25(2)–(3); staff "inspectors" to "serve" at those polling places, which inspectors must "be a qualified elector of a county in which the municipality where the official serves is located," Wis. Stat. § 7.30(2)(a); "[r]eassign" inspectors as needed "to assure adequate staffing at all polling places," Wis. Stat. § 7.15(1)(k); "[e]quip polling places" with "sufficient election supplies," Wis. Stat. §§ 7.10(1)(b), 7.15(1)(a)–(b); and "[t]rain election officials" according to the Commission's standards, Wis. Stat. § 7.15(1)(e).

## B.   The April 7, 2020 Election

The turnout for the April 7 Election was exceptionally high, with 1,555,263 votes cast, Wis. Elections Comm'n, *Canvass Results for 2020 Spring Election and Presidential Preference Vote – 4/7/2020* (May 4, 2020),[12] or 34.3% of eligible voters,

---

[11]   Available at https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/April% 202020%20Absentee%20Voting%20Report.pdf.

[12]   Available at https://elections.wi.gov/sites/elections.wi.gov/files/Canvass%20Results %20Summary_spring%20election%20all%20contests_4_7_2020.pdf.

*see* Wis. Elections Comm'n, *Unofficial Spring Election Turnout-34.3%-4/14/2020* (Apr. 14, 2020) (estimating Wisconsin's voting-age population at 4,524,066).[13] 1,157,599 voters cast their ballot absentee—"reach[ing] unprecedented levels"—yet "the final election data conclusively indicate[d] that the election did not produce an unusual number [of] unreturned or rejected [absentee] ballots." WEC Absentee Voting Report at 3, 5, 24.

Any difficulties on Election Day, like long lines in certain parts of the State, *see* Dkt. 1 ¶¶ 3, 117, were the result of ill-advised decisions from high-ranking local officials—not the named Defendants[14] here. Milwaukee officials, for instance, inexplicably chose to drastically cut and consolidate polling locations on election day. *See* Dkt. 1 ¶¶ 172–73; Wolfe Memo at 7–8; Wis. Elections Comm'n, *Special Teleconference Meeting* (noting "[d]iscussion of Milwaukee . . . Polling Place Consolidation" on agenda).[15] Other major metropolitan areas in Wisconsin, like the City of Madison, however, acted responsibly and so did not see these same difficulties. *See* Wolfe Memo at 8; City of Madison, *CORRECTED Polling Place Listing for April*

---

[13] Available at https://elections.wi.gov/node/6853.

[14] Plaintiffs named as Defendants Commissioners Marge Bostelmann, Julie M. Glancey, Ann S. Jacobs, Dean Knudson, Robert F. Spindell, Jr., and Mark L. Thomsen, as well as Administrator Meagan Wolfe, all in their official capacities. Dkt. 1 ¶¶ 15–16. This Memorandum will hereinafter collectively refer to these Defendants as "the Commission."

[15] Available at https://elections.wi.gov/node/6857.

*7* (listing "all polling places for the April 7" Election in light of COVID-19);[16] Dkt. 1 ¶ 121 (explaining that, in Madison, "voting . . . proceeded smoothly").

### C.   Post-April 7 Developments

The federal government has promulgated guidelines for "opening up America again," as the COVID-19 threat begins to decrease.   *See* The White House, The Centers for Disease Control and Prevention ("CDC"), & The Food and Drug Administration ("FDA"), *Testing Overview: Opening Up America Again* (Apr. 27, 2020);[17] The White House, CDC, & FDA, *Testing Blueprint: Opening Up America Again* (Apr. 27 2020);[18] *see also* Statement From The [White House] Press Secretary (Apr. 27, 2020).[19]   These guidelines act as a "[b]lueprint" for States to "reopen their economies and get people back to work, while protecting the health and safety of the American people."   The White House, CDC, & FDA, *Testing Blueprint* at 2, *supra*.

Wisconsin's stay-at-home regime is over.   The Wisconsin Governor's original "Safer at Home" Order, which the Governor issued on March 24, 2020, expired by its own term on April 24, 2020.   *See* Emergency Order #12, Safer At Home Order (Mar.

---

[16]   Available   at   https://www.cityofmadison.com/news/corrected-polling-place-listing-for-april-7.

[17]   Available   at   https://www.whitehouse.gov/wp-content/uploads/2020/04/Testing-Overview-Final.pdf.

[18] Available at https://www.whitehouse.gov/wp-content/uploads/2020/04/Testing-Blue print.pdf.

[19]   Available   at   https://www.whitehouse.gov/briefings-statements/statement-press-secretary-126/.

24, 2020).[20]   The Governor's appointee sought to renew that Order with slight modifications, but only then until May 26, 2020.  *See* Emergency Order #28, Safer At Home Order (Apr. 16, 2020).[21]   The Wisconsin Supreme Court invalidated that extension on state-law grounds. *Wis. Legislature v. Palm*, 2020 WI 42, ¶ 3.  The Governor has indicated that he does not intend to pursue any further statewide emergency restrictions due to COVID-19.  *See* Wis. Dep't of Health Servs., *Public Notice: Withdrawal of Scope Statement SS 040-20* (May 18, 2020) (withdrawing emergency-rule scope statement related to COVID-19).[22]

On May 12, Wisconsin's Seventh Congressional District successfully completed a special election for its U.S. Congressional seat.  Wis. Elections Comm'n, *7th Congressional District Special Election*.[23]  94,007 voters in the district voted absentee in the election, Wis. Elections Comm'n, *Absentee Ballot Report – May 12, 2020 Special Election for Congressional District 7* (May 18, 2020),[24] or over 22% of the whole registered voter population in the district, *see* Wis. Elections Comm'n, *May 1, 2020 Voter Registration Statistics* (May 1, 2020).[25]  Over 69,000 of those absentee ballots were received by the afternoon of May 8.  Wis. Elections Comm'n, *More Than*

---

[20] Available at https://evers.wi.gov/Documents/COVID19/EMO12-SaferAtHome.pdf.

[21] Available at https://evers.wi.gov/Documents/COVID19/EMO28-SaferAtHome.pdf.

[22]  Available  at  https://docs.legis.wisconsin.gov/code/register/2020/773B/ register/ public_notices/public_notice_withdrawal_of_ss_040_20/public_notice_withdrawal_of_ss_040 _20.pdf.

[23] Available at https://elections.wi.gov/node/6577.

[24] Available at https://elections.wi.gov/node/6906.

[25] Available at https://elections.wi.gov/node/6886.

*69,000 Absentee Ballots Already Returned for May 12 Special Election* (May 8, 2020).[26]  Further, almost every voter who requested an absentee ballot in the May 12 Special Election received one.  Wis. Elections Comm'n, *Absentee Ballot Report – May 12, 2020 Special Election for Congressional District 7, supra.*

Meanwhile, the Commission is investigating additional steps to increase further the State's readiness for Wisconsin's upcoming 2020 elections.  *See generally* Wolfe Memo; Wis. Elections Comm'n, *Update on Commission Actions 5/27- COVID-19* (May 27, 2020).[27]  The Commission is investigating methods to better provide sanitation supplies and personal-protective equipment for polling locations, Wolfe Memo at 1–3; upgrading the WisVote Database, Wolfe Memo at 3; WEC Absentee Voting Report at 22–23, and the MyVote Website, Wolfe Memo at 4; WEC Absentee Voting Report at 22–23; funding the purchases of envelopes and postage for absentee ballots, Wolfe Memo at 5; ensuring adequate levels of poll workers for future elections, *id.* at 5–6; issuing guidance and communications for clerks, *id.* at 6–7; studying polling-place consolidations, *id.* at 7–8; studying how better to use the National Guard and other groups as "last minute" poll workers, *id.* at 8–9; building an intelligent-barcode system into the absentee-ballot system, *id.* at 10; WEC Absentee Voting Report at 21–23, and issuing guidance on election-results-reporting systems, Wolfe Memo at 10.

---

[26] Available at https://elections.wi.gov/node/6897.

[27] Available at https://elections.wi.gov/node/6915.

The Commission recently adopted several reforms in light of the above-described inquiries. The Commission will mail absentee-ballot applications to "all voters without an active absentee request on file," which would facilitate these voters' ability to vote absentee in the upcoming 2020 elections.  Wis. Elections Comm'n, *Update on Commission Actions 5/27- COVID-19*, *supra*; Wis. Elections Comm'n, *WEC Prepares For Fall Elections By Approving Block Grants To Municipalities and Mailing to Voters - COVID-19* (May 29, 2020).[28]  The Commission has "direct[ed] staff to incorporate intelligent mail barcodes into the existing [absentee-ballot-envelope] design" to assist in absentee-ballot tracking.  Wis. Elections Comm'n, *Update on Commission Actions 5/27- COVID-19*, *supra*.  And the Commission has approved an over $4 million "CARES Act sub-grant to local election officials," *id.*, to help them "and voters prepare for the Fall 2020 elections amid the COVID-19 pandemic," Wis. Elections Comm'n, *WEC Prepares For Fall Elections*, *supra*.

### D.    Plaintiffs' Complaint

Plaintiffs are three registered Wisconsin voters—Jill Swenson, Melody McCurtis, and Maria Nelson, Dkt. 1 ¶¶ 10–12—and two interest groups—Black Leaders Organizing for Communities ("BLOC"), Dkt. 1 ¶ 13, and Disability Rights Wisconsin ("DRW"), Dkt. 1 ¶ 14.  Ms. Swenson alleges that she received an absentee ballot for the April 7 Election and cast that ballot without the required witness signature, pursuant to the order of this Court enjoining that witness-signature requirement, which order the Seventh Circuit subsequently overturned. Dkt. 1 ¶ 10.

---

[28] Available at https://elections.wi.gov/node/6917.

