IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

Jill Swenson                                              )
Melody McCurtis                                           )
Maria Nelson                                              )
Black Leaders Organizing for Communities                  )
Disability Rights Wisconsin                               )
                                                          )
                                                          )   No. 20-CV-459-WMC
                              Plaintiffs,                 )
            v.                                            )
                                                          )
Marge Bostelmann, Julie M. Glancey, Ann S. Jacobs,        )
Dean Knudson, Robert F. Spindell, Jr., and                )
Mark L. Thomsen, Commissioners of the Wisconsin           )
Elections Commission;                                     )
                                                          )
Meagan Wolfe, Administrator of                            )
the Wisconsin Elections Commission.                       )
                                                          )
                                                          )
                              Defendants.                 )
_____                   )

**FIRST AMENDED COMPLAINT AND PRAYER FOR DECLARATORY AND
INJUNCTIVE RELIEF**

## INTRODUCTION

1.      The April 7, 2020 election was unlike any other in Wisconsin's history, tainted by breakdowns in critical aspects of the election process and disenfranchisement of a substantial number of Wisconsin voters. Two days before the election, the Surgeon General of the United States likened the novel coronavirus ("COVID-19") pandemic to the Pearl Harbor and September 11 attacks, warning the nation to prepare for the "saddest week of most Americans' lives."[1] While all other states with primaries scheduled in April delayed their elections, Wisconsin held its election in the midst of a global pandemic. Defendants and others took steps to attempt to administer the election fairly, including some at the order of this Court, but those actions were insufficient to protect the rights of Wisconsin voters. As a result, voters were forced to choose between forgoing their constitutional rights to participate in their democracy or risking the health of themselves and their loved ones in order to vote. Tens of thousands of voters were disenfranchised by failures in the absentee and in-person voting systems. The election shook the public's faith in the democratic process.

2.      This outcome was foreseeable and, for too many Wisconsin voters, including Plaintiffs, preventable. For over a month before the election, Defendants were aware of the growing danger of COVID-19 and the attendant risks of administering an election during the escalating pandemic. With each passing day, public health officials grew louder in their calls for social distancing, urging Americans to stay at home. Each day brought more deaths and more new infections. By election day, 83 Wisconsinites had died of COVID-19 and 2,440 residents were known to be infected with the virus. At the same time, election experts from across the country expressed alarm over the lack of actionable steps taken by the state to conduct an

---

[1] Quint Forgey, *Surgeon General Warns This Week 'Is Going to Be Our Pearl Harbor Moment'*, POLITICO (Apr. 5, 2020), *available at* https://www.politico.com/news/2020/04/05/surgeon-general-pearl-harbor-moment-165729.

election in such extraordinary circumstances. As municipal and county clerks warned about the lack of capacity and resources to carry out the election properly, nine mayors, including the mayors of the five largest cities in Wisconsin, demanded that the election be postponed.[2]

3.     What ensued has been described by one election law expert as the biggest election failure since the Voting Rights Act was enacted in 1965.[3] Voters encountered obstacles at almost every stage of the election process, including: navigating the online systems designed to register voters and request absentee ballots; requesting absentee ballots, which were either never delivered or delivered too late; and voting in person. Before election day, 111 voting jurisdictions reported not having enough poll workers to open even one polling place; on election day, Milwaukee had 5 (of its usual 180) polling locations, Green Bay had 2 (of its usual 31) polling locations, and Waukesha had only 1 (of its usual 15). Voters who did go to the polls in many places encountered long waits and voting locations without adequate safety supplies for voters and poll workers alike.

4.     Plaintiffs bring this case to prevent a replay of this mass disenfranchisement in either the August Partisan Primary or the November General Election. Like the April 7 election, those elections will take place against the backdrop of COVID-19 and the extraordinary challenges it presents to election administrators and voters. There is a growing consensus among experts that COVID-19 will alter the daily lives of Americans at least into next year, and certainly through November. Whatever the precise course of the pandemic between now and the coming elections, there is no question that community transmission and attendant risks will

---

[2] Joseph Ax, *Citing Coronavirus, Wisconsin Mayors Urge Postponement of Tuesday's Election*, REUTERS (Apr. 5, 2020), *available at* https://www.reuters.com/article/us-health-coronavirus-election-wisconsin/citing-coronavirus-wisconsin-mayors-urge-postponement-of-tuesdays-election-idUSKBN21O00CZ.
[3] Shawn Johnson, *To the Polls in a Pandemic: How Wisconsin Went Ahead with an Election Amidst a Public Health Crisis*, WIS. PUBLIC RADIO (Apr. 13, 2020), *available at* https://www.wpr.org/polls-pandemic-how-wisconsin-went-ahead-election-amidst-public-health-crisis.

continue to impact the demand for online registration and for absentee voting methods, safe protocols for in-person voting, and other mechanics and processes of voting and election administration. The U.S. Constitution and the Voting Rights Act of 1965 require Defendants to administer upcoming elections in a way that avoids forcing voters to choose between their votes and their safety.

5.     The U.S. Constitution guarantees that no eligible Wisconsin citizen will be deprived of the right to vote. Plaintiffs are individuals who were deprived of that right in the April 7 election and organizations whose work to ensure that Wisconsinites can participate in elections is burdened by Defendants' failure to provide a safe and accessible election under pandemic conditions. Plaintiffs allege that Defendants, by failing to take appropriate actions to ensure that Wisconsinites can safely access the ballot, violated Section 11(b) of the Voting Rights Act, the First and Fourteenth Amendments of the U.S. Constitution, and the Americans with Disabilities Act ("the ADA"). They bring this civil action to enjoin Defendants—Commissioners and the Administrator of the Wisconsin Elections Commission—from similarly violating Wisconsinites' rights to vote during future elections affected by COVID-19.

6.     As the April 7 election demonstrated, Defendants maintain and administer an election system that—amidst a pandemic that both Wisconsin and national public health officials expect will continue and might well intensify between now and November—forces voters to choose between casting a ballot and protecting their own, their families', and their communities' health. In the April 7 election, Defendants failed to take available steps necessary to allow voters to vote safely, either in person or by the absentee voting procedures provided by Wisconsin law; and, despite the reports of substantial voter disenfranchisement, they have not taken sufficient steps to remedy those failures in advance of the coming elections. The burdens imposed by those

failures, moreover, did not fall equally on voters across the state. As a result, voters faced starkly different opportunities to safely cast a ballot depending on where they live, their age, their disability status, and their race.

7.     Plaintiffs do not contest the results of the April 7 election. Plaintiffs instead come before this Court to obtain an order requiring Defendants to administer impending elections in a manner that will not violate eligible voters' federally protected rights to participate in those elections. To be sure, Wisconsin's April 7 election was conducted in the face of a public health crisis that few foresaw until the month before the election, and many election officials worked hard to manage the challenges it posed. Those challenges, however, do not alter the fundamental commands of the U.S. Constitution, the Voting Rights Act, and the Americans with Disabilities Act: that Defendants take reasonable steps to ensure that all voters can safely access the ballot and participate equally in a fair democratic process.

8.     Specifically, to comply with the requirements of federal law, Defendants must ensure that in-person voting can be safely conducted during the impending elections, including by mandating that all polling locations be managed in compliance with social distancing guidelines to minimize COVID-19 transmission risk; that there is an adequate number of poll workers to open and administer safe, in-person polling locations; that ample, safe opportunities for in-person absentee voting are available; that all voters who request and are qualified to receive absentee ballots in fact timely receive those ballots; that voters can safely, effectively, and timely return their absentee ballots so their votes are counted; and that online systems designed to register voters and request absentee ballots are sufficient to handle anticipated voter traffic. Critically, to restore public confidence in the electoral process and prevent further

disenfranchisement, Defendants must also educate the Wisconsin public about how they can safely vote—either in person or by absentee ballot—in the impending elections.

9.       Defendants failed to implement such measures for the April 7 election and have not taken steps to do so for the rapidly approaching August and November elections. Careful preparations are necessary to meet the inevitable challenges of conducting safe, fair elections amidst a pandemic. And those preparations must be undertaken sufficiently in advance of election day. Implementing changes to the administration of elections requires planning and preparation. Yet Defendants have not adopted policies that would implement the changes necessary to avoid the widespread disenfranchisement and substantial burdens on the right to vote that plagued the April 7 primary. Absent intervention by this Court—including by requiring Defendants to adopt such necessary policies when authorized by state law, and by enjoining state laws that currently preclude Defendants from taking necessary measures—the same electoral process breakdown and resulting violation of Plaintiffs' rights under federal law is likely to recur during the impending August Partisan Primary and November General Election.

## PARTIES

### I.    Plaintiffs

10.      **Plaintiff Jill Swenson** is a resident of Appleton, Wisconsin, and a registered voter. Ms. Swenson is sixty-one years old and has early stage chronic obstructive pulmonary disease ("COPD"), an inflammatory lung disease. Ms. Swenson was unable to vote in person because of the risk to her physical health and safety represented by the COVID-19 pandemic. She requested and received a mail-in absentee ballot, but she lives alone and was unable to secure an in-person witness. Consistent with this Court's order in *Democratic Nat'l Comm. v. Bostelmann,* No. 20-CV-249-WMC, 2020 WL 1638374, *18-20 (W.D. Wis. Apr. 2, 2020), she

5

mailed in an un-witnessed absentee ballot on the morning of April 3, 2020. After the Seventh

Circuit stayed that order, *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-1538, 1539, 1545,

1546, Order (7th Cir. Apr. 3, 2020), and as a result of Defendants' decision not to provide voters

like Ms. Swenson a reasonable opportunity to cure, Ms. Swenson's ballot was not counted. She

was thus disenfranchised in the April 7 election. Ms. Swenson does not currently have a safe and

effective way to cast a ballot in the upcoming elections.

11.     **Plaintiff Melody McCurtis** is a resident of Sherman Park in Northwest

Milwaukee, Wisconsin, and a registered voter. Ms. McCurtis lives with her

immunocompromised mother, so it was unsafe for her to vote in person due to the COVID-19

pandemic. As a Black community organizer, she is also aware of the disproportionate rates of

infection and death in the Black community, and these elevated risks added to her fears. She

timely requested an absentee ballot on March 22, 2020. Her ballot never arrived. In order to vote

in the April 7 election, Ms. McCurtis was forced to endanger her mother and endure a wait of

more than two hours at Washington High School. Ms. McCurtis was unsafe because voters in

line were not able to maintain social distance, because the polling location did not provide voters

with personal protective equipment, and because voting equipment did not appear to be sanitary.

Ms. McCurtis plans to vote in August and November and presently does not have a safe,

equitable way to cast her ballot.

12.     **Plaintiff Maria Nelson** is a resident of Appleton, Wisconsin, and a registered

voter. Ms. Nelson has breast cancer and has been undergoing treatment since February 2019. As

a result, she did not feel safe voting in person. Ms. Nelson timely emailed her absentee ballot

request to the Appleton Clerk's office. She did not receive an absentee ballot by April 7, 2020.

Ms. Nelson was unable to vote in person on April 7 because of the risk to her physical health and

safety represented by the ongoing COVID-19 pandemic. Ms. Nelson was thus disenfranchised in the April 7 election. Ms. Nelson does not currently have a safe and effective way to cast a ballot in the upcoming elections.

13. **Plaintiff Black Leaders Organizing for Communities ("BLOC")** is a civic engagement project based in Milwaukee, Wisconsin, and a fiscally sponsored project of Tides Advocacy, a California nonprofit. BLOC mobilizes Black Wisconsinites to participate at all levels of government and encourages communities of color to fulfill their potential for electoral impact in Milwaukee. As part of its work, BLOC educates the Black community in Milwaukee about voter eligibility rules and the options for casting a ballot, and it conducts a get-out-the-vote field program. In the run-up to the April 7 election, BLOC was forced to divert significant resources in response to the constitutional and statutory violations challenged here. BLOC staff were forced to spend additional time troubleshooting online registration and absentee ballot request issues, walking voters through changing deadlines, and providing them with information about what in-person voting in Milwaukee would look like. This diversion of resources has continued through the May 12th Special Election and will continue through the August and November elections if these violations are not remedied.

14. **Plaintiff Disability Rights Wisconsin ("DRW")** is a statewide nonpartisan, nonprofit, non-stock corporation organized under the laws of Wisconsin. DRW is based in Madison, and maintains offices across the state, including in Menasha, Milwaukee, Green Bay, and Rice Lake. DRW's mission is to address the issues facing, and to ensure the rights of, all people with disabilities in Wisconsin. DRW is a member of the National Disability Rights Network and is designated by the Governor of Wisconsin to act as the congressionally mandated protection and advocacy system for Wisconsin citizens with disabilities, pursuant to Wis. Stat.

§ 51.62; 29 U.S.C. § 794e; 42 U.S.C. §§ 15041, *et seq.*; and 42 U.S.C. §§ 10801, *et seq.*
Accordingly, DRW has a state and federal mandate to protect and advocate for the rights of
people with disabilities in Wisconsin, including those with developmental disabilities, mental
illness, and traumatic brain injury. As part of this mandate, DRW oversees self-advocacy training
and other programs and services to assist people with disabilities, including to secure election
access, registering to vote, accessing polling places, and casting their ballots, and it staffs a Voter
Hotline to assist voters with disabilities. DRW also co-leads the Wisconsin Disability Vote
Coalition. In the run-up to the April 7 election, DRW was forced to divert significant resources
in response to the constitutional and statutory violations challenged here. DRW had to produce
numerous resources and trainings for voters that it would not have otherwise produced, and it
had to spend staff time untangling the options for voters with disabilities and assisting voters
who were at risk of being disenfranchised. This diversion of resources has continued through the
May 12th Special Election and will continue through the August and November elections if these
violations are not remedied. DRW also brings this suit on behalf of people with disabilities in
Wisconsin who face significant obstacles to voting as a result of COVID-19 and will either be
disenfranchised or exposed to heightened risk of illness if their legal rights to safely vote are not
vindicated.

## II.   Defendants

15.   **Defendants Marge Bostelmann**, **Julie M. Glancey**, **Ann S. Jacobs**, **Dean
Knudson**, **Robert F. Spindell, Jr.**, and **Mark L. Thomsen** are the six Commissioners of the
Wisconsin Elections Commission and are named as Defendants in their official capacities.
Together, they comprise the Wisconsin Elections Commission, the body that administers and

enforces Wisconsin's election laws other than those related to campaign finance. Wis. Stat. § 5.05(1), (2w).

16.     **Defendant Meagan Wolfe** is sued in her official capacity as the Administrator of the Wisconsin Elections Commission. She is the chief elections officer of the state. Wis. Stat. § 5.05(3g).

17.     Defendants have acted under color of state law at all times relevant to this action.

## JURISDICTION AND VENUE

18.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution and by the Voting Rights Act, 52 U.S.C. §§ 10101, *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. §§ 12131, *et seq.* This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under the U.S. Constitution and federal statute and seeks equitable and declaratory relief for the deprivation of federal constitutional and statutory rights under color of state law.

