IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JILL SWENSON, MELODY MCCURTIS,
MARIA NELSON, BLACK LEADERS
ORGANIZING FOR COMMUNITIES, and
DISABILITY RIGHTS WISCONSIN,

        Plaintiffs,

        v.

MARGE BOSTELMANN, JULIE M. GLANCEY,
ANN S. JACOBS, DEAN KNUDSON, ROBERT
F. SPINDELL, JR., and MARK L. THOMSEN,
Commissioners of the Wisconsin Elections
Commission;

MEAGAN WOLFE, Administrator of the
Wisconsin Elections Commission,

        Defendants,

    and

WISCONSIN LEGISLATURE,
REPUBLICAN NATIONAL COMMITTEE,
and REPUBLICAN PARTY OF WISCONSIN,

        Intervening Defendants.

20-cv-459-wmc

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY
INJUNCTION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................iii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

I.    THE COVID-19 PANDEMIC .................................................................... 2

II.   THE APRIL 7 ELECTION........................................................................... 4

     A.     Defendants Declined To Adopt Policies And Practices To Ensure Safe And Effective Voting Access Despite Clear Warning Signs................................ 4

     B.     Defendants' Failure To Prepare Adequately For The April 7 Election Led To Widespread Disenfranchisement. ......................................... 7

          1.     Defendants Did Not Take Reasonable And Available Steps To Ensure The MyVote Website Would Function Properly To Allow Voters To Register To Vote And Request Absentee Ballots.................... 7

          2.     Defendants Did Not Take Reasonable And Available Steps To Ensure The Absentee Voting System Could Handle The Increased Demand Resulting From Greatly Reduced, Unsafe In-Person Voting Options........................................................................... 9

          3.     Insufficient Poll Workers Led To A Significant Reduction In Poll Locations................................................................................... 13

          4.     Defendants Failed To Ensure The Polling Places That Remained Open Were Safe. ................................................................ 15

          5.     Defendants' Failures Arbitrarily Impacted Certain Voters And Municipalities More Than Others.............................................. 17

III.  ABSENT JUDICIAL INTERVENTION, DEFENDANTS' FAILURES ARE PRACTICALLY CERTAIN TO RECUR IN THE NOVEMBER ELECTION. ............ 20

     A.     COVID-19 Will Pose A Substantial Health Risk To Voters For The Remainder Of 2020........................................................................ 20

          1.     COVID-19 Continues To Spread Throughout Wisconsin And Will Still Be A Major Public Health Concern During The Remaining Months Of 2020. ...................................................................... 20

          2.     The Harms Caused By COVID-19 In The November Election Are Likely To Be Greater, Not Less, Than In The April Election. ................ 21

     B.     Defendants Have Not Adopted Adequate Measures To Ensure That The Failures Of The April 7 Election Do Not Recur................................... 22

LEGAL STANDARD.......................................................................................... 24

ARGUMENT ..................................................................................................... 25

I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR STATUTORY CLAIMS.............................................................................. 25

i

# TABLE OF CONTENTS
## (cont'd)

**Page**

A.    Plaintiffs Are Likely To Prevail On Their Claim That Defendants' Failure To Ensure Safe Voting Conditions Violates Section 11(b) Of The Voting Rights Act (Count 1). ........................................................... 25

B.    Plaintiffs Are Likely To Prevail On Their Claim That Defendants' Failure To Make Reasonable Modifications For Voters With Disabilities Violates The Americans With Disabilities Act (Count 5)................................................. 30

    1.    Plaintiffs Are Qualified Individuals With Disabilities And An Organization That Represents Them. ...................................... 31

    2.    Plaintiffs Have Been Denied Access To A Government Program, And Defendants Cannot Prove That The Proposed Modifications Are Unreasonable............................................................ 32

II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.................................................... 36

A.    Plaintiffs Are Likely To Prevail On Their Claim That Defendants' Election Administration And Various Provisions of Wisconsin Election Law Unduly Burden Their Right To Vote Under *Anderson-Burdick* (Count 3). ..........................................................................36

    1.    Failure To Ensure Safe In-Person Voting. ............................... 38

    2.    Failure to Ensure Adequate Number of In-Person Polling Locations......................................................................... 40

    3.    Statutory Deadline for Receipt of Absentee Ballots. .............................. 42

    4.    Absentee-Ballot Witnessing...................................................... 44

B.    Plaintiffs Are Likely To Prevail On Their Claims That Defendants Are Violating the Procedural Guarantees of the Due Process Clause Of The Fourteenth Amendment (Count 4). ........................................... 46

    1.    Requesting Absentee Ballots .................................................... 48

    2.    Absentee-Ballot Counting........................................................ 51

C.    Plaintiffs Are Likely To Prevail On Their Claim That Defendants' Arbitrary And Disparate Election Administration Violates The Equal Protection Clause Of The Fourteenth Amendment (Count 2). ...........................54

III.    IN THE ABSENCE OF A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM DURING THE PENDENCY OF THIS ACTION. ............................................................................... 60

IV.    THE BALANCE OF HARDSHIPS SUPPORTS ISSUANCE OF AN INJUNCTION.................................................................... 63

V.    AN INJUNCTION IS IN THE PUBLIC INTEREST. .................................. 64

CONCLUSION............................................................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Civil Liberties Union of Ill. v. Alvarez,*
   679 F.3d 583 (7th Cir. 2012) ............................................................................ 24

*Ameritech Corp. v. McCann,*
   403 F.3d 908 (7th Cir. 2005) ............................................................................ 25

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983)................................................................................... 34, 36

*Ariz. Democratic Party v. Ariz. Republican Party,*
   2016 WL 8669978 (D. Ariz. Nov. 4, 2016)...................................................... 61

*Belitskus v. Pizzingrilli,*
   343 F.3d 632 (3d Cir. 2003) ............................................................................. 39

*Black v. McGuffage,*
   209 F. Supp. 2d 889 (N.D. Ill. 2002) ............................................................... 59

*Burdick v. Takushi,*
   504 U.S. 428 (1992)....................................................................... 34, 36, 37, 38

*Bush v. Gore,*
   531 U.S. 98 (2000)............................................................................... 54, 55, 59

*Cal. Council of the Blind v. Cty. of Alameda,*
   985 F. Supp. 2d 1229 (N.D. Cal. 2013) ........................................................... 35

*Coal. for Educ. in Dist. One v. Bd. of Elec. of City of N.Y.,*
   370 F. Supp. 42 (S.D.N.Y. 1974) ..................................................................... 55

*Common Cause/New York v. Brehm,*
   2020 WL 122589 (S.D.N.Y. Jan. 10, 2020) ..................................................... 38

*Dees v. Austin Travis Cty. Mental Health & Mental Retardation,*
   860 F. Supp. 1186 (W.D. Tex. 1994) ............................................................... 34

*Democratic Exec. Comm. of Fla. v. Lee,*
   915 F.3d 1312 (11th Cir. 2019) ........................................................................ 38

*Democratic Nat'l Comm. v. Bostelmann,*
   2020 WL 1638374 (W.D. Wis. Apr. 2, 2020) .......................................... *passim*

*Democratic Nat'l Comm. v. Bostelmann,*
   2020 WL 3077047 (W.D. Wis. Jun. 10, 2020) ........................................... 47, 64

# TABLE OF AUTHORITIES
### (cont'd)

**Page(s)**

*Democratic Nat'l Comm. v. Bostelmann,*
  Nos. 20-1538, 1539, 1545, 1546 (7th Cir. April 3, 2020) ................................................. 6, 34

*Disabled in Action v. Bd. of Elections in City of N.Y.,*
  752 F.3d 189 (2d Cir. 2014) ................................................................. 30, 31, 33, 35

*Drenth v. Boockvar,*
  2020 WL 2745729 (M.D. Pa. May 27, 2020) ..................................................... 35, 36

*Dunn v. Blumstein,*
  405 U.S. 330 (1972) ........................................................................................ 54

*Eckles v. Consol. Rail Corp.,*
  94 F.3d 1041 (7th Cir. 1996) ............................................................................ 34

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ............................................................................ 61

*Frank v. Walker,*
  819 F.3d 384 (7th Cir. 2016) ............................................................................ 44

*Gen. Elec. Co. v. EPA,*
  53 F.3d 1324 (D.C. Cir. 1995) ......................................................................... 51

*Gray v. Sanders,*
  372 U.S. 368 (1963) ....................................................................................... 54

*Griffin v. Roupas,*
  385 F.3d 1128 (7th Cir. 2004) ......................................................................... 34

*Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.,*
  397 U.S. 50 (1970) ..................................................................................... 54, 56

*Harlan v. Scholz,*
  866 F.3d 754 (7th Cir. 2017) ............................................................................ 24

*Harper v. Va. Bd. of Elections,*
  383 U.S. 663 (1966) ................................................................................... 46, 55

*Harris v. Bd. of Supervisors,*
  366 F.3d 754 (9th Cir. 2004) ............................................................................ 62

*Henrietta D. v. Bloomberg,*
  331 F.3d 261 (2d Cir. 2003) ............................................................................ 32

*Hicks v. Knight,*
  Civ. No.15,727 (E.D. La.), 10 Race Rel. L. Rep. 1504 (1965) ............................... 27

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Holzmueller v. Illinois High Sch. Ass'n*,
  881 F.3d 587 (7th Cir. 2018) ............................................................ 33

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*,
  582 F.3d 721 (7th Cir. 2009) ............................................................ 25

*Ind. State Conf. of NAACP v. Lawson*,
  326 F. Supp. 3d 646 (S.D. Ind. 2018) .............................................. 62

*Jordan v. Trainor*,
  563 F.3d 873 (7th Cir. 1977) ............................................................ 51

*Kapps v. Wing*,
  404 F.3d 105 (2d Cir. 2005) ............................................................. 54

*Katzenbach v. Original Knights of the Ku Klux Klan*,
  250 F. Supp. 330 (E.D. La. 1965) .................................................... 27

*Lacy v. Cook Cty.*,
  897 F.3d 847 (7th Cir. 2018) ....................................................... 30, 31

*LAJIM, LLC v. Gen. Elec. Co.*,
  917 F.3d 933 (7th Cir. 2019) ............................................................ 62

*League of Women Voters of Fla., Inc., v. Detzner*,
  314 F. Supp. 3d 1205 (N.D. Fla. 2018) ........................................... 40

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ....................................................... 60, 61

*League of Women Voters of Ohio v. Blackwell*,
  432 F. Supp. 2d 723 (N.D. Ohio 2005) ............................................ 60

*League of Women Voters of Ohio v. Brunner*,
  548 F.3d 463 (6th Cir. 2008) ............................................................ 55

*Lee v. Va. State Bd. of Elections*,
  843 F.3d 592 (4th Cir. 2016) ............................................................ 37

*LULAC Richmond Regional Council v. Pub. Interest Legal Found.*,
  2018 WL 3848404 (E.D Va. Aug. 13, 2018) ................................ 26, 28

*Mary Jo C. v. N.Y. State and Local Ret. Sys.*,
  707 F.3d 144 (2d Cir. 2013) ............................................................. 33

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ......................................................................... 47

## TABLE OF AUTHORITIES
(cont'd)

**Page(s)**

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
   339 U.S. 306 (1950) ........................................................................ 50, 51

*NAACP State Conf. of Pa. v. Cortes*,
   591 F. Supp. 2d 757 (E.D. Pa. 2008) ............................................... 60

*Nat'l Fed'n of the Blind v. Lamone*,
   813 F.3d 494 (4th Cir. 2016) ...................................................... *passim*

*New York v. Horelick*,
   424 F.2d 697 (2d Cir. 1970) ............................................................ 26, 27

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) .......................................................... 60, 61

*Oconomowoc Residential Programs v. City of Milwaukee*,
   300 F.3d 775 (7th Cir. 2002) .......................................................... 32, 33

*One Wis. Inst. v. Thomsen*,
   198 F. Supp. 3d 896 (W.D. Wis. 2016) ........................................... 46, 59

*Planned Parenthood of Wis., Inc. v. Van Hollen*,
   963 F. Supp. 2d 858 (W.D. Wis. 2013) ........................................... 25

*Preston v. Thompson*,
   589 F.2d 300 (7th Cir. 1978) ............................................................ 61

*Pugel v. Bd. of Trs. of Univ. of Ill.*,
   378 F.3d 659 (7th Cir. 2004) ............................................................ 47

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) ..................................................................... 23, 63, 64

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
   762 F. Supp. 1354 (D. Ariz. 1990) ................................................. 46, 53

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
   140 S. Ct. 1205 (2020) ...................................................... 6, 7, 10, 23

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ....................................................................... 36, 55

*S. Bay United Pentacostal Church v. Newsom*,
   590 U.S. __ (2020) ............................................................................ 2

*Saucedo v. Gardner*,
   335 F. Supp. 3d 202 (D.N.H. 2018) ............................................... 46, 53

# TABLE OF AUTHORITIES
(cont'd)

**Page(s)**

*Sinclair Ref. Co. v. City of Chicago*,
  178 F.2d 214 (7th Cir. 1949) ................................................................. 39, 40

*State of N.Y. v. Sullivan*,
  906 F.2d 910 (2d Cir. 1990) ..................................................................... 62

*Taylor v. Louisiana*,
  419 U.S. 522 (1975) ................................................................................. 63

*Tenn. State Conference of NAACP v. Hargett*,
  420 F. Supp. 3d 683 (M.D. Tenn. 2019) ................................................. 38

*United States v. Clark*,
  249 F. Supp. 720 (S.D. Ala. 1965) .......................................................... 27

*United States v. McLeod*,
  385 F. 2d 734 (5th Cir. 1967) .................................................................. 28

*United States v. Mosley*,
  238 U.S. 383 (1915) ................................................................................. 54

*United Utah Party v. Cox*,
  268 F. Supp. 3d 1227 (D. Utah 2017) ..................................................... 39

*Ury v. Santee*,
  303 F. Supp. 119 (N.D. Ill. 1969) ........................................................... 55

*Vande Zande v. Wis. Dept. of Admin.*,
  44 F.3d 538 (7th Cir. 1995) ..................................................................... 33

*Vargas v. Trainor*,
  508 F.2d 485 (7th Cir. 1974) ................................................................... 54

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) ................................................................... 51

*Washington v. Ind. High Sch. Athletic Ass'n, Inc.*,
  181 F.3d 840 (7th Cir. 1999) ................................................................... 36

*Zessar v. Helander*,
  2006 WL 642646 (N.D. Ill. Mar. 13, 2006) ....................................... 46, 53

## Statutes

42 U.S.C. § 12102(1)(A) ............................................................................ 31

42 U.S.C. § 12102(2) .................................................................................. 32

## TABLE OF AUTHORITIES
(cont'd)

**Page(s)**

42 U.S.C. § 12132 ........................................................................................... 30

42 U.S.C. § 1971(b) ........................................................................................ 26

42 U.S.C. § 1973i(b) ....................................................................................... 25

52 U.S.C. § 10101(b) ...................................................................................... 26

52 U.S.C. § 10307(b) ...................................................................................... 25

52 U.S.C. § 20301 ........................................................................................... 35

Wis. Stat. § 5.05(12) ....................................................................................... 51

Wis. Stat. § 6.20 .............................................................................................. 46

Wis. Stat. § 6.275 ............................................................................................ 52

Wis. Stat. § 6.29(2)(am) .................................................................................. 51

Wis. Stat. § 6.33(5)(a)(3) ................................................................................ 52

Wis. Stat. § 6.855 ............................................................................................ 50

Wis. Stat. § 6.855(1) ......................................................................... 23, 41, 65

Wis. Stat. § 6.86 .............................................................................................. 46

Wis. Stat. § 6.86(1) ......................................................................................... 50

Wis. Stat. § 6.86(1)(b) .................................................................................... 42

Wis. Stat. § 6.86(2) ......................................................................................... 50

Wis. Stat. § 6.87(2) ................................................................................. *passim*

Wis. Stat. § 6.87(4) ......................................................................................... 12

Wis. Stat. § 6.87(6) ................................................................................. *passim*

Wis. Stat. § 6.88 ................................................................... 23, 52, 53, 65

Wis. Stat. § 6.88(3) ......................................................................................... 51

Wis. Stat. § 6.93 .............................................................................................. 52

Wis. Stat. § 7.15(1)(cm) .................................................................................. 49

# TABLE OF AUTHORITIES
### (cont'd)

**Page(s)**

Wis. Stat. § 7.30(2) ............................................................................ 13, 23, 41, 65

Wis. Stat. § 7.51 ..................................................................................... 23, 52, 53, 65