Ms. McCurtis alleges that she requested an absentee ballot for the April 7 Election, but that the ballot did not arrive in time for Election Day.  Dkt. 1 ¶ 11.  As a result, she voted in person on Election Day at the polls.  Dkt. 1 ¶ 11.  Ms. Nelson also alleges that she requested, but did not timely receive, an absentee ballot, and that she decided not to vote on Election Day because of the risks posed by COVID-19.  Dkt. 1 ¶ 12.  Finally, BLOC and DRW allege that they are both right-to-vote organizations that have had "to divert significant resources in response to the constitutional and statutory violations [that Plaintiffs] challenge[ ] here."  Dkt. 1 ¶¶ 13–14.

Plaintiffs' Complaint brings six counts: (1) a claim under Section 11(b) of the VRA, Dkt. 1 ¶¶ 190–202; (2) a *Bush v. Gore* equal-protection claim, Dkt. 1 ¶¶ 203–12 (citing *Bush v. Gore*, 531 U.S. 98 (2000) ); (3) a First and Fourteenth Amendment right-to-vote claim, Dkt. 1 ¶¶ 213–19 (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)); (4) a substantive-due-process claim under the Fourteenth Amendment, Dkt. 1 ¶¶ 220–27; (5) a Fourteenth Amendment procedural-due-process claim, Dkt. 1 ¶¶ 228–36 (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)); and (6) a claim under Title II of the Americans with Disabilities Act ("ADA"), Dkt. 1 ¶¶ 237–45 (citing 42 U.S.C. § 12132).

Plaintiffs also seek declaratory and injunctive relief against the Commission. For declaratory relief, Plaintiffs request that the Court "[d]eclare that administering an election during the COVID-19 pandemic in the manner" that the Commission "administered" the April 7 Election "violates Section 11(b) of the Voting Rights Act, the First and Fourteenth Amendments of the U.S. Constitution, and the Americans

- 11 -

with Disabilities Act." Dkt. 1 at 66 ¶ A. To support this request, many of Plaintiffs' allegations relate to the April 7 Election specifically. Dkt. 1 ¶¶ 39–137.

For injunctive relief, Plaintiffs ask that the Court enjoin the Commission to "[t]ake all appropriate actions" for the August and November 2020 elections to: "ensure that in-person voting, whether exercised by casting an absentee ballot or by casting a ballot on election day, can be safely conducted," Dkt. 1 at 66 ¶ B.1; "ensure an adequate number of poll workers to administer safe polling places"; Dkt. 1 at 66 ¶ B.3; "ensure that all voters who request and are qualified to receive an absentee ballot in fact receive such absentee ballot, and that any voter whose request for an absentee ballot is rejected or not processed for any reason be notified and given the opportunity to cure any defect in a timely manner"; Dkt. 1 at 66 ¶ B.5; "upgrade electronic voter registration systems so they can process the anticipated elevated number of online registrations and absentee ballot requests"; Dkt. 1 at 66 ¶ B.6; and "coordinate with, and require municipalities to coordinate with, the United States Postal Service to ensure the timely delivery and return of, and counting of, absentee ballots," Dkt. 1 at 66 ¶ B.7.

Plaintiffs also ask that the Court enjoin the Commission for the upcoming 2020 elections as follows: to "[r]equire that accessible voting machines be available at all in-person absentee voting locations," Dkt. 1 at 66 ¶ B.2; to "[e]nsure that each registered voter in Wisconsin receives an absentee ballot request form and that all residents of care facilities have adequate opportunities to register to vote and request absentee ballots"; Dkt. 1 at 66 ¶ B.4; to "[r]equire municipalities to establish secure

drop boxes for in-person return of absentee ballots and to increase in-person absentee voting opportunities that are safe and accessible, including, for instance, drive-through voting," Dkt. 1 at 66 ¶ B.8; to "[p]rovide timely notice to any voter whose absentee ballot is rejected as to the reason for rejection, as well as an opportunity to cure or contest the ballot rejection," Dkt. 1 at 66 ¶ B.9; and to "[e]ngage in a public education campaign to apprise the public on: how to request, vote, and return absentee ballots; the locations and times for in-person absentee voting; all early voting opportunities in each community; the provisions being made for safe in-person voting; and any changes in election day polling locations," Dkt. 1 at 66 ¶ B.10.

Finally, Plaintiffs ask the Court to enjoin a host of specific election laws for these same upcoming elections: Section 7.30(2), which requires "that each election official be an elector of the county in which the municipality is located," Dkt. 1 at 68 ¶ C.1; Section 6.87(2)'s witness-signature requirement, as it applies "to immunocompromised voters who cannot safely secure an in-person witness," Dkt. 1 at 68 ¶ C.2; Section 6.86(1)(ac)'s photo-ID requirement for absentee-ballot applications, as it applies to "immunocompromised and disabled voters without means to provide photo identification," Dkt. 1 at 68 ¶ C.3; Section 6.87(6)'s election-day deadline for absentee ballots, so as to require acceptance of "absentee ballots postmarked by election day or not bearing a postmark but received within a week of election day," Dkt. 1 at 68 ¶ C.4; Sections 6.88 and 7.51's "requirement that absentee ballots not be counted before election day," Dkt. 1 at 68 ¶ C.5; and Section 7.52(1)(a),

"with respect to the requirement that a municipality pass an ordinance in order to count absentee ballots at a central location," Dkt. 1 at 68 ¶ C.6.

## ARGUMENT

### I.   This Court Lacks Jurisdiction Over Plaintiffs' Complaint

#### A.   Plaintiffs' Attacks On The Now-Past April 7 Election Are Moot

Much of Plaintiffs' Complaint focuses upon the April 7 Election, Dkt. 1 ¶¶ 39–137, in support of their request that this Court "[d]eclare that administering an election during the COVID-19 pandemic in the manner that Defendants administered the April 7, 2020 election violates . . . the Voting Rights Act, the First and Fourteenth Amendments of the U.S. Constitution, and the Americans with Disabilities Act." Dkt. 1 at 66 ¶ A.  These arguments and the attendant requested relief are moot.

A Court must dismiss a moot case as "nonjusticiable."  *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001).  A challenge to an election is moot after the "election ha[s] come and gone by."  *Id.*  This rule also applies to requests for a declaratory judgment, since the passing of the election makes such requested relief "now worthless."  *Stone v. Bd. of Election Comm'rs*, 643 F.3d 543, 544–45 (7th Cir. 2011) (noting that the plaintiffs sought a declaratory judgment declaring an election law unconstitutional).

Plaintiffs' arguments regarding the April 7 Election and the requested declaration as to that election, Dkt. 1 at 66 ¶ A, are moot.  Plaintiffs explicitly "do not contest the results of the April 7 election," Dkt. 1 ¶ 7, or seek any damages resulting from that election.  The declaratory relief that they seek as to the April 7 Election

- 14 -

would thus be "worthless" to Plaintiffs, *Stone*, 643 F.3d at 545, now that the election has "come and gone by," *Tobin*, 268 F.3d at 528.  Therefore, the Court should dismiss this request for declaratory relief as moot.  *Id.*

### B.   Plaintiffs' Challenge To The Future Elections In 2020 Is Unripe

1. All plaintiffs in federal court have the burden to prove justiciability under Article III under the ripeness doctrine.  *Renne v. Geary*, 501 U.S. 312, 316, 320–21 (1991).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).  So, "when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts," the court must dismiss the case as unripe.  *Lehn v. Holmes*, 364 F.3d 862, 867 (7th Cir. 2004) (citation omitted).  Such a ripeness dismissal prevents the courts from "entangling themselves in abstract disagreements," *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); allows the courts to avoid making any "unnecessary decision of constitutional issues," *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 138 (1974); and enables the courts to decide the matter later, after "further factual development" sharpens the issue, *see Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733, 737 (1998).  This inquiry is part of the Court's subject-matter jurisdiction because "it implicates the possibility of th[e] Court issuing an advisory opinion."  *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008).

Courts analyze ripeness issues under a two-factor test. First, the court considers the "fitness of the issues for judicial decision." *Abbott*, 387 U.S. at 149; *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167–68 (2014); *accord Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011). "[P]urely legal" disputes are ripe for adjudication at once, while issues that "will [ ] be clarified by further factual development," *Susan B. Anthony List*, 573 U.S. at 167 (citation omitted), or that are "uncertain" or "contingent" on future events, are unripe, *Wis. Right to Life*, 664 F.3d at 148. Second, the court examines "the hardship to the parties of withholding court consideration." *Abbott*, 387 U.S. at 149. Claims not involving present or immediate violations of the plaintiff's rights are unripe, as opposed to claims where the plaintiff is already suffering a "substantial hardship." *Susan B. Anthony List*, 573 U.S. at 167–68; *accord Wis. Right to Life*, 664 F.3d at 148.

2. Plaintiffs' injunctive-relief requests for future elections are unripe. Plaintiffs speculate that the alleged difficulties during the April 7 Election "are overwhelmingly likely to recur" in the upcoming 2020 elections, absent relief from this Court now. Dkt. 1 ¶¶ 151, 154, 157, 159–63. As a remedy, Plaintiffs request that this Court enter a series of broad injunctions, ordering the Commission to take seemingly any "appropriate action[ ]" to address Plaintiffs' myriad concerns, Dkt. 1 at 66–68 ¶¶ B.1.–10, and blocking scores of Wisconsin election laws touching on almost every aspect of election administration, Dkt. 1 at 66–68. The Court lacks jurisdiction to entertain these sweeping claims and requests for relief since they are unripe.