19.     This Court has jurisdiction to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) and 28 U.S.C. § 1920.

20.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

21.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities only.

22.     Venue is appropriate in the Western District of Wisconsin, under 28 U.S.C. § 1391(b)(1), because Defendants are state officials located in Madison, Wisconsin. A

substantial part of the events giving rise to these claims occurred and continues to occur in this district, making venue also proper under 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### I.   Defendants and the Wisconsin Elections Commission

23.    The Wisconsin Elections Commission ("the Commission") administers and enforces all "laws relating to elections and election campaigns, other than laws relating to campaign financing," which are administered separately by the Wisconsin Ethics Commission. Wis. Stat. § 5.05(1), (2w).

24.    The Commission consists of six members, four appointed by legislative leaders and two nominated by the Governor. Wis. Stat. § 15.61. Defendants Bostelmann, Glancey, Jacobs, Knudson, Spindell, and Thomsen are the members of the Commission.

25.    The Commission operates "under the direction and supervision of an administrator," who also serves as the "chief election officer" for the state. Wis. Stat. § 15.61(1)(b); Wis. Stat. § 5.05(3g). Defendant Wolfe is the Administrator of the Commission.

26.    The Commission maintains wide-ranging authority over the architecture of Wisconsin's electoral system. The Commission retains authority to promulgate rules "applicable to all jurisdictions for the purposes of interpreting or implementing the laws regulating the conduct of elections or election campaigns, other than laws regulating campaign financing, or ensuring their proper administration." Wis. Stat. § 5.05(1)(f).

27.    Among many other things, the Commission's authority includes:

- Issuing appropriate guidance or formal advisory opinions, or promulgating administrative rules, necessary to implement any state or federal court decision that is binding on the Commission. Wis. Stat. § 5.05(5t).

10

- Providing financial assistance to eligible counties and municipalities for election administration costs, consistent with other provisions of state law. Wis. Stat. § 5.05(10)-(11).

- Conducting or prescribing requirements for educational programs to inform electors about voting procedures, voting rights, and voting technology. Wis. Stat. § 5.05(12).

-  Ensuring that the voting system used at each polling place permits all individuals with disabilities to vote without the need for assistance and with the same degree of privacy that is accorded to nondisabled electors voting at the same polling place. Wis. Stat. § 5.25(4); and

- Prescribing uniform instructions for municipalities to provide to absentee electors. Wis. Stat. § 6.869.

28.     The Commission may also "reconsider at any time any written directives or written guidance provided to the general public . . . with regard to the enforcement and administration" of Wisconsin election law, including by county and municipal officials. Wis. Stat. § 5.05(16)(c).

29.     Defendants at all times acted under color of state law.

**II.     The Coronavirus Pandemic and Wisconsin's Response**

A.  COVID-19 and its Health Effects

30.     In the United States, the first confirmed case of the novel coronavirus known as COVID-19 was identified in Washington State on January 21, 2020.

31.     People infected by COVID-19 exhibit a wide range of symptoms, most prominently cough or shortness of breath or difficulty breathing.[4] In addition, according to the

---

[4] Ctrs. for Disease Control and Prevention, "Symptoms of Coronavirus," *available at* https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last updated May 13, 2020).

U.S. Centers for Disease Control and Prevention ("CDC"), five other symptoms indicate that a person may have COVID-19, including: fever, chills, muscle pain, sore throat, and new loss of taste or smell.[5]

32.     COVID-19 is an especially infectious virus because it is frequently transmitted by people who are not experiencing symptoms. It may take up to 14 days after exposure to the virus for a person to exhibit any symptoms, and people may be most infectious prior to exhibiting symptoms. One study estimated that 44 percent of people infected contracted the virus from people who felt healthy at the time.[6] In fact, some people may remain asymptomatic carriers and nonetheless transmit the virus.[7] Others recover fully from their symptoms and continue shedding the virus that can infect others.[8]

33.     The highly infectious nature of the disease—including its long incubation period and the number of asymptomatic, pre-symptomatic, and post-symptomatic carriers—poses significant concerns for populations that are most vulnerable to COVID-19, such as the elderly and the immunocompromised. The CDC identifies older adults as having a higher risk of developing more serious complications from COVID-19 and recommends that they stay home as much as possible when the virus is spreading in the community. The CDC has also warned that immunocompromised people (including smokers, those undergoing cancer treatment, bone marrow or organ transplantation, and those with poorly controlled HIV or AIDS, and immune deficiencies), as well as individuals with lung disease, asthma, heart conditions, severe obesity, diabetes, chronic kidney disease undergoing dialysis, and liver disease are at higher risk of

---

[5] *Id.*
[6] Katherine Harmon Courage, *How People Are Spreading Covid-19 Without Symptoms*, Vox (Apr. 22, 2020), *available at* https://www.vox.com/2020/4/22/21230301/coronavirus-symptom-asymptomatic-carrier-spread.
[7] *Id.*
[8] *Are COVID-19 Patients Contagious After Symptoms*, Labmate (Apr. 16, 2020), *available at* https://www.labmate-online.com/news/laboratory-products/3/breaking-news/are-covid-19-patients-contagious-after-symptoms/52030.

developing more serious complications from COVID-19 illness.[9] The Kaiser Family Foundation estimated that 92.6 million Americans ages 18 and older—nearly 40 percent of all American adults—are at heightened risk from COVID-19.[10]

34.     People outside of these groups, however, are not free from risk. The Wisconsin Department of Health Services has warned that "[y]ounger people, and particularly those who are 18 to 30 years old, aren't immune to COVID-19."[11] A recent CDC analysis of coronavirus cases from mid-February to mid-March found that a fifth of those who needed to be hospitalized were ages 20 to 44, and nearly half were ages 20 to 54.[12] In Wisconsin, people ages 20 to 49 account for 54 percent of all COVID-19 cases.[13]

35.     COVID-19 is infecting and killing Black people at disproportionately high rates across the United States. The latest available data indicates that the COVID-19 mortality rate for Black Americans is 2.3 times higher than the rate for Whites and Asians and 2.2 times higher than the rate for Latinos.[14] A *Washington Post* analysis of available data and census demographics shows that "counties that are majority-black have three times the rate of infections and almost six times the rate of deaths as counties where white residents are in the majority."[15]

---

[9] Ctrs. for Disease Control and Prevention, "People Who Are at Higher Risk for Severe Illness," *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last updated May 14, 2020).

[10] Wyatt Koma, *et al.*, *How Many Adults Are at Risk of Serious Illness If Infected with Coronavirus? Updated Data*, KAISER FAMILY FOUNDATION (Apr. 23, 2020), *available at* https://www.kff.org/global-health-policy/issue-brief/how-many-adults-are-at-risk-of-serious-illness-if-infected-with-coronavirus/.

[11] Wis. Dep't of Health Servs., "Outbreaks in Wisconsin," *available at* https://www.dhs.wisconsin.gov/outbreaks/index.htm (last visited March 26, 2020).

[12] Ctrs. for Disease Control and Prevention, "Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020" (Mar. 27, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w#T1_down.

[13] Wis. Dep't of Health Servs., "COVID-19: Wisconsin Cases," *available at* https://www.dhs.wisconsin.gov/covid-19/cases.htm (last updated June 18, 2020).

[14] APM Research Lab, "The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.," *available at* https://www.apmresearchlab.org/covid-deaths-by-race (last updated June 10, 2020).

[15] Reis Thebault, *et al.*, *The Coronavirus Is Infecting and Killing Black Americans at an Alarmingly High Rate*, THE WASHINGTON POST (Apr. 7, 2020), *available at* https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true.

This trend is also discernable at the individual state level, where Black people disproportionally are infected with, and die of, COVID-19.

36.     In Wisconsin, Governor Tony Evers has called the disproportionally high COVID-19 rates and deaths in the Black community "a crisis within a crisis." Although Black Wisconsinites comprise just 6.7 percent of the state's population, they account for roughly a fourth of COVID-19 deaths and nearly a fifth of COVID-19 cases.[16] In Milwaukee County, an analysis found that areas that are "predominantly black are experiencing disproportionately high numbers of reported cases and concentrations of coronavirus clusters," adding that "[r]ace is emerging as [a] key factor in determining who lives and who dies as this virus sweeps through the county."[17] Indeed, Blacks in Milwaukee are dying at nearly double the rate of their respective share of the population.[18]

37.     Overall, according to the World Health Organization, "around 1 in every 5 people who catch COVID-19 needs hospital treatment."[19] To date, in Wisconsin, 13 percent of cases have required hospitalization, 3 percent of cases have required intensive care, and 3 percent of cases have ended in death.[20]

---

[16] Wis. Dep't of Health Servs., "COVID-19: Wisconsin Deaths," *available at* https://www.dhs.wisconsin.gov/covid-19/deaths.htm (last updated June 18, 2020); Wis. Dep't of Health Servs., "COVID-19: Wisconsin Cases," *available at* https://www.dhs.wisconsin.gov/covid-19/cases.htm (last updated June 18, 2020); U.S. Census Bureau, "QuickFacts Wisconsin," *available at* https://www.census.gov/quickfacts/WI (last accessed June 18, 2020).
[17] Joel Rast, *et al.*, *Milwaukee's Coronavirus Racial Divide: A Report on the Early Stages of COVID-19 Spread in Milwaukee County*, UNIVERSITY OF WISCONSIN-MILWAUKEE (Apr. 2020), *available at* https://uwm.edu/ced/wp-content/uploads/sites/431/2020/04/COVID-report-final-version.pdf.
[18] *Compare* Milwaukee County, "COVID-19 Dashboard," *available at* https://county.milwaukee.gov/EN/COVID-19 (last accessed May 12, 2020), *with* U.S. Census Bureau, "QuickFacts Milwaukee County, Wisconsin," *available at* https://www.census.gov/quickfacts/fact/table/milwaukeecountywisconsin/RHI225218 (last accessed May 12, 2020).
[19] World Health Organization, "Getting Your Workplace Ready for COVID-19" (Mar. 3, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/getting-workplace-ready-for-covid-19.pdf.
[20] Wis. Dep't of Health Servs., "COVID-19: Wisconsin Cases," *available at* https://www.dhs.wisconsin.gov/covid-19/cases.htm (last accessed June 16, 2020).

38.     According to the CDC, the best way to protect against illness from COVID-19 is to avoid exposure. As a result, the CDC recommends putting "distance between yourself and other people outside your home" if COVID-19 is spreading in your community.[21]

B.  <u>February and March in Wisconsin</u>

39.     On February 5, 2020, Wisconsin announced its first known case of COVID-19, the twelfth confirmed case in the United States.[22]

40.     During a February 27 Commission meeting, the first at which COVID-19 was discussed, Defendant Knudson, the Chair of the Commission, dismissed the need to plan for a COVID-19 outbreak, saying "at worst . . . there would be either long lines or a delay in reporting" and boasting about the Commission's "robust procedures" for absentee voting.[23] When pressed on how to ensure that every voter would have access to the polls during a coronavirus outbreak, Defendant Knudson changed the subject.

41.     On March 11, 2020, the World Health Organization declared an international pandemic. On the same day, municipal clerks in Wisconsin began raising concerns about the impact on the upcoming election, including polling place closures and poll worker shortages. On that date, Wisconsin had six confirmed COVID-19 cases.[24]

42.     On March 12, 2020, Governor Tony Evers declared a health emergency in response to the virus, authorizing the Department of Health Services to "take all necessary and appropriate measures to prevent and respond to incidents of COVID-19" and activating the

---

[21] Ctrs. for Disease Control and Prevention, "How to Protect Yourself & Others," *available at* https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (last accessed May 11, 2020).
[22] Bill Miston & Katie Delong, *DHS officials confirm 1st case of coronavirus in Wisconsin, patient in 'home isolation'*, FOX NEWS 6 (Feb. 5, 2020), *available at* https://fox6now.com/2020/02/05/dhs-officials-confirm-1st-case-of-coronavirus-in-wisconsin/.
[23] WisconsinEye, "Wisconsin Elections Commission February 2020 Meeting" (Feb. 27, 2020), *available at* https://wiseye.org/2020/02/27/wisconsin-elections-commission-february-2020-meeting/, at 1:46:07 - 1:50:38.
[24] Shamane Mills, *COVID-19 Cases in Wisconsin Jump from 3 to 6*, WIS. PUBLIC RADIO (Mar. 11, 2020), *available at* https://bit.ly/2xPVCOZ.

Wisconsin National Guard.[25] Soon after the Governor's announcement, fearful that nursing homes would become incubators for infection, the Defendants allowed municipal clerks to move polling places and directed municipalities not to use the statutory Special Voting Deputy process that facilitates absentee voting by residents of nursing homes and other care facilities.[26]

43.     By March 15, 2020, as the number of confirmed COVID-19 cases in Wisconsin rose to 33,[27] Milwaukee city officials stated they would need 1,800 new poll workers to replace older poll workers at higher risk of serious illness.

44.     On March 17, 2020, the Wisconsin Department of Health Services banned gatherings of 10 or more people. In response, the Mayor of Green Bay noted that the city would be "unable to administer a normal election."[28]

45.     The next day, multiple Defendants acknowledged that it was not possible for the state to have a safe and fair election on April 7. Defendant Ann Jacobs said that she "no longer believe[d] that we are able to fairly and properly administer this election without delay or postponement, . . . I believe we're putting people at risk." Defendant Mark Thomsen echoed that concern, saying, "We're going to have an election where no one can vote safely — that's absurd," and Defendant Julie Glancey argued in favor of an election by mail-in ballot only.[29]

---

[25] Wis. Executive Order No. 72, Relating to a Proclamation Declaring a Health Emergency in Response to the COVID-19 Coronavirus (Mar. 12, 2020), *available at* https://bit.ly/3eEZpPR.
[26] Meeting of the Wis. Elections Commission (Mar. 12, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/March%2012%20Commission%20Meeting%20Agenda%20and%20Materials.pdf.
[27] *33 Positive COVID-19 Cases in Wisconsin*, Fox News 11 (Mar. 15, 2020), *available at* https://bit.ly/2Kkde8m.
[28] Shawn Johnson, *Wisconsin Bans Crowds Of 10 Or Larger; Order Bars and Restaurants Closed*, Wis. Public Radio (Mar. 17, 2020), *available at* https://www.wpr.org/wisconsin-bans-crowds-10-or-larger-order-bars-and-restaurants-closed.
[29] Laurel White, *State Election Officials Spar Over Possible Postponement Of April 7 Election*, Wis. Public Radio (Mar. 18, 2020), *available at* https://www.wpr.org/state-election-officials-spar-over-possible-postponement-april-7-election.

46.     Defendants also issued a memorandum highlighting shortages of absentee ballot envelopes, polling locations, poll workers, and cleaning equipment.[30] As Defendants encouraged voters to vote absentee, local clerks across the state estimated a shortage of 600,000 envelopes.