Wis. Stat. § 7.52 ................................................................................................... 52

Wis. Stat. § 7.60(5) .............................................................................................. 52

Wis. Stat. § 7.70(3)(a) .......................................................................................... 52

Wis. Stat. § 8.40(2) .............................................................................................. 45

**Regulations**

28 C.F.R. § 35.104 ............................................................................................... 35

28 C.F.R. § 35.108(b)(2) ...................................................................................... 32

28 C.F.R. § 35.108(d)(2)(iii)(B) .......................................................................... 32

28 C.F.R. § 35.108(d)(2)(iii)(F) ........................................................................... 32

28 C.F.R. § 35.130(7)(i) ....................................................................................... 31

28 C.F.R. § 35.130(b)(1)(ii) ................................................................................. 34

28 C.F.R. § 35.130(b)(3) ...................................................................................... 35

28 C.F.R. § 35.130(b)(7) ...................................................................................... 32

28 C.F.R. § 35.130(b)(7)(i) ............................................................................ 32, 33

28 C.F.R. § 35.130(b)(8) ...................................................................................... 35

28 C.F.R. § 35.160(b)(1) ...................................................................................... 35

28 C.F.R. § 35.164 ............................................................................................... 31

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ................................................................................ 46

**Other**

Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. Rev. L. & Soc. Change 173 (2015) .................................. 26

H.R. Rep No. 89-439 (1965) ................................................................................. 26

## TABLE OF AUTHORITIES
(cont'd)

**Page(s)**

Hearing on the U.S. Commissioner System Before the Subcomm. on Improvements in
   Judicial Machinery of the S. Comm. on the Judiciary, 189th Cong. 138-39 (1965),
   https://bit.ly/2UZGsj6 ............................................................................................ 27

U.S. Dep't of Justice, "The Americans with Disabilities Act and Other Federal Laws
   Protecting the Rights of Voters with Disabilities,"
   https://www.justice.gov/file/69411/download .......................................................... 31

Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary, 89th
   Cong. 16 (1965) ....................................................................................................... 26

## INTRODUCTION

The April 7, 2020 election—held amidst a global pandemic—suffered from widespread breakdowns in critical aspects of the election process that disenfranchised tens of thousands of Wisconsin voters.  Although Defendants took steps to administer the election fairly, including some at the order of this Court, those actions were insufficient to protect the rights of Wisconsin voters.  Citizens across the state encountered obstacles at every stage of the voting process, including registering to vote, requesting and receiving absentee ballots, and returning their absentee ballots to be counted.  Voters who attempted to vote in person encountered long waits and voting locations that lacked adequate safety protocols and supplies for voters and poll workers alike, forcing voters to risk their own health and that of their loved ones to exercise their constitutional rights to participate in their democracy.

Plaintiffs—individual Wisconsin voters who were disenfranchised or unable to vote safely in the April election, and organizations whose work and missions suffered due to these widespread election breakdowns in April—filed this suit to prevent a replay of this mass disenfranchisement in the November presidential election.  Medical and public-health experts project that, like the April 7 election, the impending November election will occur in the midst of the COVID-19 pandemic and present extraordinary challenges to election administrators and voters.  Yet Defendants have failed to take the steps necessary to safeguard Wisconsinites' right to vote.  And the clock is ticking: without swift action to improve safety and voting access in the upcoming November election, relief may become practically impossible.[1]

Plaintiffs seek an order enjoining the enforcement of certain statutory requirements that fatally impair Defendants' ability to administer the election effectively during the pandemic and

---

[1] Report of Kevin J. Kennedy ("Kennedy Report"), ¶ 37.

requiring Defendants to implement reasonable measures to ensure that the fundamental breakdowns plaguing the April election do not recur in the upcoming November election. Specifically, to comply with Section 11(b) of the Voting Rights Act, the Americans with Disabilities Act, and the First and Fourteenth Amendments, Defendants must ensure that in-person voting can be safely conducted; adequate numbers of poll workers can open and administer safe, in-person polling locations; ample, safe opportunities for in-person absentee voting are available; all voters who request and are qualified to receive absentee ballots in fact timely receive those ballots; voters can safely, effectively, and timely return their absentee ballots so their votes are counted; and online systems designed to register voters and request absentee ballots are sufficient to handle anticipated voter traffic.  And critically, to restore public confidence in the electoral process and prevent further disenfranchisement, Defendants must educate the Wisconsin public about how to vote safely.  Absent this Court's intervention, Defendants' administration of the November presidential election will violate Plaintiffs' statutory and constitutional rights.

## BACKGROUND

## I.      THE COVID-19 PANDEMIC

COVID-19 is "a novel severe acute respiratory illness that has killed … more than 100,000 nationwide."  *S. Bay United Pentacostal Church v. Newsom*, 590 U.S. __ (2020), *slip op.* at 1 (Roberts, J., concurring).  The virus "spread[s] mainly from person-to-person" through "respiratory droplets," and is more likely to spread "between people who are in close contact with one another (within about 6 feet)."[2]

---

[2] Statement of Proposed Facts in Support of Plaintiffs' Motion for A Preliminary Injunction ("SOPF") ¶ 1.

The first confirmed case in Wisconsin was diagnosed on February 5, 2020.[3]  It was the twelfth case in the United States and a harbinger of over 2 million more to come.[4]  Since February, over 25,000 people have tested positive for COVID-19 in Wisconsin alone.[5]  And experts predict that "over the next several months"—"from June to November 2020"—it is likely that "Wisconsin will see continued community transmission [of COVID-19] (at best), and may see increased transmission and more outbreaks (at worst)."[6]

In-person voting under these circumstances poses "a significant risk to human health."[7]  Physically casting a ballot requires voters and poll workers to come "in[to] close contact with one another," and to "touch[] surfaces or objects at [the] polling place, such as door handles, tables, pens, and ballots."[8]  And because infected people are often "contagious before the onset of symptoms, [or] never develop symptoms," it is virtually impossible to keep polling places virus-free.[9]  There will consequently be "a significant risk of contracting and transmitting COVID-19 in Wisconsin during any in-person voting for the November 2020 elections in Wisconsin," with dangerous—and potentially fatal—consequences for many Wisconsinites.[10]

---

[3] SOPF ¶ 3.

[4] SOPF ¶ 4.

[5] SOPF ¶ 4.

[6] SOPF ¶ 6; Report of Patrick Remington, MD, MPH ("Remington Report"), at 7.

[7] SOPF ¶ 7; Remington Report at 8.

[8] SOPF ¶ 8; Remington Report at 9.

[9] SOPF ¶ 9; Remington Report at 9.

[10] SOPF ¶ 10; Remington Report at 10.

## II.     THE APRIL 7 ELECTION

### A.      Defendants Declined To Adopt Policies And Practices To Ensure Safe And Effective Voting Access Despite Clear Warning Signs.

In the two months between the first confirmed case of COVID-19 in Wisconsin and the April 7, 2020 Election and Presidential Preference Primary, Defendants and other Wisconsin officials failed to take the actions necessary to hold a safe election during the impending pandemic.  At a February 27 meeting of the Wisconsin Elections Commission—the first at which COVID-19 was discussed—Defendant Dean Knudson, at the time the Chair of the Commission, dismissed the need to plan for a COVID-19 outbreak.[11]  "[A]t worst," Knudson said, "there would be either long lines or a delay in reporting," and the Commission has "robust procedures" for absentee voting.[12]  Defendant Wolfe similarly stated:  "currently, [the Commission] do[es not] talk about things like, you know, if all your poll workers are sick . . . what would you do?"[13]  Exactly two weeks later, Governor Tony Evers declared a statewide public health emergency.[14]

As confirmed case counts kept climbing in Wisconsin, local agencies and leaders sounded the alarm.  The Wisconsin Department of Health Services banned gatherings of 10 or more people on March 17.[15]  The same day, the Mayor of Green Bay said that the city would be "unable to administer a normal election."[16]  Multiple Defendants then acknowledged that it was not possible to have a safe and fair election on April 7.  Defendant Jacobs said that she "no longer believe[d] that we are able to fairly and properly administer this election without delay or

---

[11] SOPF ¶ 11.

[12] SOPF ¶ 12

[13] SOPF ¶ 13.

[14] SOPF ¶ 14.

[15] SOPF ¶ 15.

[16] SOPF ¶ 16.

postponement, . . . I believe we're putting people at risk."[17]  Defendant Thomsen likewise said that "[Wisconsin is] going to have an election where no one can vote safely—that's absurd." [18] And Defendant Glancey argued in favor of an election by mail-in ballot only.[19]

Defendants issued a memorandum on March 18, 2020 highlighting shortages of absentee-ballot envelopes, polling locations, poll workers, and cleaning equipment.[20]  A few days later, a bipartisan group of mayors urged that the election be delayed.[21]  On March 24, Department of Health Services Secretary-designee Andrea Palm issued Emergency Order No. 12, the Safer At Home Order.[22]  The Order banned all public and private gatherings, closed nonessential businesses, and required that everyone maintain social distancing of at least six feet from any other person.[23]  Nevertheless, the next day Wisconsin Assembly Speaker Robin Vos and Senate Majority Leader Scott Fitzgerald said they did not expect to change the date of the election.[24]

Several plaintiffs filed suit, seeking to ensure that all Wisconsinites could safely and effectively cast a ballot.  On April 2, 2020, this Court entered an injunction (a) ordering that absentee ballots received by April 13 at 4 p.m. be counted; (b) extending by one day, to April 3, the window to request an absentee ballot; and (c) adjusting the requirement under Wis. Stat. § 6.87(2) that absentee voters have a witness sign their ballot, instead requiring Defendants to "accept an unwitnessed ballot" if it contains a sufficient affirmation or statement averring that

---

[17] SOPF ¶ 17.

[18] SOPF ¶ 18.

[19] SOPF ¶ 19.

[20] SOPF ¶ 20.

[21] SOPF ¶ 21.

[22] SOPF ¶ 22.

[23] SOPF ¶ 23.

[24] SOPF ¶ 24.

the voter was unable "to safely obtain a witness certification" despite using "reasonable efforts to do so." *Democratic Nat'l Comm. v. Bostelmann*, 2020 WL 1638374, at *20, *22 (W.D. Wis. Apr. 2, 2020) (hereinafter "*DNC*"). The Seventh Circuit stayed the portion of this Court's decision requiring Defendants to accept unwitnessed ballots and declined to modify the extension of the absentee ballot deadline. *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-1538, 1539, 1545, 1546, Order (7th Cir. April 3, 2020) (hereinafter "*DNC II*").

On the same day as the Seventh Circuit's decision, Governor Evers called a special legislative session for the Legislature to consider postponing the April 7 election.[25] But both the Wisconsin Assembly and the Senate immediately adjourned the special session, ensuring that the April 7 election would go forward as planned.[26] As this Court noted, the Legislature's decision was "[c]ontrary to the view of at least a dozen other states, as well as the consensus of medical experts across the country as to the gathering of large groups of people." *DNC*, 2020 WL 1638374, at *1.

In a last-ditch effort, Governor Evers issued an executive order on April 6 suspending in-person voting hours before polls opened on April 7.[27] The Wisconsin Supreme Court enjoined the Governor's order[28]; shortly thereafter, the United States Supreme Court held that all absentee ballots had to be postmarked by April 7 (in addition to being received by 4 P.M. on April 13) to be counted, partially overturning this Court's Order. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) (hereinafter "*RNC*"). The Court noted that "[t]his Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules

---

[25] SOPF ¶ 28.

[26] SOPF ¶ 29.

[27] SOPF ¶ 31.

[28] SOPF ¶ 32.

on the eve of an election." *Id.* at 1207.  The election thus went forward in the midst of the COVID-19 pandemic.

**B.    Defendants' Failure To Prepare Adequately For The April 7 Election Led To Widespread Disenfranchisement.**

During the April 7 election, problems arose with every method of voting and at every step of the voting process.  Voters attempted to utilize the absentee ballot process in historically high numbers[29] but faced a host of severely burdensome—and often insurmountable—barriers.  Meanwhile, voters who sought to vote in person faced huge waits and unsafe conditions due to the mass closure of polling locations and shortage of poll workers.[30]  As a consequence of these and other problems, thousands of voters across Wisconsin—and in particular older, minority, and immunocompromised voters—were disenfranchised.

1.    *Defendants Did Not Take Reasonable And Available Steps To Ensure The MyVote Website Would Function Properly To Allow Voters To Register To Vote And Request Absentee Ballots.*

Well before any voter even attempted to cast a ballot, problems arose with registration and absentee ballot requests.  Defendants administer a website called MyVote Wisconsin that, among other things, allows eligible Wisconsin residents to register to vote, request an absentee ballot, and find their polling place.[31]  Months before the election, Defendants were aware that the website experienced outages.[32]  Yet despite an increase in voters' use of and reliance on MyVote due to the pandemic,[33] Defendants did not secure the server capacity and bandwidth necessary to maintain the system.  Predictably, Wisconsin voters using MyVote for the April 7 election faced

---

[29] SOPF ¶ 35.

[30] SOPF ¶ 36.

[31] SOPF ¶ 37.

[32] SOPF ¶ 38.

[33] SOPF ¶ 40.

system crashes that prevented them from accessing the site.[34]  The site also failed to record ballot requests properly and to provide accurate information about the status of absentee ballot requests.[35]

The problems with MyVote are well documented.  An investigation by the Milwaukee Journal Sentinel, for instance, found that eligible voters in Lodi, Pewaukee, Marshfield, Shorewood, and Bristol had trouble requesting absentee ballots online, either because the MyVote system crashed or because they finally gave up after spending hours trying to make their request via MyVote.[36]  Some Wisconsin voters requested absentee ballots through MyVote, the investigation found, only to be informed later that the MyVote system had no record of their request.[37]  Other voters received inaccurate information from MyVote's ballot tracker system, leaving them with the (incorrect) impression that they would receive their absentee ballots before election day.[38]  Defendant Wolfe acknowledged these failures, writing that voters attempting to use MyVote experienced "unique challenges and obstacles" during the April election.[39]

Despite knowledge of problems with MyVote as early as February 2020,[40] Defendants did not take reasonable and available steps necessary to ensure the system would meet the needs of Wisconsin voters in April.  Those failures had meaningful consequences.  In Milwaukee

---

[34] SOPF ¶ 41.

[35] SOPF ¶ 42.

[36] SOPF ¶ 43.

[37] SOPF ¶ 44.

[38] SOPF ¶ 45.

[39] SOPF ¶ 46.

[40] SOPF ¶ 39.

alone, for instance, more than 2,600 absentee ballots requested by voters were never sent as the result of a technical failure in the WisVote system.[41]

> 2.    *Defendants Did Not Take Reasonable And Available Steps To Ensure The Absentee Voting System Could Handle The Increased Demand Resulting From Greatly Reduced, Unsafe In-Person Voting Options.*

In other recent elections, absentee ballots cast by mail made up between 4.8% and 8.1% of the total votes.[42]  As a result of the pandemic, however, absentee ballots cast by mail made up 61.8% percent of the total votes in the April 2020 election.[43]  Nevertheless—amidst unprecedented demand for absentee ballots in light of the COVID-19 pandemic—Defendants did not ensure proper distribution, collection, and counting of absentee ballots, resulting in the disenfranchisement of voters throughout the state.  Indeed, Defendants acknowledge that the increases in absentee voting "created resource issues for a system primarily designed to support polling place voting."[44]  But despite the availability of reasonable procedures that could have prevented the April 7 breakdowns, Defendants failed to implement them.

To begin, Defendants failed to take the necessary steps to ensure voters that requested absentee ballots timely received them.  Some voters, as discussed above, faced technical issues with MyVote preventing them from requesting absentee ballots, or resulting in their absentee ballot request going unnoticed.  *See supra* at 7-8.  Other voters, like Plaintiffs Melody McCurtis and Maria Nelson, timely requested absentee ballots but never received them.[45]  They were not alone: more than 2,600 absentee ballots requested in Milwaukee were never sent as the result of

---

[41] SOPF ¶ 47.

[42] SOPF ¶ 49.

[43] SOPF ¶ 48.

[44] SOPF ¶ 50.