- 16 -

Beginning with the fitness factor of the ripeness inquiry, *Susan B. Anthony List*, 573 U.S. at 167, Plaintiffs' requested future relief is not fit for judicial decision now because it depends on the state of the COVID-19 situation, any medical innovations, and the government's responses, including as to election administration. *See* Dkt. 1 ¶¶ 151, 154, 157, 159–62; *id.* at 66–68 ¶¶ B.–C. All of these potential developments are both "uncertain" and "contingent" on factual circumstances that have not yet come to pass. *Wis. Right to Life*, 664 F.3d at 148.

Consider just the recent developments beginning in late April 2020. The CDC, the FDA, and the White House issued guidelines for "opening up America again" in the months to come, as the risks posed by COVID-19 lessen and America successfully flattens the curve of transmissions. *See* The White House, CDC & FDA, *Guidelines: Opening Up America Again*, *supra*; The White House, CDC, & FDA, *Testing Blueprint*, *supra*. Governor Evers' unconfirmed appointee sought to extend the Governor's original "Safer At Home" Order, which expired on April 24, but only to May 26—well before either of the forthcoming 2020 statewide elections—and the Wisconsin Supreme Court recently struck down even that extension on state-law grounds, *Palm*, 2020 WI 42, ¶ 3. The Governor has indicated that he will not pursue further statewide COVID-19 emergency orders or rules. *Supra* p. 8 (citing rescinding of scope statement).

The Commission has already taken significant steps to investigate the State's readiness for future 2020 elections, in the event of COVID-19 complications, and has adopted specific actions to improve Wisconsin's on-the-ground election

administration, absentee-ballot tracking, the MyVote Website, and so on. *See supra* pp. 9–10; *contra* Dkt. 1 ¶¶ 151, 154, 157, 159–62. Unlike the situation that this Court confronted prior to the April 7 Election, where the Commission had only "weeks leading up to the election" to respond to COVID-19, the Commission has *months* to prepare a fulsome response for the upcoming 2020 elections. The Commission has announced that it will mail absentee-ballot applications to "all voters without an active absentee request on file," which would facilitate these voters' ability to vote absentee in the upcoming 2020 elections, Wis. Elections Comm'n, *Update on Commission Actions 5/27- COVID-19, supra*; Wis. Elections Comm'n, *WEC Prepares For Fall Elections, supra*—and this is interrelated with Plaintiffs' specific request for that exact relief, Dkt. 1 at 67 ¶ B.4. The same mailing will specifically advise voters on how to vote absentee by mail or in person, as well as voting at the polls on election day, Wis. Elections Comm'n, *WEC Prepares For Fall Elections, supra*, which closely impacts Plaintiffs' requested "public education campaign," Dkt. 1 at 68 ¶ B.10. These actions are on top of the Commission's announcement that it has earmarked over $4 million in grant funds for local election officials to respond to any COVID-19 difficulties for the future 2020 elections, Wis. Elections Comm'n, *WEC Prepares For Fall Elections, supra*—which grants will go to, for example, sanitation supplies, personal-protective equipment, and other voter and poll-worker safety measures, Wolfe Memo at 1–3; Wis. Elections Comm'n, *WEC Prepares For Fall Elections, supra*.

In all, without knowing what substantial developments will occur in the upcoming months regarding the trajectory of the COVID-19 pandemic, the

development and implementation of medical advances, and the government's response, this Court cannot adjudicate whether the enforcement of any election law in the future elections will burden Plaintiffs' constitutional and statutory voting rights in the manner that they claim. *Accord League of Women Voters of Wis. v. Knudson*, No. 19-CV-1029-JDP, 2020 WL 1638452, at *1–2 (W.D. Wis. Apr. 2, 2020).

Moving to the hardship factor of ripeness, *Abbott*, 387 U.S. at 149, Plaintiffs would suffer no hardship if the Court refused to adjudicate their claims for relief for the future 2020 elections in this case. *See Susan B. Anthony List*, 573 U.S. at 167–68. Plaintiffs' lawsuit seeks to vindicate their right to vote in those upcoming elections. But Plaintiffs fully vindicate their voting rights by voting in these upcoming elections, which they plainly can do with reasonable effort. *See supra* pp. 1–4; *see also infra* pp. 34–41. Plaintiffs have until August 6, 2020, to request absentee ballots by mail or online for the August 11 Partisan Primary, *see* Wis. Stat. § 6.86 (1)(b), and until October 29 to request absentee ballots by mail or online for the November 3 General and Presidential Election, *see id.* Each Plaintiff (and every other registered Wisconsin voter) can request an absentee ballot *immediately*, months in advance of the deadlines, and none of them have any reason to believe that such a request would be left unfulfilled now. Again, the Commission has already announced that all registered voters who have not yet registered to vote absentee will receive, by mail, an absentee-ballot-request form and information on all voting options, Wis. Elections Comm'n, *WEC Prepares For Fall Elections*, *supra*, and there is every indication that the Commission is diligently preparing to handle any

- 19 -

increased volume of absentee-ballot requests, *see generally* WEC Absentee Voting Report; Wolfe Memo.   Thus, Plaintiffs have alleged no present or immediate violations of their rights, so they have not claimed that a "substantial hardship" would result from the Court dismissing both their claims on ripeness grounds now. *Susan B. Anthony List*, 573 U.S. at 167–68.

### C.   Much Of Plaintiffs' Complaint Seeks Relief Against Local Election Officials, Whom Plaintiffs Decided Not To Sue

The "irreducible constitutional minimum of [Article III] standing" requires Plaintiffs to allege, among other things, a causal connection between their asserted injuries and "the challenged action of the defendant," as opposed to "the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted); *accord Frank I*, 768 F.3d at 755.   Under controlling law, "units of government"—including localities within a state—"are responsible for *their own* discrimination."   *Frank I*, 768 F.3d at 755 (emphasis added).

Here, much of Plaintiffs' Complaint targets the actions of unnamed local election officials, not the officials of the Commission named as Defendants.   Plaintiffs allege that actions of local election officials were responsible for the majority of voting difficulties in the April 7 Election.   *See, e.g.*, Dkt. 1 ¶ 58; *id.* ¶ 208.   They have asked the Court to order "all appropriate actions to ensure an adequate number of poll workers to administer safe polling places," Dkt. 1 at 67 ¶ B.3, even though the law imposes such staffing responsibilities on local officials, *see* Wis. Stat. §§ 7.10, 7.15; Wolfe Memo at 1, 6.   And they request that the Court "require *municipalities* to coordinate with[ ] the United States Postal Service to ensure the timely delivery and

- 20 -

return of, and counting of, absentee ballots," Dkt. 1 at 67 ¶ B.7 (emphasis added), and "[r]equire *municipalities* to establish secure drop boxes for in-person return of absentee ballots and to increase in-person absentee voting opportunities that are safe and accessible," *id.* at 67 ¶ B.8 (emphasis added).  Since these claims and requests for relief against local officials do not "challenge[ ] action of the defendant[s]," these claims and requests fail for lack of standing.  *Lujan*, 504 U.S. at 560.

## II. *Burford* Abstention Requires The Court To Dismiss Or, At A Minimum, Stay, This Case

A. When "the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern," *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) ("*NOPSI*") (citation omitted), federal courts should dismiss or, at a minimum, stay a case, under the *Burford* abstention doctrine, *see Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); *E & E Hauling v. Forest Preserve Dist.*, 821 F.2d 433 (7th Cir. 1987).  "In other words, federal courts may abstain [under *Burford*] when principles of federalism warrant deference to a state's regulatory regime."  *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 504 (7th Cir. 2011).

State election law qualifies as such a "regulatory regime," *id.*, for purposes of *Burford* abstention, given that such laws involve the people's right to govern themselves, *accord Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004), which is the most "substantial" of "public concern[s]," *NOPSI*, 491 U.S. at 361.  Indeed, a comprehensive election-law system not only furthers "the State's important regulatory interests," *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788),

but is also necessary to protect "fair and honest" elections from plagues of "chaos," *Anderson*, 460 U.S. at 788; *accord Griffin*, 385 F.3d at 1130.

B. This Court should abstain under *Burford* from adjudicating Plaintiffs' sweeping claims, thereby avoiding the extreme disruption that granting Plaintiffs' requested injunctions would cause to Wisconsin's core interests in its comprehensive election administration.  *NOPSI*, 491 U.S. at 361.

Plaintiffs have asked this Court to, among other things: (1) enjoin the Commission to "[t]ake all appropriate actions" for the August and November 2020 Elections to "ensure that in-person voting, whether exercised by casting an absentee ballot or by casting a ballot on election day, can be safely conducted," Dkt. 1 at 66 ¶ B.1; "ensure an adequate number of poll workers to administer safe polling places," Dkt. 1 at 66 ¶ B.3; "ensure that all voters who request and are qualified to receive an absentee ballot in fact receive such absentee ballot, and that any voter whose request for an absentee ballot is rejected or not processed for any reason be notified and given the opportunity to cure any defect in a timely manner," Dkt. 1 at 66 ¶ B.5; "upgrade electronic voter registration systems so they can process the anticipated elevated number of online registrations and absentee ballot requests," Dkt. 1 at 66 ¶ B.6; and "coordinate with, and require municipalities to coordinate with, the United States Postal Service to ensure the timely delivery and return of, and counting of, absentee ballots," Dkt. 1 at 66 ¶ B.7, and (2) to suspend numerous state election laws relating to the eligibility of election officials, *see* Wis. Stat. § 7.30(2), the witness-signature requirement, Wis. Stat. § 6.87(2), the photo-ID requirement for absentee-ballot

- 22 -

applications, Wis. Stat. § 6.86(1)(ac), the election-day deadline for return of absentee ballots, Wis. Stat. § 6.87(6), the requirement that absentee ballots not be counted before election day, Wis. Stat. §§ 6.88, 7.51, and the requirement that municipalities pass an ordinance in order to count absentee ballots at a central location, Wis. Stat. § 7.52(1)(a); Dkt. 1 at 67–68 ¶C.