47.     On March 20, 2020, a bipartisan group of mayors from Green Bay, Appleton, and Neenah urged that the election be delayed. At that point, there were 216 confirmed cases and three Wisconsinites had died.[31] The same day, this Court ordered extended online voter registration until March 30, 2020. *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1320819, at *9 (W.D. Wis. Mar. 20, 2020).

48.     On March 22, 2020, citing COVID-19, the Wisconsin Supreme Court suspended jury trials until at least May 22.

49.     On March 24, 2020, Department of Health Services Secretary-designee Andrea Palm issued Emergency Order No. 12, the Safer At Home Order, which banned all public and private gatherings of any number of people among members of different households, closed non-essential businesses, and required that everyone maintain social distancing of at least six feet from any other person.[32] In response, Defendant Wolfe issued a memorandum stating that in-person absentee voting, sometimes known as early voting, must continue.[33]

50.     On March 25, 2020, the Wisconsin Senate began preparing for virtual sessions to enable remote voting on legislation. On March 26, 2020, the Wisconsin State Capitol building

---

[30] Wis. Elections Commission, "Update Regarding COVID-19 Election Planning" (Mar. 18, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Com_.%20memo%20re%20COVID-19%20Election%20Planning%203.18.20.pdf.

[31] *Officials: 216 Confirmed Cases of COVID-19 in the State; 3,455 Negative Tests*, FOX6 NOW (Mar. 20, 2020), *available at* https://fox6now.com/2020/03/20/wisconsin-dhs-206-confirmed-cases-of-covid-19-in-the-state/.

[32] Wis. Dep't of Health Servs., Emergency Order No. 12, Safer at Home Order, *available at* https://bit.ly/3cObK2D.

[33] Wis. Elections Commission, "Emergency Order No. 12 Does Not Eliminate In-Person Absentee Voting - COVID-19" (Mar. 24, 2020), *available at* https://elections.wi.gov/node/6773.

closed to the public. Assembly Speaker Robin Vos and Senate Majority Leader Scott Fitzgerald told reporters that they did not expect to change the date of the April 7 election.[34]

C.   Events Leading up to the April 7 Election

51.     On April 2, 2020, after an extensive evidentiary hearing, this Court entered an injunction (a) ordering that absentee ballots received by April 13, 2020 at 4 p.m. be counted; (b) extending by one day, to April 3, 2020, the window to request an absentee ballot; and (c) adjusting the requirement under Wis. Stat. § 6.87(2) that absentee voters have a witness sign their ballot. *Democratic Nat'l Comm. v. Bostelmann,* No. 20-CV-249-WMC, 2020 WL 1638374, *22 (W.D. Wis. Apr. 2, 2020).

52.     With respect to the absentee witness requirement, the Court ordered that Defendants "accept an unwitnessed ballot that contains a written affirmation or other statement by an absentee voter that due to the COVID-19 pandemic, he or she was unable to safely obtain a witness certification despite his or her reasonable efforts to do so, provided that the ballot is otherwise valid." *Id.*, at *20.

53.     The next day, April 3, 2020, the Seventh Circuit stayed the portion of this Court's decision that adjusted the witness requirement for absentee voters but declined to modify the District Court's extension of the absentee ballot deadline. *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-1538, 1539, 1545, 1546, order (7th Cir. April 3, 2020).

54.     Also on April 3, Governor Evers issued an Executive Order calling a special legislative session so that the Legislature could postpone the April 7 election due to COVID-

---

[34] Will Kenneally, *Legislative Leaders Want April Election to Move Forward*, PBS Wisconsin (Mar. 25, 2020), *available at* https://pbswisconsin.org/news-item/legislative-leaders-want-april-election-to-move-forward/.

19.[35] The next day, both the Wisconsin Assembly and the Senate adjourned the special session within seconds, ensuring that the election would go forward as planned.

55.     On April 6, 2020, at 12:46 p.m., just eighteen hours before polls opened, Governor Evers issued Executive Order No. 74, suspending in-person voting for the April 7 election until June 9, or a different date ordered by the legislature.[36] Less than 5 hours later, the Wisconsin Supreme Court enjoined the Governor's order, holding that he did not have the power to change the date of the election.[37]

56.     Several hours after that, the United States Supreme Court held that all absentee ballots had to be postmarked by April 7 to be counted, partially overturning this Court's Order. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1208 (Apr. 6, 2020).

57.     By election day, 83 Wisconsinites had died of coronavirus. Wisconsin had 2,440 reported coronavirus cases, and the Safer At Home Order remained operative.[38]

### III.   Widespread Disenfranchisement in the April 7 Election

58.     The fears surrounding the administration of the election were realized. Neil Albrecht, the Executive Director of the Milwaukee Election Commission, stated that "[i]t was

---

[35] Wis. Executive Order No. 73, Relating to a Special Session of the Legislature to Provide for an All-Mail Spring Election and Special Election for the 7th Congressional District During the COVID-19 Pandemic (Apr. 3, 2020), *available at* https://docs.legis.wisconsin.gov/code/executive_orders/2019_tony_evers/2020-73.pdf.
[36] Office of the Governor, "Gov. Evers Suspends In-Person Voting, Calls Legislature into Special Session on April 7 Election" (Apr. 6, 2020), *available at* https://content.govdelivery.com/accounts/WIGOV/bulletins/2852119; Wis. Executive Order No. 74, Relating to Suspending In-Person Voting on April 7, 2020, Due to the COVID-19 Pandemic (Apr. 6, 2020), *available at* https://content.govdelivery.com/attachments/WIGOV/2020/04/06/file_attachments/1420231/EO074-SuspendingInPersonVotingAndSpecialSession.pdf.
[37] Zac Schultz, *Live: Where Wisconsin's Election Currently Stands*, PBS WISCONSIN (Apr. 6, 2020), *available at* https://pbswisconsin.org/news-item/live-where-wisconsins-election-currently-stands/.
[38] German Lopez, *Wisconsin's Election Day Is a Public Health Disaster*, VOX (Apr. 7, 2020), *available at* https://www.vox.com/2020/4/7/21212005/coronavirus-wisconsin-voting-lines-election-primary-court; *Wisconsin Coronavirus Map and Case Count*, N.Y. TIMES, *available at* https://www.nytimes.com/interactive/2020/us/wisconsin-coronavirus-cases.html (last updated May 11, 2020).

chaos, and chaos is never good for the administration of an election."[39] MIT Professor Charles

Stewart III, a leading empirical scholar of election administration, has estimated that poll

closings kept more than 16,000 people from casting ballots in Milwaukee alone.[40] Absentee

ballots were never sent to over 11,000 voters who requested them,[41] and more than 14% of

absentee ballots requested and sent to voters were not received back for counting as of April 8,

in significant part as a result of mail delays.[42]

59.    Moreover, the Wisconsin Department of Health Services has identified 52 cases

of COVID-19 among poll workers and voters who were at in-person voting locations during the

April 7 election and could have contracted the disease at those locations.[43]

60.    Defendants' administration of the April 7 election failed on numerous

dimensions, described in detail below. These failures caused substantial disenfranchisement,

particularly among elderly voters, voters with disabilities, immunocompromised voters, and

voters of color. Fundamentally, Defendants lacked a coherent, effective plan to ensure that each

and every voter had a full and fair opportunity to vote while remaining protected from the threat

presented by COVID-19.

A.    Defendants' Failure to Manage Online Registration and Absentee Ballot Problems
       Disenfranchised Voters

---

[39] Daphne Chen, *et al.*, *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*, FRONTLINE PBS (Apr. 21, 2020), *available at* https://www.pbs.org/wgbh/frontline/article/wisconsin-election-coronavirus-absentee-ballots/.
[40] Charles Stewart III, @cstewartiii, Twitter (Apr. 15, 2020, 11:12 p.m.), *available at* https://twitter.com/cstewartiii/status/1250623188150751232; Charles Stewart III, *Important Lessons from the Wisconsin Primary*, Mischiefs of Action (Apr. 17. 2020), *available at* https://www.mischiefsoffaction.com/post/important-lessons-from-the-wisconsin-primary.
[41] Wis. Elections Commission, "Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary" (Apr. 6, 2020), *available at* https://elections.wi.gov/node/6817.
[42] Wis. Elections Commission, "Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary" (Apr. 8, 2020), *available at* https://elections.wi.gov/node/6833.
[43] Scott Bauer, *52 Who Worked or Voted in Wisconsin Election Have COVID-19*, ABC NEWS (Apr. 29, 2020), *available at* https://abcnews.go.com/Health/wireStory/52-worked-voted-wisconsin-election-covid-19-70406317.

61.     Defendants failed to maintain digital systems sufficient to meet the needs of Wisconsin voters with respect to online registration and absentee ballot requests.

62.     Wisconsin law requires eligible voters to register in order to cast a ballot. Wis. Stat. § 6.27. Eligible voters can register in person or by mail until 5:00 p.m. on the third Wednesday before election day, or online until 11:59 p.m. on the third Wednesday before election day. Wis. Stat. § 6.28(1). Thus, for the April 7 election, the deadline for registration was set by statute on March 18, 2020. With respect to online registration, this Court's Order subsequently extended the deadline until March 30, 2020. *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1320819, at *9 (W.D. Wis. Mar. 20, 2020).

63.     Those who miss these deadlines can register at the municipal clerk's office until close of business on the Friday before election day, Wis. Stat. § 6.29(2)(a), or in person on election day. *See generally* Wis. Stat. § 6.55.

64.     Eligible voters who register to vote electronically or by mail must provide a copy of an "identifying document that establishes proof of residence." Wis. Stat. § 6.34(2). To do so, they must not only have access to the document, but be able to upload or photocopy it. The only exception to this requirement is for individuals registering electronically, who do not have to provide such documentation if they provide "the number of a current and valid operator's license [or] identification card." Wis. Stat. § 6.34(2m). To vote at polls, eligible voters must present an approved voter ID. Wis. Stat. § 6.79.

65.     The Wisconsin Division of Motor Vehicles ("DMV") is responsible for issuing all driver's license, state ID, or official voter ID cards to Wisconsin residents. Many people can still only obtain a qualifying voter ID by actually visiting a DMV office in person, including those who are applying for a Wisconsin identification card for the first time, or who have not held a

21

qualifying Wisconsin ID in recent years. Many of those in this category are voters with disabilities.

66.    Wisconsin allows voters to vote by absentee ballot without providing an excuse for why they cannot vote in person. *See* Wis. Stat. § 6.20. Eligible voters can request an absentee ballot by mail; in person at the municipal clerk's office; by signing a statement and requesting to receive an absentee ballot under special procedures for voters who are indefinitely confined; by an agent, under special procedures for voters who are hospitalized; by delivery to a special voting deputy; or by e-mail or fax. Wis. Stat. § 6.86(1)(a).

67.    Defendants administer the digital systems that track voter registration and absentee balloting. MyVote is the public-facing website that allows eligible voters to review general information, register to vote, request an absentee ballot, view the contents of their ballot, view their voting history, and find their polling place. WisVote is Wisconsin's statewide voter list and election-management database, accessible to election officials.

68.    When a request for an absentee ballot is made by a voter in the MyVote website, the system converts it into an email. Next, a municipal elections clerk must review the email to verify the voter's identification, manually enter the information into WisVote, and print mailing labels.[44]

69.    MyVote has seen increased traffic in the last few years. It has experienced outages since at least early 2020, which Defendant Wolfe acknowledged in a memorandum on February 18, 2020.[45] Defendants failed to take sufficient action to remedy and prevent those outages, and as a result the outages continued during high-demand periods in the run-up to the April 7

---

[44] Chen, *et al.*, *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*.
[45] Wis. Elections Commission, "Update for Clerks on MyVote Address Problems" (Feb. 18, 2020), *available at* https://elections.wi.gov/node/6688.

election. During the specific periods of time that voters sought to register to vote or request an absentee ballot for that election, the MyVote website suffered from outages and was sometimes erroneously closed to new requests.[46]

70.     Absentee ballot requests also caused problems for the system.[47]

71.     An investigation by the Milwaukee Journal Sentinel, FRONTLINE, and Columbia Journalism Investigations into Wisconsin's April 7 election named the "[i]nadequate computer system" as one of the main problems in the election.[48] It found eligible voters in Lodi, Pewaukee, Marshfield, Shorewood, and Bristol who had trouble requesting absentee ballots online, either because the system simply crashed or because they had to give up after spending hours in front of a computer trying to make their request. The investigation also found that—across eight cities—Wisconsin voters said they requested absentee ballots only to be later informed that the state's system had no record of their request.[49]

72.     Defendants do not appear to have secured the server capacity and bandwidth necessary to support the surge of online registrations and online absentee ballot requests that was inevitable for an election conducted under the threat of COVID-19.

73.     Defendants did not take action to divert traffic away from the website.

74.     Defendant Wolfe wrote in a memorandum after the election that the WisVote system "performed very well but required round the clock monitoring and auditing to handle this unique and unprecedented user behavior and traffic."[50]

---

[46] Chen, *et al.*, *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*.
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] Wis. Elections Commission, "Summary of April 7, 2020 Election" (Apr. 18, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/April%207%20Election%20Summary%20and%20Next%20Steps.pdf.

75.     In the same memorandum, she acknowledged with respect to MyVote that "there were unique challenges and obstacles for some voters at the election," while maintaining that Commission staff had been successful in "accommodating a significant level of voter turnout." *Id.* at 4.

B.   Defendants' Failures to Ensure Distribution of Requested Absentee Ballots Disenfranchised Voters

76.     Defendants failed to ensure that voters who requested absentee ballots timely received them, resulting in the disenfranchisement of those, like immunocompromised voters, unable to vote in person.

77.     Under Wisconsin law, voters can request absentee ballots until 5:00 p.m. on the fifth day before an election, and in-person requests must be made at the municipal clerk's office by the Sunday preceding an election. Wis. Stat. § 6.86(1)(b). Municipal clerks must send an absentee ballot within one business day of when the request was received. Wis. Stat. § 7.15(cm).

78.     For the April 7 election, the deadline for the receipt of absentee ballot requests was set by statute as April 2, 2020. With respect to mail, fax, or email absentee ballot requests, this Court's Order subsequently extended the deadline to April 3, 2020. *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, ___ F.Supp.3d ___, 2020 WL 1638374, at *2 (W.D. Wis. Apr. 2, 2020).

79.     Wisconsin law requires voters to present a copy of their proof of identification with their application for an absentee ballot. Wis. Stat. § 6.86(1)(ac).

24

80.     Approximately 73% of votes ultimately cast in the April 7 election were absentee ballots;[51] by contrast, in the 2016 General Election, just 27% of the votes were cast absentee.[52]

81.     However, many voters, especially immunocompromised voters, were unable to participate in the April 7 election as a result of Defendants' failures to ensure effective and timely distribution of absentee ballots.