[45] SOPF ¶ 51.

a technical failure in the WisVote system and hundreds of absentee ballots were found undelivered to voters in Appleton, Oshkosh, and Fox Point.[46]  Issues at every level in the distribution chain contributed to the breakdown of effective and equitable absentee-ballot distribution.  Some municipalities but not others mailed registered voters absentee-ballot-request forms.[47]  Inadequately staffed offices were nearly overwhelmed by the demand for absentee ballots.[48]  Clerks across the state reported a shortage of 600,000 absentee-certificate envelopes for voters to use when returning their absentee ballots.[49]  And issues with mail delivery led to absentee ballots never reaching voters or being returned to the clerks' offices.[50]

Assuming an absentee ballot safely made its way to the requesting voter ahead of the election, there was no guarantee the ballot would be received and counted.  Wisconsin law requires the rejection of absentee ballots that do not *arrive* at the polling place by 8 p.m. on election day.  Wis. Stat § 6.87(6).  Under the Supreme Court's order, "a voter's absentee ballot [had to] be either (i) postmarked by election day, April 7, 2020, and received by April 13, 2020, at 4:00 p.m., or (ii) hand-delivered as provided under state law by April 7, 2020, at 8:00 p.m." *RNC*, 140 S. Ct. at 1207.

For many voters at high risk from COVID-19, including Plaintiffs Jill Swenson and Nelson, hand-delivering a ballot to the municipal clerk was not an option—social distance was imperative to preserve their health and safety.[51]  While Defendant Wolfe identified absentee-ballot drop-boxes as a potential solution—in which voters could return ballots while maintaining

---

[46] SOPF ¶¶ 53-54.

[47] SOPF ¶ 55.

[48] SOPF ¶ 56.

[49] SOPF ¶ 57.

[50] SOPF ¶ 58.

[51] SOPF ¶ 62.

social distancing—the idea was not uniformly required or implemented.[52]  Similarly, drive-through and curbside voting was not widely administered.[53]  Even ordinary in-person absentee voting was restricted.  In Green Bay, for example, in-person absentee voting was confined to a single site that was open for only ten weekdays with sporadic hours.[54]  In Milwaukee, the city briefly had just three in-person early absentee voting sites; then had no early absentee voting sites for nearly a full week; and finally opened a single drive-through absentee voting location at the municipal building, which was inconvenient for voters in other parts of the city—especially those without access to a car.[55]

Another option for returning an absentee ballot was mailing it to the clerk's office.  By Defendants' own analysis, authorizing the acceptance of ballots postmarked by election day (and received by 4 P.M. on April 13), rather than received by election day, resulted in 79,054 ballots being counted that would have otherwise been rejected.[56]  But Defendants failed to promulgate rules or issue guidance with respect to postmarks to ensure the uniform and fair treatment of ballots received by mail.[57]  Clerks received ballots bearing no postmarks, two postmarks, or postmarks that did not clearly indicate a date.[58]  As a result, some jurisdictions counted ballots without a postmark, while others rejected such ballots.[59]  Ultimately, more than 120,000 people who requested absentee ballots did not return them as of election day; a significant proportion of

---

[52] SOPF ¶ 63.

[53] SOPF ¶ 64.

[54] SOPF ¶ 65.

[55] SOPF ¶ 66.

[56] SOPF ¶ 67.

[57] SOPF ¶ 68.

[58] SOPF ¶ 69.

[59] SOPF ¶ 70.

those voters were stymied by the many errors and obstacles to absentee voting that Defendants failed to prevent.[60]

Defendants' enforcement of Wis. Stat. § 6.87(2), the witness requirement for absentee ballots, also disenfranchised voters.  Under Wisconsin law, absentee ballots must be witnessed and signed by another adult citizen who is not a candidate on the ballot.  Wis. Stat. § 6.87(2), (4).  But for high-risk voters, including Plaintiff Swenson, satisfying this requirement meant coming into contact with others and putting their lives in danger.[61]  This Court has already recognized this danger.  *See DNC*, 2020 WL 1638374, at *2 (enjoining "the enforcement of Wis. Stat. § 6.87(2) as to absentee voters who have provided a written affirmation or other statement that they were unable to safely obtain a witness certification despite reasonable efforts to do so").  After the Seventh Circuit stayed enforcement of this aspect of this Court's injunction, Wis. Stat. § 6.87(2) deprived voters unable to secure a witness, including Plaintiff Swenson, of the ability to cast an effective absentee ballot.[62]

Voters with disabilities were especially burdened given the lack of effective options to vote absentee.  Because many of these voters felt unsafe voting in person, being unable to vote absentee meant that they were unable to vote at all.[63]  And voters who are blind or otherwise

---

[60] SOPF ¶ 74.

[61] SOPF ¶ 76.  For voters that live alone, satisfying the witness requirement while maintaining social distancing is problematic, even if the voter is not considered high risk.  SOPF ¶ 77; Remington Report at 13.  The Wisconsin Election Commission proposed an elaborate 11-part method for witnessing their ballots, which required that the "witness should be prepared to watch the voter mark their ballot through a window or by video chat."  SOPF ¶ 80; Remington Report at 13.  However, this complicated advice was not easily applied, and "may be difficult to understand by the homebound individual and witness," and "may be impractical in certain situations, such as for persons living in multi-level or multi-unit apartment complexes."  SOPF ¶ 81; Remington Report at 14.

[62] SOPF ¶ 83.

[63] SOPF ¶ 93.

require assistive technology to vote, for instance, faced unique challenges because Defendants did not offer online ballots accessible to these voters.[64]  Plaintiff DRW, for instance, was in contact with a blind voter who was both unable safely to vote in person during the pandemic and who lacked a private and independent at-home voting option.[65]

> ### 3.   *Insufficient Poll Workers Led To A Significant Reduction In Poll Locations.*

Nearly a month before the April 7 election, Defendants began to suspect that poll worker shortages would reduce voting access.[66]  According to a survey conducted by Defendants, one week before the election 111 voting jurisdictions believed they would not have enough workers to open even one polling place on election day, and 126 additional jurisdictions thought they would not have enough workers to open "all desired polling places."[67]  In a memorandum issued to clerks across Wisconsin on March 13, 2020, Defendants, aware of the impending shortages, stated that municipalities had attempted to recruit extra poll workers, and that the Commission was trying to assign state and county employees to serve as reserve poll workers.[68]

Wisconsin law made it unlikely that municipal and county clerks could solve their poll worker problems on their own:  Wisconsin statutes mandate that each election official, including each poll worker, be "a qualified elector of a county in which the municipality where the official serves is located," Wis. Stat. § 7.30(2). [69]  As a consequence, jurisdictions hit the hardest by poll worker reductions were unable to recruit replacement poll workers from other parts of the state.

---

[64] SOPF ¶ 97.

[65] SOPF ¶ 96.

[66] SOPF ¶ 98.

[67] SOPF ¶ 99.

[68] SOPF ¶ 100.

[69] SOPF ¶ 101.

And while Defendants suggested that counties could serve as a clearinghouse for available election inspectors, they made no efforts to facilitate or coordinate intra-county poll worker sharing.[70]

Without a statewide system to address poll worker shortages, some jurisdictions were forced to close a staggering number of polling places, while others were largely unaffected. Milwaukee, which is home to 69.4% of Wisconsin's Black population,[71] was able to open only five of its usual 180 polling sites.[72]  As a result, voters, including Plaintiff McCurtis, were forced to endure wait times of up to two-and-a-half hours to cast an in-person ballot.[73]  Milwaukee Election Commission executive director Neil Albrecht told reporters that he learned through media reports that National Guard members could be used at polling sites—a request he had made in the lead up to the election, but was denied at the time.[74]  Had Albrecht known about the National Guard's availability earlier, Milwaukee could have opened additional voting centers.[75] In Green Bay, the city's 31 polling sites were reduced to just two high school gymnasiums.[76] Voters faced wait times of up to four hours.[77]  Waukesha, a city of 70,000, was only able to open one of its polling places.[78]

---

[70] SOPF ¶ 102.

[71] SOPF ¶ 103.

[72] SOPF ¶ 104.

[73] SOPF ¶ 105.

[74] SOPF ¶ 106.

[75] SOPF ¶ 107.

[76] SOPF ¶ 108.

[77] SOPF ¶ 109.

[78] SOPF ¶ 110.

Meanwhile, some municipalities were able to mitigate the damage.  Madison, for example, was able to open 66 of its usual 92 polling sites.[79]  Madison City Clerk Maribeth Witzel-Behl credited the city's commitment to staffing polling locations, noting that the Emergency Operations Center and Planning staff pushed to fill shifts.[80]  Generally, smaller towns and suburban areas were less affected by the pandemic, more fully staffed, and had shorter wait times.[81]  Even some cities in Milwaukee County, such as Wauwatosa and Whitefish Bay, reported empty polling places with short wait times.[82]

4.    *Defendants Failed To Ensure The Polling Places That Remained Open Were Safe.*

Not only did Defendants fail to ensure an adequate number of polling places, they failed to ensure voters' safety at polling locations that remained open.  As Defendants acknowledged in a memorandum summarizing the April 7 election, they knew "in early March that local election officials were unable to procure supplies needed for in-person voting."[83]  Indeed, Defendants themselves experienced trouble procuring necessary supplies.[84]  Yet, although some of those supplies—such as PPE, masks and gloves, and equipment to sanitize voting machines—were ultimately delivered, Defendants took no action to require voters or poll workers to employ those supplies or take other precautions to maintain safety at polling places.[85]

---

[79] SOPF ¶ 111.

[80] SOPF ¶ 112.

[81] SOPF ¶ 113.

[82] SOPF ¶ 114.

[83] SOPF ¶ 115.

[84] SOPF ¶ 116.

[85] SOPF ¶ 117.

In Milwaukee, for example, voters were crowded together indoors for much of the hours-long wait to vote, such that social distancing was impossible to maintain.[86]  Plaintiff McCurtis, who was forced to vote in person at Washington High School in Milwaukee, noted that officials made no attempt to enforce social distancing and did not provide PPE to voters.[87]  When she finally made it to the front of the line, no sanitized pens were made available for voters to use.[88]  Voters in other cities experienced a similar lack of safety protocols.  In Green Bay, voters were not directed to use sanitization supplies (although poll workers did).[89]  In Oshkosh, poll workers wore masks, but not properly, and reused paper towels to clean voter booths between voters.[90]  And in Beloit, many poll workers were not wearing any PPE at all.[91]

These outcomes were preventable through the exercise of reasonable efforts.  Indeed, in the absence of any guidance from Defendants, some cities took it upon themselves to ensure safe in-person voting on election day.  In Madison, city workers erected Plexiglas barriers to protect poll workers.[92]  The Mayor of Neenah, Dean Kaufert, similarly had Plexiglas screens erected.[93]  Mayor Kaufert also advocated use of Q-tips and aluminum foil to make reusable touchscreen styluses to reduce the risk of touching potentially contaminated poll books.[94]  The city of Fitchburg sent out detailed notes explaining how poll workers and voters would be kept safe:

---

[86] SOPF ¶ 118.

[87] SOPF ¶ 120.

[88] SOPF ¶ 121.

[89] SOPF ¶ 122.

[90] SOPF ¶ 123.

[91] SOPF ¶ 124.

[92] SOPF ¶ 126.

[93] SOPF ¶ 127.

[94] SOPF ¶ 128.

equipment was to be wiped down every 15 minutes, lines were to be taped off to encourage social distancing, and all poll workers were to be given masks and gloves.[95]

5. *Defendants' Failures Arbitrarily Impacted Certain Voters And Municipalities More Than Others.*

Defendants' failures, and the ensuing electoral breakdown, had an arbitrary and disparate impact on certain voters and jurisdictions. Dr. Anthony Fowler—an Associate Professor at the Harris School of Public Policy at the University of Chicago, whose research applies econometric methods to questions in political science, including elections and political representation— analyzed voter turnout data to determine whether and to what extent Wisconsin voters were deterred from voting by COVID-19 in the April 2020 election. Dr. Fowler found that the effects of COVID-19 on the April 2020 election "systematically harmed" those who had not previously voted absentee, those in urban areas, and those in economically depressed communities.[96]

In Milwaukee County, the county with the highest COVID-19 prevalence in the state at the time of the election, turnout was at least 4.3 percentage points lower than expected when controlling for prior voter histories.[97] This is a lower-bound estimate based on the assumption that there was no deterrent effect in counties with the lowest COVID-19 prevalence, and thus likely understates the true impact on turnout.[98] Turnout was particularly low not just in Milwaukee County, but also in other urban zip codes where people regularly rely on public transportation, in economically depressed zip codes with higher rates of unemployment, and in zip codes with greater shares of residents without health insurance.[99]

---

[95] SOPF ¶ 129.

[96] SOPF ¶ 130; Report of Anthony Fowler, Ph.D. ("Fowler Report"), at 20.

[97] SOPF ¶ 133; Fowler Report at 9.

[98] SOPF ¶ 134; Fowler Report at 9.

[99] SOPF ¶ 135; Fowler Report at 17.

As one might expect, the pandemic especially affected in-person voting.[100]  In the counties with high prevalence of COVID-19, in-person voting decreased by 7.4 percentage points, when compared to the counties with low prevalence.[101]  So, for example, in Milwaukee County, where there were nearly 490,000 voters in Dr. Fowler's sample, approximately 36,000 were deterred from voting in person.[102]  While COVID-19 may have increased absentee voting, this effect was not nearly large enough to make up for the decrease in voting at the polls.[103]

The pandemic also resulted in significantly lower than expected turnout for those who had not cast a ballot by mail in previous statewide elections.  Voters across the state who had not previously navigated the absentee ballot process—68 percent of the registered voters in Dr. Fowler's sample—were 7.5 percent less likely to vote in the April 2020 election than other registered voters.  Applying this estimate to the number of registered voters who had never before voted absentee, Dr. Fowler estimated that approximately 166,000 people across the state who had not previously voted by mail were deterred from voting in April 2020.[104]  This effect varied from counties with the lowest COVID-19 prevalence to the highest COVID-19 prevalence.  In higher-prevalence counties like Milwaukee County, as many as 9.2 percent of voters who had never voted by mail—at least 30,000 people—were deterred from voting.[105]

Electoral failures in April also disproportionally affected older voters and minority communities.  Individuals over the age of 65—a demographic usually overrepresented at the polls—were 6.2 percentage points less likely to vote in the April 2020 election compared to other

---

[100] SOPF ¶ 136; Fowler Report at 10-11.

[101] SOPF ¶ 137; Fowler Report at 11.

[102] SOPF ¶ 138; Fowler Report at 11.

[103] SOPF ¶ 139; Fowler Report at 10.

[104] SOPF ¶ 140; Fowler Report at 11-12.

[105] SOPF ¶ 142; Fowler Report at 12.

voters in the same counties with the same voting histories, whether or not they lived in a county with high COVID-19 prevalence.[106]

Turnout was also lower than expected for Black and Hispanic communities, relative to other communities.  Based on the available data, compared to zip codes that are entirely non-minority, turnout in hypothetical zip codes consisting entirely of Black or Hispanic residence was 14.8 and 16.6 percentage points lower, respectively, than would be expected for other voters in the county with the same prior voting history.[107]  Applying these results to actual zip codes, Dr. Fowler found, for example, that the zip code 53204, which consists of 70 percent Hispanic residents and 11 percent Black residents, had a turnout 13 percentage points lower than expected compared to a zip code with no Hispanic or Black residents but identical voting history.[108]  Similarly, Dr. Fowler found that turnout was 14 percent lower than expected in zip code 53206, which has 94 percent Black residents and 2 percent Hispanic residents.[109]  In all, Dr. Fowler identified 14 zip codes where minority turnout dropped by more than 5 percentage points compared to similarly situated voters with identical voting history.[110]

---

[106] SOPF ¶ 143; Fowler Report at 13-14.

[107] SOPF ¶ 145; Fowler Report at 14.

[108] SOPF ¶ 146; Fowler Report at 14-15.

[109] SOPF ¶ 147; Fowler Report at 15.

[110] SOPF ¶ 148; Fowler Report at 15.

III.   **ABSENT JUDICIAL INTERVENTION, DEFENDANTS' FAILURES ARE
PRACTICALLY CERTAIN TO RECUR IN THE NOVEMBER ELECTION.**

A.   **COVID-19 Will Pose A Substantial Health Risk To Voters For The
Remainder Of 2020.**

1.   *COVID-19 Continues To Spread Throughout Wisconsin And Will Still Be
A Major Public Health Concern During The Remaining Months Of 2020.*

Since Wisconsin's first COVID-19 case on February 5, 2020, the number of cases has

consistently increased, with more than 23,000 Wisconsinites testing positive for the disease.[111]

Importantly, the state continues to experience "community spread," meaning that there are too

many COVID-19 cases to trace and isolate infections.[112]

According to a comprehensive model developed by the Institute for Health Metrics and

Evaluation (IMHE) at the University of Washington, "the evolution of the epidemic depends on

the balance between relaxed social distancing, increasing temperature, and rising rates of testing

and contact tracing."[113]  Because many states have begun to reopen, IMHE Director Dr.