These extraordinary requests, amounting to federal judicial receivership of Wisconsin's election system until a COVID-19 vaccine is developed, would "disrupt[ ]" Wisconsin's efforts to establish a "coherent" election-administration policy. *NOPSI*, 491 U.S. at 361. According to Plaintiffs, this Court must commandeer Wisconsin's election-administration system and modify seemingly any Wisconsin election law necessary to make voting in the upcoming 2020 Elections "reasonable" or "appropriate." Dkt. 1 ¶ 7; *id.* at 66–67 ¶¶ B.1, B.3, B.5–.7; *see also id.* ¶¶ 192–96. These requests maintain no "sound respect" for Wisconsin's independence in its statewide elections, necessarily causing "needless federal conflict with [ ] state policy." *See NOPSI*, 491 U.S. at 360 (citation omitted); *accord Adkins*, 644 F.3d at 504 ("principles of federalism").

Plaintiffs' requested relief would be deeply "disruptive of" Wisconsin's election administration, *NOPSI*, 491 U.S. at 361, including by critically undermining the State's ongoing preparations for the upcoming 2020 elections, *accord Bowes v. Ind. Sec'y of State*, 837 F.3d 813, 821 (7th Cir. 2016); Dkt. 1 ¶ 9 (recognizing that "[c]areful preparations are necessary to meet the inevitable challenges of conducting safe, fair elections amidst a pandemic"). These preparations have already been fruitful,

resulting in the Commission's decision to mail absentee-ballot applications, as well as election-information materials, to "all voters without an active absentee request on file"; to update its absentee-ballot envelopes "to incorporate intelligent mail barcodes" that will assist in ballot tracking; and to direct over $4 million in grant money to local election officials to mediate COVID-19 concerns.   Wis. Elections Comm'n, *Update on Commission Actions 5/27- COVID-19*, *supra*; Wis. Elections Comm'n, *WEC Prepares For Fall Elections*, *supra*.   Since Plaintiffs' expansive requests for relief would cause broad-based interruptions in the Commission's efforts—and in the other measures that the Commission is currently investigating, *see generally* Wolfe Memo—this case merits abstention under *Burford*.

Finally, this Court abstaining does not deprive Plaintiffs of the opportunity to seek judicial review of their claimed concerns.   Wisconsin courts are "fully capable of resolving any federal constitutional arguments that [Plaintiffs] might make." *SKS & Assocs., Inc. v. Dart*, 619 F.3d 674, 681 n.6 (7th Cir. 2010).   The Wisconsin Supreme Court has already ably addressed multiple highly contentious issues related to COVID-19 on an expedited basis, *see, e.g.*, Order, *Jefferson v. Dane Cty.*, 2020AP557-OA, at *2 (Wis. Mar. 31, 2020); *Palm*, 2020 WI 42, ¶ 3, and nothing prohibits Plaintiffs from seeking a similar resolution of their claims in that state forum.

## III.   Plaintiffs' Claims For Relief Fail To State A Claim

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   "[A] formulaic recitation of the

elements of a cause of action will not do;" nor will "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 557) (second brackets in original).  A court must determine whether, after "disregard[ing] any portions that are 'no more than conclusions,' [the complaint] 'contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678–79) (third brackets in original).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "'Plausibility' is not a synonym for 'probability' in this context, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015) (citations omitted).

### A.   Plaintiffs Have Not Stated A Claim For Voter Intimidation Under Section 11(b) Of The Voting Rights Act

Section 11(b) of the VRA provides that "[n]o person . . . shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b).  Courts interpreting Section 11(b) have held, consistent with its text, that a plaintiff must claim both that a "person"— namely, the defendant—committed "an act of intimidation or attempt to intimidate," *and* "that the act was done with the *specific intent* to intimidate or attempt to intimidate." *See Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016) (discussing need to show that the *defendant* "undertook acts of intimidation")

(emphasis added) (citing *Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985), and *United States v. McLeod*, 385 F.2d 734, 740–41 (5th Cir. 1967)); *accord Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) ("Federal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state."). Thus, to succeed on a Section 11(b) voter-intimidation claim, a plaintiff must establish that the defendant's actions actually intimidated voters *and* that the defendant *intended* to intimidate those voters with these actions. *Olagues*, 770 F.2d at 804.

Plaintiffs allege that the State violated, and will continue to violate, Section 11(b) "by failing to take objectively reasonable precautions to enable Wisconsin citizens to vote free of fear of contracting COVID-19," Dkt. 1 ¶¶ 192, 196, 202, but Plaintiffs fail to allege sufficiently either essential element of a Section 11(b) voter-intimidation claim, meaning that their claim fails for two independently sufficient reasons.

First, Plaintiffs have not alleged that they or other voters were intimidated by any "person," or will be intimated by such other persons in the future. 52 U.S.C. § 10307(b) ("No *person* . . . shall intimidate . . . any person for voting or attempting to vote . . . ." (emphasis added)); *see Parson*, 157 F. Supp. 3d at 498–99. Plaintiffs allege only feelings of fear and intimidation *from COVID-19.* Dkt. 1 ¶¶ 197–99.

Second, Plaintiffs' claim fails to allege that any Defendant acted with an intent to "intimidate, threaten, or coerce," or would do so in the future. 52 U.S.C. § 10307(b). To the contrary, Plaintiffs *affirmatively pleaded* that Wisconsin's "election officials"—

which would include Defendants here—"worked very hard to manage the challenges [COVID-19] posed." Dkt. 1 ¶ 7; *accord DNC*, No. 3:20-cv-249, Dkt. 170 at 34 ("If there is a hero to this story, it is the Administrator, her staff and municipal workers, all of whom continue to improvise election practices."). Because Plaintiffs have not alleged any intent by Defendants to intimidate or coerce any voter not to vote—instead, affirmatively acknowledging election officials' praiseworthy intent to aid Wisconsinites in exercising their franchise, Dkt. 1 ¶ 7—Plaintiffs' voter-intimidation claim under Section 11(b) of the VRA fails as a matter of law.

### B.   Plaintiffs Have Not Stated A *Bush v. Gore* Equal Protection Claim

Plaintiffs' equal-protection claim, premised on *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam), Dkt. 1 ¶¶ 203–212, fails. "Even were *Bush* applicable to more than the one election to which the [Supreme] Court appears to have limited it," *Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th Cir. 2008), such a claim would require Plaintiffs to plausibly allege that specific election "procedures" resulted in "arbitrary and disparate treatment of the members of [the State's] electorate," *Bush v. Gore*, 531 U.S. at 105.

Here, Plaintiffs have not pointed to *any* election procedures relevant to the forthcoming 2020 elections that are insufficiently uniform to violate the guarantee of equal treatment. *Id.* at 106–07. Indeed, Plaintiffs seem satisfied to claim only (and fatally broadly) in this portion of the Complaint that "Defendants' administration of the April 7 election arbitrarily advantaged voters in some jurisdictions and

disadvantaged those who resided in others." Dkt. 1 at ¶¶ 206, 212. That wide-ranging, unspecified claim is insufficient. *See Bush v. Gore*, 531 U.S. at 105.

Elsewhere, Plaintiffs' Complaint states that the April 7 Election saw "radically different staffing levels" at polling locations across the State—which caused some voters, including at least one Plaintiff here, to experience longer waiting times for in-person voting—yet this too fails to identify a specific election procedure under *Bush v. Gore* causing "arbitrary and disparate treatment."  531 U.S. at 105; Dkt. 1 at ¶¶ 207–09. Under Wisconsin's "decentralized" approach to election regulation, "1,850 municipal election officials and 72 county election officials" throughout the State are *equally* responsible for administering elections in their individual jurisdictions, including by staffing and reassigning poll workers. Wolfe Memo at 1, 6; *see* Wis. Stat. §§ 7.10, 7.15; *supra* pp. 4–5. Likewise, the Commission made members of the National Guard *equally* available to all municipalities to serve as supplemental poll workers in light of staffing shortages caused by COVID-19. *See* Wolfe Memo at 8–9. In other words, Wisconsin law imposes the equal burden on local election officials to staff polling locations, and, to the extent the Commission acted in this arena, it offered supplemental staff on an equal basis. That cannot serve as the basis of a *Bush v. Gore* claim. *See* 531 U.S. at 105.

Even putting these outcome-determinative points aside, Plaintiffs have not alleged any plausible connection between the assertedly unequal "administration" of the April 7 Election and the future 2020 elections. *See Iqbal*, 556 U.S. at 678; *Bible*, 799 F.3d at 639. Plaintiffs baselessly speculate that "[u]nless enjoined by the Court,

Defendants will continue to violate the Equal Protection Clause" for the upcoming 2020 elections.  Dkt. 1 ¶ 212.  Even if this Court were to indulge the fanciful notion that there was a *Bush v. Gore* violation on April 7, 2020, this accusation does not plausibly allege the likelihood of a similar violation in the upcoming 2020 elections. On the contrary, the Commission has already begun to study and implement significant measures to better administer the remaining 2020 elections in light of any COVID-19 difficulties—including by mailing absentee-ballot-request forms to 2.7 million registered voters, *supra* p. 9, a remedy that Plaintiffs specifically sought here, *e.g.* Dkt. 1 at 67 ¶ B.4.