82.     Wisconsin Elections Commission data show that on election day, more than 12,000 requested absentee ballots had not yet been sent to voters. Voters around the state who had timely requested absentee ballots never received them. One survey found that voters from almost 100 Wisconsin cities and towns reported not receiving an absentee ballot, despite having requested one—in most cases at least two weeks in advance of the election.[53]

83.     Moreover, according to the Commission's website, 14.5% of 1,284,438 absentee ballots sent to voters (over 186,000 votes) had not been returned by April 13, 2020.[54] In comparison, in the 2016 general election, only 14,480, or 1.7%, of the 845,243 absentee ballots sent were reported as having not been received for counting.[55] Though it is impossible to know what proportion of absentee ballots were not returned because voters did not timely receive them, the disproportionate non-return rate suggests that thousands of additional voters who timely requested ballots never actually received them. These data do not take into account how

---

[51] Chen, *et al.*, *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*.
[52] Wis. Elections Commission, "Elections and Voting Statistics," *available at* https://elections.wi.gov/elections-voting/statistics (last accessed May 9, 2020); Wis. Elections Commission, "General Election Voter Registration and Absentee Statistics 1984-2016.xlsx," *available at* https://elections.wi.gov/sites/elections.wi.gov/files/page/general_election_voter_registration_and_absentee_s_40046 .xlsx (last accessed May 12, 2020).
[53] Chen, *et al.*, *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*.
[54] Wis. Elections Commission, "Absentee Ballot Statistics for April 7" (Apr. 13, 2020), *available at* https://elections.wi.gov/node/6765.
[55] Wis. Elections Commission, "Absentee Ballot Report" (Nov. 14, 2016), *available at* https://elections.wi.gov/node/4414.

many of the returned ballots were actually counted. One estimate put the number of returned ballots that were not counted because of mail delays and confusion about deadlines in the tens of thousands.[56]

84.    Several problems contributed to this failure to ensure effective distribution of absentee ballots:

- ***First***, a shortage of envelopes appears to have delayed the mailing of absentee ballots. On March 18, for example, Defendants noted that clerks across the state estimated a shortage of approximately 600,000 envelopes.[57] Although Defendants worked with paper suppliers to address the shortage, it created a backlog that contributed to delays.[58]

- ***Second***, election clerks struggled to keep up with the large volume of absentee ballot requests, and Defendants did not provide them with additional funding or staff to help. The Madison City Clerk reported that there was "no way humanly possible" for officials to mail out ballots at the rate they were receiving requests, despite working 110 hours a week.[59] She suggested that exhausted officials were more likely to make errors in fulfilling the ballot requests. Indeed, some voters reported receiving multiple ballots, while one couple reported receiving empty envelopes without a ballot. Another voter did not receive a ballot until after the election because it had been mailed without a street name and had been returned to the clerk's office as undeliverable.

---

[56] Scott Bauer & Nicholas Riccardi, *Parties Mine Wisconsin for Clues to Voting in the Virus Era*, AP NEWS (Apr. 14, 2020), *available at* https://apnews.com/99f183ea43fd558e08393d2b064bb801.
[57] Wis. Elections Commission, "Update Regarding COVID-19 Election Planning."
[58] Emily Bazelon, *Will Americans Lose Their Right to Vote in the Pandemic?*, N.Y. TIMES MAGAZINE (May 5, 2020), *available at* https://www.nytimes.com/2020/05/05/magazine/voting-by-mail-2020-covid.html.
[59] Chen, *et al.*, *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*.

- **Third**, mail delivery problems, of which Defendants were on notice, contributed to this failure. Defendants were aware of "potential delays in mail delivery" by the United States Postal Service ("USPS") as early as March 18, and, although Defendants sought to stay in touch with USPS to learn about delays and "encouraged clerks to communicate and coordinate with local post offices," this response was insufficient.[60]

85.    The problems turned out to be overwhelming. In Milwaukee, numerous voters never received an absentee ballot even though their ballots had been issued two weeks before the election. In the week leading up to the election, Fox Point Village Hall received returns from USPS of 100 to 150 undelivered absentee ballots per day, with officials making at least seven trips to the post office to re-mail the undelivered ballots.[61] On the morning of the election, officials received a plastic mail bin containing 175 absentee ballots that appeared to have never been sent to voters, including several ballots intended for a different municipality.[62] The day after the election, a postal worker discovered three containers of undelivered absentee ballots intended for voters in Oshkosh and Appleton.[63]

86.    Defendants failed to ensure a uniform appropriate response to these challenges, and as a result, voters' ability to cast a ballot that would be counted varied widely and arbitrarily, depending on the location of the residential address at which they were registered to vote. For

---

[60] Wis. Elections Commission, "Update Regarding COVID-19 Election Planning."

[61] *Returned to Sender: Postal Officials Investigating Wisconsin Absentee Ballots That Were Never Delivered*, WIS. PUBLIC RADIO (Apr. 9, 2020), *available at* https://www.wpr.org/returned-sender-postal-officials-investigating-wisconsin-absentee-ballots-were-never-delivered.

[62] Jeff Rumage, *Post Office Returns Hundreds of Absentee Ballots That Were Supposed to Be Delivered to Fox Point Voters*, MILWAUKEE JOURNAL SENTINEL (Apr. 8, 2020), *available at* https://www.jsonline.com/story/communities/northshore/news/fox-point/2020/04/08/wisconsin-election-fox-point-absentee-ballots-never-made-voters/5119812002/.

[63] *Returned to Sender: Postal Officials Investigating Wisconsin Absentee Ballots That Were Never Delivered*, WIS. PUBLIC RADIO.

example, to ensure the orderly distribution of absentee ballots to voters who wanted to avoid in-person voting, some municipalities, including Whitefish Bay and Bayside, mailed every registered voter within the municipality an absentee ballot request form.[64] Those municipalities experienced significantly higher rates of voter participation than did most municipalities that did not take this step.

87.     All of this makes clear that Defendants failed to ensure that all registered voters who timely requested absentee ballots received them in time to participate in the April 7 election.

C.   Defendants' Failure to Make Adequate Provisions for Voters to Return Absentee Ballots Disenfranchised Voters

88.     Wisconsin law provides that absentee ballots must be "delivered to the polling place no later than 8 p.m. on election day." Wis. Stat. § 6.87(6). This means that absentee ballots must be physically received by that time in order to count.

89.     With respect to the April 7 election, this Court's Order enjoined "the enforcement of the requirement under Wis. Stat. § 6.87(6) that absentee ballots must be received by 8:00 p.m. on election day to be counted and extend[ed] the deadline for receipt of absentee ballots to 4:00 p.m. on April 13, 2020." *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, ___ F.Supp.3d ___, 2020 WL 1638374, at *2 (W.D. Wis. Apr. 2, 2020). On April 6, the U.S. Supreme Court partially stayed that injunction, requiring that "a voter's absentee ballot must be either (i) postmarked by election day, April 7, 2020, and received by April 13, 2020, at 4:00 p.m., or (ii) hand-delivered as provided under state law by April 7, 2020, at 8:00 p.m." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1208 (Apr. 6, 2020).

---

[64] Craig Gilbert, *How Two Communities on Milwaukee's North Shore Achieved Sky-High Levels of Absentee Voting Despite Coronavirus*, Milwaukee Journal Sentinel (Apr. 10, 2020), *available at* https://www.jsonline.com/story/news/politics/elections/2020/04/10/wisconsin-absentee-ballot-forms-sent-whitefish-bay-bayside-voters/5129125002/.

90.     More than 100,000 absentee ballots were received in the extended window—namely, after April 7 and before April 13.[65]

91.     For many voters, including Plaintiffs Swenson and Nelson, personally delivering a ballot to the municipal clerk, as anticipated by Wis. Stat. § 6.86(6), was not an option due to the need to maintain social distance to preserve their health. Defendants had acknowledged that USPS was experiencing significant delay issues as early as March 18. However, they nonetheless failed to ensure that the many voters seeking and receiving absentee ballots in the weeks before the election would be able to return them so that their votes could be counted.

92.     For example, Defendants failed to require that municipalities establish secure drop boxes so that voters could return absentee ballots while maintaining social distancing and without relying on USPS. Defendant Wolfe issued a memorandum on March 31 that identified drop boxes as an option, but it did not require or even recommend that option.[66]

93.     This failure presented particular difficulties after the Supreme Court's April 6 decision requiring either that ballots be postmarked by 8 p.m. on April 7 or that they be hand-delivered by that time. *Republican Nat'l Comm.*, 140 S. Ct. at 1208.

94.     Most significantly, Defendants failed to take action to ensure that validly cast absentee ballots without a postmark would be counted. Some voters who responded to this Court's decision by placing their ballots in the mail on April 7, before the deadline, were nonetheless disenfranchised because no postmark appeared on their ballot — a fact entirely beyond the control of those voters. The Madison City Clerk reported several thousand ballots

---

[65] Richard Pildes, *How Many Absentee Ballots in WI Came In on Time Because of the Court Decision to Extend the Receipt Deadline?*, ELECTION LAW BLOG (Apr. 15, 2020), *available at* https://electionlawblog.org/?p=110746.
[66] Wis. Elections Commission, "FAQs: Absentee Ballot Return Options: USPS Coordination and Drop Boxes" (Mar. 31, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Ballot%20Return%20Options%203.31.2020.pdf.

missing a postmark, and some ballots bearing two different postmarks, one dated before April 7 and one dated after. Milwaukee, Greenfield, Manitowoc, Fitchburg, and Sister Bay also received ballots without postmarks. Clerks in Luxembourg and Elm Grove reported ballot envelopes with postmarks so light that the date on them was unreadable.

95.     Defendants failed to promulgate rules or issue guidance to ensure uniform, appropriate treatment of ballots without a postmark that arrived on April 8, the day after the election, be counted, even though the president of the Wisconsin State Association of Letter Carriers confirmed that ballots received on April 8 had "almost certainly" been mailed by April 7.[67]

D.  Defendants' Enforcement of Wis. Stat. § 6.87(2)'s Witness Requirement Disenfranchised Voters at High Risk From COVID-19

96.     As to voters at elevated risk for COVID-19, including elderly and immunocompromised voters, Wisconsin's absentee ballot-witnessing requirement effectively denied citizens the right to vote.

97.     Under Wisconsin law, absentee ballots must be witnessed and signed by another adult citizen who is not a candidate on the ballot. Wis. Stat. § 6.87(4). For elderly and immunocompromised voters, including Plaintiff Swenson, in-person voting was not an option because of the infection risk presented by contact with other people. But absentee voting also presented a risk to the health to these voters because of the requirement that an adult citizen witness them sign the ballot.

---

[67] Riley Vetterkind, *Elections Commission Deadlocks Over Whether to Count Ballots Without Postmarks*, WIS. STATE JOURNAL (Apr. 11, 2020), *available at* https://madison.com/wsj/news/local/govt-and-politics/elections-commission-deadlocks-over-whether-to-count-ballots-without-postmarks/article_74e0285c-76d7-5471-a82e-144b78609f48.html.

98.     In Wisconsin, the envelopes in which absentee ballots are returned must include the following language in the "Certification of Voter" box:

> I certify that I exhibited the enclosed ballot unmarked to the witness, that I then in (his)(her) presence and in the presence of no other person marked the ballot and enclosed and sealed the same in this envelope in such a manner that no one but myself and any person rendering assistance under s. 6.87(5), Wis. Stats., if I requested assistance, could know how I voted.

Wis. Stat. § 6.87(2).

The absentee ballot witness is required to certify to the following language:

> I, the undersigned witness, subject to the penalties of s. 12.60 (1)(b), Wis. Stats., for false statements, certify that I am an adult U.S. citizen and that the above statements are true and the voting procedure was executed as there stated. I am not a candidate for any office on the enclosed ballot (except in the case of an incumbent municipal clerk). I did not solicit or advise the elector to vote for or against any candidate or measure.

*Id.* Defendants have promulgated a form envelope for absentee ballots that contains these certifications and provides space for the relevant signatures and witness address information.

99.     Defendants failed to take action to ensure that immunocompromised voters could successfully comply with this requirement. Defendant Wolfe issued a memorandum declaring that there were "no exemptions in the law for the witness requirement."[68] Although the memorandum suggested some ways voters might comply with the requirements while maintaining a physical quarantine, Plaintiff Swenson did not believe that she could plausibly use them to keep herself safe and cast a ballot.

100.    This Court recognized that the mechanisms were insufficient at least as applied to certain populations, "in particular those who are immunocompromised or elderly." *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, ___ F.Supp.3d ___, 2020 WL 1638374, at *2- (W.D. Wis. Apr. 2, 2020). This Court's Order enjoined "the enforcement of Wis. Stat.

---

[68] Wis. Elections Commission, "Absentee Witness Signature Requirement Guidance COVID-19" (Mar. 29, 2020), *available at* https://elections.wi.gov/node/6790.

§ 6.87(2) as to absentee voters who have provided a written affirmation or other statement that they were unable to safely obtain a witness certification despite reasonable efforts to do so, provided that the ballots are otherwise valid." *Id.*

101.    The following day, April 3, 2020, the Seventh Circuit stayed enforcement of this aspect of the injunction. *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-1538, 1539, 1545, 1546, Order (7th Cir. Apr. 3, 2020).

102.    In response, Defendants adopted a rule that disenfranchised Plaintiff Swenson and other voters who had complied fully with then-operative law. On April 5, 2020, almost two days after the Commission's initial advisory notice on the topic, Defendants concluded that "[e]ach absentee ballot for this election must have the required witness signature and address in order to be counted, including ballots that were returned when this Court's original order was in effect for approximately 24 hours."[69]

103.    Defendants' action invalidated ballots—like that of Plaintiff Swenson—that complied at the time they were submitted with this Court's then-valid order and Commission guidelines. The only option that Defendants presented for voters who had cast these ballots was to present a witness to election officials in person—defeating both social distancing and the entire purpose of absentee voting.

E.   Defendants Failed to Safeguard the Availability of In-Person Absentee Voting

104.    Defendants failed to take action to ensure adequate opportunities for in-person absentee voting (also known as "early voting") throughout the state. In-person absentee voting allows voters to apply for and obtain an absentee ballot in person, and then to complete and cast the ballot immediately. This increasingly popular method of voting is particularly important

---

[69] Wis. Elections Commission, "Updated Absentee Witness Signature Requirement Guidance - COVID-19" (Apr. 5, 2020), *available at* https://elections.wi.gov/node/6816.

during the pandemic because it accommodates voters who are unable to obtain a mail-in absentee ballot for a variety of reasons, such as lack of ready access to the online application system, a transient mailing address, homelessness, and other difficulties. It also alleviates the burden on election day voting by spreading out the period of in-person voting and allowing those voters who prefer to vote in-person—perhaps because they do not trust the mail to deliver or return their ballot—to do so at uncrowded, safer locations at a more convenient time.