Christopher Murray "expects that the epidemic in many states will now extend through the

summer."[114]  Indeed, in the week ending June 20, 10 states saw all-time highs in their seven-day

average number of new positive COVID-19 cases.[115]  Wisconsin is not immune from the

potential increase in caseload that accompanies reopening.  Social distancing metrics (*e.g.*, data

from cell phones) indicate that social distancing in Wisconsin decreased from April to May.[116]

And given that the "Safer at Home" Order was in effect during the April election, but was later

---

[111] SOPF ¶ 214.

[112] SOPF ¶ 215; Remington Report at 6.

[113] SOPF ¶ 216; Remington Report at 10.

[114] SOPF ¶ 217; Remington Report at 10.

[115] SOPF ¶ 218.

[116] SOPF ¶ 219; Remington Report at 7.

overturned by the Wisconsin Supreme Court, social distancing rates are likely to keep dropping.[117]

Further, even assuming that "warming seasonal temperatures…could help slow transmission" during the summer (which is far from clear), the November Election will occur in the fall, when decreasing temperatures may very well trigger a second wave of COVID-19.[118] Indeed, experts including Dr. Anthony Fauci have warned of a "bad fall and a bad winter" that may result in the increased spread of COVID-19.[119]

Based on the epidemiology of COVID-19 transmission in Wisconsin, there will accordingly be a significant risk of contracting and transmitting COVID-19 during the November 2020 election in Wisconsin.[120]

2. *The Harms Caused By COVID-19 In The November Election Are Likely To Be Greater, Not Less, Than In The April Election.*

As noted above, the spread of COVID-19 is likely to continue throughout the summer and into the fall.  The result:  absent judicial intervention mandating significant changes, voters will face substantial health risks in their efforts to exercise their right to vote.  Indeed, given the increased participation rate in the November general election relative to the April primary election, the risk of COVID-19 spread will *increase* unless appropriate measures are taken.  In recent presidential elections, 200-300% more people have participated in the November general election than in the April primaries.[121]  Given the confined nature of many polling places, the need for additional space to accommodate additional voters in November, and the continued

---

[117] SOPF ¶ 220; Remington Report at 7.

[118] SOPF ¶ 222-23; Remington Report at 10.

[119] SOPF ¶ 223.

[120] SOPF ¶ 225; Remington Report at 8-11.

[121] SOPF ¶ 228; Remington Report at 4.

mandate that all absentee voters abide by the witnessing requirement, transmission risk in November will thus grow exponentially absent significant changes.[122]

Increased voter demand for absentee ballots and online registration will also continue to strain the MyVote platform, likely resulting in outages comparable to or greater than those faced in April.[123]  The demand for more than double the number of absentee ballots will also make it more likely that voters either fail to receive their ballots or that those ballots themselves fail to make it back to their polling locations in time.[124]  In short, the problems in November are likely to be the same problems faced in April, only worse.[125]

**B.    Defendants Have Not Adopted Adequate Measures To Ensure That The Failures Of The April 7 Election Do Not Recur.**

In the months following the April 7 election, Defendants have shown that they are either unwilling or unable to ensure all Wisconsinites have a safe, practical means to vote.  To be sure, they have urged Wisconsinites to vote absentee,[126] and they now intend to mail absentee ballot applications to nearly all registered voters who have not already requested one.[127]  They have issued "recommendations" in varying degrees of specificity.[128]  And they have reported data on thousands of disenfranchised voters.[129]  But they have not taken the necessary concrete actions to

---

[122] SOPF ¶ 229; Remington Report at 9, 13.

[123] SOPF ¶ 230; Kennedy Report ¶¶ 44, 47-48.

[124] SOPF ¶ 231; Kennedy Report ¶¶ 104-106, 110, 125.

[125] SOPF ¶ 238.

[126] SOPF ¶ 239.

[127] SOPF ¶ 243.

[128] SOPF ¶ 240.

[129] SOPF ¶ 242.

*solve* the vast majority of the myriad problems they and Plaintiffs have identified, and that Wisconsin voters experienced in April.[130]

Time grows short.  Much of the relief sought by Plaintiffs must be granted soon to improve safety and voting access in the upcoming November election.[131]  Estimates suggest that more than 1.8 million Wisconsin voters will request an absentee ballot for the November election.[132]  Action must be taken now to prepare Wisconsin's poll workers and clerks for this massive surge.  Relief on the eve of the election will be too late.[133]

Moreover, Defendants cannot implement certain elements of the requested relief without judicial intervention.  Wisconsin statutes prevent Defendants from making some of the necessary changes to policies and practices.  These include the requirement that each election official be an elector of the county in which the municipality is located (Wis. Stat. § 7.30(2)); that voters secure an in-person witness (Wis. Stat. § 6.87(2)); that absentee ballots must be delivered to the polling place no later than 8 p.m. on election day (Wis. Stat § 6.87(6)); that absentee ballots not be counted before election day (Wis. Stat. §§ 6.88, 7.51-.52); and that locations for in-person absentee voting must have been determined *already*, by June 11, 2020 (Wis. Stat. § 6.855(1)).[134] Absent judicial intervention, Defendants will be powerless to make necessary adjustments that run afoul of these statutory mandates.

---

[130] SOPF ¶ 244; Kennedy Report ¶¶ 24-34.

[131] Kennedy Report ¶ 37.

[132] SOPF ¶ 246.

[133] *See, e.g.*, *Purcell v. Gonzalez*, 549 U.S. 1, 4, 5 (2006) ("[c]ourt orders" issued "[a]s an election draws closer" "can … result in voter confusion and consequent incentive to remain away from the polls"); *RNC*, slip op. at 2 ("By changing the election rules so close to the election date ... the District Court contravened this Court's precedent" holding that "lower federal courts should ordinarily not alter the election rules on the eve of an election." (citing *Purcell*)).

[134] SOPF ¶ 247.

The pandemic has rendered a "normal" election an impossibility.  Practices that were once routine are now questionable at best, and dangerous at worst.[135]  Dr. Patrick Remington, a veteran epidemiologist and the Director of the Preventative Medicine Residence Program and Professor Emeritus in the University of Wisconsin-Madison, recommends a series of public health-oriented measures that would protect the safety and wellbeing of both poll workers and electors alike.[136]  Kevin J. Kennedy, a seasoned election administration official who served as Wisconsin's Chief Election Officer for more than 33 years, likewise offers practicable and simple solutions to the problems posed by COVID-19 that draw on his nearly four decades of experience administering Wisconsin's elections.[137]  Defendants must implement these measures to ensure the safety of all Wisconsinites and to protect access to the ballot in Wisconsin.[138]  And this Court should enjoin statutory requirements that prevent the free and fair exercise of the right to vote in Wisconsin.

## LEGAL STANDARD

To prevail on a motion for a preliminary injunction, a party must show that it has (1) "some likelihood of success on the merits" and (2) "no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied."  *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012).  If this initial showing is successful, the court must "weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one."  *Harlan v. Scholz*, 866 F.3d 754, 758 (7th Cir. 2017).  "In addition, the court must ask whether the preliminary injunction is in the public interest."  *Id.*  This Court

---

[135] Remington Report at 8-9.

[136] Remington Report at 14-17.

[137] Kennedy Report ¶ 41.

[138] Kennedy Report ¶¶ 35-41.

"applies a sliding scale in weighing whether preliminary relief is warranted." *Planned Parenthood of Wis., Inc. v. Van Hollen*, 963 F. Supp. 2d 858, 864 (W.D. Wis. 2013). "[T]he more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while supporting some preliminary relief." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).

## ARGUMENT

## I. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR STATUTORY CLAIMS.

Plaintiffs bring claims for relief on both statutory and constitutional bases. Specifically, Plaintiffs assert violations of Section 11(b) of the Voting Rights Act and the Americans with Disabilities Act, as well as the First and Fourteenth Amendments. The merits of Plaintiffs' statutory claims are addressed first, in Section I, and the merits of Plaintiffs' constitutional claims are addressed in Section II. *See Ameritech Corp. v. McCann*, 403 F.3d 908, 911 (7th Cir. 2005) ("We shall tackle the issues in the right order, starting with the statute and moving to the Constitution only to the extent necessary in light of the statutory decision.").

### A. Plaintiffs Are Likely To Prevail On Their Claim That Defendants' Failure To Ensure Safe Voting Conditions Violates Section 11(b) Of The Voting Rights Act (Count 1).

Section 11(b) of the Voting Rights Act makes it unlawful for any person to "intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b) (formerly 42 U.S.C. § 1973i(b)). As explained below, the statute's reach includes governmental action that puts a voter in harm's way, even when the government does not directly inflict the harm or intend the harm to be inflicted. Defendants administer an election system that, under current conditions, does exactly that: it exposes voters to unnecessarily elevated risk of harm by failing to ensure safe opportunities for

in person voting and simultaneously failing to provide adequate absentee voting procedures to accommodate all voters who might avail themselves to that option.  By running an election system whose multiple deficiencies deprive voters of a safe way to participate in future elections, Defendants violate Section 11(b).

Section 11(b) sweeps broadly to prohibit any actions that have the effect of intimidating voters, regardless whether the defendant intended the intimidation.  Congress modeled Section 11(b) on Section 131(b) of the Civil Rights Act of 1957, 52 U.S.C. § 10101(b) (formerly 42 U.S.C. § 1971(b)), copying Section 131(b) verbatim in almost every respect, save one.  Section 131(b) imposes a distinct *mens rea* element, proscribing intimidation "for the purpose of" interfering with voting.  That statutory language is absent from Section 11(b):  "The text of § 11(b), unlike § 131(b), plainly omits 'for the purpose of,' suggesting § 11(b)'s deliberately unqualified reach."  *LULAC Richmond Regional Council v. Pub. Interest Legal Found.*, 2018 WL 3848404, at *4 (E.D Va. Aug. 13, 2018); *see also* Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. Rev. L. & Soc. Change 173, 204 (2015) ("Section 11(b) does not require a plaintiff to make any showing with regard to the defendant's intent.").[139]

Reading Section 11(b) next to Section 131(b) is important, because the operative language of Section 11(b) is otherwise indistinguishable from Section 131(b), and quite broad— prohibiting voter intimidation in all its forms.  No act of violence, or any physical intimidation, is required.  *See New York v. Horelick*, 424 F.2d 697, 700 (2d Cir. 1970) (Friendly, J.) (contrasting

---

[139] The legislative history confirms that "no subjective purpose or intent need be shown."  H.R. Rep No. 89-439, at 30-31 (1965) ("no subjective purpose or intent need be shown"); *see also* Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary, 89th Cong. 16 (1965).

the Voting Rights Act to another provision of federal law that the court found applied only to

"violent activity").  Conducting an election in a manner that causes potential voters to fear that

participation will jeopardize their safety is sufficient to violate the statute.  Critically, Section

131(b) has long been interpreted to prohibit a jurisdiction from taking actions that have the effect

of exposing voters to unsafe or intimidating conditions.  For instance, a sheriff cannot look the

other way while private parties intimidate voters:  "The law is clear that a [jurisdiction] cannot

effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge

them whatever the motive may be."  *United States v. Clark*, 249 F. Supp. 720, 729 (S.D. Ala.

1965); *see Katzenbach v. Original Knights of the Ku Klux Klan*, 250 F. Supp. 330, 341 (E.D. La.

1965).[140]  Indeed, the Department of Justice has pursued consent decrees reflecting this

understanding of the statute.[141]  Given Congress's intent to incorporate Section 131(b)'s

definition of intimidation into Section 11(b)—a conclusion buttressed by the statutory text and

legislative history—Section 11(b)'s prohibition on unlawful voter intimidation must likewise

---

[140] In *Katzenbach*, the court discussed an earlier set of orders in *Hicks v. Knight*, Civ. No.15,727 (E.D. La.), 10 Race Rel. L. Rep. 1504, 1507-09 (1965), where the district court found that a city failed to take reasonable measures to protect the Bogalusa Voters' League from violence.  The district court not only enjoined the city from failing to protect plaintiffs in exercising their civil rights but went on to order the chief of police to publish a plan to rectify the failure to protect, including a chain of command and system for responsibility, written instructions for police officers to provide adequate protection, and a requirement that officials certify that they were adhering to the court's orders.  *See Hicks*, 10 Race Rel. L. Rep. at 1507-08; *see generally Katzenbach*, 250 F. Supp. at 342 (citing *Hicks v. Knight*, noting that the police had "fail[ed] to use all reasonable means to protect" citizens from assault, harassment, and intimidation when exercising their civil rights, and observing that such conduct constitutes unlawful intimidation).

[141] *See* Hearing on the U.S. Commissioner System Before the Subcomm. on Improvements in Judicial Machinery of the S. Comm. on the Judiciary, 189th Cong. 138-39 (1965) (*available at* https://bit.ly/2UZGsj6) (describing DOJ consent judgment in *United States v. Mathews* that enjoined defendants "from refusing reasonable police protection to any person in need thereof" when exercising the right to vote or encouraging others to exercise the right to vote).

prohibit government officials from conducting elections without mitigating threats to voters' safety at polling places.[142]

Defendants' failure to provide safe in-person voting during the COVID-19 pandemic poses a manifest threat to voters. *See supra* at 13-24. Take the April 7 election. Some voters, like Plaintiff McCurtis, faced conditions that would cause any reasonable person to fear for her safety—large numbers of people (caused by consolidation of polling places), inadequate social distancing, and insufficient personal protective equipment. Those conditions posed a threat of infection to McCurtis, who lives with her immunocompromised mother, causing McCurtis to fear that she would infect and seriously harm her own mother.[143] Voters at high risk from COVID-19, like Plaintiffs Swenson and Nelson, were so intimidated and threatened by this voting environment that they reasonably concluded that their only safe option to exercise the franchise was to vote absentee.[144] Yet Defendants' failures to ensure effective absentee voting options meant that those voters were disenfranchised by the combination of unsafe in-person voting options and ineffective absentee voting procedures.[145] Defendants' failure to ensure safe voting conditions disenfranchised voters on a wide scale. Thousands of voters were deterred from or otherwise prevented from voting, with the voters who live in hardest hit parts of the state

---

[142] Importantly, Section 11(b) is not limited in its application to government officials. *See LULAC v. Pub. Interest Legal Found.*, 2018 WL 3848404, at *3 (holding that "the statutory text is dispositive" in showing "Congressional intent to reach both government and private conduct under § 11(b)"). For that reason, it may very well apply in situations where a private party fails to protect voters from an external threat. But existing case law makes absolutely clear that government officials may not stand by when the decision to vote puts a person in peril; failure to protect voters in those circumstances violates § 11(b).

[143] SOPF ¶¶ 161-71. That Plaintiff McCurtis in fact voted makes no difference—voter intimidation remains actionable under federal law even when individual voters persist in casting their ballots. *See, e.g.*, *United States v. McLeod*, 385 F. 2d 734, 741 (5th Cir. 1967).

[144] SOPF ¶¶ 161, 166, 174-75.

[145] SOPF ¶¶ 164-71, 175-78.

experiencing the highest rates of disenfranchisement.[146]  *See supra* at 17-19.  In Milwaukee County alone, about 36,000 voters were deterred from voting at the polls by the unsafe conditions.[147]

Absent judicial intervention, Defendants will conduct the November election in a manner that again violates Section 11(b) by exposing voters to an unsafe and threatening environment during the pandemic.  The best available epidemiological evidence shows that administering ordinary in-person voting processes this fall would imperil most voters, a burden that will fall especially hard on immunocompromised individuals.[148]  And yet Defendants have still not taken "[s]ufficient measures to ensure that the significant failures of the April 7 election are not repeated in November."[149]  *Supra* at 22-24.

The dangers posed by voting during COVID-19, however, are not inevitable.  As a practical matter, the dangers voters will face in the November election will depend on how Defendants administer the elections:  whether they take necessary measures to ensure voters' safety, or whether they enforce statutes that, applied in the current pandemic, place voters at risk.  Crucially, the level of risk voters face during the pandemic is not fixed or merely a matter of forces beyond Defendants' control.  Defendants continue to administer an election system whose interlocking elements increase the risk of voting.  The combined effects of Defendants' failure to provide safe and reliable opportunities to register before election day; their failure to ensure safe opportunities to vote in person; and their failure to ensure adequate absentee voting procedures to accommodate voters who choose not to vote in person cumulatively intimidate Plaintiffs and

---

[146] *See, e.g.*, Fowler Report at 8-20.