Finally, this Court lacks jurisdiction over Plaintiffs' *Bush v. Gore* claim to the extent that Plaintiffs complain of "the independent action of some third party not before the court," as opposed to "the defendant[s]."  *Lujan*, 504 U.S. at 560 (citation omitted)); *accord Frank I*, 768 F.3d at 755; *accord* Part I.C.  Here, significant portions of Plaintiffs' grievances lie solely with the actions of independent third parties— certain high-level local officials—not the Commission.  *See, e.g.*, Dkt. 1 ¶¶ 115 (noting that Milwaukee "open[ed] just 5 of its 180 polling sites"), 116 (noting that the Milwaukee Election Commission Executive Director was "not aware of th[e] option" to use National Guard members at polling locations),  207 (complaining of "situations in which municipalities in the same county had radically different staffing levels"); *compare* Dkt. 1 ¶ 121 (noting the relative success that local officials had in Madison, where voting "proceeded smoothly").  Plaintiff McCurtis claims that she was injured by the "more dysfunctional" election administration in Milwaukee, as compared to

voters in other Wisconsin jurisdictions, while BLOC and DRW claim that they "divert[ed] resources . . . to ensure that voters in Milwaukee, Green Bay, and other municipalities . . . are enfranchised in subsequent elections during the pandemic." Dkt. 1 ¶¶ 208–09.  Whatever failings occurred at the hands of local officials, this is not attributable to the Commission, which went above and beyond its legal obligations by, for example, helping to provide additional poll workers to all polling locations that needed and requested them.  Wolfe Memo at 5–6, 8–9.[29]

## C. Plaintiffs Have Not Stated A First And Fourteenth Amendment Right-To-Vote Claim

1. The *Anderson/Burdick* test generally governs a First and Fourteenth Amendment right-to-vote claim.  Under this test, a court determines the constitutionality of any restrictions imposed by a challenged election-law by "weigh[ing] 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate'" against "'the precise interests put forward by the State as justification for the burden imposed by its rule.'"  *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).  This imposes a steep burden on the challengers and requires the Court to weigh any election-law burden against the State's interests, including its sovereign

---

[29] Plaintiffs' single statement that "some municipalities, including Whitefish Bay and Bayside, mailed every registered voter within the municipality an absentee ballot request form," Dkt. 1 ¶ 86, does not adequately allege a *Bush v. Gore* claim for this same reason. Even if Plaintiffs did intend to rest such a claim on this allegation, *but see supra* pp. 27–28, the Commission was not responsible for the decision of these Whitefish Bay or Bayside officials.  Regardless, the Commission has voted to mail absentee-ballot applications to all voters without an active absentee request on file, *see supra* p. 9, thus defeating whatever *Bush v. Gore* claim could have been made on this particular allegation.

- 30 -

interests in election integrity and orderly administration. *See Stone v. Bd. of Election Comm'rs.*, 750 F.3d 678, 681 (7th Cir. 2014). The State's justification for its election laws is generally treated as a "legislative fact" that must be accepted by the Court if it is reasonable. *Frank I*, 768 F.3d at 750.

Under the *Anderson/Burdick* framework, a law survives constitutional scrutiny when the burdens that it imposes on the right to vote do not "represent a significant increase over the usual burdens of voting." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (controlling plurality of Stevens, J.); *accord Frank I*, 768 F.3d at 748. Given this controlling principle, "it is obvious that a federal court is not going to decree weekend voting, multi-day voting, all-mail voting, [ ] Internet voting," or "unlimited absentee voting." *Griffin*, 385 F.3d at 1130.

Finally, even where a court concludes that an election regulation does unconstitutionally burden *certain* specially burdened voters, this conclusion "[can]not prevent the state from applying the law generally." *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) ("*Frank II*"). Rather, the specially burdened voters who cannot comply with a given election law with "reasonable effort" are at most eligible for as-applied relief, not statewide relief applicable to all voters generally. *Id.*

2. Plaintiffs' right-to-vote claim challenges large swathes of Wisconsin election law, claiming that various provisions unduly burden their constitutional right to vote, and their Complaint requests correspondingly broad remedies from this Court. *E.g.* Dkt. 1 at 66–68. Plaintiffs' sweeping challenges fall into four general categories.

First, Plaintiffs' ask the Court to enjoin certain election-integrity provisions, specifically the witness-signature requirement for absentee ballots, as applied to "immunocompromised voters who cannot safely secure an in-person witness," Dkt. 1 at 31, 68 ¶ C.2; Wis. Stat. § 6.87(2), and the photo-ID requirement for absentee ballots, as applied to "immunocompromised and disabled voters without means to provide photo identification," Dkt. 1  at 68 ¶ C.3; Wis. Stat. § 6.86(1)(ac).

Second, Plaintiffs challenge various other absentee-ballot provisions.  They ask the Court to order the Commission to provide all residents with absentee-ballot request forms, Dkt. 1 at 67 ¶ B.4, and challenge the adequacy of the State's system to request absentee ballots online, Dkt. 1 at 21, 67 ¶ B.6; *see* Wis. Stat. § 6.86(1)(ac), (b).  They request an injunction directing the Commission to ensure the timely delivery of absentee ballots to voters, Dkt. 1 at 24, 67 ¶ B.5; *see* Wis. Stat. § 7.15(1)(cm), and to coordinate with the United States Postal Service, Dkt. 1 at 67 ¶ B.7.  They ask the Court to extend the deadlines for the return of absentee ballots until one week after each 2020 election, Dkt. 1 at 28, 68 ¶ C.4; Wis. Stat. § 6.87(6), and to expand the availability of both in-person absentee voting, Dkt. 1 at 33, 67 ¶ B.8; *see* Wis. Stat. §§ 6.855; 6.86(1), and of drop boxes for completed absentee ballots, Dkt. 1 at 67 ¶ B.8.  Finally, Plaintiffs ask the Court to order the Commission to provide voters with notice and an opportunity to cure when the Commission denies an absentee-ballot request, Dkt. 1 at 67 ¶ B.5, and when an election official rejects a cast absentee ballot, Dkt. 1 at 67 ¶ B.9.

Third, Plaintiffs challenge certain laws related to the administration and staffing of polling places. They ask the Court to enjoin the Commission to ensure adequate staffing at each polling place throughout the State. Dkt. 1 at 34, 67 ¶ B.3; Wis. Stat. §§ 5.25(2); 7.15(1)(k); 7.30(2). They seek to enjoin Section 7.30(2)(a)'s requirement that polling-place inspectors "be a qualified elector of a county in which the municipality where the official serves is located." Wis. Stat. § 7.30(2)(a); Dkt. 1 at 68 ¶ C.1. And they request orders expanding walk-in early voting and drive-through voting at polling locations, Dkt. 1 ¶ 159, at 67 ¶ B.8, as well as ensuring that voting systems at each polling location are accessible to those with disabilities, Dkt. 1 at 40, 67 ¶ B.2; Wis. Stat. § 5.25(4)(a).

Finally, Plaintiffs assert a handful of miscellaneous challenges and requests for relief. They ask the Court broadly to order that any 2020 election be "safely conducted," no matter what form of voting a voter elects. Dkt. 1 at 66 ¶ B.1; Dkt. 1 at 39; *see generally* Wis. Stat. §§ 7.10(1)(b), 7.15(1)(a)–(b) (providing that local election officials must adequately supply polling places). They request that the Court order the Commission to engage in a "public education campaign" to publicize Wisconsin's various election laws. Dkt. 1 at 68 ¶ B.10. And they seek an injunction against the requirement in Wis. Stat. §§ 6.88 and 7.51 "that absentee ballots not be counted before election day," Dkt. 1 at 68 ¶ C.5, and against Section 7.52(1)(a)'s requirement that "a municipality pass an ordinance in order to count absentee ballots at a central location," Dkt. 1 at 68 ¶ C.6.

Plaintiffs' four categories of challenges fail to allege that Wisconsin's election laws, taken as a whole, impose a more than reasonable burden on the right to vote. Further, Wisconsin's compelling interests in the integrity and orderly administration of elections easily outweigh whatever burdens these laws impose.   Therefore, Plaintiffs' Complaint fails to state an *Anderson/Burdick* claim.

Before discussing the specific challenges below, it is important to note that to the extent that some of the individual Plaintiffs make claims regarding their own unsuccessful attempts to vote in the April 7 Election, *see supra* pp. 10–11, these assertions cannot support any of their requested remedies for future elections.   Even if their claims were sufficient to allege that they, themselves, could not vote in the April 7 Election after expending only "reasonable effort," these allegations "[can]not prevent the state from applying the law[s] generally" in all future 2020 elections. *Frank II*, 819 F.3d at 386.   Any special burdens faced by these individual voters in a single election are insufficient to nullify Wisconsin's various election laws even as to those same voters for the upcoming elections, let alone all voters across the State.   *Id.*

a. *Election-Integrity Provisions.*   Plaintiffs have not plausibly alleged that the witness-signature and photo-ID requirements impose anything more than reasonable burdens on "immunocompromised and disabled voters."   Dkt. 1 at 68 ¶¶ C.2–3.

On the witness-signature requirement, the Seventh Circuit has already held that voters may comply with this election-integrity measure with "reasonable efforts," even *four days* before an upcoming election at the height of the COVID-19 pandemic. *Democratic Nat'l Comm. v. Bostelmann*, No. 20-1539, Dkt. 30 at 3 (7th Cir. Apr. 3,

2020).  This is because there are many ways that a voter may comply with this law, including "at least five concrete alternative suggestions" that the Commission has published "in light of the extraordinary challenges presented by the COVID-19 crisis." *Id.* at 4 (citing Wis. Elections Comm'n, *Absentee Witness Signature Requirement Guidance COVID-19*[30]); *accord DNC*, No. 3:20-cv-249-wmc, Dkt. 170 at 43 n.18 ("While the witness will still have to sign the physical certificate, this can be accomplished without a direct interaction with the age or health[-]compromised voter.").  For example, any voter—including those that are immunocompromised or disabled—could have a witness observe the voter "through a window" or "via video chat like Skype or Facetime" and then leave the ballot "on the door step" for the witness to sign after socially distancing.  Wis. Elections Comm'n, *Absentee Witness Signature Requirement Guidance COVID-19*, *supra*.  Plaintiffs have not plausibly alleged that immunocompromised or disabled voters cannot use one of these readily available alternatives going forward; rather, they simply assert the *ipse dixit* that these voters "cannot safely comply with the witnessing requirements," Dkt. 1 ¶ 158, which does not meet their burden to state a claim, under Rule 12(b)(6), *Schumacher*, 844 F.3d at 675.  Notably, whatever claims Plaintiffs' could have made on the eve of the April 7 Election, they would certainly lack plausibility now, *months* before the next election, at a time when no statewide emergency orders are in force.