105.    In-person absentee voting can also be conducted on a "drive through" basis, allowing voters to obtain and cast a ballot while minimizing contact with other people or shared surfaces.

106.    During the April 7 election period, Defendants failed to take action to ensure adequate in-person absentee voting opportunities, or to ensure that available opportunities were properly publicized. For example, all three of the City of Milwaukee's in-person absentee voting locations abruptly closed on March 23, 2020, following an announcement the previous day. The city subsequently reopened one early voting site downtown but made it available only as a drive-through, thereby limiting it to those voters with access to a car. These voting changes were poorly publicized, leaving many voters confused or simply unaware of early voting options in the city. Moreover, the closure of early voting locations outside of downtown disproportionately affected the ability of residents of low-income and predominantly Black and Latino neighborhoods to vote.

107.    Similarly, in Green Bay, in-person absentee voting opportunities were severely limited. In-person absentee voting was confined to a single site that was only open on ten weekdays leading up to the election. On eight of those ten days, voting was limited to four midday hours. Capacity was further limited during in order to permit social distancing.

108.     More broadly, opportunities for in-person absentee voting varied dramatically across the state in terms of the number of locations, hours, and manner of voting (*i.e.*, drive through vs. walk in). These options were also generally poorly publicized. Defendants' actions and inaction with respect to in-person absentee voting thus deprived voters of a safer alternative to in-person election day voting and put additional pressure on the mail-in absentee system that failed so many voters.

109.     For the upcoming August and November elections, Wisconsin law required municipalities to designate locations for in-person absentee voting by June 11, 2020. Wis. Stat. § 6.855(1). Unless this provision is enjoined, Defendants and municipalities will not have the flexibility necessary to provide sufficient and safe in-person absentee voting opportunities because of the early cut-off for designating polling locations.

F.   Defendants Failed to Ensure An Adequate Number of Election Day Polling Places

110.     Defendants failed to take action to ensure that adequate in-person voting locations would be available to all voters around the state. As a result, in some jurisdictions a high proportion of polling places did not open, and voters who sought to vote in-person—whether because they had not received an absentee ballot or because they had always intended to vote in person—faced hurdles to casting a ballot.

111.     Wisconsin law requires that "[p]olling places shall be established for each election at least 30 days before the election." Wis. Stat. § 5.25(3).

112.     Each of these polling places "shall be accessible to all individuals with disabilities," and Defendants are charged with the responsibility to ensure that voting systems at these polling places allow voters with disabilities to vote privately and independently. *Id.* § 5.25(4)(a).

34

113.     Voters with disabilities who require the use of assistive technology available to them at polling places have no option to avoid in-person voting. Many other voters require in-person voting options if the online registration system fails or they do not receive a requested absentee ballot on time. Still others vote in person because of the symbolic significance of voting at a polling place on election day.

114.     Defendants failed to ensure that Wisconsin voters could safely exercise the right to vote, including by ensuring an adequate numbers of poll workers—referred to as election inspectors by Wisconsin statute—available to operate the number of polling places that would enable safe and uncrowded voting.

115.     Almost 60 percent of Wisconsin municipalities reported a shortage of poll workers ahead of the April 7 election as volunteers sought to protect themselves against COVID-19. These staffing shortages were especially acute because many older poll workers were unwilling to risk their health. According to a survey conducted by Defendants prior to the election, 111 voting jurisdictions in Wisconsin believed they would not have enough workers to open even one polling place on election day, and 126 additional jurisdictions thought they did not have enough workers to open "all desired polling places."[70]

116.     These massive anticipated poll worker shortages led to unprecedented reductions in the number of polling locations in some jurisdictions. Milwaukee faced the most closures of any city, opening just 5 of its 180 polling sites. While the city usually has 2,000 election

---

[70] Wis. Elections Commission, "Special Teleconference-Only Meeting, Polling Place Supply and Personnel Shortages Memorandum" (Mar. 31, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Complete%20Packet%203_31.pdf.

workers, on April 7 it had only 400. One news report noted that some communities with just a tenth of Milwaukee's population had more polling sites open.[71]

117.    Although the Governor eventually mobilized the National Guard to work at the polls, many municipalities were not aware of that option until after they had announced poll closures. City of Milwaukee Election Commission Executive Director Neil Albrecht, who made a request for National Guard assistance months earlier, said that he learned about the Governor's decision through media reports.[72] Albrecht said that if he had known about the assistance, he could have opened more polling locations in Milwaukee, but it was "too little too late" right before the election.[73] In any event, according to a survey conducted by Defendants, only 2,400 National Guard members were available to address the 7,000 person shortage in poll workers.[74]

118.    As a result, the 19,000 Milwaukee voters who voted in person encountered wait times of up to two-and-a-half hours. Plaintiff McCurtis waited in line to vote at Washington High School for more than two hours. When the polls were set to close at 8:00 p.m., hundreds of Milwaukee voters were still waiting in line, Plaintiff McCurtis among them.

119.    Milwaukee had offered drive-up in-person absentee voting in the days leading up to the election, but on the last day it was possible to vote in that manner, lines of cars stretched for blocks downtown and the wait lasted hours.[75]

---

[71] Corrinne Hess & Megan Hart, *Wisconsin Polls Close But Hundreds Of Voters Remain In Line*, WIS. PUBLIC RADIO (Apr. 7, 2020), *available at* https://www.wpr.org/wisconsin-polls-close-hundreds-voters-remain-line.
[72] Molly Beck, *Gov. Tony Evers to Use National Guard Members to Work the Polls Amid Massive Shortage of Workers*, MILWAUKEE JOURNAL SENTINEL (Apr. 1, 2020), *available at* https://www.jsonline.com/story/news/politics/elections/2020/04/01/tony-evers-use-national-guard-members-work-polls-amid-massive-shortage-workers/5102869002/.
[73] *Id.*
[74] Marisa Wojcik, *State Increases Contact Tracing After In-Person Voting*, PBS WISCONSIN (Apr. 10, 2020), *available at* https://pbswisconsin.org/news-item/state-increases-contact-tracing-after-in-person-voting/.
[75] Aaron Maybin, *'I Had to Go Do This:' Some Waited 2 Hours on Final Day of Drive-Thru Voting in Milwaukee*, FOX 6 (Apr. 5, 2020), *available at* https://fox6now.com/2020/04/05/i-had-to-go-do-this-some-waited-2-hours-on-final-day-of-drive-thru-voting-in-milwaukee/.

120.     That Milwaukee was so hard hit by these issues is particularly troubling because Milwaukee is home to 69.4% of Wisconsin's Black population[76]—meaning that Black Wisconsin voters were disproportionately likely to be affected by polling place closures.

121.     In Green Bay, which opened just two of its 31 polling sites because just 17 of its 270 usual poll workers were able or willing to work,[77] voters faced wait times of up to four hours.[78] In Waukesha, which has a population of 70,000, just one polling location out of the usual 15 was open.

122.     Defendants' failures to ensure safe access to polling places on election day also resulted in arbitrary disparities, in which whether a voter had access to safe voting options depended on where that voter lives. For example, in stark contrast to Milwaukee and Green Bay, in Madison, 66 out of 92 polling sites were open. Madison also began offering curbside voting as early as Friday, April 1 to high-risk voters. While the voting process was altered, it nonetheless proceeded smoothly. Similarly, in some rural counties across Wisconsin, voting went more smoothly, without the same extended wait times.

123.     Nearly a month before the April 7 election, Defendant Wolfe acknowledged that poll worker shortages were likely to be a problem, but she did not take action sufficient to remedy the problem. While she provided several recruiting suggestions and instructed clerks to contact the Commission if they were experiencing "significant poll worker shortages," the

---

[76] Wis. Dep't of Health Servs., "African Americans in Wisconsin: Overview," *available at* https://www.dhs.wisconsin.gov/minority-health/population/afriamer-pop.htm (last revised Sept. 10, 2018).
[77] *Wisconsin Primary Recap: Voters Forced to Choose Between Their Health and Their Civic Duty*, N.Y. TIMES (Apr. 7, 2020), *available at* https://www.nytimes.com/2020/04/07/us/politics/wisconsin-primary-election.html.
[78] *Wisconsin Heads to the Polls Amid Coronavirus Pandemic*, WIS. PUBLIC RADIO (Apr. 7, 2020), *available at* https://www.wpr.org/wisconsin-heads-polls-amid-coronavirus-pandemic.

"possible recruitment efforts" that the Commission suggested it might undertake did not solve the problem.[79]

124.    Defendants' failure to take action here had a particularly significant effect because underlying legal requirements made it extremely unlikely that municipalities could solve their poll-worker problems on their own. Wisconsin statutes provide that each election official, including each inspector, must be "a qualified elector of a county in which the municipality where the official serves is located." Wis. Stat. § 7.30(2). The county-residence requirement forbids recruiting inspectors from other parts of the state. This restriction needlessly makes it more difficult for Defendants to address poll worker shortages, which will recur during the upcoming elections.

125.    This statute also means that municipalities within the same county can draw from the same pool of inspectors. Defendants did not attempt to facilitate, encourage, or coordinate such intra-county poll-worker sharing.

126.    As a result, significant disparities in the availability of polling places and the concomitant wait to vote persisted even within the same county. For example, while the City of Milwaukee experienced the numerous problems described above, other cities within Milwaukee County looked very different. In Wauwatosa, a city which borders Milwaukee with a population of over 46,000, polling locations were largely empty, and in Germantown, with a population of just less than 20,000, there were no lines at all during the day of the election.[80]

---

[79] Wis. Elections Commission, "COVID-19 Frequently Asked Questions (FAQ's) and Guidance on Procedural Changes for Care Facility Absentee Voting and Polling Place Relocation" (Mar. 13, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/UPDATED%20-%20Clerk%20comm%20re%20FAQ%20and%20SVD%20and%20Polling%20Place%20Procs_3_13_20.pdf.

[80] *Election Day Blog Recap: Milwaukee Releases Tuesday's Voter Turnout; Late Lines After Polls Closed*, MILWAUKEE JOURNAL SENTINEL (Apr. 7, 2020), *available at* https://www.jsonline.com/story/news/politics/2020/04/07/wisconsin-april-7-presidential-primary-election-updates-voting-pandemic-milwaukee-polling-places/2959757001/.

127.    Defendants' failures with respect to polling place locations and poll workers led to a situation in which voters in some Wisconsin jurisdictions—but not others—were forced to locate an unfamiliar polling place to cast a ballot in person and, in some cases, to wait in very long lines to cast a ballot in person, or to forgo voting altogether.

G.    Defendants' Failure to Ensure Safe In-Person Voting Resulted in Widespread Voter Intimidation

128.    In conducting an election during a pandemic, Defendants failed to ensure that in-person voting was safe in each jurisdiction around the state. As alleged above, numerous failures by Defendants resulted in extremely long lines at polling places. In addition, the availability of personal protective equipment (PPE) for poll workers varied widely around the state. These failures increased the risks that voters faced of contracting COVID-19 from a poll worker.

129.    Milwaukee was and is the epicenter of Wisconsin's COVID-19 pandemic, and as of the April 7 primary election, it accounted for over half of coronavirus cases and 81 percent of related deaths.[81] As a result, the city, which is home to nearly 70 percent of the state's Black residents, was one of the most dangerous places to vote. Many Milwaukee voters reported being afraid to vote in person. Other voters compared voting in person on April 7 to moments in civil rights history when seeking to cast a ballot meant risking your life.[82] Given the disparate racial impact of COVID-19 on the Black community, these comparisons are especially apt.

---

[81] Ella Nilsen & Li Zhou, *How Wisconsin's Election Disenfranchised Voters*, Vox (Apr. 7. 2020), *available at* https://www.vox.com/2020/4/7/21212053/wisconsin-election-coronavirus-disenfranchised-voters.

[82] Christina A. Cassidy & Gretchen Ehlke, *Black Voters Weighed History, Health in Wisconsin Election*, AP News (Apr. 8, 2020), *available at* https://apnews.com/be402510fea98fd7c37067ca05fd8e1a ("'We had to be willing to die to get our vote, and the same thing is happening right now,' said Thomas, a 33-year-old director of youth ministry at a Milwaukee church."); Miela Fetaw & Hunter Woodall, *'I Could Get the Virus If I Vote': Wisconsin's Terrifying Election Day*, The Daily Beast (Apr. 7, 2020), *available at* https://www.thedailybeast.com/people-are-going-to-die-in-this-election-wisconsin-votes-amid-coronavirus-pandemic-1 ("'Was I scared? Hell yea I'm scared!' he said. 'This virus is taking out the black people in this community, but I knew what I had to do. My daddy couldn't vote during his time, so I voted for him.'").

130.     The health risk presented by these lines during COVID-19 were objectively intimidating to voters. As a result, some voters were actually deterred from voting, opting to stay home or to leave a polling place before casting a ballot rather than wait in line and increase the risk to their physical well-being and the well-being of their families.

131.     Others, like Plaintiff McCurtis, who chose to remain in line to vote, did so in the face of dangerous voting conditions, risking their health in order to exercise the right to vote.

132.     Numerous voters expressed their fear to reporters and on social media. The Governor acknowledged that voters were "scared of going to the polls."[83]

133.     Nonetheless, after the election, Defendant Wolfe claimed in her summary memorandum that voters had reported to the Commission "that they felt safe in polling places and that there were adequate sanitation supplies." [84]

H.  Burdens on Voters with Disabilities

134.     The Commission's failures also severely burdened immunocompromised voters as well as other voters with disabilities who require assistive technology available only at in-person polling places.

135.     Voters who are immunocompromised are voters with disabilities during the COVID-19 pandemic. These voters must isolate themselves from other people in order to minimize the risk that they will contract COVID-19 and experience severe illness or death.

136.     As a result, these voters with disabilities can cast only absentee ballots; in-person voting is not available to them.

---

[83] Scott Bauer & Steve Peoples, *Wisconsin Moves Forward with Election Despite Virus Concerns*, AP NEWS (Apr. 6, 2020), *available at* https://apnews.com/97db30e6564b9b5eedfc300234ea6630.
[84] Wis. Elections Commission, "Summary of April 7, 2020 Election" (Apr. 18, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/April%207%20Election%20Summary%20and%20Next%20Steps.pdf.

137.     Because Defendants failed to ensure that all voters who requested absentee ballots received them and failed to ensure that absentee voters had access to drop boxes to ensure delivery of their ballots, many of these voters were disenfranchised, despite making every effort to cast an effective ballot. They were also disenfranchised by the witness verification requirement to the extent these immunocompromised voters could not safely secure a witness to verify their ballot.

138.     Some voters with disabilities, like voters who are blind, must utilize assistive technology available only at in-person polling locations in order to vote privately and independently.

139.     Some voters fall into both of these categories—they are immunocompromised and require the use of assistive technology at an in-person polling place. These voters had no safe opportunity to vote privately and independently, and they were therefore disenfranchised.