[147] Fowler Report at 11.

[148] *See, e.g*., Remington Report at 5-6, 8-11, 13.

[149] Kennedy Report ¶ 32; *see also id.* ¶¶ 31, 33-34.

other voters by depriving them of safe opportunities to vote.[150]  This Court can provide specific

relief that would ensure voters enjoy substantially safer conditions when voting in November.[151]

Of course, Defendants are not responsible for causing COVID-19, and Plaintiffs do not

ask this Court to superintend the state's general public health policy.  But Defendants *are* liable

under federal law for administering an election in a manner that threatens or intimidates voters.

In the upcoming November election, that means Defendants must administer Wisconsin's

election laws and procedures consistent with the demands of public health during a pandemic.  It

is possible to administer the elections consistent with those demands.[152]  Refusing to do so, in

violation of Section 11(b), forces each voter to make the Hobson's choice between safety and the

right to vote.  The Voting Rights Act provides a judicial remedy when election officials

administer an election that threatens to exact such a cost.

### B.   Plaintiffs Are Likely To Prevail On Their Claim That Defendants' Failure To Make Reasonable Modifications For Voters With Disabilities Violates The Americans With Disabilities Act (Count 5).

Title II of the ADA addresses state and local government programs, including the

administration of elections.  Title II's "primary mandate" is that "'no qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity.'"  *Lacy v. Cook Cty.*, 897 F.3d 847, 852 (7th Cir. 2018)

(quoting 42 U.S.C. § 12132).  "Voting is a quintessential public activity."  *Nat'l Fed'n of the*

*Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016); *see Disabled in Action v. Bd. of Elections in*

---

[150] Kennedy Report ¶¶ 49-61, 62-97, 98-151.

[151] Kennedy Report ¶¶ 42-156 (outlining "feasible and practicable actions" Defendants can take to ensure that Wisconsin voters can fully and safely access the ballot for the November 3, 2020 election).

[152] Kennedy Report ¶¶ 42-156; Remington Report at 14-17.

*City of N.Y.*, 752 F.3d 189, 199 (2d Cir. 2014).  "Title II of the ADA requires state and local governments … to ensure that people with disabilities have a full and equal opportunity to vote. The ADA's provisions apply to all aspects of voting, including voter registration, site selection, and the casting of ballots, whether on Election Day or during an early voting process."[153]

"To provide a *prima facie* case of discrimination under Title II, a plaintiff must show: (1) that he is a qualified individual with a disability; (2) that he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such entity; and (3) that the denial or discrimination was by reason of his disability."  *Lacy*, 897 F.3d at 853.  "It is well established that a failure to make 'reasonable modifications in policies, practices, or procedures' can constitute discrimination under Title II."  *Id.*  If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to show that the modification "would fundamentally alter the nature of the service."  28 C.F.R. §§ 35.130(7)(i), 35.164; *see, e.g.*, *Lamone*, 813 F.3d at 508.

1. *Plaintiffs Are Qualified Individuals With Disabilities And An Organization That Represents Them.*

As relevant here, the term disability means "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  Plaintiffs Swenson and Nelson fall within that definition.  Plaintiff Swenson suffers from chronic obstructive pulmonary disease (COPD), "an inflammatory lung disease that causes obstructed airflow from the lungs."[154]  Ms. Swenson's COPD substantially limits her ability to breathe and her respiratory function, which means, during the COVID-19 pandemic, that she is unable to

---

[153] U.S. Dep't of Justice, "The Americans with Disabilities Act and Other Federal Laws Protecting the Rights of Voters with Disabilities," *available at* https://www.justice.gov/file/69411/download.
[154] SOPF ¶ 150.

safely leave her home.[155]  42 U.S.C. § 12102(2).  Plaintiff Nelson, meanwhile, "has breast cancer and is currently undergoing treatment."[156]  *See* 28 C.F.R. §§ 35.108(b)(2), (d)(2)(iii)(F).  DRW, moreover, represents the interests of voters who are blind, including one such voter who was unable to safely vote in person during the pandemic and lacked a private and independent at-home voting option.[157]  *See* 28 C.F.R. §§ 35.108(d)(2)(iii)(B).

> 2.  *Plaintiffs Have Been Denied Access To A Government Program, And Defendants Cannot Prove That The Proposed Modifications Are Unreasonable.*

"[U]nder the ADA, a public entity must reasonably accommodate a qualified individual with a disability by making changes in rules, policies, practices, or services when needed." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 782-83 (7th Cir. 2002); 28 C.F.R. § 35.130(b)(7) (requiring reasonable modifications in the context of Title II).  Of course, the proposed modification must be reasonable, but the burden of proving reasonableness in this context "is not a heavy one."  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003); *see Lamone*, 813 F.3d at 507-08.  The plaintiff need only show that the modification is "reasonable on its face," *Oconomowoc*, 300 F.3d at 783, and then the burden shifts to the defendant to demonstrate unreasonableness or prove that it "would 'fundamentally alter' the program," *Lamone*, 813 F.3d at 508 (quoting 28 C.F.R. § 35.130(b)(7)(i)).

a. *The witness requirement*.  COVID-19 poses a dire threat to voters like Plaintiffs Swenson and Nelson who are at high risk for complications of COVID-19.[158]  Given these risks, these individuals must vote absentee—or not at all.  But Wisconsin law requires mail-in absentee

---

[155] SOPF ¶¶ 150-53.

[156] SOPF ¶ 172.

[157] SOPF ¶ 96.

[158] SOPF ¶¶ 2, 150, 179; Remington Report at 8.

voters to locate and secure an adult U.S. citizen witness to verify the ballot and sign the

envelope.  *See* Wis. Stat. § 6.87(2).  For a limited class of individuals who are

immunocompromised or otherwise at high risk from COVID-19, or who are actively infected

with COVID-19, and who are unable to secure a witness safely, this requirement imposes an

insuperable obstacle to absentee voting.[159]  *See also DNC*, 2020 WL 1638374, at *20.

     This barrier to access can easily be lifted.  The Court should waive the in-person witness

requirement for this limited class of voters who are unable to secure a witness safely, replacing it

with a self-verification on penalty of perjury.  *See, e.g.*, *Mary Jo C. v. N.Y. State and Local Ret.*

*Sys.*, 707 F.3d 144 (2d Cir. 2013) ("[W]e find nothing in the statutory phrase 'reasonable

modification' to suggest that Congress intended to exclude modifications that require violation or

waiver of mandatory state statutes in some circumstances."); *see also Oconomowoc*, 300 F.3d at

784 (modification reasonable "if it is both efficacious and proportional to the costs to implement

it").  Defendants cannot carry *their burden* to prove that this modification will impose

"significant financial or administrative costs" or "fundamentally alter[] the nature of the program

or service."  *Holzmueller v. Ill. High. Sch. Ass'n*, 881 F.3d 587, 594 (7th Cir. 2018); *see Disabled*

*in Action*, 752 F.3d at 202.

     The cost of substituting the witness-verification rule with another anti-fraud tool like a

self-certification is not "excessive in relation … to the benefits," *Vande Zande v. Wis. Dept. of*

*Admin.*, 44 F.3d 538, 543 (7th Cir. 1995), and would not "fundamentally alter the character" of

voting.  28 C.F.R. § 35.130(b)(7)(i); *see Lamone*, 813 F.3d at 508.  Plaintiffs ask only to be given

---

[159] Kennedy Report ¶ 128.

access to the ballot on par with non-disabled voters and other disabled voters able to secure a witness.[160]

   b. *Accessible online ballots*.  Defendants' failure to provide online ballot marking tools will also exclude those with vision and other disabilities that prevent them from reading or using a pen and paper ("print disabilities") from full participation in absentee and mail-in voting. Voters with print disabilities either vote in person on election day so they can vote privately and independently using accessible voting machines, or they are forced to give up their privacy and independence by having others read and mark their ballots at home.  *See* 28 C.F.R. §§ 35.130(b)(1)(ii) (public entities required to "[a]fford a qualified individual with a disability an opportunity to participate in [the] service that is … equal to that afforded others"); *Lamone*, 813 F.3d at 507 (holding that "by effectively requiring disabled individuals to rely on the assistance of others to vote absentee, defendants have not provided plaintiffs with meaningful access to

---

[160] On April 3, 2020, the Seventh Circuit stayed the portion of this Court's April 2 order that granted relief from § 6.87(2), ruling that the order "did not give adequate consideration to the state's interests in suspending this [the witnessing] requirement."  *DNC II*, Order at 3 (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004)).  That rationale is inapposite to the ADA analysis; while the *Anderson-Burdick* analysis involves a balancing test, the ADA does not.  There is no state interest sufficient to justify discrimination against voters with disabilities where, as here, a reasonable modification is available.  *See, e.g.*, *Dees v. Austin Travis Cty. Mental Health & Mental Retardation*, 860 F. Supp. 1186, 1191 (W.D. Tex. 1994) ("[T]he standard Congress has determined that should be applied in assessing the reasonableness of the modification under the ADA is not a balancing test of competing interests … but whether the modification can be made without fundamental alteration or undue burden such that disabled individuals will not be denied the equal opportunities enjoyed by others."); *cf. Eckles v. Consol. Rail Corp.*, 94 F.3d 1041, 1050 n.15 (7th Cir. 1996) (noting the ADA "provide[s] statutory factors to be considered in determining whether a particular accommodation would produce an 'undue hardship'").  Moreover, Plaintiffs do not seek to "categorically eliminate[] the witness requirement applicable to absentee ballot," *DNC II*, Order at 3; Plaintiffs seek to enjoin § 6.87(2) only with respect to voters who are immunocompromised or otherwise at high risk from COVID-19, or who are actively infected with COVID-19, who cannot safely secure an in-person witness. The effect of the Seventh Circuit's ruling on the *Anderson-Burdick* analysis for the November election is discussed below.  *See infra* at 44 n.182.

Maryland's absentee voting program"); *Disabled in Action*, 752 F.3d at 199 (emphasizing the importance of privacy and independence for voters with disabilities); *Drenth v. Boockvar*, 2020 WL 2745729, at *5 (M.D. Pa. May 27, 2020) (during COVID-19 pandemic, "Plaintiffs have also been denied the benefits of a public program—in this case the ability to vote privately and independently without being physically present at a polling location—because of their disability [i.e., print disabilities]."); *Cal. Council of the Blind v. Cty. of Alameda*, 985 F. Supp. 2d 1229, 1238 (N.D. Cal. 2013) ("[U]nder the terms of the ADA …, the covered entity must provide meaningful access to private and independent voting."); *see also* 28 C.F.R. §§ 35.130(b)(3), (8).[161]

But there are straightforward methods—methods that WEC currently does not employ—to allow voters with print disabilities to participate in absentee and mail-in voting without compromising their privacy and independence.  In particular, current Wisconsin law allows for military and overseas voters to receive a ballot electronically in compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. §§ 20301 *et seq*.[162]  As a first and simple step to accommodate voters with print disabilities, this option need only be extended and online ballots made accessible to voters who use screen reader and marking technologies.[163]  Voters with print disabilities could mark their ballots privately and

---

[161] Defendants are also required to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities … an equal opportunity to participate in" the government service.  28 C.F.R. § 35.160(b)(1).  These include "accessible electronic and information technology" such as the accessible absentee ballots Plaintiffs seek.  *Id.* § 35.104.

[162] Kennedy Report ¶¶ 90-94.

[163] In an ideal world, voters with print disabilities would be able to return their ballots electronically, so they do not have to rely on others for assistance with the envelope and mailing. But in the short term, until online returns can be safeguarded from fraud, providing these voters with private and independent access to absentee ballot marking at all is an important ADA-required remedy.

independently, and then print and mail them to the appropriate clerk.  This is a reasonable modification that Defendants are required to adopt under the ADA, particularly where in-person voting—the only other way these individuals can vote privately and independently—has not been made safe.  *See, e.g.*, *Lamone*, 813 F.3d at 506-10 (holding Maryland's online ballot marking tool was a reasonable modification that would allow individuals with print disabilities to participate equally in absentee voting).  Indeed, another federal court recently granted a preliminary injunction on this basis.  *See Drenth*, 2020 WL 2745729, at *6 (noting an extension of UOCAVA "offers the benefits of having been tested in Michigan's May 5, 2020 primary and providing a more user-friendly option for blind voters that is verifiably accessible" but declining to adopt a different remedy for the primary because the defendants could not implement that solution in just 12 days).[164]

## II.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.

### A.   Plaintiffs Are Likely To Prevail On Their Claim That Defendants' Election Administration And Various Provisions of Wisconsin Election Law Unduly Burden Their Right To Vote Under *Anderson-Burdick* (Count 3).

The right to vote, as embodied in the First and Fourteenth Amendments, is fundamental, and any alleged infringement on that right "must be carefully and meticulously scrutinized."  *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).  Under the balancing framework articulated in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992), a court must weigh "the character and magnitude of the asserted injury to the rights

---

[164] To prove causation under Title II, the plaintiff must show that she was denied access to a public service "by reason of" her disability.  *See Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 848-49 (7th Cir. 1999).  This is a relatively lax standard, requiring only "but for" causation.  *Id.*  There is no question that, but for their disabilities, Plaintiffs would have had equal access to the franchise.

protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434. In other words, the court must (1) "determine the extent of the burden imposed by the challenged provision"; (2) "evaluate the interest that the state offers to justify that burden"; and (3) "judge whether the interest justifies the burden." *DNC*, 2020 WL 1638374, at *11.

When voting rights are severely restricted, a law or practice "must be narrowly drawn to advance a state interest of compelling importance." *Id.* (citation omitted). But even less-severe burdens must "be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Id.* (citations omitted). "In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 605 (4th Cir. 2016).

Absent judicial intervention, several aspects of the upcoming elections are likely to impose unconstitutional burdens on the right to vote. As the April 7 election demonstrated, Defendants are likely to fail to ensure safe and accessible in-person voting, as well as adequate numbers of in-person polling locations for both election day and early (in-person) absentee voting. Wisconsin's statutory deadline for receipt of mail-in absentee ballots is again likely to disenfranchise thousands of voters. And Wisconsin's absentee-ballot witnessing requirement is likely to disenfranchise a discrete class of immunocompromised, high-risk, or infected individuals unable to safely secure a witness. Because each of these challenged practices and

laws severely burdens the right to vote and is not narrowly tailored to a compelling state interest, each is unconstitutional.[165]  *DNC*, 2020 WL 1638374, at *17.

        1.    *Failure To Ensure Safe In-Person Voting.*

      During the April 7 election, many polling locations, including in parts of the state most acutely affected by COVID-19, lacked the social distancing protocols and safety equipment—such as PPE and sanitary voting machines—necessary to ensure safe voting.[166]  *See supra* at 15-17.  Voters were thus forced to risk their health in order to exercise their fundamental right to vote.[167]  Both Wisconsin and national public health officials expect the pandemic will continue and might well intensify between now and November.  *See supra* at 20-22.  Yet Defendants have failed to take adequate and concrete steps to ensure that in-person absentee and election day voting sites will be administered with appropriate safety precautions in the upcoming elections to adequately protect voters from the known health risks posed by COVID-19.[168]

---

[165] Even if the Court were to deem one of these burdens significant but not severe, Defendants cannot articulate sufficiently weighty and legitimate state interests to justify the burdens imposed.  *See infra* at 38-46.  Moreover, the cumulative effect of these burdens is most certainly severe.  *See Burdick*, 504 U.S. at 435-37 (weighing the cumulative effect that Hawaii's ballot access laws had on plaintiff's First and Fourteenth Amendment rights); *Tenn. State Conference of NAACP v. Hargett*, 420 F. Supp. 3d 683, 710 (M.D. Tenn. 2019) (holding that "plaintiffs have demonstrated that these aspects of [Tennessee's Election Offenses] Act, functioning together, create a cumulative burden that is even more difficult to justify as a constitutional matter.").

[166] SOPF ¶¶ 120-25; Kennedy Report ¶¶ 24-29.

[167] SOPF ¶¶ 76-77, 227; Kennedy Report ¶¶ 24-29.

[168] The right to vote can be unjustifiably burdened under *Anderson-Burdick* through deficient election administration, not only problematic statutory requirements.  *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (Florida's deficient implementation of signature-match scheme established undue burden under *Anderson-Burdick*); *Common Cause/New York v. Brehm*, 2020 WL 122589, at *16 (S.D.N.Y. Jan. 10, 2020) (New York's deficient administration of its inactive-voter scheme established undue burden under *Anderson-Burdick*).