Similarly, for the photo-ID requirement, this Court has already concluded—consistent with Supreme Court and Seventh Circuit precedent—that voters could

---

[30] Available at https://elections.wi.gov/index.php/node/6790.

comply with this law with minimal burden at a date much closer to Election Day that had much more apparent difficulties from COVID-19. *DNC*, No. 3:20-cv-249-wmc, Dkt. 170 at 47–49; *accord Crawford*, 553 U.S. at 196 (controlling plurality of Stevens, J.); *Frank I*, 768 F.3d at 751. All a voter must do to comply with this law is submit one of "several forms" of common IDs (which many voters "may already have," MyVote Wisconsin, *Photo ID Required*[31]), and this may be done electronically if requesting an absentee ballot online, *DNC*, No. 320-cv-249-wmc, Dkt. 37 at 15 & n.10; Wis. Elections Comm'n, *I Want To Vote Absentee*, *supra*. If the voter requests the absentee ballot by mail, the voter need only submit a copy of their ID, which copy would be even easier to obtain now, given that no statewide orders remain in effect and that the next elections are *months* away. *Supra* pp. 1–2. Here again, Plaintiffs do not plausibly allege how it could be that a disabled or immunocompromised voter cannot comply with this requirement after expending minimal effort, like the voters immediately before the April 7 Election, thus they have not alleged that this law imposes anything more than reasonable burdens on them. *See Schumacher*, 844 F.3d at 675.

The State has a compelling interest in the continued enforcement of these election-integrity measures, which outweighs the reasonable burdens imposed on disabled and immunocompromised voters. These election-integrity measures further the State's compelling interest in "orderly administration and accurate recordkeeping . . . for carefully identifying all voters [who may] participat[e] in the election process,"

---

[31] Available at https://myvote.wi.gov/en-us/PhotoIDRequired.

thus legitimately ensuring that "only the votes of eligible voters" are tallied, *Crawford*, 553 U.S. at 196 (controlling plurality of Stevens, J.); *accord Frank I*, 768 F.3d at 751.  This, in turn, promotes the compelling interests in election integrity and public confidence in elections, *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam), which the Seventh Circuit recognized when overturning this Court's recent injunction of the witness-signature requirement, *Democratic Nat'l Comm.*, No. 20-1539, Dkt. 30 at 3.  Indeed, these concerns are especially implicated with absentee ballots, since "voting by mail makes vote fraud much easier to commit."  *Nader v. Keith*, 385 F.3d 729, 734 (7th Cir. 2004); *Griffin*, 385 F.3d at 1130–31; *see Veasey v. Abbott*, 830 F.3d 216, 255–56 (5th Cir. 2016) (en banc) (recognizing examples of "people who harvest mail-in ballots from the elderly"); *Crawford*, 553 U.S. at 225 (Souter, J., dissenting) (noting that "absentee-ballot fraud . . . is a documented problem").

Finally, even if Plaintiffs had plausibly alleged some unconstitutional burden from some small sliver of disabled or immunocompromised voters (which, to be clear, they have not), that would not support the broad relief that they ask this Court to impose.  Plaintiffs have not even attempted to allege any burden on the vast majority of voters, who can easily comply with these provisions and, in any even, may easily vote in person.  That precludes the broad relief Plaintiffs that seek, as a matter of law.  *See Frank II*, 819 F.3d at 386; *Griffin*, 385 F.3d at 1130.

*b. Absentee-Ballot Provisions.*  The various absentee-ballot provisions that Plaintiffs challenge do not impose any constitutionally impermissible burden on the right to vote, especially since the next elections are *months* away.

- 37 -

Plaintiffs first claim that the Court should order the Commission affirmatively to deliver absentee-ballot request forms to Wisconsin voters, in order to alleviate any undue burdens on the right to vote. *See supra* p. 12.   While that argument is incorrect, since requiring voters to obtain such forms themselves—for example, online at the MyVote Website—clearly requires only minimal effort, and since voters have ample opportunities to vote in person in any event, the Commission has already decided to mail such forms to "all voters without an active absentee request on file," Wis. Elections Comm'n, *Update on Commission Actions 5/27- COVID-19*, *supra*, obviating Plaintiffs' concerns on this score.

Plaintiffs next speculate that the MyVote Website for requesting absentee ballots online may not handle the anticipated volume of absentee-ballot requests, *supra* pp. 11–12; Dkt. 1 ¶ 72, yet the Commission has already committed to improving this process, building off its experience with the April 7 Election.   Wis. Elections Comm'n, April 7, 2020 Absentee Voting Report at 11, 20, 22[32] ("WEC Absentee Ballot Report").[33]   At minimum, however, these technical concerns with the MyVote Website impose only minimal burdens on Plaintiffs, as they would require— at most—Plaintiffs to attempt to complete an online request on multiple occasions or simply request an absentee ballot by some other method. *Supra* pp. 1–3.   Since the

---

[32] Available at https://elections.wi.gov/node/6847.

[33] Plaintiffs quibble that the Commission's efforts to enhance the MyVote Website "d[o] not address outages or mention securing additional capacity," Dkt. 1 ¶ 150, but a recent public report from the Commission states that it has addressed "the new volume of absentee requests," WEC Absentee Ballot Report at 11, and certain "technical failures," WEC Absentee Ballot Report at 20.

next elections are *months* away, and since Plaintiffs may file a request *immediately*, this burden is reasonable. And, in any event, to the extent that any voters have some problems with the website in the future, they can always vote in person, which fully satisfies all constitutional requirements. *See Griffin*, 385 F.3d at 1130.

Likewise, the absentee-ballot-return deadlines for the August and November 2020 Elections impose only minimal burdens, given the time until these elections. *See supra* pp. 2–3. Voters may request absentee ballots for the upcoming 2020 Elections *immediately*, and must only submit requests by "the 5th day immediately preceding the election" if by mail, fax, or online (August 6 or October 29), or by "the Sunday preceding the election" if in person (August 9 or November 1), Wis. Stat. § 6.86 (1)(ac), (b); Wis. Elections Comm'n, *I Want To Vote Absentee*, *supra*. So, any voter with even a potential concern about submitting an absentee-ballot application by these deadlines can simply take action *now*, which is no meaningful burden. Further, and relatedly, municipal clerks must begin delivering absentee ballots well over a month before the elections, *see* Wis. Stat. § 7.15(1)(cm); Wis. Elections Comm'n, *Absentee Ballots*, *supra*, and the Commission is implementing a barcode system to increase the monitoring of these deliveries, *see supra* pp. 9–10. Therefore, there is no reason to think that Plaintiffs' requested injunction is necessary at this stage to ensure timely absentee-ballot arrival. *See supra* pp. 11–13; *Twombly*, 550 U.S. at 555 ("speculative" allegations do not "raise a right to relief"). In any event, voters (unnecessarily) concerned with these issues can vote in person, thereby erasing any constitutional burden. *See Griffin*, 385 F.3d at 1130.

Next, Plaintiffs have not sufficiently alleged that Wisconsin's provisions for in-person-absentee voting or the use of drop boxes for the return of absentee ballots somehow imposes more than reasonable burdens. *Supra* pp. 12–13. Under Wisconsin law, *any person* may vote via absentee ballot by requesting such a ballot and mailing it to the municipal clerk. *Supra* pp. 1–3. This generous absentee-ballot process itself is well above the constitutional minimum. *See Griffin*, 385 F.3d at 1130. So, while local officials may elect to provide those additional methods of voting, solely as a means to make voting more convenient for Wisconsinites, *see* Wis. Stat. §§ 6.855; 6.86(1); Memo of Administrator Meagan Wolfe, Absentee Ballot Return Options - COVID-19 (Mar. 31, 2020)[34] (noting that "drop boxes can be used for voters to return ballots"), the lack of such methods throughout the State could not possibly impose a burden on the right to vote in a constitutionally meaningful sense.

Finally, as for Plaintiffs' claims for notice and an opportunity to cure for rejected absentee-ballot requests, Plaintiffs may easily check the status of any such request on the MyVote Website itself, *see* MyVote Wisconsin, *My Voter Info*,[35] or by calling their local municipal office, *see generally* Wis. Elections Comm'n, *Are Municipal Clerks Required To Be Available On Registration, Absentee, And Provisional Deadlines?*,[36] and the Commission's plan to add barcodes to absentee-ballot envelopes will make tracking the progress of such ballots even easier, *supra*

---

[34] Available at https://elections.wi.gov/node/6798.

[35] Available at https://myvote.wi.gov/en-US/MyVoterInformation.

[36] Available at https://elections.wi.gov/node/1950.

pp. 9–10.   Likewise, Wisconsin law has already addressed Plaintiffs' request for notice/opportunity-to-cure for rejected absentee ballots: polling-place staff only reject absentee ballots *after* the election-day deadline, which affords any absentee voter who may believe that their ballot is invalid "an opportunity to correct" that ballot before it is rejected.   Wis. Elections Comm'n, *Election Day Manual*, *supra*, at 89.   Plaintiffs have not plausibly alleged that this already existing procedure is insufficient due to COVID-19 difficulties.   Indeed "the final election data [from the April 7 Election] conclusively indicates that the election did not produce an unusual number [of] unreturned or rejected [absentee] ballots."  WEC Absentee Ballot Report at 24.