140.     For voters with disabilities who were forced to vote in person, long lines and lack of curbside voting at some polling locations, particularly in Green Bay, served as additional— often insurmountable—barriers to their ability to access the ballot.

**IV.     Absent Judicial Intervention, These Failures Are Practically Certain to Recur in August and November**

141.     When Defendants administer the August and November elections, the COVID-19 pandemic will be ongoing. As a result, regardless of the precise circumstances of the pandemic on those election days, the demand for online registration and absentee voting will remain elevated, and safety measures to protect in-person voters will remain vital. However, as the April 7 election showed, Defendants do not have policies or other measures in place to ensure safe voting in the upcoming August and November elections.

A.     The Ongoing COVID-19 Pandemic

142.    As of the time of this filing, there have been 23,454 cases reported in Wisconsin and 712 deaths.[85]

143.    As of this filing, approximately 279 new cases are diagnosed each day in Wisconsin, as measured by the seven-day average.[86] The rate of COVID-19 confirmed cases in metropolitan areas continues to grow. And some metropolitan areas are seeing continually increasing growth rates.[87] It is not yet clear whether Wisconsin has reached the peak of this initial wave of infections.[88]

144.    It is unlikely that a vaccine will be available until at least 2021,[89] and until then, the country will need to continue to take precautions to minimize the spread of COVID-19.[90]

145.    Experts predict that there will be multiple peaks in Wisconsin, with their timing tied directly to the duration of the Safer At Home Order and the availability of testing.[91]

146.    According to Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, a second round of COVID-19 cases in the United States is "inevitable" in the fall.[92]

---

[85] Wis. Dep't of Health Servs., "Outbreaks in Wisconsin," *available at* https://www.dhs.wisconsin.gov/outbreaks/index.htm (last updated June 17, 2020); Wis. Dep't of Health Servs., "COVID-19: Wisconsin Cases"; Wis. Dep't of Health Servs., "COVID-19: Wisconsin Deaths."

[86] Wis. Dep't of Health Servs., "COVID-19: Wisconsin Summary Data," *available at* https://www.dhs.wisconsin.gov/covid-19/data.htm (last accessed June 18, 2020).

[87] Univ. of Madison, Wis. "Coronavirus in Wisconsin: How Fast It's Growing," *available at* https://data-viz.it.wisc.edu/wi-metro-growth-rate/ (last accessed May 14, 2020).

[88] *Wisconsin Sees 4-day Spike in Coronavirus Cases*, WISN 12 (May 4, 2020), *available at* https://www.wisn.com/article/wisconsin-sees-spike-in-new-coronavirus-cases/32361185.

[89] Stephen M. Kissler, *et al.*, *Projecting the Transmission Dynamics of SARS-CoV-2 Through the Postpandemic Period*, American Association for the Advancement of Science (Apr. 14, 2020), *available at* https://science.sciencemag.org/content/early/2020/04/24/science.abb5793.

[90] Lena H. Sun, *CDC Director Warns Second Wave of Coronavirus Is Likely to Be Even More Devastating*, THE WASHINGTON POST (Apr. 21, 2020), *available at* https://www.washingtonpost.com/health/2020/04/21/coronavirus-secondwave-cdcdirector/.

[91] Wis. Dep't of Health Servs., "Johns Hopkins Modeling WI COVID-19 - GOAL" (Apr. 24, 2020), *available at* https://www.dhs.wisconsin.gov/publications/p02643a.pdf.

[92] Nicole Chavez, *Another Wave of Coronavirus Will Likely Hit the US in the Fall. Here's Why and What We Can Do to Stop It*, CNN (May 2, 2020), *available at* https://www.cnn.com/2020/05/02/health/coronavirus-second-wave-fall-season/index.html.

147.    The Commission is scheduled to conduct two more elections in 2020: the August 11, 2020 partisan primary and the November 3, 2020 general election. On each of these dates, it is overwhelmingly likely that COVID-19 transmission will continue in Wisconsin, that no vaccine will exist, and that many voters will accordingly retain an objectively reasonable fear of the risk to their physical safety presented by traditional in-person voting.

B.    Turnout in November Will Exacerbate Problems

148.    If Defendants' election system was unable to ensure that voters in April were enfranchised during the COVID-19 pandemic, it will be that much more inadequate in November absent significant changes. Indeed, "[e]xperts worry that poll worker shortages, long lines and other delays in processing requests for absentee ballots will only get worse in November, when there will be more voters."[93]

149.    Nearly three million Wisconsin voters cast ballots in the 2016 presidential election.[94] With experts predicting higher than usual voter turnout nationwide this November,[95] the number of Wisconsin voters who seek to participate in the presidential election is likely to be more than twice the 1.5 million voters who participated in the April 7 election.[96] As Defendants note, there are particular challenges in November presidential elections, which "see a greater

---

[93] Sam Levine, *'We're going to have a catastrophe': US faces November election fiasco*, The Guardian (June 12, 2020), *available at* https://www.theguardian.com/us-news/2020/jun/12/us-presidential-election-fiasco-voter-suppression.

[94] *Election 2016: Wisconsin Results*, N.Y. TIMES (Aug. 1, 2017), *available at* https://www.nytimes.com/elections/2016/results/wisconsin.

[95] Susan Milligan, *Preparing for a Voter Surge*, U.S. NEWS (Sept. 20, 2019), *available at* https://www.usnews.com/news/elections/articles/2019-09-20/experts-predict-huge-turnout-in-2020.

[96] *Live: Wisconsin Supreme Court and Statewide Election Results*, N.Y. TIMES, *available at* https://www.nytimes.com/interactive/2020/04/07/us/elections/results-wisconsin-spring-elections.html (last accessed May 9, 2020).

proportion of inexperienced voters" and voters that are "more likely to have difficulty navigating the absentee voting process."[97]

150.    If the proportion of voters seeking to cast absentee ballots in the November election is similar to the proportion in April, Defendants' system would need to be equipped to distribute and receive back more than twice as many absentee ballots as it did in April, and it would need to be able to ensure that more than twice as many voters could vote safely in person. Defendants estimate that if voting patterns from April hold, Wisconsin could receive "more than 1.8 million requests for absentee ballots by mail."[98] If a lower proportion of voters seeks to vote absentee, then that system would need to be able to ensure that any even larger number of voters could vote safely, and free from intimidating conditions, in person.

151.    Defendants must equip municipal and county clerks to successfully count this unprecedented number of absentee ballots.

152.    Larger turnout will also exacerbate the poll worker shortages experienced during the April 7 election. Across the country, poll worker shortages have continued to frustrate elections,[99] and experts fear that such shortages will only grow worse in the November General Election—particularly since elderly poll workers who often run elections will fear contracting COVID-19.[100]

---

[97] Wis. Elections Commission, "April 7, 2020 Absentee Voting Report" (May 15, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/May%20%2C%202020.Final_.pdf.

[98] *Id.*

[99] *See, e.g.*, AP, *Coronavirus fears create shortage of Alaska election workers*, Alaska Public Media (June 17, 2020), *available at* https://www.alaskapublic.org/2020/06/17/coronavirus-fears-create-shortage-of-alaska-election-workers/; Sam Levine & Suman Naishadham, *Georgia primary blighted by long lines and broken voting machines*, The Guardian (June 2, 2020), *available at* theguardian.com/us-news/2020/jun/09/georgia-election-primary-long-lines-broken-voting-machines ("Elections officials across the state consolidated polling locations as they faced poll worker shortages.").

[100] *See* Sam Levine, *'We're going to have a catastrophe': US faces November election fiasco*, The Guardian (June 12, 2020), *available at* https://www.theguardian.com/us-news/2020/jun/12/us-presidential-election-fiasco-voter-suppression; Carrie Levine, *Elderly workers run elections. But COVID-19 will keep many home*, Center for Public Integrity (May 13, 2020), *available at* https://publicintegrity.org/politics/elections/democracy-2020/elderly-workers-run-elections-but-covid-19-will-keep-many-home/.

153.     Unless Defendants take swift actions, the numerous irregularities that plagued the April 7 election will disenfranchise countless more voters during the impending August and November elections as well.

C.     Defendants Have Not Taken Steps Sufficient to Correct the Ongoing Problems with Wisconsin Elections under COVID-19

154.     While Defendants have announced some actions that they plan to take to improve upon the administration of the April 7 election, these actions are insufficient to ensure that subsequent elections during the pandemic will protect voters' rights under the Constitution and federal statutes.

155.     **First**, Defendants have not taken sufficient action to ensure that MyVote will be able to support the large-scale online registration and at-home absentee voting which will continue to be necessary during the impending August and November elections. In her April 7 Election Summary Memorandum, Defendant Wolfe wrote on this topic that staff would "work to augment voter workflows for online voter registration and absentee ballot requests."[101] The memorandum did not address outages or mention securing additional capacity.  In her May 20 CARES Grant Planning Memorandum, Defendant Wolfe again did not make specific mention of adding additional capacity, although she did acknowledge the need for "software development and consultation" and "system load testing.[102]

156.     Absent significant improvement of computer-system infrastructure, Wisconsin voters will not have adequate access to online absentee ballots or online registration during the August and November elections.

---

[101] Wis. Elections Commission, "Summary of April 7, 2020 Election" (April 18, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/April%207%20Election%20Summary%20and%20Next%20Steps.pdf.
[102] Wis. Elections Commission, "CARES Grant Planning" (May 20, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/May%2020%2C%202020.Final_.pdf.

157.    **Second**, Defendants have failed to take sufficient action to ensure that voters who timely request absentee ballots for subsequent 2020 elections will receive those ballots in time to participate in those elections. Although the Elections Commission now intends to mail absentee ballot applications to nearly all registered voters who have not already requested one, the April 7 election exposed failures at almost every juncture in the voting process. These failures will not be corrected as a result of this one action. For example, on the topic of allowing voters to track where their absentee ballot is in the process,  Defendant Wolfe's memorandum stated that staff "*hopes* to incorporate intelligent mail barcodes into the absentee process and incorporate that information into the MyVote system," but offers no concrete commitment or contingency plan. (emphasis added).[103]  Similarly, in a May 20 memorandum, Defendants mention intelligent mail barcodes as a "potential direction," without any assurances that any system will ultimately be implemented.[104]

158.    **Third**, Defendants have failed to take sufficient action to ensure that all voters who receive absentee ballots can cast their ballots and have them counted.

159.    The statutory deadline for requesting an absentee ballot is just five days before election day, Wis. Stat. § 6.86(1)(b), and clerks can wait up to one business day before mailing a ballot. Wis. Stat. § 7.15(cm). Defendants have acknowledged that postal mail can take up to a week to transport a ballot both from clerk to voter and voter back to clerk, for a total of two weeks. As a result, some voters who timely request absentee ballots, receive them, cast their votes, and timely return them by postal mail will still be disenfranchised. Nonetheless**,**

---

[103] *Id.*
[104] Wis. Elections Commission, "April 7, 2020 Absentee Voting Report" (May 15, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/May%2020%2C%202020.Final_.pdf.

Defendants have failed to require or facilitate the availability of secure drop boxes in each municipality for the socially distant return of absentee ballots.

160.    Even with drop boxes, absent judicial relief ensuring that mailed absentee ballots postmarked by election day are accepted for counting, some voters who timely request absentee ballots will inevitably be disenfranchised again.

161.    Defendants have no policy or other measures in place to create any more workable alternatives for voters at high risk from COVID-19, especially immunocompromised voters, who cannot safely comply with the witnessing requirements for absentee ballots set forth in Wis. Stat. § 6.87(2).

162.    **Fourth**, Defendants have no policy or other measures in place to ensure that voters statewide have sufficient access to in-person absentee voting opportunities, including both walk-in early voting and drive-through early voting. In-person absentee voting is essential for those who are unable, for a variety of reasons, to obtain an absentee ballot by mail or through the online system. It is also essential in order to spread out in-person voting over a longer period, thereby reducing the likelihood that election day polling locations will be overwhelmed and allowing better compliance with safety precautions against spread of coronavirus. Additionally, Wisconsin law requires municipalities to designate locations for in-person absentee voting by June 11, 2020.  Wis. Stat. § 6.855(1). Unless this provision is enjoined, Defendants and municipalities will not have the flexibility necessary to provide sufficient and safe in-person absentee voting opportunities because of the early cut-off for designating polling locations.

163.    **Fifth,** Defendants, although recognizing the critical shortage of poll workers that led to widespread polling place closures, have no policy or other measure in place to facilitate recruitment of poll workers or provide assistance in facilitating the equitable distribution of poll

47

workers within counties. Instead, Defendant Wolfe's memorandum stated that the Commission would (1) "work with" and "survey" jurisdictions to keep abreast of their shortages; (2) maintain a ticket for personnel with the State Emergency Operations Center; and (3) develop training for last-minute poll-worker certification.[105]

164.    **Sixth**, Defendants have failed to take adequate action to ensure that in-person absentee and election day polling places will be safe during the August and November elections, and that voters are made aware in advance of these changes so that the failures of the April 7 election do not have an intimidating effect on voters in August and November. While Defendant Wolfe wrote that, for the August and November elections, Commission staff would assist jurisdictions in finding sanitary supplies and masks and gloves for poll workers, Defendants have taken no action to require voters or poll workers to wear masks or take other precautions to ensure that voters feel secure in appearing at polling places.[106]

165.    **Seventh,** Defendants have failed to take adequate steps to ensure that voters with disabilities who require the use of assistive technology to vote privately and independently will have both the option to vote safely in person and the option to use an at-home accessible voting option.

166.    **Eighth**, Defendants have not put forward a plan to ensure that all members of the voting public have the information they need to register online, request an absentee ballot, and successfully return that ballot, so that no one at high risk for COVID-19 and thus unable to vote in person is disenfranchised in August or November. They have not put forward a plan to ensure that voters on the wrong side of the digital divide have the information they need to register and request an absentee ballot. Wisconsin voters on the wrong side of the digital divide—who lack

---

[105] Wis. Elections Commission, "Summary of April 7, 2020 Election."
[106] *Id.*

internet access or familiarity with online resources—are particularly likely to be disenfranchised because they will not be able to access MyVote in order to easily register and request an absentee ballot. Black, Latino, elderly, and rural voters are disproportionately likely to be on the wrong side of the digital divide.[107]

167.    Defendants refer only generally to "voter outreach programs."[108]  This is insufficient for the growing demand and need for a comprehensive voter education effort.

168.    As a result of these failures, the harms experienced by the voters of Wisconsin, and by Plaintiffs in particular, are overwhelmingly likely to recur in the August and November elections absent relief here.

## V.    Plaintiffs' Injuries

**Jill Swenson**

169.    Plaintiff Jill Swenson is sixty-one years old and has, among other serious ailments, early stage chronic obstructive pulmonary disease ("COPD"), an inflammatory lung disease that causes obstructed airflow from the lungs. Ms. Swenson is in one of the highest-risk populations for COVID-19.