Defendants cannot articulate an interest sufficiently compelling to justify that severe burden on the right to vote.  It is feasible and practicable to implement adequate safety protocols that will significantly improve the opportunities for Wisconsin voters to access the ballot safely.[169]  These include employee temperature and wellness checks; providing and requiring masks or face coverings for employees and voters; installing cough and sneeze barriers between employees and members of the public; designing each polling location to allow for appropriate social distancing throughout the voting process; selecting larger in-person voting venues; mandatory hand-washing for poll workers; and thorough and continuous sanitization practices.[170]

Implementing such safety protocols, in accordance with medical and expert guidance, would not trespass on the State's interest in maintaining order in the election process—it would facilitate that interest.  Nor would providing safe in-person voting in any way diminish the State's interest in ensuring finality or certainty of elections, or preventing voter fraud.  The only conceivable countervailing interest Defendants could cite is administrative cost, but the cost of these safety measures will be moderate,[171]—and the need to protect Wisconsin voters from life-threatening health risks far outweighs the cost of implementing social distancing measures and supplying PPE.  *See Belitskus v. Pizzingrilli*, 343 F.3d 632, 646-47 (3d Cir. 2003) ("defraying the costs of elections" is not "of compelling importance"); *United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1254-55 (D. Utah 2017) ("Courts have repeatedly rejected the argument that cost is a sufficient state interest in election cases.").  Indeed, protecting the health and safety of its citizens *is* the State's paramount interest.  *Sinclair Ref. Co. v. City of Chicago*, 178 F.2d 214, 216 (7th Cir. 1949) ("The police power of the State is that power required to be exercised in order to

---

[169] Kennedy Report ¶¶ 35-41.

[170] Kennedy Report ¶¶ 39, 66; Remington Report at 14-17.

[171] Kennedy Report ¶¶ 38-39.

effectually discharge within the scope of the constitutional limitations its paramount obligation to promote and protect the public health, safety, morals, comfort and general welfare of the people."). Moreover, the COVID-19 safety costs associated with in-person voting are the same costs that will have to be assumed going forward to provide other in-person government services such as issuing permits and licenses, meeting with clients or citizens, and providing access to public information and records.[172]

2.      *Failure to Ensure Adequate Number of In-Person Polling Locations.*

Defendants are also likely to severely burden many Wisconsin voters' right to vote in the upcoming elections by failing to ensure an adequate number of in-person polling locations. *See League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) (enjoining prohibition on early voting sites on college campuses as unjustified burden due to additional travel distance for students). For example, in the April 7 election, Milwaukee closed 175 out of 180 polling sites, leaving voters to face wait-times of up to two-and-a-half hours, and in Green Bay, only 2 of 31 polling sites remained open and voters faced up to four-hour long waits.[173] *See supra* at 13-15. Not only did these closures of vast number of in-person polling locations result in exceptionally long wait times; the closures also caused dangerous overcrowding, contributing to the unsafe in-person voting conditions described above.[174] While the desire to protect poll workers from potential exposure is a compelling interest, allowing nearly all polling places to close is not a reasonably—let alone narrowly—tailored solution. Less restrictive means to protect poll-worker health while ensuring all voters are able to safely and effectively exercise their right to vote are available—including, e.g., providing and requiring

---

[172] Kennedy Report ¶¶ 38-39.

[173] SOPF ¶¶ 103, 105, 108-09.

[174] SOPF ¶ 119; *see also* Kennedy Report ¶ 87.

use of adequate PPE, implementing appropriate social distancing measures, staging polling locations appropriately, and spreading out the time, modes, and locations of voting.[175]  Yet Defendants have not taken these, or any other adequate steps to ensure that vast numbers of polling locations will not be closed again in the upcoming elections.  *See supra* at 13-15.

Further, by restricting the pool of available poll workers by county, Wisconsin law makes it likely that poll-worker shortages—and corresponding closures of polling locations—will recur in the upcoming elections.  Under Wis. Stat. § 7.30(2), each election official, including each inspector, must be "a qualified elector of a county in which the municipality where the official serves is located."  The county-residence requirement thus forbids recruiting inspectors from other parts of the state.  No compelling state interest justifies this arbitrary restriction, particularly in light of the massive poll-worker shortages in the April 7 election and anticipated poll-worker shortages in the upcoming elections, shortages that experts fear will grow worse.[176] *See supra* at 13-15.  Lifting this restriction so that poll workers can be efficiently allocated around the State would facilitate a greater number of polling locations operating smoothly, efficiently, and safely for the November election.

Wisconsin likewise requires municipalities to designate locations for in-person absentee voting by June 11, 2020.  Wis. Stat. § 6.855(1).  If § 6.855(1) is enforced, the WEC and municipalities can no longer direct direct additional in-person absentee polling sites to be opened as a measure to spread out in-person voting, take pressure off election day, and provide an alternative to unreliable mail.  *See supra* at 11, 23-24; *infra* at 42-44.  This is especially problematic because the pandemic and Wisconsin's response to the pandemic will evolve

---

[175] Kennedy Report ¶¶ 39, 87; Remington Report at 1-2, 14-17.
[176] SOPF ¶ 237; Kennedy Report ¶¶ 67-69.

throughout the summer, and because resources and locations available for in-person absentee voting in November are not yet fully apparent.  Municipalities may have designated locations (say, public libraries) that could be closed when in-person absentee voting begins.  Again, no compelling state interest justifies this early cut-off for designating polling sites during a pandemic; municipalities should not be prohibited from adapting to COVID-19 by designating replacement sites, additional sites to ease overcrowding, or better sites based on facilities that are ultimately available.  Enjoining this provision would facilitate a greater number of in-person polling locations operating smoothly, efficiently, and safely for the November election.

### 3.  *Statutory Deadline for Receipt of Absentee Ballots.*

Wisconsin's statutory framework for valid return of mail-in absentee ballots is also likely to severely burden the right to vote for many Wisconsin voters.  Under current statutes, an absentee ballot will be rejected, even if cast before election day, if it does not *arrive* at the polling place by 8 p.m. on election day.  Wis. Stat § 6.87(6).  But Wisconsin statutes authorize voters to timely *request* an absentee ballot by mail up until five days (Thursday) before election day.  Wis. Stat. § 6.86(1)(b).  Because there is not enough time between Thursday and election day for ballots to be processed by a clerk, mailed to the voter, completed by the voter, witnessed, and then returned,[177] the deadline currently in place effectively guarantees that many absentee ballots will be rejected even though the voter made a timely request and acted consistently with state law at every turn.

Indeed, in the April 7 election, the judicial orders enjoining this statute and ultimately authorizing ballots to be accepted if postmarked by election day (rather than if received by election day), *see supra* at 6-7, resulted in *79,054 additional ballots* being counted that otherwise

---

[177] SOPF ¶¶ 232-34; Kennedy Report ¶¶ 126-129.

would have been rejected, according to Defendants' own analysis.[178]  This figure amounts to 6.68% of all absentee ballots cast and 5.1% of all votes.  Put differently, absent judicial intervention, an alarming proportion of voters would have been disfranchised—through no fault of their own and despite following all procedures required by law—because their ballots were delayed in the mail.

This Court previously determined that the statutory deadline thus imposes an unconstitutional burden on the right to vote.  *See DNC*, 2020 WL 1638374, at *16-18.  That conclusion rested on findings equally—if not more—applicable to the upcoming election: Wisconsin clerks will again face unprecedented numbers of absentee-ballot requests,[179] and "even the most diligent voter may be unable to return his or her ballot in time to be counted."[180] *Id.* at *17.  As in the April 7 election, there is "no practical way that a person submitting a request for an absentee ballot on the deadline for submitting the request ... will have the time to receive, vote and return their ballot by Election Day."[181]  *DNC*, 2020 WL 1638374, at *17.  Because "[t]he state's interest in deadlines surely also extends to preserving the rights of those voters who themselves relied on those deadlines," and is not so "compelling as to overcome the burden faced by voters who, through no fault of their own, will be disenfranchised by the enforcement of the law," *id.*, Plaintiffs are likely to succeed on the merits of their challenge to the statutory absentee-ballot-receipt deadline.

---

[178] SOPF ¶ 67.
[179] SOPF ¶ 235; Kennedy Report ¶ 147.
[180] SOPF ¶ 236.
[181] Kennedy Report ¶¶ 134-37.

4.      *Absentee-Ballot Witnessing.*

Because disenfranchisement severely burdens the right to vote, disenfranchising a

subgroup of voters gives rise to a severe burden as to *those* voters.  *See, e.g.*, *Frank v. Walker*,

819 F.3d 384 (7th Cir. 2016) (agreeing that "high hurdles for *some* persons eligible to vote entitle

those *particular* persons to relief"); *DNC*, 2020 WL 1638374, at *20 (recognizing that

"particular voters facing unreasonably high burdens" may be entitled to "specific relief").

For voters who are immunocompromised or at high risk from COVID-19, or who are

actively infected with COVID-19, absentee voting is necessary to ensure they can vote at all.

*See supra* at 28-30.  Yet, as explained above, for a limited class of these individuals who are

unable to safely secure a witness, Wisconsin's requirement that would-be absentee voters locate

and secure a witness to verify the ballot and sign the envelope, Wis. Stat. § 6.87(2), will impose

a severe—indeed, insurmountable—obstacle to absentee voting in the upcoming elections.  *See*

*supra* at 32-34.

On the other side of the ledger, Wisconsin has an interest in preventing voter fraud.  But,

as this Court recognized in connection with the April 7 election, "the particularly high hurdles

faced by this subset of voters are not overcome by the state's general anti-fraud goals, and some

limited relief is therefore appropriate."  *DNC*, 2020 WL 1638374, at *20.[182]  The same holds true

---

[182] As discussed above, *see supra* at 6, 34 n.160, the Seventh Circuit stayed the portion of this
Court's April 2 order that granted relief under *Anderson-Burdick* from § 6.87(2).  But that ruling
rested on the Seventh Circuit's concerns about the fast-moving nature of those proceedings in
light of the imminent April 7 election, the tailoring of the relief, and the sufficiency of the
preliminary evidentiary record to overcome the state's interest in preventing voter fraud—none
of which obtains here.  The November election is sufficiently distant in time to avoid any risk of
voter confusion as a result of an order from this Court.  Plaintiffs' proposed relief is tailored only
to immunocompromised, high-risk, and currently infected voters, allowing the state to maintain
its interest in protecting voter fraud.  Dkt. 37 ¶¶ 96-103, 161.  And with the opportunity at hand
for advance planning, the remedy can be extremely precise: for example, the Court can provide
specific language for an attestation and require WEC to ensure that language is provided with
every absentee ballot.  Finally, the evidence now available from the April 7 election shows that

for the upcoming elections: the state's interest in preventing voter fraud cannot justify imposing

such a serious obstacle on these immunocompromised voters.  And the state's anti-fraud goals

would, in any event, be adequately served by a self-certification on penalty of perjury.  For

instance, Wisconsin regularly relies on an affidavit requirement to prevent fraud elsewhere in the

election context.  *See* Wis. Stat. § 8.40(2) (requiring certification of qualified circulator on each

sheet of petition for an election).

For several reasons, WEC's proposed workarounds do not alleviate the burden posed by

Wis. Stat. § 6.87(2).[183]  First, Wisconsin's 11-step process for voters to have their absentee-ballot

witnessed may be difficult to understand by the homebound individual or witness with limited

literacy or cognitive abilities.[184]  Second, these steps—which suggest witnessing through a

window or open door—may be impractical in certain situations, such as for persons living in

multi-level or multi-unit apartment complexes.[185]  Perhaps most revealing, by allowing the

witness to be a mail or food delivery person, Defendants themselves undermine their asserted

anti-fraud interest—those "witnesses" will often lack the knowledge to certify that "the voter

who requested the ballot is the person who actually received and voted the ballot."[186]

Defendants' suggestion that voters should leave their certificate envelopes outside unattended for

---

maintaining the witness requirement for immunocompromised voters did in fact disenfranchise
voters, heightening the need for relief and demonstrably outweighing the state's interest in
preventing fraud *for those voters*.  Kennedy Report ¶¶ 130-33.  Ms. Swenson, for instance, was
unable to find anyone who could safely witness her ballot.  SOPF ¶¶ 83, 154-58.

[183] SOPF ¶¶ 80-81; Kennedy Report ¶ 133.

[184] Remington Report at 14.

[185] SOPF ¶ 81; Remington Report at 14.

[186] SOPF ¶¶ 84-85.

24 hours to avoid COVID-19 transmission before and after witnessing likewise invites ballot malfeasance, undercutting Defendants' own anti-fraud rationale.[187]

**B.** **Plaintiffs Are Likely To Prevail On Their Claims That Defendants Are Violating the Procedural Guarantees of the Due Process Clause Of The Fourteenth Amendment (Count 4).**

Plaintiffs are likely to succeed on their procedural due process claims because Defendants fail to provide effective notice and an opportunity to be heard with respect to a denial of a request for an absentee ballot, or the rejection of an absentee ballot timely cast.  Defendants further fail to provide clear, effective, and comprehensive notice to Wisconsin voters about the procedures and requirements to have their ballot counted, the modifications being made in light of COVID-19, and the voting opportunities available to each eligible voter.

Wisconsin may not deprive any voter of "liberty or property" without "due process of law."  U.S. Const. amend. XIV, § 1.  The right to vote is fundamental, *see Harper v. Va. Bd. of Elections*, 383 U.S. 663, 666 (1966), and is a "liberty" or property interest protected by the due process clause.  *See, e.g.*, *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1357 (D. Ariz. 1990).  By granting all eligible voters a right to obtain an absentee ballot for any reason, Wis. Stat. §§ 6.20, 6.86, and then to cast an absentee ballot, *id.* § 6.87(6), the State has created statutory rights that are entitled to due process protection.  *See Saucedo v. Gardner*, 335 F. Supp. 3d 202 (D.N.H. 2018); *Zessar v. Helander*, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. at 1358; *see also One Wis. Inst. v. Thomsen*, 198 F. Supp. 3d 896, 933 (W.D. Wis. 2016) (rejecting "argument that plaintiffs' challenge to ... in-person absentee voting provisions does not implicate their constitutional rights").

---

[187] SOPF ¶ 86.

"The hallmarks of procedural due process are notice and an opportunity to be heard."

*Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 662-63 (7th Cir. 2004).  The specific form such

procedures must take is determined by considering, "first, the private interest that will be

affected by the official action" including "the degree of potential deprivation;" "second, the risk

of an erroneous deprivation of  such interest through the procedures used, and the probable

value, if any, of additional or substitute procedural safeguards;" and, third "the Government's

interest, including the function involved and the fiscal and administrative burdens that the

additional or substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424 U.S.

319, 335, 341 (1976).[188]

Here, the private interest at stake—the right to vote by absentee ballot—weighs heavily

in the balance, and its weight has only increased as a result of the COVID-19 pandemic.  For

many people, including Plaintiffs Swenson and Nelson, voting absentee by mail is the only way

to exercise the franchise without seriously jeopardizing their lives or health.[189]  For most others,

mail-in absentee voting is far safer than voting in person on election day—both because of the

risk to the voter's own health and the risk of viral transmission at the polls or afterwards.[190]

Defendants themselves have described an "exceptional shift to vote-by-mail," reporting that

61.8% of voters cast an absentee ballot by mail in the most recent statewide elections,

representing a massive increase from other recent elections where the proportion of votes cast by

---

[188] Because these procedural rights are analytically distinct from the *Anderson/Burdick*
framework, there is a specific "rationale for applying the *Mathews* test over the *Anderson-Burdick* test."  *Democratic Nat'l Comm. v. Bostelmann*, 2020 WL 3077047, at *7 (W.D. Wis.
Jun. 10, 2020).  The focus of the procedural due process inquiry is what *process* is due before a
statutorily protected liberty or property interest is deprived.  Voters are entitled to such process
whether or not their absence imposes a burden on the substantive right to vote sufficient to
prevail under the *Anderson/Burdick* framework.

[189] SOPF ¶ 226; Remington Report at 12-13.

[190] SOPF ¶ 227; Remington Report at 12-13.

mail ranged between only 4.8 and 8.1%.[191]  *See supra* at 9.  But even with this shift, as many as

166,000 voters statewide were deterred from voting in the April election, because they had never

before voted by mail.[192]  The interest at stake in ensuring voters can effectively both request and

cast an absentee ballot is very weighty indeed.