The State's interests in the enforcement of each of these absentee-ballot-related provisions are substantial, as a matter of law.   The "State indisputably has a compelling interest in preserving the integrity of its election process," *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989), and in the "orderly administration" of its elections, *Crawford*, 553 U.S. at 196 (controlling plurality of Stevens, J.).   Clear and consistent absentee-ballot deadlines, the operation of the MyVote Website, the methods for returning absentee ballots, and the notice/opportunity-to-cure procedures surrounding absentee ballots are all part of this substantial election-administration interest.  *See Eu*, 489 U.S. at 231; *Crawford*, 553 U.S. at 196 (controlling plurality of Stevens, J.).

Finally, even if Plaintiffs had plausibly alleged some unconstitutional burden for some special categories of voters from any of these provisions (which, of course,

- 41 -

they have not), that would do nothing to support the overbroad relief they seek. *See Frank II*, 819 F.3d at 386; *Griffin*, 385 F.3d at 1130.

   *c. Administration And Staffing Of Polling Places.* Plaintiffs have also failed to allege that the State's provisions for administering and staffing polling places require anything more than minimal efforts from Plaintiffs to exercise their right to vote.

   Plaintiffs claim that shortfalls in polling-place staff in certain municipalities unduly burdened their right to vote, Dkt. 1 at 34, 67 ¶ B.3, but Plaintiffs make no plausible allegation that any of these staffing shortfalls are likely to recur in future 2020 elections, *Iqbal*, 556 U.S. at 678; *Bible*, 799 F.3d at 639, especially since those elections are *months* away and the Commission has already begun to address this issue in multiple ways, Wolfe Memo at 5–6, 8–9.  In any event, any hypothetical shortfalls leading to some manner of lines would not rise to the level of constitutional concern. *Frank I*, 768 F.3d at 745 (election laws permissibly require individuals to "spend time" to "stand in line").

   Next, Plaintiffs inexplicably challenge Section 7.30(2)'s requirement that polling-place inspectors may only work in those municipalities within the county in which the inspector is a qualified elector.  Wis. Stat. § 7.30(2)(a); Dkt. 1 at 34, 67 ¶ B.3.  Nowhere do Plaintiffs' allege how this provision imposes any burden on them. This provision did not cause any meaningful staffing shortfall in the April 7 Election, as the Commission was able to staff National Guard members "to serve as poll workers *in their local counties of residence*."  Wolfe Memo at 8 (emphasis added).

Plaintiffs have also failed to allege any constitutionally meaningful burden from the lack of availability of walk-in early voting or drive-through voting at polling locations throughout the State. Dkt. 1 at 67 ¶ B.8. As with the challenge to in-person-absentee voting and drop-box availability, the Constitution does not require this method of voting at all, *see Griffin*, 385 F.3d at 1130, especially in light of Wisconsin's other robust methods of casting a ballot, including its generous absentee-ballot provisions, *supra* pp. 1–3.

Finally, Plaintiffs cannot have suffered a burden from any lack of polling-place voting systems accessible to those with disabilities, based on the allegations in their Complaint. Dkt. 1 at 40, 67 ¶ B.2. Wisconsin law *already* imposes that requirement, Wis. Stat. § 5.25(4)(a), and no allegations in Plaintiffs' Complaint even remotely indicate that any polling place has failed to comply with this law. Moreover, the only individual Plaintiff who attempted to vote in-person *successfully* cast a ballot. Dkt. 1 ¶ 11 (Ms. McCurtis).

Like the previously discussed election laws, all of these polling-place provisions further the State's "indisputably . . . compelling interest in preserving the integrity of its election process," *Eu*, 489 U.S. at 231, and the "orderly administration" of its elections, *Crawford*, 553 U.S. at 196 (controlling plurality of Stevens, J.). Indeed, election-day personnel are perhaps the most visible part of the State's election administration, given the essential role that they play in administering in-person voting. *See generally* Wolfe Memo at 11. Section 7.30(2)'s requirement on poll workers also furthers the State's significant interests, as such a requirement helps

ensure that the administration of Wisconsin's elections remains in local control, consistent with Wisconsin's "decentralized" approach to election administration. *See supra* pp. 4–5; *Frank I*, 768 F.3d at 750 (State's justification is "legislative fact").

      *d. Miscellaneous Challenges.* Plaintiffs' remaining challenges do not assert a more-than-reasonable burden on voting rights.

      Plaintiffs broadly claim that the upcoming elections will not be "safely conducted," Dkt. 1 at 66 ¶ B.1, and criticize the alleged lack of sanitation supplies and personal-protective equipment, Dkt. 1 ¶ 161, yet no Wisconsin law or policy even arguably requires that result, *see Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789) (requiring "burden[s]" to be "imposed" by a "State . . . rule"). To the contrary, the Commission has engaged in praiseworthy efforts to ensure sufficient sanitation supplies, staffing, and the like for every polling place, *see, e.g.*, Wolfe Memo 2–3, 5–6, and has approved a $4 million grant to address any safety concerns for the upcoming 2020 elections, *supra* p. 10. These efforts exceed the requirements of state law, given that local officials ultimately have the state-law obligation to staff and supply polling places, Wis. Stat. §§ 7.10 (1)(b), 7.15 (1)(a)–(b), (k), under Wisconsin's "decentralized" regime, *supra* pp. 4–5.

      Plaintiffs assert that a "public education campaign" is needed to publicize Wisconsin's various election laws, Dkt. 1 at 68 ¶ B.10, but Wisconsin's election law is published publicly. "The onus is on citizens to inform themselves of the laws and regulations of the state . . . ." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 600 (7th Cir. 2016). In any event, the Commission already operates numerous

webpages designed to further inform the public about these requirements.[37] Expecting the public to utilize these freely accessible resources cannot rise above a minimal burden. *Accord Frank I*, 768 F.3d at 745–46. Regardless, the Commission has already announced that—along with an absentee-ballot-request form—all registered voters without an absentee-ballot request on file will receive information by mail on all voting options, Wis. Elections Comm'n, *WEC Prepares For Fall Elections*, *supra*, which forecloses any possible burden that Plaintiffs could allege on this front.

Finally, Plaintiffs have not even attempted to allege that Sections 6.88 or 7.51, which require that absentee ballots not be counted before Election Day, or Section 7.52(1)(a), which requires that a municipality pass an ordinance in order to count absentee ballots at a central location, impose any burden at all on them. Dkt. 1 at 68 ¶¶ C.5–6. Nor is such a burden self-evident, as these provisions do not purport to regulate Plaintiffs in any manner as they seek to cast a ballot.

And, as with all previous election law provisions, the laws that Plaintiffs have challenged in this final category also further the State's compelling interests in the integrity and orderly administration of its elections. *Eu*, 489 U.S. at 231; *Crawford*, 553 U.S. at 196 (controlling plurality of Stevens, J.). When considered against the negligible constitutional burdens that these various laws imposed on Plaintiffs, the *Anderson/Burdick* balance falls squarely in the State's favor.

---

[37]   For example, https://elections.wi.gov/, https://myvote.wi.gov/en-us/, and https://bringit.wi.gov/.

### D.     Plaintiffs Have Not Stated A Substantive-Due-Process Claim

Plaintiffs' Fourteenth Amendment substantive-due-process claim, Dkt. 1
¶¶ 220–27, is wholly duplicative of their *Anderson/Burdick* claim and so fails for the
same reasons.  As with Plaintiffs' *Anderson/Burdick* claim, Plaintiffs' substantive-
due-process allegations center on the events surrounding the April 7 Election.  Dkt. 1
¶¶ 222–24.  But since Plaintiffs' *Anderson/Burdick* right-to-vote claim relies on a
much more "specific guarantee[ ]" in the Constitution, that legal framework governs
these allegations, not the "more generalized notion" of substantive due process.
*Albright v. Oliver*, 510 U.S. 266, 273 (1994).  Or, as the Supreme Court explained in
*Burdick*, constitutional voting-rights claims are governed by the "more flexible
standard" of *Anderson/Burdick*, rather than the tiers of scrutiny applicable to due-
process claims.  *Burdick*, 504 U.S. at 433–34; *accord DNC*, Dkt. 170 at 27 n.13
(explaining that voting-rights claims "are properly addressed within the more specific
*Anderson-Burdick* framework," not in "the due process clause of the Fourteenth
Amendment" (citations omitted)); *Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005)
(equal-protection and Eighth Amendment claims were duplicative of a more-specific
Free Exercise Clause claim).  Therefore, because Plaintiffs' Complaint fails to state
an *Anderson/Burdick* claim, *supra* Part III.C., it necessarily fails to state a
substantive-due-process claim for the same reasons.[38]

---

[38] Plaintiffs' citations of *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975), and
*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008), do not change
the result, Dkt. 1 ¶¶ 205, 221–22.  The Seventh Circuit decided *Hennings* before the Supreme
Court established *Anderson/Burdick* as the specific framework to govern right-to-vote claims,

### E.    Plaintiffs Have Not Stated A Procedural-Due-Process Claim

Like Plaintiffs' substantive-due-process claim, their procedural-due-process claim, premised on the events of the April 7 Election, Dkt. 1 ¶¶ 228–36, is similarly duplicative of their *Anderson/Burdick* claim and so fails for the same reasons. As just explained, *supra* Part III.D., courts adjudicate claims involving the constitutional right to vote under the more "specific" *Anderson/Burdick* framework, not the "more generalized" protections in the Due Process Clause, *Albright*, 510 U.S. at 273; *accord DNC*, Dkt. 170 at 27 n.13; *Conyers*, 416 F.3d at 586. So, since Plaintiffs' *Anderson/Burdick* claim fails as a matter of law, *see supra* Part III.C., their procedural-due-process claim fails for the same reasons.