170.    Ms. Swenson is a regular voter and makes it her usual practice to vote in person on election day. This year, because of her age and health, Ms. Swenson felt unsafe voting in person at her polling location or returning an absentee ballot in person at Appleton City Hall.

---

[107] U.S. Census Bureau, "The Digital Divide: Percentage of Households by Broadband Internet Subscription, Computer Type, Race and Hispanic Origin" (Sept. 11, 2017), *available at* https://www.census.gov/library/visualizations/2017/comm/internet.html; Andrew Perrin, *Digital Gap Between Rural and Nonrural America Persists*, PEW RESEARCH CENTER (May 31, 2019), *available at* https://www.pewresearch.org/fact-tank/2019/05/31/digital-gap-between-rural-and-nonrural-america-persists/; Andrea Caumont, *Who's not online? 5 factors tied to the digital divide*, PEW RESEARCH CENTER (May 31, 2019), *available at* https://www.pewresearch.org/fact-tank/2013/11/08/whos-not-online-5-factors-tied-to-the-digital-divide/.

[108] Wis. Elections Commission, "April 7, 2020 Absentee Voting Report" (May 15, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/May%2020%2C%202020.Final_.pdf.

After several unsuccessful attempts to scan in her identification, she successfully requested a mail-in absentee ballot online at the end of February. It arrived about a week later.

171.    By March 11, Ms. Swenson had begun to self-quarantine. She did not leave her home or interact with others in person. Ms. Swenson was unable to find anyone who could safely witness her ballot. Her friends and neighbors were either failing to practice social distancing, still working at essential businesses, or recently recovered from possible COVID-19.

172.    On March 31, Ms. Swenson contacted the Commission for advice on how to submit her ballot. The Commission told Ms. Swenson to have someone come to her home and hand the ballot back-and-forth through a window or door. It also pointed her to a website with guidance suggesting that voters leave their ballot outside for day before a witness handles the ballot, and then wait another day before handling the witnessed ballot. Ms. Swenson did not feel safe inviting anyone over. The Commission also told Ms. Swenson she could bring her absentee ballot to Appleton City Hall, but she felt unsafe doing so because interacting with staff and other members of the public could cause her serious illness or death.

173.    When Ms. Swenson learned about the Court's April 2 order allowing voters to submit un-witnessed absentee ballots by mail, she completed and mailed her absentee ballot immediately, with a note stating that she lived alone, feared contracting COVID-19, and could not find a witness, and that she was submitting an unwitnessed ballot in conformity with the court order. Later that day, the Seventh Circuit stayed enforcement of that Order. Several days later, Ms. Swenson learned through news reports that her ballot would be invalidated and that her vote would not count. She was deeply upset; she cherishes exercising her right to vote.

174.    Ms. Swenson was not aware of any opportunity to cure the defect with her absentee ballot and knew that attempting to vote in person after submitting even an invalidated absentee ballot would be unlawful.

175.    If the witnessing requirement remains in effect during the August and November elections, Ms. Swenson will not have a safe way to vote—and to ensure her vote is counted—in Wisconsin's August and November elections.

**Melody McCurtis**

176.    Plaintiff Melody McCurtis lives in the Sherman Park neighborhood of Milwaukee, Wisconsin. She is a lifelong voter who votes in almost every election, large or small. She lives in a multi-generational household that includes her mother, who has hypertension, high blood pressure, and an enlarged heart, putting her at increased risk of COVID-19 complications. As a community organizer, Ms. McCurtis was aware of the disparate impact that COVID-19 had had on the Black community in Milwaukee. Her polling location at Washington High School is located in Sherman Park, the epicenter of the COVID-19 crisis in the Black community. Knowing all this, Ms. McCurtis requested an absentee ballot on March 22.

177.    Ms. McCurtis's ballot never arrived. On April 6, Ms. McCurtis called the Clerk's office, but there was no answer. She called again on April 7, and was told that she had no choice but to vote in person. Although Ms. McCurtis's mother was afraid of Ms. McCurtis voting in person, Ms. McCurtis joined the blocks-long line outside of Washington High School around 6:30 p.m. on election day. She cast her ballot at 9:09 p.m.

178.    During the wait of more than two-and-a-half hours, Ms. McCurtis experienced intimidation, fear, and frustration. Voters in line were not able to practice social distancing due to the large number of people in line and the failure of election officials to enforce the practice. The

polling location did not provide PPE for voters, and it had run out of sanitary pens. Ms. McCurtis observed seniors and individuals with disabilities waiting in the long line. In addition, there was a noticeably high police presence, including the National Guard. Yet despite the high police presence, no one stopped a young woman who spent over an hour dancing along the line of voters, entering voters' personal space and creating a health risk for those in line.

179.    As she waited in line, Ms. McCurtis observed a member of the National Guard approach and speak to a female voter. The woman stepped out of line and left. That National Guard member then approached Ms. McCurtis and said, "You know this will be a two-hour wait, right?" The National Guard member appeared to be discouraging voters from remaining in line. Ms. McCurtis asked him to stop speaking to voters and refrain from discouraging voters from remaining in line, but she was not able to monitor whether he did so. This experience deeply hurt Ms. McCurtis, who is a community organizer focused on encouraging Metcalfe Park community members to vote.

180.    Ms. McCurtis still feels the traumatic impact of being subjected to such an unsafe voting experience; the heavy police presence and long line of Black voters reminded her of the violence surrounding earlier generations of Black Americans' efforts to vote. On April 7, she felt afraid for her health and physical safety, and the health and physical safety of her community. In light of her experience in April, Ms. McCurtis reasonably fears that she will not be able to exercise her right to vote in August and November without exposing herself, and therefore her mother, to significant health risks.

**Maria Nelson**

181.    Plaintiff Maria Nelson has breast cancer and is currently undergoing chemotherapy treatment. She is also a regular voter and enjoys taking her two young children to

the polls to teach them the importance of voting. Because of highly publicized reports explaining that immunocompromised individuals are most at risk from the COVID-19 pandemic, Ms. Nelson felt unsafe voting in person at her polling location on election day. Because of this, on March 31, she timely emailed the Appleton City Clerk and requested an absentee ballot. She received a call in response from the Clerk's office stating that the Clerk's office would be sending an absentee ballot by mail. Ms. Nelson agreed, assuming that the Clerk's office was accurately representing its ability to send her a timely ballot.

182.    Ms. Nelson's absentee ballot did not arrive before April 7. Instead, it arrived on April 8, too late to be used. On election day, Ms. Nelson was not able to vote in person because she felt too unsafe and was not willing to risk her life by voting in person. As a result, Mrs. Nelson was disenfranchised.

183.    If Defendants do not remedy the defects in the in-person and absentee voting systems, Ms. Nelson will not have a safe and reliable way to cast a ballot in the August and November elections.

**Black Leaders Organizing for Communities**

184.    Plaintiff BLOC mobilizes Black Wisconsinites to participate at all levels of government and encourages communities of color to fulfill their potential for electoral impact in Milwaukee. As part of its work, BLOC educates the Black community in Milwaukee about voter eligibility rules, voter ID requirements, the importance of voting, and the opportunity for early voting. BLOC primarily operates as a robust field program. For example, BLOC knocked on approximately 227,000 doors in Milwaukee in 2018, encouraging Black residents to engage in civic participation, including voting. Ahead of the April 7 election, BLOC had hired 50 ambassadors to knock on an anticipated 44,000 doors. Each ambassador went through more than

30 hours of civics training, including training on registering voters and how to vote. Much of that training became out of date as Defendants' policies and deadlines shifted again and again in the days leading up to April 7. Because of the COVID-19 pandemic, BLOC ambassadors have reduced capacity and are working half of their ordinary hours. BLOC is paying ambassadors for their full hours.

185.    In light of Defendants' failures to provide adequate and safe voting opportunities in the face of the COVID-19 pandemic, BLOC had to uproot its highly effective field program and divert significant resources to digital outreach to Black Wisconsin voters, including implementing a texting and phone-banking campaign to educate voters on how to cast mail-in absentee ballots. This required setting up new technological tools, and training BLOC's ambassadors on those tools remotely. While BLOC would inevitably had to have made changes to its field program in light of COVID-19, Defendants' policies and practices significantly increased that burden. As deadlines and absentee ballot requirements shifted, BLOC had to repeatedly push out additional training and information to its remote staff and ensure that updated messages were being sent to constituents. BLOC's staff created graphics and social media posts for every new deadline and policy change; ordinarily, minimal new content would be created, and BLOC would be able to reuse any new content. BLOC will be unable to reuse most of the new content created for April.

186.    BLOC was also unable to fulfill its mission of encouraging Black Wisconsinites to vote. BLOC had to contact voters multiple times as policies changed. Each call was longer than usual, as BLOC staff spent time explaining confusing online systems, helping voters scan identification over the phone, and walked them through changing deadlines. Because of this, and because BLOC staff had been and continues to work reduced hours, BLOC was unable to meet

its goals for voter contacts leading up to the April 7 election (but at the same cost to BLOC). But for Defendants' failures, much of this work would have been unnecessary. Instead, BLOC would have focused on traditional get-out-the-vote efforts, speaking to voters about candidates and issues. BLOC was not able to have those conversations with voters this year and, because of the numerous barriers facing its constituents, was not able to meet its goals related to getting significant numbers of the Black community to vote.

187.    BLOC's organizational planning for the summer and fall are on hold, because BLOC has no way of knowing what policies or deadlines will be in place for the August and November elections. Many voters with whom BLOC works did not receive an absentee ballot by April 7, 2020. Others found the absentee ballot request system confusing and difficult to use. Many of those voters feared for their health and safety due to the ongoing COVID-19 pandemic, including because COVID-19 has disproportionately affected the Black community. They were too afraid to vote in person on April 7. As a result, those voters were disenfranchised and unable to cast a ballot in the election.

188.    Absent relief here, many voters with whom BLOC works will be similarly disenfranchised and burdened during subsequent elections. As a result, BLOC will be forced to continue to divert resources in order to attempt to enfranchise these voters, to counteract the uncertainty Defendants' policies and practices are creating, and to reach the increased number of Black voters facing unsafe voting conditions.

189.    Although BLOC has invested heavily in building community trust in the election system and building community power through civic engagement, BLOC is now faced with re-building that trust after many of the voters with whom BLOC works were disenfranchised due to Defendants' failures. This shift in programmatic focus will likely mean generating new

messaging and outreach campaigns. The lost trust created by Defendants' failures and the

disenfranchisement of BLOC's constituents has made it harder for BLOC to achieve its mission.

**Disability Rights Wisconsin**

190.    Plaintiff DRW's mission is to address the issues facing, and to ensure the rights

of, all people with disabilities in Wisconsin. DRW has a state and federal mandate to protect and

advocate for the rights of people with disabilities in Wisconsin, including those with

developmental disabilities, mental illness, and traumatic brain injury. As part of this mandate,

DRW oversees self-advocacy training and other programs and services to assist people with

disabilities, including to secure election access, including registering to vote, accessing polling

places, and casting their ballot. DRW also leads the Wisconsin Disability Vote Coalition.

191.    In light of Defendants' failures to provide adequate and safe voting opportunities

in the face of the COVID-19 pandemic, DRW had to produce numerous resources and trainings

ahead of the April 7 election that it would not have otherwise produced, at the expense of staff

time and DRW's other programmatic priorities. For example, DRW organized four Zoom

briefings to explain the special circumstances and changing policies around the April 7 election.

As requirements changed, DRW had to update and rewrite resources provided to voters five to

six times, including its popular Election FAQ document. With each update, DRW staff had to

spend time liaising with the Commission to make sure they were conveying accurate

information. Ordinarily, DRW would have to create only a single version of these materials.

DRW also had to attend emergency meetings of the Commission, prepare for at least two

unplanned calls with WEC, and coordinate on an emergency basis with other Wisconsin

organizations to ensure voters were getting accurate information.

56

192.     Because of this unplanned and additional work, significant staff time was spent responding to Defendants' failures and informing DRW's constituents about how to vote. This staff time was diverted from other DRW priorities, such as creating key reference materials for parents of children with serious disabilities, completing federal grant reporting requirements, and coordinating Wisconsin's Mental Health Task Force.

193.     DRW continues to have to divert resources in response to Defendants' failures and in anticipation of future disenfranchisement, if policies are not changed. DRW has devoted significant staff time to organizing Zoom briefings for the May 12 election, and it is currently coordinating with other Wisconsin groups on a joint voter-education plan for future elections, and developing a campaign to encourage voters to vote absentee. As a part of campaign planning, DRW is conducting in-depth research, including interviews, on how other states provide for accessible absentee voting. None of this work was previously planned, and all of it takes staff time away from previously planned work and affects DRW's ability to fulfill its mission.

194.     Many of the Wisconsinites with disabilities on whose behalf DRW advocates face significant obstacles to voting as a result of COVID-19. They will either be disenfranchised or exposed to heightened risk of illness if their legal rights to safely vote are not vindicated. DRW also brings this suit on their behalf.

## CLAIMS FOR RELIEF

### Count 1: Violation of Section 11(b) of the Voting Rights Act
### (All Plaintiffs)

195.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

196.     Section 11(b) of the Voting Rights Act provides that:

No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

52 U.S.C. § 10307(b).

197.     Defendants violated Section 11(b) of the Voting Rights Act by failing to take objectively reasonable precautions to enable Wisconsin citizens to vote free of fear of contracting COVID-19. *See Hicks v. Knight*, Civ. No. 15,727, 10 Race Rel. L. Rep. 1507-09 (E.D. La. 1965) (finding that a city violated federal voting rights law when it failed to take reasonable measures to protect voter registration group from physical danger).

198.     Defendants did not take objectively reasonable steps to run an absentee-voting program that guaranteed registered voters who timely requested ballots the ability to reliably and safely cast their ballots from home. They did not provide municipal clerks with the resources necessary to timely process an unprecedented volume of absentee ballot requests. They did not provide a means of complying with the absentee ballot witness requirement that was safe and feasible for voters at high risk from COVID-19. And they did not ensure that drop boxes would be available for absentee voters who wanted to ensure timely receipt of their voted ballots.

199.     Defendants did not take objectively reasonable precautions to ensure that every voter had access to a safe polling site or in-person absentee voting location that allowed for adequate social distancing practices. They took insufficient steps to ensure, for instance, that there were enough poll workers in each county to staff an adequate number of polling sites to forestall long lines and crowds, and they did not facilitate the equitable sharing of poll workers across jurisdictions within a county. They did not require that poll workers or voters wear masks.

200.    As a result, many Wisconsin voters—even those who had timely requested absentee ballots—were forced to choose between risking their physical safety to vote and abstaining from voting.

201.    Defendants' failure to take objective reasonable precautions to ensure that each Wisconsin voter could vote free of fear of contracting COVID-19 intimidated and injured Plaintiffs.