        1.     *Requesting Absentee Ballots*

Additional procedural protections are necessary to avoid erroneous denials of absentee-

ballot requests.  As it stands, thousands of Wisconsin voters who requested absentee ballots in

the April election never received one.  Many of these voters, like Plaintiffs McCurtis and Nelson,

never even received an explanation for the denial of an absentee ballot: one simply never

arrived.[193]  *Supra* at 9-10 & nn.45-46.  Although the Elections Commission now intends to mail

absentee ballot applications to nearly all registered voters who have not already requested one,[194]

this single action will not correct the failures exposed by the April 7 election.

There are a number of reasons for these widespread failures.  Some voters' ballots appear

to have been mishandled or misplaced in the mail system.  *See supra* at 9-10.  The online system

for requesting and tracking absentee ballots (MyVote.wi.gov) suffered from numerous

breakdowns—including frequent overloads and timeouts, problems recording ballot requests,

and failure to provide accurate information about whether ballots were in fact mailed to a voter.

*See supra* at 7-9.  In a May 20 memorandum, Defendants mention intelligent mail barcodes as a

"potential direction," without any assurances that any system will ultimately be implemented.[195]

---

[191] SOPF ¶ 49.

[192] Fowler Report at 11-12.

[193] SOPF ¶¶ 52, 161, 175.

[194] SOPF ¶ 243.

[195] Kennedy Report ¶¶ 122-23.

Moreover, Defendants failed to issue clear, statewide guidance about how municipal clerks must permit a voter to obtain an absentee ballot in the event their first request was rejected or simply not processed in a timely fashion.[196]  As a result, plaintiffs and many thousands of other people were deprived of an absentee ballot.

These problems could be solved with simple, additional procedural protections.  With respect to the MyVote system, the right to obtain an absentee ballot would be properly protected if Defendants ensured well in advance that there were sufficient bandwidth and server resources to manage the volume of requests anticipated for the November elections, and if the system were configured to track not just ballot requests, but delivery of ballots through the mailing process as well.[197]  Although Defendant Wolfe acknowledged in her May 20 CARES Grant Planning Memorandum the need for "software development and consultation" and "system load testing," she made no specific mention of adding additional capacity.[198]

With respect to processing and delivery of absentee ballots more generally, Defendants must issue directives requiring municipal clerks to provide prompt, effective notice to a voter if their ballot request is defective or if it will not be filled within one day as required by law, Wis. Stat. § 7.15(1)(cm); and clear, uniform procedures to cure any defect in a ballot request or replace an undelivered ballot.[199]  Moreover, the Court should direct Defendants to establish policies applicable to municipal clerks regarding coordination with the U.S. Postal Service to ensure that USPS is prepared for the anticipated volume of outgoing and incoming mail,[200] and

---

[196] SOPF ¶ 59; Kennedy Report ¶ 25.

[197] Kennedy Report ¶¶ 43-48, 113-16, 119.

[198] SOPF ¶ 241.

[199] Kennedy Report ¶¶ 108-12.

[200] Kennedy Report ¶¶ 113-16.

49

to establish procedures for processing mail (including, for example, a special tracking barcode) in order to avoid lost ballots and to provide voters with timely notice if their ballot is delayed or lost so that they can take steps to obtain a new absentee ballot in time to cast it.[201]  Defendants should also ensure safe and sufficient in-person absentee voting sites, which allow voters immediate access to an absentee ballot and reduce the pressure on the mail and the online ballot-request system.[202]  Wis. Stat. §§ 6.86(1)-(2), 6.855.  None of these measures imposes a significant or disproportionate burden on the government.  Indeed, some municipalities adopted such measures despite the absence of statewide direction by Defendants.[203]  *Supra* at 10-11 & n.47.

Effective public education by Defendants is also necessary to provide voters with constitutionally adequate notice of their rights, and the procedures they must follow, if they do not receive their absentee ballot promptly after requesting one.[204]  The details of voting procedures cannot readily be discerned by consulting statute books because much discretion is left to Defendants to determine how voting procedures are implemented.  This is particularly true with respect to procedures that have been adopted or modified to respond to the COVID-19 pandemic.

Defendants must provide every voter with timely, clear, effective notice of the procedures available to them to exercise their statutory right to vote absentee.  "The means employed" to provide notice "must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."  *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306,

---

[201] Kennedy Report ¶¶ 117-23.

[202] Kennedy Report ¶¶ 79-97.

[203] Kennedy Report ¶ 29.

[204] Kennedy Report ¶¶ 157-64.

315 (1950) ("The reasonableness and hence the constitutional validity of any chosen method

may be defended on the ground that it is in itself reasonably certain to inform those affected.");

*Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("[E]lementary fairness compels

clarity in the statements and regulations setting forth the actions with which the agency expects

the public to comply.") (internal quotation omitted).  And the means employed must be designed

to reach all voters—including those with disabilities and those without ready access to the

internet.  *See infra* at 53-54.

It is appropriate for this Court to direct Defendants to provide this kind of "explanatory

notice" regarding their rights, *Jordan v. Trainor*, 563 F.3d 873, 875 (7th Cir. 1977), *aff'd*, *Quern

v. Jordan*, 440 U.S. 332 (1979), particularly where changes to voting procedures are at issue, *cf.

Veasey v. Abbott*, 830 F.3d 216, 256 & n.52 (5th Cir. 2016), and Defendants have clear statutory

authority to engage in such outreach, Wis. Stat. § 5.05(12) (empowering WEC to "conduct or

prescribe requirements for educational programs to inform electors about voting procedures,

voting rights, and voting technology").

### 2.     *Absentee-Ballot Counting*

Additional procedural protections are also necessary with respect to the rejection of

absentee ballots that are actually cast.  Wisconsin law allows officials to reject an absentee ballot

for numerous reasons including, for example, if the witness certification is "insufficient," Wis.

Stat. §§ 6.88(3), 7.52(3)(b), if a person "is not a qualified elector in the ward or election district,"

*id.*, and if a voter appears on a list provided by the Department of Corrections of people

disenfranchised because they remain under supervision on a felony conviction, *id.* § 6.29(2)(am).

In the April 7 election, more than 14,000 ballots were rejected for an insufficient certification

and thousands of other ballots were rejected for other reasons.[205]  Election inspectors also retain broad discretion to challenge absentee ballots for other reasons when ballots are canvassed.  Wis. Stat. §§ 6.93, 7.52(5).  Yet despite all of these grounds for rejection—each one of which can invite error—Wisconsin does not guarantee individual voters *any* opportunity to be heard on whether such rejections are incorrect.[206]

The timelines for counting absentee ballots in Wisconsin make it difficult or impossible to provide adequate notice and opportunity to be heard.  The law does not allow absentee ballots to be counted until election day—even if they are received weeks prior.  Wis. Stat. §§ 6.88, 7.51-.52.  The law also instructs election officials, upon receipt of an absentee ballot, to "enclose it, unopened, in a carrier envelope" and to leave it untouched until election day.  Wis. Stat. § 6.88.  These provisions mean that any alleged defects in an absentee ballot—such as a problem with the witness certification—will not be identified until election day, and voters could not, even in theory, receive timely notice prior to election day that their ballot has been or will be rejected.

Still worse, under current law, Wisconsin does not provide notice of alleged grounds for rejecting a ballot even after they are discovered on election day.  Wisconsin does not even notify voters whether their ballot has been counted until 30 or 45 days post-election, well after results have been certified and far too late to remedy an erroneous ballot rejection.  *See* Wis. Stat. § 6.275 (30-day deadline to report); *id.* § 6.33(5)(a)(3) (45-day deadline to report on General Election); § 7.60(5) (deadlines to certify county results); *id.* § 7.70(3)(a) (deadlines to certify statewide results).[207]

---

[205] SOPF ¶¶ 89-90; Kennedy Report ¶ 30.

[206] The process for challenging absentee ballots on or after election day during the canvassing process does not involve any notice to the voter or opportunity to be heard.  *See* Wis. Stat. § 7.52.

[207] SOPF ¶ 88.

These procedures violate voters' right to timely notice and an opportunity to be heard when their ballots are being rejected.  Absentee voters must have an opportunity to contest a decision to reject their ballot and such opportunity must include, at minimum, timely individual notice of the reasons the ballot was rejected, and a meaningful opportunity to show that the relevant officials' determination was in error *before* results are finalized.  *See, e.g.*, *Zessar*, 2006 WL 642646 (invalidating absentee-voting scheme that failed to provide notice that ballot had been rejected or opportunity to contest before certification deadline); *Raetzel*, 762 F. Supp. 1354 (same); *Saucedo*, 335 F. Supp. 3d at 219-22 (requiring notice and opportunity to be heard before ballot is rejected for mismatched signatures).

In order to afford constitutionally adequate notice and a timely opportunity to be heard, laws currently forbidding canvassing of absentee ballots prior to election day should be invalidated.[208]  Wis. Stat. §§ 6.88, 7.51-.52.  Early notice, prior to election day where possible, is necessary to allow a timely and meaningful opportunity to be respond on the matter and, where appropriate, to cure defects.[209]

Moreover, in order for notices to be effective, they must be designed to reach all voters—including those with disabilities, without ready access to the internet, or who are unable

---

[208] Kennedy Report ¶¶ 110-11, 141-46.

[209] Kennedy Report ¶¶ 141-42.  Before the April 7 election, for example, the Commission suggested in an April 5 memorandum that municipal clerks should "make best efforts" to contact voters if their ballot was missing a witness signature, and provide an opportunity to cure by having their original witness appear with them at the clerk's office or at the polls on election day.  *See* SOPF ¶ 88.  While this guidance attempted to recognize the notice and opportunity-to-cure requirements of due process, it fell short because it was not mandatory, came extremely late in the election cycle and thus likely missed many ballots, and did not provide a timely opportunity to be heard or to cure.  It is also unclear how clerks could comply with the requirement to notify voters about a missing witness signature given the statutory requirement to place absentee ballots in a "carrier envelope" that is "securely sealed" and not to be opened until election day.  Wis. Stat. § 6.88.

effectively to navigate the MyVote website.  Due process requires notice that is meaningful and effective, including to those who are "aged, blind, or disabled" or "unable or disinclined, because of physical handicaps [or] mental handicaps ... to take the necessary affirmative action" to seek out notice from particular sources.  *Vargas v. Trainor*, 508 F.2d 485, 489 (7th Cir. 1974); *see also, e.g.*, *Kapps v. Wing*, 404 F.3d 105, 124 (2d Cir. 2005) ("[I]n the absence of effective notice, the other due process rights ... such as the right to a timely hearing ... are rendered fundamentally hollow.").  Encouraging voters to visit the MyVote website to determine the status of their absentee ballot therefore does not on its own satisfy due process.  Instead, Defendants should be required to send explanations of the applicable procedures with a statewide mailing of absentee-ballot request forms and to instruct municipal clerks to send explanations with every absentee ballot they send out to voters.

### C.   Plaintiffs Are Likely To Prevail On Their Claim That Defendants' Arbitrary And Disparate Election Administration Violates The Equal Protection Clause Of The Fourteenth Amendment (Count 2).

"In decision after decision," the Supreme Court has held that the Equal Protection Clause protects voters' "right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).[210]  That guarantee extends not only to "the initial allocation of the franchise," but to "the *manner* of its exercise."  *Bush v. Gore*, 531 U.S. 98, 104 (2000) (emphasis added).  After granting citizens the right to vote, states therefore

---

[210] *See also, e.g.*, *Gray v. Sanders*, 372 U.S. 368, 380 (1963) ("The idea that every voter is equal to every other voter in his State … underlies many of our decisions."); *Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 54 (1970) ("[I]n situations involving elections, the States are required to insure that each person's vote counts as much, insofar as it is practicable, as any other person's."); *United States v. Mosley*, 238 U.S. 383, 386 (1915) (It is "unquestionable that the right to have one's vote counted is as open to protection as the right to put a ballot in a box.").

"may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-105.[211]

Defendants are prohibited, for example, from "arbitrarily deny[ing]" citizens "the right to vote depending on where they live," including by "causing … severe wait times" in certain polling places. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476, 477-78 (6th Cir. 2008); *see also Ury*, 303 F. Supp. at 124 (forcing voters in certain populous precincts "to wait unreasonable lengths of time to obtain and cast their ballots" due to "inadequate voting facilities and the failure to provide sufficient [election officials]" "effectively deprived [voters in those precincts] of their right to vote" in violation of the Equal Protection Clause); *cf. Sims*, 377 U.S. at 565 (burdening the right to vote "because of [a voter's] place of residence impairs basic constitutional rights under the Fourteenth Amendment").

Defendants' administration of the April 7 election violated this basic constitutional command. Despite the foreseeable impact of the COVID-19 pandemic on registration, absentee ballots, in-person voting, and other election procedures, Defendants failed to adopt "specific rules designed to ensure uniform treatment" or other measures to ensure the "nonarbitrary treatment of voters." *Bush*, 531 U.S. at 105. Consequently, far from being "able to participate

---

[211] *Bush v. Gore* reaffirmed and reiterated longstanding equal-protection principles prohibiting the arbitrary and disparate treatment of voters. *See, e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."); *Reynolds v. Sims*, 377 U.S. 533, 554, 555 (1964) ("[T]he Equal Protection Clause guarantees the opportunity for equal participation by all voters" in elections, and "the right of suffrage can be denied by a debasement … of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."); *Ury v. Santee*, 303 F. Supp. 119, 125-27 (N.D. Ill. 1969) (understaffing populous precincts resulting in long lines violates Equal Protection Clause); *Coal. for Educ. in Dist. One v. Bd. of Elec. of City of N.Y.*, 370 F. Supp. 42, 54-57 (S.D.N.Y. 1974) (intentional and unintentional electoral irregularities that have an arbitrary and disparate impact on minority voters violate the Equal Protection Clause).

on an equal footing in the election process," *Hadley*, 397 U.S. at 55, Wisconsin voters faced starkly different access to the franchise depending on arbitrary factors, such as place of residence, age, disability status, and race.

Poll closings and poll-worker shortages, for example, severely burdened or foreclosed in-person voting at some polling places, but not at others. *See supra* at 13-15, 38-42. The burdens of poll closings and worker shortages were not, however, borne equally. In Madison, for example, 66 out of 92 polling places remained open, reducing wait times considerably.[212] And, belying claims that disparities resulted from independent local decision making, wide differences persisted even within the same county: In Wauwatosa, a small city in Milwaukee County bordering the City of Milwaukee, voters faced practically no lines at all.[213] *See supra* at 15. Because Defendants failed to prepare, including by adopting measures for the intra-county sharing of poll workers[214] or by uniformly adopting drive-through voting or other forms of in-person absentee voting,[215] these foreseeable disparities went unaddressed.

Widely different access to equipment necessary to guarantee safe in-person voting similarly imposed unequal burdens on voters. *See supra* at 17-19. Polling places in parts of the state suffering from the highest prevalence of COVID-19, like the City of Milwaukee,[216] lacked the social distancing protocols and safety equipment—such as PPE and sanitized voting machines—required to ensure safe voting.[217] Voters in Green Bay likewise were not directed to

---

[212] SOPF ¶ 111.

[213] SOPF ¶ 114.

[214] SOPF ¶ 102.

[215] SOPF ¶ 64.

[216] Fowler Report at 7, 12.

[217] SOPF ¶ 118.

use sanitization supplies,[218] and election officials in multiple jurisdictions did not use PPE.[219]  It is no surprise then that as many as 8.4% of voters in these high-prevalence counties were deterred from casting a ballot.[220]  Meanwhile, other cities made serious strides toward ensuring safe in-person voting.  In Madison and Neenah, for instance, Plexiglas barriers protected poll workers.[221]  And in Fitchburg, equipment was frequently sanitized and all poll workers were required to wear masks and gloves.[222]

Arbitrary disparities similarly plagued voter registration and requests for absentee ballots.  *See supra* at 7-13.  Defendants' failure to adopt a uniform response to increased volume transformed voting absentee into a game of chance.  Many voters faced problems requesting absentee ballots online in the first instance due to problems with MyVote.[223]  Other voters were able to submit requests for absentee ballots through MyVote, but were later advised by clerks that there was no record of their requests.[224]  Yet other voters timely requested absentee ballots but did not receive their ballot in time to vote,[225] received envelopes with no ballots inside (or duplicate ballots),[226] or were unable to return ballots to the clerks' offices due to mail delivery problems.[227]  At the same time, voters in other parts of the state navigated a relatively smooth process.  For instance, some municipalities—like Whitefish Bay and Bayside—timely mailed

---

[218] SOPF ¶ 122.

[219] SOPF ¶¶ 121, 123-24.

[220] Fowler Report at 9-10.

[221] SOPF ¶¶ 126-27.