But even if Plaintiffs' procedural-due-process claim retained some independent force, the Court must still "reject [it] . . . for the same reasons" as that claim, as a matter of law. *Lemons*, 538 F.3d at 1104 (rejecting due-process claim by applying *Burdick*, 504 U.S. at 434, and *Crawford*, 553 U.S. at 189–90 (controlling plurality of Stevens, J.)). Plaintiffs' claim invokes the procedural-due-process standard from *Mathews v. Eldridge*, 424 U.S. 319 (1976). Under that standard, Plaintiffs must first claim a protected liberty/property interest and then allege that the State's processes to protect that interest are insufficient given: (1) Plaintiffs' "private interest" at stake; (2) "the risk of an erroneous deprivation," which balances the current process

---

*compare Hennings*, 523 F.2d 861 (1975), *with Anderson*, 460 U.S. 780 (1983), *and Burdick*, 504 U.S. 428 (1992). And *Brunner*—an out-of-circuit case—fails to even cite, let alone discuss, the *Anderson/Burdick* standard, although it is the governing standard to adjudicate "fundamental right to vote" claims, 548 F.3d at 478, as all agree here.

available with the "probable value" of any additional processes; and (3) the "Government's interest." *Id.* at 335.

Here, Wisconsin law fully protects all of Plaintiffs' lawful rights and interests, since voters need only expend reasonable effort to exercise these rights. *See supra* Part III.C.; *Mathews*, 424 U.S. at 335 ("private interest"). Under these existing election laws, there is currently minimal risk of an "erroneous deprivation," *Mathews*, 424 U.S. at 335, since all Wisconsin voters have *months* to request absentee ballots or to plan to vote in person safely, *supra* pp. 2–3. And the Commission recently announced plans to mail approximately 2.7 million absentee-ballot-request forms, return envelopes, and informational packets to registered voters, Wis. Elections Comm'n, *WEC Prepares For Fall Elections*, *supra*, negating Plaintiffs' concerns about a lack of "constitutionally adequate rules, directives, or similar guidance," or "timely, meaningful, or effective notice of changes in voting protocols," Dkt. 1 at ¶¶ 231, 233. Finally, the "probable value" of any additional processes—which additional processes Plaintiffs do not specifically propose, beyond vague claims that the Commission must "[t]ake all appropriate actions," to address Plaintiffs' concerns, Dkt. 1 at 67 ¶¶ B.5, 7—would be negligible and are substantially outweighed by the State's compelling interests in the integrity and orderly administration of its elections, *Eu*, 489 U.S. at 231; *Crawford*, 553 U.S. at 196 (controlling plurality of Stevens, J.); *Mathews*, 424 U.S. at 335 ("Government's interest").

**F.    Plaintiffs Have Not Stated A Claim For Relief Under Title II Of The Americans With Disabilities Act**

1. Plaintiffs also allege a violation of Title II of the ADA, 42 U.S.C. § 12132, *see* Dkt. 1 ¶¶ 237–45, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under Title II, a "public entity must reasonably accommodate a qualified individual with a disability by making changes in rules, policies, practices, or services when needed." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 782–83 (7th Cir. 2002).

Under Title II, a plaintiff must plausibly allege three elements. First, the plaintiff must allege that he "is a qualified individual with a disability," *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (citations omitted); 42 U.S.C. § 12131(2), which, "in turn," requires him to claim that he may "participat[e]" in a state "program[ ] with or without *reasonable* accommodations," *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (emphasis added). An accommodation that "fundamentally alter[s] the nature of the service," program, or activity at issue is by law unreasonable. *Tennessee v. Lane*, 541 U.S. 509, 532 (2004); *accord P.F. by A.F. v. Taylor*, 914 F.3d 467, 472 (7th Cir. 2019) (citing 28 C.F.R. § 35.130(b)(7)(i)). And if the State already provides accommodations that are reasonable, the State need not provide a different accommodation that the plaintiff may happen to request. *Hildreth v. Butler*, ___ F.3d ___; 2020 WL 2536620, at *9 (7th Cir. May 19, 2020). At bottom, "Title II is about access to public services," *Toeller v. Wis. Dep't of Corr.*, 461 F.3d

871, 878 (7th Cir. 2006), and modifications that successfully bridge the access gap for disabled voters to a State's voting systems are reasonable as a matter of law, *see, e.g., Wagoner*, 778 F.3d at 593 (plaintiff failed to state a Title II accommodation claim where challenged conduct did not deny, or severely limit, access to any services). Second, the plaintiff must assert that he was "denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity." *Id.* at 592 (citations omitted). And third, the plaintiff must claim that "the denial or discrimination was by reason of his disability." *Id.*

2. Plaintiffs fail to state a claim under Title II of the ADA. While Plaintiffs broadly allege that all immunocompromised, disabled, and blind voters' ADA rights have been violated by the Commission, Dkt. 1 ¶¶ 241–43, they have not brought a class action, and only Ms. Swenson and Ms. Nelson have even arguably alleged a disability under the ADA, *see id.* ¶¶ 10, 12, 164, 176. Plaintiffs allege that Ms. Swenson suffers from chronic obstructive pulmonary disease, which made her "unable to vote in person because of the risk to her physical health and safety represented by the COVID-19 pandemic." *Id.* ¶¶ 10, 164. Ms. Nelson alleges that she has breast cancer and is undergoing treatment that compromises her immune system, which left her "unable to vote in person on April 7 because of the risk to her physical health and safety represented by the ongoing COVID-19 pandemic." *Id.* ¶¶ 12, 176.

Plaintiffs cannot satisfy the first element of their ADA claim because they have failed to allege that the Commission has denied them a reasonable accommodation

that would afford the disabled Plaintiffs the ability to vote. *See Hildreth*, 2020 WL 2536620, at *9. While Plaintiffs request broad, statewide exemptions from multiple election laws—including the witness-signature, Wis. Stat. § 6.87(2), and photo-ID requirements for absentee ballot applications, Wis. Stat. § 6.86(1)(ac), *see* Dkt. 1 at 68 ¶¶ C.2–3—they wholly fail to address the existing, reasonable accommodations that are available. Plaintiffs acknowledge the existence of curbside voting, Dkt. 1 ¶ 121, but do not plausibly allege that Ms. Swenson, Ms. Nelson, or other disabled voters cannot take advantage of that reasonable accommodation for disabled voters, *see* Wis. Stat. § 6.82 (1); Wis. Elections Comm'n, *Curbside Voting*, *supra*. For example, while Ms. Swenson contends that she continues to self-quarantine, cannot rely on a friend or neighbor to safely witness her ballot, and "did not feel safe inviting anyone over," Dkt. 1 ¶¶ 166–67, she does not explain why any of her associates were unable to witness her ballot through a window or over FaceTime or Skype, *see* Memo of Administrator Meagan Wolfe, Absentee Witness Signature Requirement Guidance at 2, *supra*. Further, the Commission has explained that "hospitalized electors" "include[s] voters who are quarantined" due to COVID-19 and provides extensive directions on how to safely use an agent to vote from home. *See* Memo of Administrator Meagan Wolfe, Hospitalized Electors And Public Health Guidance at 1, *supra*. In short, these numerous and reasonable accommodations successfully give Plaintiffs "access to [the] public services" that they seek. *Toeller*, 461 F.3d at 878.

- 51 -

Although Plaintiffs request the specific accommodation of enjoining the photo-ID and witness-signature requirements for disabled voters, Dkt. 1 at 68 ¶ C.2–3, the ADA does not require a defendant to provide a plaintiff with a specific requested accommodation, *Hildreth*, 2020 WL 2536620, at *9, and Plaintiffs' proposed accommodation would impermissibly constitute a "fundamental and unreasonable change" to Wisconsin's election scheme in any event, *Dadian v. Village of Vilmette*, 269 F.3d 831, 838–39 (7th Cir. 2001) (citation omitted); 28 C.F.R. § 35.130(b)(7) (same).  Both the photo-ID and witness-signature measures limit the fraud that is especially "facilitated by absentee voting," *Griffin*, 385 F.3d at 1130–31, since "voting by mail makes vote fraud much easier to commit," *Nader*, 385 F.3d at 734, and Wisconsin has a noted critical interest in these measures, *Purcell*, 549 U.S. at 4; *Crawford*, 553 U.S. at 196 (controlling plurality of Stevens, J.); *see also Democratic Nat'l Comm.*, No. 20-1539, Dkt. 30 at 3–4 (noting "the [S]tate's interests in . . . this requirement").  The ADA does not require Wisconsin to implement such an extreme accommodation, *Dadian*, 269 F.3d at 838–39; 28 C.F.R. § 35.130(b)(7)(i), which means that Plaintiffs' ADA claim fails for this reason alone, *see Love*, 103 F.3d at 560–61.

## CONCLUSION

The Court should dismiss the Complaint.

Dated, June 8, 2020

Respectfully Submitted,

/s/ Misha Tseytlin

MISHA TSEYTLIN
(State Bar No. 1102199)
KEVIN M. LEROY
(State Bar No. 1105053)
SEAN T.H. DUTTON
TROUTMAN SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com
sean.dutton@troutman.com

*Attorneys for the Wisconsin Legislature*

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of June, 2020, a true and accurate copy of

the foregoing was served via the Court's CM/ECF system upon all counsel of record.

/s/ Misha Tseytlin

MISHA TSEYTLIN
TROUTMAN SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com