202.    Plaintiff Swenson was too intimidated by fear of contracting COVID-19 both to vote in person and to get a witness to sign her absentee ballot. As a result, she was disenfranchised. Absent relief, she will be intimidated again in subsequent elections during the pandemic.

203.    Plaintiff McCurtis was intimidated and threatened by the unsafe conditions she encountered in voting at Washington High School in Milwaukee. Absent relief, she will anticipate similar conditions at polling places during subsequent elections during the pandemic, and thus will remain intimidated.

204.    Plaintiff Nelson was too intimidated by fear of contracting COVID-19 to vote in person, and she did not receive her timely requested absentee ballot. As a result, she was disenfranchised. Absent relief, she will be intimidated again in subsequent elections during the pandemic.

205.    Widespread voter intimidation has forced DRW and BLOC to divert resources from other activities in order to ensure that voters are not afraid to cast ballots in subsequent elections during the pandemic.

206.    Defendants have not taken sufficient steps to remedy their failure to protect voters from intimidation during the April election.

207.     Unless enjoined by the Court, Defendants will continue to violate Section 11(b) of the Voting Rights Act.

### Count 2: Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution (Plaintiff McCurtis, Organizational Plaintiffs)

208.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

209.     The Fourteenth Amendment prohibits Wisconsin from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

210.     "Having once granted the right to vote on equal terms, [a state] may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-105 (2000). Defendants cannot "arbitrarily deny" Wisconsinites "the right to vote depending on where they live." *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008).

211.     Defendants' administration of the April 7 election arbitrarily advantaged voters in some jurisdictions and disadvantaged those who resided in others, including especially voters in Milwaukee.

212.     Defendants failed to take sufficient action to remedy known poll worker shortages. They also failed to facilitate the equitable sharing of poll workers within counties, leading to situations in which municipalities in the same county had radically different staffing levels and thus provided radically different experiences for voters.

213.     Defendants' arbitrary and disparate administration of the April election injured Plaintiff McCurtis by subjecting her, as a resident of the City of Milwaukee, to a voting system

more dysfunctional than that experienced by Wisconsinites in many jurisdictions—who voted without waiting in line for more than two and a half hours.

214.    Defendants' arbitrary and disparate administration of the April election has forced the Organizational Plaintiffs to divert resources from other activities in order to ensure that voters in Milwaukee, Green Bay, and other municipalities that experienced severe problems in April are enfranchised in subsequent elections during the pandemic.

215.    Defendants' actions, taken under color of law, deprive Plaintiffs of rights, privileges, or immunities secured to them by the Constitution of the United States, in violation of 42 U.S.C. § 1983.

216.    Defendants' actions and failures to act have subjected Plaintiffs to arbitrary disparities in their ability to have their votes counted depending on where they live.

217.    Unless enjoined by the Court, Defendants will continue to violate the Equal Protection Clause.

## Count 3: Violation of the First and Fourteenth Amendments
## to the U.S. Constitution
## (All Plaintiffs)

218.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

219.    United States citizens' voting rights are protected by the First and Fourteenth Amendments to the U.S. Constitution. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

220.    Defendants' actions unduly burdened Plaintiffs Swenson, McCurtis, and Nelson's constitutionally protected voting rights by forcing them to choose between exercising their rights to vote and their personal safety.

61

221.    As a result, Defendants' actions imposed a severe—and sometimes impossible—burden on Plaintiffs' right to vote.

222.    Defendants' administration of the April election in a manner that imposed severe burdens on voters has forced the Organizational Plaintiffs to divert resources from other activities in order to ensure that voters are nonetheless enfranchised in subsequent elections during the pandemic.

223.    Defendants have no countervailing legitimate governmental purpose in forcing individuals to choose between the right to vote and their safety.

224.    Unless enjoined by the Court, Defendants will continue to violate the First and Fourteenth Amendments.

### Count 4: Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution (Procedural Due Process) (Plaintiffs Swenson and Nelson, Organizational Plaintiffs)

225.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

226.    The Due Process Clause of the Fourteenth Amendment prohibits the Defendants from denying any person of a protected property or liberty interest without fair process. *See* U.S. Const. Amend. XIV, § 1. At the core of these procedural protections is the right to adequate notice with respect to any deprivation of a protected interest, and a fair opportunity to be heard on the matter at a meaningful time and in meaningful manner. *See Mathews v. Eldridge,* 424 U.S. 319 (1976).

227.    All eligible Wisconsin voters have a fundamental right to vote protected by the U.S. Constitution and Wisconsin law. Wis. Stat. § 6.02. All eligible Wisconsin voters also have a right to request and receive an absentee ballot for any reason, Wis. Stat. § 6.85, *et seq.*, and to

have their properly cast absentee ballots counted, Wis. Stat. §§ 6.88, 7.52. Each of these rights is a protected liberty or property interest that triggers the fundamental procedural protections of the Due Process Clause.

228.   Defendants violated Plaintiffs' procedural rights under the Due Process Clause with respect to the right to obtain an absentee ballot. Defendants violated this right by failing to provide: adequate notice of the procedures by which individuals might cure any errors in a request for an absentee ballot; adequate notice that an absentee ballot would not be delivered to the voter in time to cast the ballot; clear, timely, and effective procedures by which to exercise the right to vote in the event an absentee ballot did not arrive in sufficient time before election day; and clear, timely, and effective procedures by which a voter could seek redress in the event of an erroneous deprivation of the right to obtain an absentee ballot. Defendants further violated these rights by failing to adopt constitutionally adequate rules, directives, or similar guidance on these matters statewide.

229.   Defendants also violated Plaintiffs' procedural rights under the Due Process Clause with respect to the right to have absentee ballots counted. Defendants violated this right by failing to provide timely notice that an absentee ballot had been rejected before election results are certified, including with respect to absentee ballots rejected on the grounds that the ballot allegedly lacked necessary signatures or other details, or because of alleged problems with the postmark or other evidence that the ballot was timely cast. Wis. Stat. §§ 6.88, 7.52. Defendants also failed to provide voters a constitutionally adequate opportunity to be heard on the validity of their ballots before they were excluded from the certified election results. *Id.* In order to afford constitutionally adequate notice and a timely opportunity to be heard, state laws

that currently forbid canvassing of absentee ballots prior to election day should be enjoined. *See* Wis. Stat. §§ 6.88, 7.51–.52.

230.    Defendants further violated Plaintiffs' procedural rights under the Due Process Clause by failing to provide timely, meaningful, and effective notice of changes in voting protocols, procedures, and requirements precipitated by the coronavirus pandemic. Defendants' failure to communicate effective notice of such changes to the public created widespread confusion in the April 7 election about how eligible voters could or could not exercise their fundamental right to vote. This failure resulted in Plaintiffs, like Plaintiffs Swenson and Nelson, losing their fundamental right to vote and other protected interests, including the right to obtain and cast an absentee ballot rather than incur the health risk of going to a polling place on election day. Defendants have not cured those failures and have a continuing obligation under the Due Process Clause to provide effective, timely notice to voters with respect to the protocols, procedures, and other requirements they must satisfy in order to exercise their fundamental right to vote either in person or absentee. Defendants have also violated these requirements by failing to implement rules, directives, or similar guidance with respect to such matters statewide.

231.    Defendants' heavy reliance on websites, particularly MyVote Wisconsin, as a means of providing notice to voters failed to satisfy the requirements of procedural due process with respect to the large number of Wisconsin residents who do not have ready access such means of communication, including those who lack necessary technical skills, those with disabilities, and those who simply do not have ready access to computers or the internet. This failure disproportionately affects low-income, disabled, elderly, and minority voters, and forces the Organizational Plaintiffs to expend significant additional resources to carry out voter

education, voter outreach, and get-out-the-vote activities with respect to the populations that they each serve.

232.    Defendants are not taking adequate steps to cure these violations of procedural due process in the August and November elections.

233.    Unless enjoined by the Court, Defendants will continue to violate procedural rights guaranteed by the Due Process Clause.

**Count 5: Violation of the Americans with Disabilities Act**
**(Plaintiffs Swenson and Nelson, Organizational Plaintiffs)**

234.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

235.    Under Title II of the ADA, state and local governments must not impose requirements on participation in public services, programs, or activities, including voting, that prevent individuals with disabilities from fully and equally enjoying that participation, and must make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability. 42 U.S.C. § 12132. "Title II of the ADA requires [such entities] to ensure that people with disabilities have a full and equal opportunity to vote. The ADA's provisions apply to all aspects of voting, including voter registration, site selection, and the casting of ballots, whether on Election Day or during an early voting process."[109]

236.    Immunocompromised individuals and those who suffer a significant medical vulnerability that would place them at high risk of serious bodily injury or death should they leave the confines of their home, or should they interact with a non-member of their household, have a disability within the meaning of the ADA.

---

[109] U.S. Dep't of Justice, "The Americans with Disabilities Act and Other Federal Laws Protecting the Rights of Voters with Disabilities," *available at* https://www.justice.gov/file/69411/download (last accessed June 18, 2020).

237.    Defendants have failed to safeguard these individuals' right to participate in our democracy in at least three ways.

238.    First, through the conduct described above, Defendants have failed to ensure that such individuals who request absentee ballots receive them, as necessary to allow them to vote, and to count their ballots if they are able to mail them back. Defendants must maintain a voting process that ensures those with such disabilities can register for, receive, vote, and have counted their absentee ballots.

239.    Second, Defendants have failed to provide reasonable accommodations to voters with disabilities from the in-person witness requirements for absentee voting, Wis. Stat. § 6.87(2). Many Wisconsin voters with disabilities live alone and cannot safely arrange for an in-person witness. Defendants have failed to accommodate these voters by, for example, replacing the witness verification requirement with a self-certification requirement. In so doing, Defendants have violated the ADA by denying these voters the right to participate in Wisconsin's voting process by reason of their disability.

240.    Third, blind individuals and others who require the use of assistive technology available only in person to vote privately and independently also have a disability within the meaning of the ADA. By failing to guarantee safe access to in-person voting for these voters, Defendants have violated the ADA.

241.    Defendants are not taking adequate steps to avoid these violations of the ADA.

242.    Unless the requested relief is granted, Plaintiffs Swenson and Nelson and those similarly situated will suffer irreparable harm in that they will be discriminated against and denied equal access to participation in voting in violation of the ADA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court:

A. Declare that administering an election during the COVID-19 pandemic in the manner that Defendants administered the April 7, 2020 election violates Section 11(b) of the Voting Rights Act, the First and Fourteenth Amendments of the U.S. Constitution, and the Americans with Disabilities Act;

B. Order Defendants, for the August and November 2020 elections, to:

1. Take all appropriate actions to ensure that in-person voting, whether exercised by casting an absentee ballot or by casting a ballot on election day, can be safely conducted;

2. Require that accessible voting machines be available at all in-person absentee voting locations;

3. Take all appropriate actions to ensure an adequate number of poll workers to administer safe polling places;

4. Ensure that each registered voter in Wisconsin receives an absentee ballot request form and that all residents of care facilities have adequate opportunities to register to vote and request absentee ballots;

5. Ensure that individuals with print disabilities have an accessible means of receiving, marking, and submitting absentee ballots privately and independently;

6. Take all appropriate actions to ensure that all voters who request and are qualified to receive an absentee ballot in fact receive such absentee ballot, and that any voter whose request for an absentee ballot is rejected or not processed for any reason be notified and given the opportunity to cure any defect in a timely manner;

7. Take all appropriate actions to upgrade electronic voter registration systems so they can process the anticipated elevated number of online registrations and absentee ballot requests;

8. Take all appropriate actions to coordinate with, and ensure that municipalities coordinate with, the United States Postal Service to ensure the timely delivery and return of, and counting of, absentee ballots;

9. Ensure that secure drop boxes for in-person return of absentee ballots are available to every voter and increase in-person absentee voting opportunities that are safe and accessible, including, for instance, drive-through voting; and

10. Engage in a public education campaign to apprise the public on: how to request, vote, and return absentee ballots; the locations and times for in-person absentee voting; all early voting opportunities in each community; the provisions being made for safe in-person voting; and any changes in election day polling locations.

C.  Enjoin the enforcement of:

1. Wis. Stat. § 7.30(2) with respect to the requirement that each election official be an elector of the county in which the municipality is located;

2. Wis. Stat. § 6.87(2) during the pendency of the COVID-19 pandemic for all voters who are immunocompromised or otherwise at high risk from COVID-19, or who are actively infected with COVID-19, who cannot safely secure an in-person witness;

3. Wis. Stat. § 6.855(1) with respect to the requirement that all in-person absentee voting locations for the November general election must have already been designated;

4. Wis. Stat § 6.87(6) and require that absentee ballots postmarked by election day or not bearing a postmark but received within a week of election day be counted; and

5. Wis. Stat. §§ 6.88, 7.51-.52 with respect to the requirement that absentee ballots not be counted before election day.

D. Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988(b), 28 U.S.C. § 1920, and other applicable laws; and

E. Grant such other relief as the Court deems just and proper.

Dated: June 23, 2020

By: /s/ Rachel E. Goodman

Rachel E. Goodman
THE PROTECT DEMOCRACY PROJECT
115 Broadway, 5th Fl.
New York, NY 10006
(202) 997-0599
rachel.goodman@protectdemocracy.org

Laurence M. Schwartztol
THE PROTECT DEMOCRACY PROJECT
15 Main St., Suite 312
Watertown, MA 02472
(202) 856-9191
larry.schwartztol@protectdemocracy.org

Jamila Benkato*
Farbod Kaycee Faraji*
Cameron Kistler
THE PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington, D.C. 20006
(202) 579-4582
jamila.benkato@protectdemocracy.org
farbod.faraji@protectdemocracy.org
cameron.kistler@protectdemocracy.org
*Admitted to practice in California, not
D.C.; practice consistent with D.C. App. R.
49(c)(3).

Anton Metlitsky
Leah Godesky
Yaira Dubin
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 326-2000
ametlitsky@omm.com
lgodesky@omm.com
ydubin@omm.com

Molly M. Lens
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
(310) 553-6700
mlens@omm.com

Jason Zarrow
O'MELVENY & MYERS LLP
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
(213) 430-6000
jzarrow@omm.com

Jonathan Manes
RODERICK & SOLANGE MACARTHUR
JUSTICE CENTER
160 E Grand Ave, Sixth Floor
Chicago, IL 60611
(312) 503-0012
jonathan.manes@law.northwestern.edu

Douglas M. Poland
State Bar No. 1055189
RATHJE WOODWARD LLC
10 E Doty Street
Suite 507
Madison, WI 53703
(608) 960-7430
dpoland@rathjewoodward.com

Jeffrey A. Mandell
State Bar No. 1100406
STAFFORD ROSENBAUM LLP
222 West Washington Avenue
P.O. Box 1784
Madison, WI 53701-1784
(608) 256-0226
jmandell@staffordlaw.com

*Counsel for Plaintiffs*