[222] SOPF ¶ 129.

[223] SOPF ¶¶ 41-47.

[224] SOPF ¶ 44.

[225] SOPF ¶¶ 72, 161, 175.

[226] SOPF ¶ 71.

[227] SOPF ¶ 73.

every registered voter an absentee ballot request form on the different ways to obtain an absentee

ballot, with the predictable result of significantly boosting voter participation rates through the

absentee process.[228]

These radical differences in absentee and in-person voting experiences did more than

cause general inconvenience.  In addition to depressing voter turnout by tens of thousands in

hard-hit locations like Milwaukee,[229] they imposed severe burdens on specific classes of voters.

*See supra* at 17-19.  Many disabled voters, for instance, require assistive technology available

only at in-person polling locations.[230]  Given the poll closings and lack of safety protocols, those

voters had no safe or practical way to cast a ballot in some parts of Wisconsin.[231]  The lack of

safe in-person voting options likewise disproportionally impacted older voters, resulting in

significantly lower turnout among voters over 65 relative to similarly situated younger voters.[232]

Minority communities were also disproportionately likely to be on the wrong side of

voting access disparities.  *See supra* at 18-19.  Black and Hispanic Americans are more likely to

die from COVID-19 than others.[233]  And the most dangerous and difficult places to vote in April,

like the City of Milwaukee, are home to the vast majority of Wisconsin's minority population.[234]

Unsurprisingly, estimates suggest voter participation in zip codes with higher proportions of

Black and Hispanic voters was significantly lower in April than would be expected given prior

---

[228] SOPF ¶ 55.

[229] Fowler Report at 8-11.

[230] SOPF ¶ 211.

[231] SOPF ¶ 212.

[232] Fowler Report at 12-14.

[233] Fowler Report at 14.

[234] SOPF ¶ 104; Fowler Report at 15.

voting history.[235]  *See supra* at 18-19.  That these disparities disproportionately harmed members of a protected class warrants heightened scrutiny.  *See Black v. McGuffage*, 209 F. Supp. 2d 889 (N.D. Ill. 2002) ("When the allegedly arbitrary system also results in a greater negative impact on groups defined by traditionally suspect criteria, there is cause for serious concern."); *cf. One Wis. Inst.*, 198 F. Supp. 3d at 959 ("Disparities in housing, education, and employment, have left minority groups condensed into high-density urban areas, which makes them particularly vulnerable to Wisconsin's [voting access] rules.").

In short, the April 7 election was "not a process with sufficient guarantees of equal treatment." *Bush*, 531 U.S. at 107.  Some Wisconsinites had a safe and practical opportunity to obtain and cast their ballot, but tens of thousands did not.  Plaintiff Nelson, for instance, did not receive her absentee ballot in time to vote, despite submitting a timely request.[236]  As an immunocompromised voter unable to vote in person safely, she was thus disenfranchised in the April 7 election.[237]  Similarly, because Plaintiff McCurtis never received the absentee ballot she had timely requested, she was forced not only to endure a more than two-and-a-half hour line at a Milwaukee polling place, but also to risk the health of her immunocompromised mother by voting at a site lacking adequate social distancing protocols, PPE, or sanitary voting equipment.[238]

Defendants have not, and cannot, advance any rationale for failing to implement "specific standards" to avoid these arbitrary and disparate burdens on the franchise.  *Bush*, 531 U.S. at 106.  While Defendants faced—and will continue to face—unprecedented challenges in

---

[235] Fowler Report at 14-16.

[236] SOPF ¶ 175.

[237] SOPF ¶¶ 176-77.

[238] SOPF ¶¶ 105, 120-21.

administering elections during a pandemic, "practical difficulties" and "[t]he press of time" are not an "excuse for ignoring equal protection guarantees." *Id.* at 108. Defendants must, therefore, take all reasonable measures to ensure that "the rudimentary requirements of equal treatment and fundamental fairness are satisfied." *Id.* at 105.

Defendants have not met that obligation, and there is no indication they will do so absent this Court's intervention. *See supra* at 20-24. If this Court does not grant Plaintiffs' requested relief, the same equal-protection violations experienced during the April 7 election are all but certain to recur. Voters should not have to rely on good fortune to exercise their fundamental right to vote. And Plaintiffs, including Ms. Nelson and Ms. McCurtis, need not wait to be disenfranchised a second time before asserting their rights under the Equal Protection Clause.[239] For all of those reasons, Plaintiffs are likely to succeed on their Equal Protection claim.

## III. IN THE ABSENCE OF A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM DURING THE PENDENCY OF THIS ACTION.

Plaintiffs will suffer irreparable harm unless the court issues a preliminary injunction. Inaction creates an intolerable risk of infringing on Plaintiffs' fundamental right to vote in November. And courts consistently find that infringements on the right to vote cannot be remedied after the fact. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury.") (collecting cases); *Obama for Am. v. Husted*, 697 F.3d 423, 435 (6th Cir. 2012) ("A

---

[239] *See League of Women Voters of Ohio v. Blackwell*, 432 F. Supp. 2d 723, 728 (N.D. Ohio 2005), *aff'd in part, rev'd in part*, 548 F.3d 463 (6th Cir. 2008) (A "state's failure to exercise [its] power, where … inaction foreseeably impairs the fair and equal exercise of the franchise" violates right to "equal protection"); *NAACP State Conf. of Pa. v. Cortes*, 591 F. Supp. 2d 757, 765 (E.D. Pa. 2008) (injunctive relief is appropriate where "there is a real danger" that "unacceptably long lines" on election day will unduly burden right to vote and violate equal protection).

restriction on the fundamental right to vote ... constitutes irreparable injury."); *DNC*, 2020 WL 1638374, at *11.  In the Seventh Circuit, "the existence of a continuing constitutional violation constitutes proof of an irreparable harm."  *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978).  This is "particularly true" where, as here, the First Amendment rights to expression and association are at issue.  *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). Additionally, at least one court has found irreparable harm in the context of a Section 11(b) intimidation claim under the Voting Rights Act, like the one at issue here, noting that if potential members of the electorate suffer intimidation "such that their right to vote freely is abridged, or altogether extinguished," they have been irreparably harmed.  *Ariz. Democratic Party v. Ariz. Republican Party*, 2016 WL 8669978, at *11 (D. Ariz. Nov. 4, 2016).

Money damages cannot make voters whole after they have been disenfranchised or otherwise burdened in the exercise of their rights to vote.  *See League of Women Voters of N. C.*, 769 F.3d at 247 ("[O]nce the election occurs, there can be no do-over and no redress."); *DNC*, 2020 WL 1638374, at *11; *Ariz. Democratic Party*, 2016 WL 8669978, at *11 ("[I]f some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact.").

Injunctive relief is especially appropriate in the face of serious and irreparable public health consequences.  Plaintiffs have shown that the COVID-19 pandemic is likely to continue through the fall, *see supra* at 20-22, and that Defendants have not taken sufficient measures to ensure safe and effective voting in November, *see supra* at 22-24.  Moreover, Plaintiffs Swenson and Nelson have health conditions that will continue to place them at high risk for serious illness

and death if they contract COVID-19, and Plaintiff McCurtis will still be living with her immunocompromised mother come November.[240]

Absent relief, Plaintiffs, like other Wisconsin voters, will once again face a choice between disenfranchisement and risking significant adverse health consequences.  In such circumstances, an injunction is appropriate to prevent potential suffering, illness, and death.  *See LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 942 (7th Cir. 2019) (recognizing that "the denial of injunctive relief after a district court has found a risk of imminent and substantial danger to public health ... should be rare");  *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (injunctive relief preventing hospital closure appropriate because "exacerbation of the current overcrowded situation and additional suffering" constitutes irreparable harm); *State of N.Y. v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (colorable claim of irreparable harm where denial of relief "potentially subjected claimants to deteriorating health, and possibly even to death").

The organizational plaintiffs will also suffer irreparable harm because they will be forced to devote additional staff time and resources to assisting voters with registration and absentee-ballot requests, educating voters about their options, thereby impeding their other work and hampering their ability to achieve their missions.[241]  "Where organizational plaintiffs are compelled to divert and expend their resources to address a defendant's allegedly wrongful conduct, this is enough to satisfy their burden of showing a likelihood of suffering irreparable harm."  *Ind. State Conf. of NAACP v. Lawson*, 326 F. Supp. 3d 646, 662 (S.D. Ind. 2018), *aff'd sub nom. Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019).

---

[240] SOPF ¶¶ 169-71, 179-80.
[241] SOPF ¶¶ 181-183, 194-95, 209-10.

Plaintiffs are likely to experience these irreparable harms before trial.  The November election is just months away.  As a result, permanent injunctive relief is likely to come either after one or both elections or too close to the election to grant relief under *Purcell v. Gonzalez*, 549 U.S. 1 (2006).  Preliminary injunctive relief is warranted.

## IV.    THE BALANCE OF HARDSHIPS SUPPORTS ISSUANCE OF AN INJUNCTION.

The equities strongly favor issuing the injunctive relief sought by Plaintiffs here.  That relief would permit Wisconsin citizens, like and including Plaintiffs, to vote without risking their health and that of others.  Absent judicial intervention, the ongoing pandemic threatens to upend the November general election, which will likely see millions of voters seeking to vote absentee—or seeking safe ways to vote in person.[242]  *See supra* at 20-24.  On the other side of the ledger, Defendants will have the administrative burden of implementing these measures.  But "administrative inconvenience" alone cannot justify an intrusion upon fundamental rights. *Taylor v. Louisiana*, 419 U.S. 522, 535 (1975).  And the measures sought here would in any case impose only modest burdens, if any.

For example, this Court can, as it did in April, suspend the deadline by which ballots must be received, so that all voters who timely request and vote a ballot can have their votes counted—at little or no cost to Defendants.  *See supra* at 42-43.  The Court likewise can require election officials to ensure online ballots are accessible to voters with print disabilities so they can vote privately and independently, as is required by federal law.  *See supra* at 34-36.  Indeed, in some instance, there would be effectively no burden on Defendants at all.  For example, an injunction suspending the requirement that poll workers cannot live in a different county would

---

[242] *See* SOPF ¶ 246; *see also* Kennedy Report ¶¶ 125, 147.

impose no financial or administrative burden, and it would likely make election administration *easier* by permitting more efficient allocation of resources.  *See supra* at 13-14.

As detailed throughout, "the severe burdens that voters are sure to face in the upcoming election" outweigh any corresponding burden on Defendants.  *DNC*, 2020 WL 1638374, at *13. And the equities favor entering an injunction *now*—while there is still sufficient time for Defendants to implement these measures and notify the public.  Delay, by contrast, "may ultimately preclude relief under the *Purcell* doctrine," leaving constitutional and statutory violations of fundamental rights unremedied.  *Democratic Nat'l Comm. v. Bostelmann*, 2020 WL 3077047, at *4 (W.D. Wis. Jun. 10, 2020).  That result should not be tolerated.

## V.    AN INJUNCTION IS IN THE PUBLIC INTEREST.

Both Defendants and the voting public have an overwhelmingly strong interest in a safe, orderly, and accessible election.  "As a general matter, enforcing constitutional rights is in the public interest," and that rule applies with even more force here because "certainly, the public interest favors permitting as many qualified voters to vote as possible."  *DNC*, 2020 WL 1638374, at *14 (quotations and citation omitted); *see also, e.g.*, *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006).  The relief proposed by Plaintiffs is narrowly tailored to achieve that end.

In many instances, moreover, that relief would further the State's interest in "the maintenance of order in the election process."  *DNC*, 2020 WL 1638374, at *13 (quotations omitted).  For instance, ensuring an adequate number of polling places is necessary to avoid election-day chaos, and a public-education campaign can only serve to benefit the public's and State's interest in a smooth election.  Likewise, a functioning and accessible absentee-ballot system will not only maintain order within that system, but it will have the collateral benefit of relieving a significant burden on in-person voting as well.  And even where the State does have an interest in the enforcement of its election laws (none of which were drafted with the current

circumstances in mind), that interest "is overcome by voters' right to exercise their franchise without undue burdens," especially as Plaintiffs here have requested relief with ample time for Defendants to implement it.  *Id*. at *20.

## CONCLUSION

For the reasons stated, Plaintiffs respectfully request that the Court issue a preliminary injunction that enjoins, for the November 2020 election, the enforcement of:

1. Wis. Stat. § 7.30(2) with respect to the requirement that each election official be an elector of the county in which the municipality is located;

2. Wis. Stat. § 6.87(2) during the pendency of the COVID-19 pandemic for all voters who are immunocompromised or otherwise at high risk from COVID-19, or who are actively infected with COVID-19, who cannot safely secure an in-person witness;

3. Wis. Stat. § 6.855(1) with respect to the requirement that all in-person absentee voting locations for the November general election must have already been designated;

4. Wis. Stat § 6.87(6) and require that absentee ballots postmarked by election day or not bearing a postmark but received within a week of election day be counted; and

5. Wis. Stat. §§ 6.88, 7.51-.52 with respect to the requirement that absentee ballots not be counted before election day.

Plaintiffs further request that the Court order Defendants, for the November 2020 election, to:

1. Take all appropriate actions to ensure that in-person voting, whether exercised by casting an absentee ballot or by casting a ballot on election day, can be safely conducted;

2. Require that accessible voting machines be available at all in-person absentee voting locations;

3. Take all appropriate actions to ensure an adequate number of poll workers to administer safe polling places;

4. Ensure that each registered voter in Wisconsin receives an absentee ballot request form and that all residents of care facilities have adequate opportunities to register to vote and request absentee ballots;

5. Ensure that individuals with print disabilities have an accessible means of receiving, marking, and submitting absentee ballots privately and independently;

6. Take all appropriate actions to ensure that all voters who request and are qualified to receive an absentee ballot in fact receive such absentee ballot, and that any voter whose request for an absentee ballot is rejected or not processed for any reason be notified and given the opportunity to cure any defect in a timely manner;

7. Take all appropriate actions to upgrade electronic voter registration systems so they can process the anticipated elevated number of online registrations and absentee ballot requests;

8. Take all appropriate actions to coordinate with, and ensure that municipalities coordinate with, the United States Postal Service to ensure the timely delivery and return of, and counting of, absentee ballots;

9. Ensure that secure drop boxes for in-person return of absentee ballots are available to every voter and increase in-person absentee voting opportunities that are safe and accessible, including, for instance, drive-through voting; and

10. Engage in a public education campaign to apprise the public on: how to request, vote, and return absentee ballots; the locations and times for in-person absentee voting; all early voting opportunities in each community; the provisions being made for safe in-person voting; and any changes in election day polling locations.

Dated:  June 24, 2020

Respectfully submitted,

*/s/ Yaira Dubin*

Anton Metlitsky
Leah Godesky
Yaira Dubin
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 326-2000
ametlitsky@omm.com
lgodesky@omm.com
ydubin@omm.com

Molly M. Lens
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
(310) 553-6700
mlens@omm.com

Jason Zarrow
O'MELVENY & MYERS LLP
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
(213) 430-6000
jzarrow@omm.com

Jonathan Manes
RODERICK & SOLANGE MACARTHUR
JUSTICE CENTER
160 E Grand Ave, Sixth Floor
Chicago, IL 60611
(312) 503-0012
jonathan.manes@law.northwestern.edu

Rachel E. Goodman
THE PROTECT DEMOCRACY PROJECT
115 Broadway, 5th Fl.
New York, NY 10006
(202) 997-0599
rachel.goodman@protectdemocracy.org

Laurence M. Schwartztol
THE PROTECT DEMOCRACY PROJECT
15 Main St., Suite 312
Watertown, MA 02472
(202) 856-9191
larry.schwartztol@protectdemocracy.org

Jamila Benkato*
Farbod Kaycee Faraji*
Cameron Kistler
THE PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington, D.C. 20006
(202) 579-4582
jamila.benkato@protectdemocracy.org
farbod.faraji@protectdemocracy.org
cameron.kistler@protectdemocracy.org
*Admitted to practice in California, not D.C.;
practice consistent with D.C. App. R.
49(c)(3).*

Douglas M. Poland
State Bar No. 1055189
RATHJE WOODWARD LLC
10 E Doty Street
Suite 507
Madison, WI 53703
(608) 960-7430
dpoland@rathjewoodward.com

Jeffrey A. Mandell
State Bar No. 1100406
STAFFORD ROSENBAUM LLP
222 West Washington Avenue
P.O. Box 1784
Madison, WI 53701-1784
(608) 256-0226
jmandell@staffordlaw.com

*Counsel for Plaintiffs*