IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| JILL SWENSON, MELODY MCCURTIS, MARIA NELSON, BLACK LEADERS ORGANIZING FOR COMMUNITIES, and DISABILITY RIGHTS WISCONSIN,<br><br>        Plaintiffs,<br><br>    v.<br><br>MARGE BOSTELMANN, JULIE M. GLANCEY, ANN S. JACOBS, DEAN KNUDSON, ROBERT F. SPINDELL, JR., and MARK L. THOMSEN, Commissioners of the Wisconsin Elections Commission;<br><br>MEAGAN WOLFE, Administrator of the Wisconsin Elections Commission,<br><br>        Defendants,<br><br>    and<br><br>WISCONSIN LEGISLATURE, REPUBLICAN NATIONAL COMMITTEE, and REPUBLICAN PARTY OF WISCONSIN,<br><br>        Intervening Defendants. | 20-cv-459-wmc |

**STATEMENT OF PROPOSED FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

In accordance with this Court's Procedures to be Followed on Motions for Injunctive

Relief, Plaintiffs submit the following Statement of Proposed Facts in support of their Motion for

Preliminary Injunction.

## PLAINTIFFS' PROPOSED FACTS

**The COVID-19 Pandemic**

1. COVID-19 "spread[s] mainly from person-to-person" through "respiratory droplets," and is more likely to spread "between people who are in close contact with one another (within about 6 feet)." Declaration of Rachel E. Goodman ("Goodman Decl."), Ex. 1 (Ctrs. for Disease Control & Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last updated June 1, 2020)).

2. COVID-19 poses a dire threat to individuals at high risk for complications from COVID-19. Expert Report of Patrick Remington, M.D. ("Remington Report") at 8.

3. The first confirmed case of COVID-19 in Wisconsin was diagnosed on February 5, 2020. Goodman Decl., Ex. 2 (*Coronavirus Spreads to Wisconsin as Hundreds More Americans Return to U.S. from Outbreak's Epicenter*, CBS News (Feb. 10, 2020), https://www.cbsnews.com/live-updates/coronavirus-usa-confirmed-cases-news-death-toll-evacuations-latest-2020-02-05/).

4. It was the twelfth case in the United States, which has since confirmed over 2 million more cases. *Id*.; Goodman Decl., Ex. 3 (Ctrs. for Disease Control & Prevention, *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated June 14, 2020)), at 1.

5. Since February, over 25,000 people have tested positive for COVID-19 in Wisconsin alone. Goodman Decl., Ex. 19 (Wis. Dep't of Health Servs.,

2

*COVID-19: Wisconsin Summary Data*, https://www.dhs.wisconsin.gov/covid-19/data.htm (last updated June 22, 2020)).

6. Experts predict that "over the next several months"—"from June to November 2020"—it is likely that "Wisconsin will see continued community transmission [of COVID-19] (at best), and may see increased transmission and more outbreaks (at worst)." Remington Report at 7.

7. In-person voting under these circumstances poses "a significant risk to human health." *Id.* at 8.

8. Physically casting a ballot requires voters and poll workers to come "in[to] close contact with one another," and to "touch[] surfaces or objects at [the] polling place, such as door handles, tables, pens, and ballots." *Id.* at 9.

9. Because infected people are often "contagious before the onset of symptoms, [or] never develop symptoms," it is virtually impossible to keep polling places virus-free. *Id.*

10. There will consequently be "a significant risk of contracting and transmitting COVID-19 in Wisconsin during any in-person voting for the November 2020 election in Wisconsin." *Id.* at 10.

**Events Leading Up to the April 7 Election**

11. At a February 27 meeting of the Wisconsin Elections Commission ("the Commission")— the first at which COVID-19 was discussed—Defendant Dean Knudson, the Chair of the Commission at the time, dismissed the need to plan for a COVID-19 outbreak. Goodman Decl., Ex. 4 (*Wisconsin Elections Commission February 2020 Meeting*, WisconsinEye (Feb. 27, 2020)), at 5.

12. "[A]t worst," Defendant Knudson said, "there would be either long lines or a delay in reporting," and the Commission has "robust procedures" for absentee voting. *Id.* at 5.

13. Defendant Meagan Wolfe similarly stated: "currently, [the Commission] do[es not] talk about things like, you know, if all your poll workers are sick . . . what would you do." *Id.* at 3.

14. On March 12, Governor Tony Evers declared a statewide public health emergency. Goodman Decl., Ex. 5 (John K. Wilson & Shamane Mills, *Evers Declares Public Health Emergency Due to COVID-19*, Wis. Public Radio (Mar. 12, 2020), https://www.wpr.org/evers-declares-public-health-emergency-due-covid-19).

15. On March 17, the Wisconsin Department of Health Services banned gatherings of 10 or more people. Goodman Decl., Ex. 6 (Shawn Johnson, *Wisconsin Bans Crowds of 10 or Larger: Order Bars and Restaurants Closed*, Wis. Public Radio (Mar. 17, 2020), https://www.wpr.org/wisconsin-bans-crowds-10-or-larger-order-bars-and-restaurants-closed).

16. The same day, the Mayor of Green Bay said that the city would be "unable to administer a normal election." Goodman Decl., Ex. 7 (Eric Genrich (@MayorGenrich), Twitter (Mar. 17, 2020, 4:53 PM), https://twitter.com/MayorGenrich/status/1240018483963985923).

17. Defendant Ann Jacobs said that she "no longer believe[d] that we are able to fairly and properly administer this election without delay or postponement," and that she "believe[d] we're putting people at risk." Goodman Decl., Ex. 8 (Laurel White, *State Election Officials Spar Over Possible Postponement of April 7 Election*, Wis. Public

4

Radio (Mar. 18, 2020), https://www.wpr.org/state-election-officials-spar-over-possible-postponement-april-7-election), at 2.

18. Defendant Mark Thomsen likewise said that "[Wisconsin is] going to have an election where no one can vote safely—that's absurd." *Id.*

19. Defendant Julie Glancey argued in favor of an election by mail-in ballot only. *Id*

20. On March 18, Defendants issued a memorandum highlighting shortages of absentee ballot envelopes, polling locations, poll workers, and cleaning equipment. Goodman Decl., Ex. 9 (Wis. Elections Comm'n, *Update Regarding COVID-19 Election Planning* (Mar. 18, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Com_.%20memo%20re%20COVID-19%20Election%20Planning%203.18.20.pdf), at 3-4.

21. A few days later, a bipartisan group of mayors urged that the election be delayed. Goodman Decl., Ex. 10 (Laurel White, *Some Wisconsin Mayors Urge Postponing April 7 Election*, Wis. Public Radio (Mar. 20, 2020), https://www.wpr.org/some-wisconsin-mayors-urge-postponing-april-7-election), at 2.

22. On March 24, the Department of Health Services Secretary-designee Andrea Palm issued Emergency Order No. 12, the Safer At Home Order. Goodman Decl., Ex. 11 (Wis. Dep't of Health Servs., *Emergency Order No. 12, Safer at Home Order* (Mar. 24, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Health%20Order%20%2312%20Safer%20At%20Home.pdf).

23. The Order banned all public and private gatherings, closed nonessential businesses, and required that everyone maintain social distancing of at least six feet from any other person. *Id*.

24. The next day, Wisconsin Assembly Speaker Robin Vos and Senate Majority Leader Scott Fitzgerald said they did not expect to change the date of the election. Goodman Decl., Ex. 12 (Will Kenneally, *Legislative Leaders Want April Election to Move Forward*, PBS Wisconsin (Mar. 25, 2020), https://pbswisconsin.org/news-item/legislative-leaders-want-april-election-to-move-forward/).

25. Several plaintiffs filed suit, seeking to ensure that all Wisconsinites could safely and effectively cast a ballot. *See Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-wmc (W.D. Wis. filed Mar. 18, 2020); *Gear v. Knudson*, No. 20-CV-278-wmc (W.D. Wis. filed Mar. 26, 2020); *Lewis v. Knudson*, No. 20-CV-284-wmc (W.D. Wis. filed Mar. 26, 2020).

26. On April 2, 2020, this Court entered an injunction (a) ordering that absentee ballots received by April 13 at 4 p.m. be counted; (b) extending by one day, to April 3, the window to request an absentee ballot; and (c) adjusting the requirement under Wisconsin Statute section 6.87(2) that absentee voters have a witness sign their ballot, instead requiring Defendants to "accept an unwitnessed ballot" if it contains a sufficient affirmation or statement averring that the voter was unable "to safely obtain a witness certification" despite using "reasonable efforts to do so." *Democratic Nat'l Comm. v. Bostelmann*, 2020 WL 1638374, *20, 22 (W.D. Wis. Apr. 2, 2020) (hereinafter "*DNC*").

27. The Seventh Circuit stayed the portion of this Court's decision requiring Defendants to accept unwitnessed ballots, and declined to stay this Court's extension of the absentee ballot deadline. Goodman Decl., Ex. 55 (*Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-1538, 1539, 1545, 1546, Order (7th Cir. April 3, 2020)), at 3.

28. On April 3, 2020, Governor Evers called a special legislative session for the Legislature to consider postponing the April 7 election. Goodman Decl., Ex. 13 (Wis. Exec. Dep't, *Exec. Order No. 73, Relating to a Special Session of the Legislature to Provide for an All-Mail Spring Election and Special Election for the 7th Congressional District During the COVID-19 Pandemic* (Apr. 3, 2020), https://docs.legis.wisconsin.gov/code/executive_orders/2019_tony_evers/2020-73.pdf).

29. Both the Wisconsin Assembly and the Senate immediately adjourned the special session, ensuring that the April 7 election would go forward as planned. Goodman Decl., Ex. 14 (Bill Glauber & Patrick Marley, *Wisconsin Republicans Reject Governor's Move to Postpone Tuesday Election*, USA Today (Apr. 4, 2020), https://www.usatoday.com/story/news/politics/elections/2020/04/04/coronavirus-wisconsin-legislature-stalls-move-postpone-election/2949675001/), at 3.

30. As this Court noted, the Legislature's decision was "[c]ontrary to the view of at least a dozen other states, as well as the consensus of medical experts across the country as to the gathering of large groups of people." *DNC*, 2020 WL 1638374, at *1.

31. On April 6, Governor Evers issued an executive order suspending in-person voting. Goodman Decl., Ex. 15 (Wis. Office of the Governor, *Gov. Evers Suspends In-Person Voting, Calls Legislature into Special Session on April 7 Election* (Apr. 6, 2020), https://content.govdelivery.com/accounts/WIGOV/bulletins/2852119); Goodman Decl., Ex. 16 (Wis. Office of the Governor, *Exec. Order No. 74, Relating to Suspending In-Person Voting on April 7, 2020, Due to the COVID-19 Pandemic* (Apr. 6, 2020), https://content.govdelivery.com/attachments/WIGOV/2020/04/06/file_attachments/1420231/EO074-SuspendingInPersonVotingAndSpecialSession.pdf).

32. Later that day, the Wisconsin Supreme Court enjoined the Governor's order. Goodman Decl., Ex. 17 (Jerrick Adams, *Wisconsin Supreme Court Enjoins Governor's Order Postponing the Election, Allowing Voting to Continue as Scheduled April 7*, Ballotpedia News (Apr. 7, 2020), https://news.ballotpedia.org/2020/04/07/wisconsin-supreme-court-enjoins-governors-order-postponing-the-election-allowing-voting-to-continue-as-scheduled-april-7/).

33. Shortly thereafter, the United States Supreme Court held that all absentee ballots had to be postmarked by April 7 and received by 4 p.m. on April 13 to be counted, partially overturning this Court's order. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) (hereinafter "*RNC*").

34. Writing for the majority, Justice Kavanaugh noted that "[t]his Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* at 1207.

**Widespread Disenfranchisement During the April 7 Election.**

35. During the April 7 election, voters attempted to utilize the absentee ballot process in historically high numbers. Goodman Decl., Ex. 18 (Wis. Elections Comm'n, *May 20, 2020 Meeting Materials* (May 20, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/May%2020%2C%202020.Final_.pdf) ("*WEC May 20 Meeting Materials*"), at 7.

36. Voters who sought to vote in-person faced huge waits and unsafe conditions due to the mass closure of polling locations and shortage of poll workers. Goodman Decl., Ex. 44 (Wis. Election Protection & League of Women Voters of Wis., *Wisconsin Election Protection, 2020 Spring Election Report* (May 11, 2020),

http://www.thewheelerreport.com/wheeler_docs/files/051120lwvreport.pdf) ("*Wis. Election Protection 2020 Spring Election Report*"), at 19-22.

<u>*Technical Deficiencies*</u>

37. Defendants administer a website called MyVote Wisconsin that, among other things, allows eligible Wisconsin residents to register to vote, request an absentee ballot, and find their polling place. Goodman Decl., Ex. 20 (MyVote Wisconsin, https://myvote.wi.gov/en-us/ (last visited June 15, 2020)), at 1.

38. Months before the election, Defendants were aware that the website experienced outages. Goodman Decl., Ex. 21 (Wis. Elections Comm'n, *Update for Clerks on MyVote Address Problems* (Feb. 18, 2020), https://elections.wi.gov/node/6688).

39. Defendants had knowledge of problems with MyVote as early as February 2020. Goodman Decl., Ex. 56 (Wis. Elections Comm'n, *MyVote Wisconsin Website Address Lookup Working Again after Experiencing Issues* (Feb. 18, 2020), https://elections.wi.gov/node/6687).

40. There was an increase in voters' use of and reliance on MyVote due to the pandemic. Goodman Decl., Ex. 22 (Wis. Elections Comm'n, *Absentee Ballot Requests for April 7 Already Exceed Last Three Spring Election Numbers Due to COVID-19* (Mar. 17, 2020), https://elections.wi.gov/index.php/node/6731).

41. Wisconsin voters using MyVote for the April 7 election faced system crashes that prevented them from accessing the site. Goodman Decl., Ex. 23 (Daphne Chen, et al., *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*, Frontline PBS (Apr. 21, 2020),

https://www.pbs.org/wgbh/frontline/article/wisconsin-election-coronavirus-absentee-ballots/), at 1.

42. The site also failed to record ballot requests properly and to provide accurate information about the status of absentee ballot requests. *Id*.

43. An investigation by the Milwaukee Journal Sentinel found that eligible voters in Lodi, Pewaukee, Marshfield, Shorewood, and Bristol had trouble requesting absentee ballots online, either because the MyVote system crashed or because they finally gave up after spending hours trying to make their request via MyVote. *Id*. at 1.

44.  Some Wisconsin voters requested absentee ballots through MyVote, the investigation found, only to be later informed the MyVote system had no record of their request. *Id*. at 3.

45. Other voters received inaccurate information from MyVote's ballot tracker system regarding whether their absentee ballot had been mailed. *Id.* at 4.

46. Defendant Wolfe acknowledged these failures, writing that voters attempting to use MyVote experienced "unique challenges and obstacles" during the April election. Goodman Decl., Ex. 24 (Wis. Elections Comm'n, *Summary of April 7, 2020 Election* (Apr. 18, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/April%207%20Election%20Summary%20and%20Next%20Steps.pdf), at 4.

47. In Milwaukee alone, 2,693 requests for absentee ballots made through MyVote were never processed due to "technical problems" and "oversight[s]." Goodman Decl., Ex. 18 (*WEC May 20 Meeting Materials*), at 19-21.

*Absentee Voting Problems*

10

48. As a result of the pandemic, absentee ballots cast by mail made up 61.8 percent of the total votes in the April 2020 election. *Id*. at 7.

49. This represented an increase from other recent elections where the proportion of ballots cast by mail ranged between 4.8 and 8.1 percent. *Id*.

50. Defendants acknowledge that the increases in absentee voting "created resource issues for a system primarily designed to support polling place voting." *Id*. at 6.

51. Some voters, like Plaintiffs Melody McCurtis and Maria Nelson, timely requested absentee ballots but never received them. Declaration of Melody McCurtis in Supp. of Pls.' Mot. for Prelim. Inj. ("McCurtis Decl.") ¶¶ 5-7; Declaration of Maria Nelson in Supp. of Pls.' Mot. for Prelim. Inj. ("Nelson Decl.") ¶¶ 5-9.

52. Many of these voters, like Plaintiffs McCurtis and Nelson, never received an explanation for the denial of an absentee ballot: one simply never arrived. Nelson Decl. ¶¶ 7-9; McCurtis Decl. ¶¶ 5-7; Expert Report of Kevin J. Kennedy ("Kennedy Report") ¶ 30.

53. More than 2,600 absentee ballots requested by voters in the City of Milwaukee were never sent as the result of a technical failure in the WisVote system. Goodman Decl., Ex. 18 (*WEC May 20 Meeting Materials*), at 19-21.

54. Hundreds of absentee ballots were never delivered to voters in Appleton, Oshkosh, and Fox Point. *Id.*, at 17-18; Goodman Decl., Ex. 25 (Jeff Rumage, *Post Office Returns Hundreds of Absentee Ballots That Were Supposed to Be Delivered to Fox Point Voters*, Milwaukee Journal Sentinel (Apr. 8, 2020), https://www.jsonline.com/story/communities/northshore/news/fox-point/2020/04/08/wisconsin-election-fox-point-absentee-ballots-never-made-voters/5119812002/).

55. Some municipalities—like Whitefish Bay and Bayside—timely mailed every registered voter an absentee ballot request form, with the predictable result of significantly boosting voter participation rates through the absentee process. Goodman Decl., Ex. 58 (Craig Gilbert, *How Two Communities on Milwaukee's North Shore Achieved Sky-High Levels of Absentee Voting Despite Coronavirus*, Milwaukee Journal Sentinel (Apr. 10, 2020), https://www.jsonline.com/story/news/politics/elections/2020/04/10/wisconsin-absentee-ballot-forms-sent-whitefish-bay-bayside-voters/5129125002/), at 3.

56. Inadequately staffed offices were nearly overwhelmed by the demand for absentee ballots. Goodman Decl., Ex. 18 (*WEC May 20 Meeting Materials*), at 6.

57. Clerks across the state reported a shortage of 600,000 absentee certificate envelopes for voters to use when returning their absentee ballots. Goodman Decl., Ex. 9 (Wis. Elections Comm'n, *Update Regarding COVID-19 Election Planning* (Mar. 18, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Com_.%20memo%20re%20COVID-19%20Election%20Planning%203.18.20.pdf), at 3.

58. Issues with mail delivery led to absentee ballots never reaching voters or being returned to the clerks' offices. Goodman Decl., Ex. 18 (*WEC May 20 Meeting Materials*), at 17.

59. Defendants failed to issue clear, statewide guidance about how municipal clerks must permit a voter to obtain an absentee ballot in the event their first request was rejected or simply not processed in a timely fashion. Kennedy Report ¶ 25.

60. Wisconsin law requires the rejection of absentee ballots that do not *arrive* at the polling place by 8 p.m. on election day. Wis. Stat § 6.87(6).

61. Under the Supreme Court's order, "a voter's absentee ballot [had to] be either (i) postmarked by election day, April 7, 2020, and received by April 13, 2020, at 4:00 p.m., or (ii) hand-delivered as provided under state law by April 7, 2020, at 8:00 p.m." *RNC*, 140 S. Ct. at 1208.

62. For many voters at high risk from COVID-19, including Plaintiffs Swenson and Nelson, hand-delivering a ballot to the municipal clerk was not an option—social distance was imperative to preserve their health and safety. Declaration of Jill Swenson in Supp. of Pls.' Mot. for Prelim. Inj. ("Swenson Decl.") ¶ 15; Nelson Decl. ¶¶ 5, 10.

63. While Defendant Wolfe identified absentee ballot drop boxes as a potential solution—in which voters could return ballots while maintaining social distancing—the idea was not uniformly required or implemented. Goodman Decl., Ex. 26 (Wis. Elections Comm'n, *FAQs: Absentee Ballot Return Options: USPS Coordination and Drop Boxes* (Mar. 31, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Ballot%20Return%20Options%203.31.2020.pdf).

64. Drive-through and curbside voting were not widely administered. Goodman Decl., Ex. 27 (Bill Ruthhart, *In Battleground Wisconsin, Long Voter Lines, No Election Results and a Missed Opportunity to Build Toward November*, Chicago Tribune (Apr. 7, 2020), https://www.chicagotribune.com/election-2020/ct-wisconsin-primary-election-20200407-ge26ymidnje65iqdrfcvnziixm-story.html), at 4; Declaration of Kit Kerschensteiner in Supp. of Pls.' Mot. for Prelim. Inj. ("Kerschensteiner Decl.") ¶¶ 18-19.

65. In Green Bay, in-person absentee voting was confined to a single site that was open for only ten weekdays with sporadic hours. Goodman Decl., Ex. 28 (*Early Voting Begins in*

13

*Green Bay*, Fox 11 News (Mar. 19, 2020), https://fox11online.com/news/local/early-voting-begins-in-green-bay).

66. In Milwaukee, the city briefly had just three in-person early absentee voting sites; then had no early absentee voting sites for nearly a full week; and finally opened a single drive-through absentee voting location at the municipal building. Goodman Decl., Ex. 59 (Katie Delong, *Milwaukee's 3 Early Voting Sites Shut Down 'Due to Increased COVID-19 Exposure Risk'*, Fox6 News (Mar. 22, 2020), https://fox6now.com/2020/03/22/milwaukees-3-early-voting-sites-shut-down-due-to-increased-covid-19-exposure-risk/); Goodman Decl., Ex. 60 (*Milwaukee to Launch Drive-Up Early Voting on Saturday, March 28*, Fox6 News (Mar. 27, 2020), https://fox6now.com/2020/03/27/milwaukee-to-launch-drive-up-early-voting-on-saturday-march-28).

67. Authorizing the acceptance of ballots postmarked by election day (and received by 4 p.m. on April 13), rather than received by election day, resulted in unp ballots being counted that would have otherwise been rejected. Goodman Decl., Ex. 18 (*WEC May 20 Meeting Materials*), at 8.

68. Defendants failed to promulgate rules or issue guidance with respect to postmarks to ensure the uniform and fair treatment of ballots received by mail. Goodman Decl., Ex. 57 (Wis. Elections Comm'n, *Postmark Issues and Processing Absentee Ballots* (Apr. 11, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/Timely%20Postmark%20Issues%20and%20Absentee%20Ballot%20Counting%204.11.20%20REVISED.pdf), at 3-4.

69. Clerks received ballots bearing no postmarks, two postmarks, or postmarks that did not clearly indicate a date. Goodman Decl., Ex. 29 (Riley Vetterkind, *Elections Commission Deadlocks Over Whether to Count Ballots Without Postmarks*, Wis. State Journal (Apr. 11, 2020), https://madison.com/wsj/news/local/govt-and-politics/elections-commission-deadlocks-over-whether-to-count-ballots-without-postmarks/article_74e0285c-76d7-5471-a82e-144b78609f48.html), at 2-3.

70. As a result, some jurisdictions counted ballots without a postmark, while others rejected such ballots. Goodman Decl., Ex. 30 (Amy Gardner, et al., *Unexpected Outcome in Wisconsin: Tens of Thousands of Ballots That Arrived After Election Day Were Counted, Thanks to Court Decisions*, Wash. Post (May 3, 2020), https://www.washingtonpost.com/politics/unexpected-outcome-in-wisconsin-tens-of-thousands-of-ballots-that-arrived-after-voting-day-were-counted-thanks-to-court-decisions/2020/05/03/20c036f0-8a59-11ea-9dfd-990f9dcc71fc_story.html), at 10.

71. Some Wisconsin voters who requested ballots received envelopes with no ballots inside (or duplicate ballots). Goodman Decl., Ex. 23 (Daphne Chen, et al., *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*, Frontline PBS (Apr. 21, 2020), https://www.pbs.org/wgbh/frontline/article/wisconsin-election-coronavirus-absentee-ballots/), at 3.

72. Some voters timely requested absentee ballots but did not receive their ballot in time to vote. McCurtis Decl. ¶¶ 5-8; Nelson Decl. ¶¶ 7-9; Goodman Decl., Ex. 25 (Jeff Rumage, *Post Office Returns Hundreds of Absentee Ballots That Were Supposed to Be Delivered to Fox Point Voters*, Milwaukee Journal Sentinel (Apr. 8, 2020), https://www.jsonline.com/story/communities/northshore/news/fox-

point/2020/04/08/wisconsin-election-fox-point-absentee-ballots-never-made-

voters/5119812002/).

73. Some voters timely requested absentee ballots but were unable to return ballots to the

clerks' offices due to mail delivery problems. Goodman Decl., Ex. 18 (*WEC May 20*

*Meeting Materials*), at 13.

74. The combined result of the above errors was that more than 120,000 people who

requested absentee ballots did not return them as of election day. *Id.* at 7.

75. Under Wisconsin law, mail-in absentee ballots must be witnessed and signed by another

adult U.S. citizen who is not a candidate on the ballot. Wis. Stat. § 6.87(4).

76. For high-risk voters, including Plaintiff Jill Swenson, satisfying this requirement meant

coming into contact with others and putting their lives in danger. Swenson Decl. ¶¶ 11-

13.

77. For voters that live alone, satisfying the witness requirement while maintaining social

distancing is problematic, even if the voter is not considered high risk. Remington Report

at 13.

78. The evidence now available from the April 7 election shows that maintaining the witness

requirement for immunocompromised voters did in fact disenfranchise voters. Kennedy

Report ¶ 131.

79. Ms. Swenson, for instance, was unable to find anyone who could safely witness her

ballot. Swenson Decl. ¶¶ 12-14.

80. The Wisconsin Election Commission proposed an elaborate 11-part method for

witnessing their ballots, which required that the "witness should be prepared to watch the

voter mark their ballot through a window or by video chat." Remington Report at 13.

81. However, this complicated advice was not easily applied, "may be difficult to understand by the homebound individual and witness," and "may be impractical in certain situations, such as for persons living in multi-level or multi-unit apartment complexes." Remington Report at 14.

82. This Court has already recognized this danger. *See DNC*, 2020 WL 1638374, at *2.

83. After the Seventh Circuit stayed enforcement of this aspect of this Court's injunction, Wisconsin Statute section 6.87(4) deprived voters unable to secure a witness, including Plaintiff Swenson, of the ability to cast an effective absentee ballot. Swenson Decl. ¶¶ 16-18; Goodman Decl., Ex. 31 (Wis. Elections Comm'n, *Updated Absentee Witness Signature Requirement Guidance - COVID-19* (Apr. 5, 2020), https://elections.wi.gov/node/6816).

84. Defendants' policy allows the witness to be a mail or food delivery person. Goodman Decl., Ex. 61 (Wis. Elections Comm'n, *Absentee Witness Signature Requirement Guidance* (Mar. 29, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Absentee%20Witness%20Guidance_0.pdf), at 2.

85. Those "witnesses" must certify that "the voter who requested the ballot is the person who actually received and voted the ballot." *Id.* at 1.

86. Defendants have suggested that voters should leave their certificate envelopes outside unattended for 24 hours to avoid COVID-19 transmission before and after witnessing. *Id.* at 2.

87. Wisconsin law also instructs election officials, upon receipt of an absentee ballot, to "enclose it, unopened, in a carrier envelope" and to leave it untouched until election day. Wis. Stat. § 6.88.

88. Wisconsin does not notify voters whether their ballot has been counted until 30 or 45 days post-election, well after results have been certified and too late to remedy an erroneous ballot rejection. *See* Wis. Stat. § 6.275 (30-day deadline to report); § 6.33(5)(a)(3) (45-day deadline to report on General Election); § 7.60(5) (deadlines to certify county results); § 7.70(3)(a) (deadlines to certify statewide results); *see generally* Goodman Decl., Ex. 62 (Wis. Elections Comm'n, *Calendar of Election Events, November 2019 – January 2021* (2019), https://elections.wi.gov/sites/elections.wi.gov/files/2020-01/2020%20Calendar%20of%20Election%20Events%20WORD%28rev%202020-01%29.pdf).

89. Wisconsin law allows officials to reject an absentee ballot for numerous reasons including, for example, if the witness certification is "insufficient," Wis. Stat. §§ 6.88(3)(b), 7.52(3)(b), if a person "is not a qualified elector in the ward or election district," id. , and if a voter appears on a list provided by the Department of Corrections of people disenfranchised because they remain under supervision on a felony conviction, *id*. § 6.29(2)(am).

90. In the April 7 election, more than 14,000 ballots were rejected for an insufficient certification and thousands of other ballots were rejected for other reasons. Kennedy Report ¶ 30; Goodman Decl., Ex. 18 (*WEC May 20 Meeting Materials*), at 26.

91. Election inspectors also retain broad discretion to challenge absentee ballots for other reasons when ballots are canvassed. Wis. Stat. §§ 6.93, 7.52(5).

92. Wisconsin does not guarantee individual voters any opportunity to be heard on whether such rejections are incorrect. *See* Wis. Stat. § 7.52.

18

93. Because many voters with disabilities felt unsafe voting in person, being unable to vote absentee meant that they were unable to vote at all.  Kerschensteiner Decl. ¶ 16.

94. Voters who are immunocompromised or at high risk from COVID-19, or who have COVID-19, will be confined at home, and so not able to vote in person. Kennedy Report ¶ 128.

95. These voters will also face particular challenges in obtaining a witness for their mail-in absentee ballot. *Id.*

96. One blind voter who Plaintiff Disability Rights Wisconsin ("DRW") was in contact with was unable to safely vote in person during the pandemic and lacked a private and independent at-home voting option. *Id*. ¶ 17.

97. Defendants did not offer online ballots accessible to voters with print disabilities. *Id*.

*Insufficient Poll Workers and Polling Places.*

98. Nearly a month before the April 7 election, Defendants began to suspect that poll worker shortages would reduce voting access. Goodman Decl., Ex. 32 (Wis. Elections Comm'n, *COVID-19 Frequently Asked Questions (FAQ's) and Guidance on Procedural Changes for Care Facility Absentee Voting and Polling Place Relocation* (Mar. 13, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/UPDATED%20-%20Clerk%20comm%20re%20FAQ%20and%20SVD%20and%20Polling%20Place%20Procs_3_13_20.pdf), at 4.

99. According to a survey conducted by Defendants, one week before the election 111 voting jurisdictions believed they would not have enough workers to open even one polling place on election day, and 126 additional jurisdictions thought they would not have enough workers to open "all desired polling places." Goodman Decl., Ex. 33 (Wis.

19

Elections Comm'n, *Special Teleconference-Only Meeting, Polling Place Supply and Personnel Shortages* (Mar. 31, 2020),

https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Complete%20Packet%203_31.pdf), at 12.

100. In a memorandum issued to clerks across Wisconsin on March 13, 2020, Defendants, aware of the impending shortages, stated that municipalities had attempted to recruit extra poll workers, and that the Commission was trying to assign state and county employees to serve as reserve poll workers. *Id*. at 13.

101.  Wisconsin statutes mandate that each election official, including each poll worker, be "a qualified elector of a county in which the municipality where the official serves is located," Wis. Stat. § 7.30(2)(a).

102. While Defendants suggested that counties could serve as a clearinghouse for available election inspectors, they made no efforts to facilitate or coordinate intra-county poll worker sharing. Goodman Decl., Ex. 32 (Wis. Elections Comm'n, *COVID-19 Frequently Asked Questions (FAQ's) and Guidance on Procedural Changes for Care Facility Absentee Voting and Polling Place Relocation* (Mar. 13, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/UPDATED%20-%20Clerk%20comm%20re%20FAQ%20and%20SVD%20and%20Polling%20Place%20Procs_3_13_20.pdf),  at 4.

103. Milwaukee was able to open only five of its usual 180 polling sites. Goodman Decl., Ex. 34 (*Milwaukee IDs 5 In-Person Voting Centers for Election Day, Expands Weekend Drive-Up Hours*, Fox6 News (Apr. 3, 2020),

https://fox6now.com/2020/04/03/milwaukee-ids-5-in-person-voting-centers-for-election-day-expands-weekend-drive-up-hours/).

104. Milwaukee is home to 69.4 percent of Wisconsin's Black population. Goodman Decl., Ex. 52 (Wis. Dep't of Health Servs., *African Americans in Wisconsin: Overview*, https://www.dhs.wisconsin.gov/minority-health/population/afriamer-pop.htm (last updated Sept. 10, 2018)).

105. As a result, voters, including Plaintiff Melody McCurtis, were forced to endure wait times of up to two-and-a-half hours to cast an in-person ballot. McCurtis Decl. ¶ 9; Goodman Decl., Ex. 35 (Mary Spicuzza, '*A Very Sad Situation for Voters':* *Milwaukeeans Brave Wait Times as Long as 2 1/2 Hours, Top Election Official Says*, Milwaukee Journal Sentinel (Apr. 7, 2020), https://www.jsonline.com/story/news/politics/elections/2020/04/07/wisconsin-election-milwaukee-voters-brave-long-wait-lines-polls/2962228001/).

106. Milwaukee Election Commission executive director Neil Albrecht told reporters that he learned through media reports that National Guard members could be used at polling sites—a request he had made in the lead up to the election, but was denied at the time. Goodman Decl., Ex. 36 (Molly Beck, *Gov. Tony Evers to Use National Guard Members to Work the Polls Amid Massive Shortage of Workers*, Milwaukee Journal Sentinel (Apr. 1, 2020), https://www.jsonline.com/story/news/politics/elections/2020/04/01/tony evers-use-national-guard-members-workpolls-amid-massive-shortage-workers/5102869002/), at 2.

107. Had Albrecht known about the National Guard's availability earlier, Milwaukee could have opened additional voting centers. Goodman Decl., Ex. 37 (Briana Reilly, *Madison*

*has 66 Polling Sites on Election Day, Milwaukee Has Five. What's the Deal?*, The Cap Times (Apr. 7, 2020), https://madison.com/ct/news/local/govt-and-politics/madison-has-66-polling-sites-on-election-day-milwaukee-has-five-whats-the-deal/article_8868bacf-6697-5cf4-aa4f-d85fb37cf846.html), at 2.

108. Poll worker shortages led Green Bay to reduce its usual 31 polling sites to just two high school gymnasiums. Goodman Decl., Ex. 27 (Bill Ruthhart, *In Battleground Wisconsin, Long Voter Lines, No Election Results and a Missed Opportunity to Build Toward November*, Chicago Tribune (Apr. 7, 2020), https://www.chicagotribune.com/election-2020/ct-wisconsin-primary-election-20200407-ge26ymidnje65iqdrfcvnziixm-story.html), at 4.

109. Voters in Green Bay faced wait times of up to four hours. Goodman Decl., Ex. 38 (Kati Anderson, *Green Bay Voters Wait in Line Past Midnight to Cast Ballot in Primary Election*, WBAY (Apr. 7, 2020), https://www.wbay.com/content/news/Long-lines-cause-hours-long-wait-to-cast-ballots-in-Green-Bay-569461981.html), at 1.

110. Waukesha, a city of 70,000, was only able to open one polling place. Goodman Decl., Ex. 39 (Adam Brewster, *A Week Before Primary, Wisconsin Faces Poll Worker Shortage in Over Half of Municipalities*, CBS News (Mar. 31, 2020), https://www.cbsnews.com/news/coronavirus-wisconsin-primary-poll-worker-shortage-in-60-of-municipalities/).

111. Madison was able to open 66 of its usual 92 polling sites. Goodman Decl., Ex. 37 (Briana Reilly, *Madison has 66 Polling Sites on Election Day, Milwaukee Has Five. What's the Deal?*, The Cap Times (Apr. 7, 2020), https://madison.com/ct/news/local/govt-and-

politics/madison-has-66-polling-sites-on-election-day-milwaukee-has-five-whats-the-
deal/article_8868bacf-6697-5cf4-aa4f-d85fb37cf846.html), at 1.

112. Madison City Clerk Maribeth Witzel-Behl credited the city's commitment to staffing
polling locations, noting that the Emergency Operations Center and Planning staff pushed
to fill shifts. *Id*. at 2.

113. Generally, smaller towns and suburban areas were less affected by the pandemic, more
fully staffed, and had shorter wait times. Goodman Decl., Ex. 27 (Bill Ruthhart, *In
Battleground Wisconsin, Long Voter Lines, No Election Results and a Missed
Opportunity to Build Toward November*, Chicago Tribune (Apr. 7, 2020),
https://www.chicagotribune.com/election-2020/ct-wisconsin-primary-election-20200407-
ge26ymidnje65iqdrfcvnziixm-story.html), at 4; Goodman Decl., Ex. 40 (Astead W.
Herndon & Alexander Burns, *Voting in Wisconsin During a Pandemic: Lines, Masks and
Plenty of Fear*, N.Y. Times (Apr. 7, 2020),
https://www.nytimes.com/2020/04/07/us/politics/wisconsin-election-coronavirus.html),
at 1.

114. Even some cities in Milwaukee County, such as Wauwatosa and Germantown, reported
empty polling places with short wait times. Goodman Decl., Ex. 41 (*Election Day Blog
Recap: Milwaukee Releases Tuesday's Voter Turnout; Late Lines After Polls Closed*,
Milwaukee Journal Sentinel (Apr. 7, 2020),
https://www.jsonline.com/story/news/politics/2020/04/07/wisconsin-april-7-presidential-
primary-election-updatesvoting-pandemic-milwaukee-polling-places/2959757001/), at 5,
13.

*Unsafe In-Person Voting*

115. Defendants acknowledged in a memorandum summarizing the April 7 election that they knew "in early March that local election officials were unable to procure supplies needed for in-person voting." Goodman Decl., Ex. 24 (Wis. Elections Comm'n, *Summary of April 7, 2020 Election* (Apr. 18, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/April%207%20Election%20Summary%20and%20Next%20Steps.pdf), at 1.

116. Defendants themselves experienced trouble procuring necessary supplies. *Id.* at 2.

117. Although some of those supplies—such as personal protective equipment ("PPE"), masks and gloves, and equipment to sanitize voting machines—were ultimately delivered, Defendants took no action to require voters or poll workers to employ those supplies or take other precautions to maintain safety at polling places. *Id.* at 2; Goodman Decl., Ex. 43 (Nathaniel Rakich, *Here's What Voters Told Us About Voting in Wisconsin's Primary*, FiveThirtyEight (Apr. 8, 2020), https://fivethirtyeight.com/features/voters-experiences-in-wisconsin-amid-the-coronavirus/), at 2.

118. During the April 7 election, many polling locations-, including in parts of the state most acutely affected by COVID-19, lacked the social distancing protocols and safety equipment—such as PPE and sanitary voting machines—necessary to ensure safe voting. Goodman Decl., Ex. 44 (*Wis. Election Protection 2020 Spring Election Report*), at 21-22; Expert Report of Anthony Fowler, Ph.D., ("Fowler Report") at 8; *see also* McCurtis Decl. ¶¶ 3-15; Remington Report at 5-6, 9-11; Kennedy Report ¶¶ 24-29.

119. In Milwaukee, voters were crowded together indoors for much of the hours-long wait to vote, such that social distancing was impossible to maintain. Goodman Decl., Ex. 44 (*Wis. Election Protection 2020 Spring Election Report*), at 22.

120. Plaintiff McCurtis, who was forced to vote in person at Washington High School in Milwaukee, noted that officials made no attempt to enforce social distancing. McCurtis Decl. ¶ 12.

121. Washington High School did not provide PPE to voters, and when Plaintiff McCurtis finally made it to the front of the line, no sanitized pens were made available for voters to use. *Id*. ¶ 9.

122. In Green Bay, voters were not directed to use sanitization supplies (although poll workers used such supplies). Goodman Decl., Ex. 44 (*Wis. Election Protection 2020 Spring Election Report*), at 21.

123. In Oshkosh, poll workers wore masks, but not properly, and reused paper towels to clean voter booths between voters. *Id*. at 22.

124. In Beloit, many poll workers were not wearing any PPE at all. Goodman Decl., Ex. 43 (Nathaniel Rakich, *Here's What Voters Told Us About Voting in Wisconsin's Primary*, FiveThirtyEight (Apr. 8, 2020), https://fivethirtyeight.com/features/voters-experiences-in-wisconsin-amid-the-coronavirus/), at 2.

125. As many as 8.4% of voters in these high-prevalence counties were deterred from casting a ballot. Fowler Report at 9-10.

126. In Madison, city workers erected Plexiglas barriers to protect poll workers. Goodman Decl., Ex. 45 (Rebecca Shabad, et al., *Wisconsin Voters Face Long Waits, Lines Amid Coronavirus Outbreak*, NBC News (Apr. 7, 2020),

https://www.nbcnews.com/politics/2020-election/wisconsin-set-vote-national-guard-called-out-many-polling-places-n1178206), at 3.

127. The Mayor of Neenah, Dean Kaufert, similarly had Plexiglas screens erected. Goodman Decl., Ex. 46 (Laurel White, *'It's Madness.' Wisconsin's Election Amid Coronavirus Sparks Anger*, NPR (Apr. 6, 2020), https://www.npr.org/2020/04/06/827122852/it-s-madness-wisconsin-s-election-amid-coronavirus-sparks-anger), at 3.

128. Mayor Kaufert also advocated use of Q-tips and aluminum foil to make reusable touchscreen styluses to reduce the risk of touching potentially contaminated poll books. *Id.* at 4.

129. The city of Fitchburg sent out detailed notes explaining how poll workers and voters would be kept safe: equipment was to be wiped down every 15 minutes, lines were to be taped off to encourage social distancing, and all poll workers were to be given masks and gloves. Goodman Decl., Ex. 47 (Laura Schulte & Alison Dirr, *Wisconsin Election Poll Workers Fear Catching, Spreading Coronavirus as Thousands Will Congregate to Vote Tuesday*, Milwaukee Journal Sentinel (Apr. 6, 2020), https://www.jsonline.com/story/news/2020/04/06/wisconsin-april-7-election-polling-place-workers-fear-safety-during-coronavirus/2944702001/), at 3.

*Uneven Effects*

130. The effects of COVID-19 on the April 2020 election "systematically harmed" those who had not previously voted absentee, those in urban areas, and those in economically depressed communities. Fowler Report at 20.

131. Thousands of voters were deterred from or otherwise prevented from voting, with the voters who live in hardest hit parts of the state experiencing the highest rates of disenfranchisement. *See, e.g.*, Fowler Report, at 8-20.

132. Indeed, in Milwaukee County alone, about 36,000 voters were deterred from voting at the polls by the unsafe conditions. *Id*. at 11.

133. In Milwaukee County, the county with the highest COVID-19 prevalence in the state at the time of the election, turnout was at least 4.3 percentage points lower than expected when controlling for prior voter histories. *Id*. at 9.

134. This is a lower bound estimate based on the assumption that there was no deterrent effect in counties with the lowest COVID-19 prevalence, and thus likely understates the true impact on turnout. *Id*.

135. Turnout was particularly low not just in Milwaukee County, but also in other urban zip codes where people regularly rely on public transportation, in economically depressed zip codes with higher rates of unemployment, and in zip codes with greater shares of residents without health insurance. *Id*. at 17.

136. Dr. Fowler's study indicates that the pandemic especially affected in-person voting. *Id.* at 10-11.

137. In counties with high prevalence of COVID-19, in-person voting decreased by 7.4 percentage points, when compared to counties with low prevalence. *Id*.

138. For example, in Milwaukee County, where there were nearly 490,000 voters in Dr. Fowler's sample, approximately 36,000 were deterred from voting in person. *Id.* at 11.

139. While COVID-19 may have increased absentee voting, this effect was not nearly large enough to make up for the decrease in voting at the polls. *Id*. at 10.

140. Voters across the state who had not previously navigated the absentee ballot process—68 percent of the registered voters in Dr. Fowler's sample—were 7.5 percent less likely to vote in the April 2020 than other registered voters. *Id.* at 11-12.

141. Applying this estimate to the number of registered voters who had never before voted absentee, Dr. Fowler estimated that approximately 166,000 people across the state who had not previously voted by mail were deterred from voting in April 2020. *Id.* at 11-12.

142. In higher-prevalence counties like Milwaukee County, as many as 9.2 percent of voters who had never voted by mail—at least 30,000 people—were deterred from voting. *Id*. at 12.

143. Individuals over the age of 65—a demographic usually overrepresented at the polls—were 6.2 percentage points less likely to vote in the April 2020 election compared to other voters in the same counties with the same voting histories, whether or not they lived in a county with high COVID-19 prevalence. *Id*. at 13-14.

144. Estimates suggest voter participation in zip codes with higher proportions of Black and Hispanic voters was significantly lower in April than would be expected given prior voting history. *Id.* at 14.

145. Based on the available data, compared to zip codes in Milwaukee County that are entirely non-minority, turnout in hypothetical zip codes consisting entirely of Black or Hispanic residence was 14.8 and 16.6 percentage points lower, respectively, than would be expected for other voters in the county with the same prior voting history. *Id*. at 14-15.

146. Applying these results to actual zip codes, Dr. Fowler found, for example, that the zip code 53204, which consists of 70 percent Hispanic residents and 11 percent Black

residents, had a turnout 13 percentage points lower than expected compared to a zip code with no Hispanic or Black residents but identical voting history. *Id.* at 15.

147. Similarly, Dr. Fowler found that turnout was 14 percent lower than expected in zip code 53206, which has 94 percent Black residents and 2 percent Hispanic residents. *Id.*

148. In all, Dr. Fowler identified 14 zip codes where minority turnout dropped by more than 5 percentage points compared to similarly situated voters with identical voting history. *Id.*

149. Black and Hispanic Americans are more likely to die from COVID-19 than others. *Id.* at 14.

**Plaintiffs' Injuries**

*Jill Swenson*

150. Plaintiff Jill Swenson has chronic obstructive pulmonary disease, an inflammatory lung disease, and is at high risk of complications, severe symptoms or death if she is infected with COVID-19. Swenson Decl. ¶¶ 5-6.

151. Ms. Swenson is sixty-one years old, a resident of Appleton, Wisconsin and a registered voter. *Id.* ¶¶ 5, 2.

152. To protect her safety during the COVID-19 pandemic, Ms. Swenson self-quarantined and requested an absentee ballot. *Id.* ¶¶ 8, 11.

153. She felt unsafe voting in person because of the risk to her physical health posed by the COVID-19 pandemic. *Id.* ¶¶ 6, 8, 11-12.

154. Ms. Swenson lives alone and was unable to find an in-person witness for the absentee ballot she received in the mail. *Id.* ¶¶ 10-14.

155. After weeks of unsuccessfully searching for a safe way to have her ballot witnessed, Ms. Swenson relied on this Court's decision in *DNC*, 2020 WL 1638374, at *18-20, and

29

submitted her unwitnessed ballot on April 3, complying with all requirements for doing so. Swenson Decl. ¶¶ 12-14, 16.

156. Ms. Swenson subsequently learned through news reports that her ballot would be invalidated and would not count. *Id*. ¶ 17.

157. Ms. Swenson contacted the Commission to seek alternative ways of casting her vote; none were available to her. *Id*. ¶ 18.

158. As a result, Ms. Swenson was disenfranchised and her vote was not counted, leaving her deeply upset. *Id*. ¶¶ 17-19.

159. Ms. Swenson is in need of a safe and effective way to vote—and to ensure her vote is counted—in Wisconsin's fall elections. *Id.* ¶ 19.

*Melody McCurtis*

160. Plaintiff Melody McCurtis is a registered voter and a resident of Sherman Park in Northwest Milwaukee, Wisconsin. McCurtis Decl. ¶ 2.

161. Ms. McCurtis requested her absentee ballot on March 22, 2020, but never received it, and was forced to vote in person at Washington High School in order to cast a ballot. *Id.* ¶¶ 5-8.

162. In doing so, Ms. McCurtis was forced to put her immunocompromised mother, who lives with her, at risk. *Id*. ¶¶ 3, 8, 9.

163. As a Black community organizer, she was also aware of the disparate impact that COVID-19 had on the Black community in Milwaukee and particularly her neighborhood of Sherman Park, in the weeks leading up to April 7. *Id.* ¶ 4.

164. In order to vote, Ms. McCurtis was forced to endure an over two-and-a-half-hour wait during which she was surrounded by a large number of people, social distancing was not

enforced, and a member of the National Guard discouraged her from remaining in line. *Id*. ¶¶ 8-11.

165. Washington High School did not provide PPE to voters, and when Ms. McCurtis finally made it to the front of the line, no sanitary pens were made available for voters to use. *Id*. ¶ 9.

166. These conditions caused McCurtis to fear that she would infect and seriously harm her own mother. *Id.* ¶¶ 3, 5, 8, 9, 14, 15.

167. Ms. McCurtis experienced intimidation, fear, stigmatization, and frustration in order to vote. *Id*. ¶ 9.

168. As a Black Milwaukeean, Ms. McCurtis was devastated by the lack of respect shown to her community on April 7. *See e.g.*, *id*. ¶¶ 11, 14.

169. Moreover, she still feels the traumatic impact of her voting experience and is afraid that if she wants to exercise her right to vote this fall, she will be forced to place her and her mother's health at risk again. *Id*. ¶¶ 14, 15.

170. Ms. McCurtis will still be living with her immunocompromised mother in November. *Id.* ¶ 15.

171. In light of her experience in April, Ms. McCurtis remains scared that she will not be able to exercise her right to vote in this year's forthcoming elections without exposing herself—and therefore her mother—to significant health risks. *Id.*

*Maria Nelson*

172. Plaintiff Maria Nelson is undergoing treatment for breast cancer and believes herself to be immunocompromised. Nelson Decl. ¶ 3.

173. Ms. Nelson is a resident of Appleton, Wisconsin, and a registered voter. *Id.* ¶ 2.

31

174. As a mother to young children already undergoing grueling medical treatment, Ms. Nelson was afraid to risk her health and her life by voting in person on April 7. *Id*. ¶ 5.

175. For that reason, she timely requested an absentee ballot in order to vote from the safety of her home—but it did not arrive until after April 7. *Id*. ¶¶ 5-7, 9.

176. Ms. Nelson did not feel safe voting in person on April 7 and is not able to risk her health or her children's security by voting in person during the COVID-19 pandemic. *Id*. ¶¶ 10, 12.

177. As a result, she was disenfranchised and was not able to cast a ballot. *Id*. ¶ 11.

178. Plaintiff Nelson, like Plaintiff Swenson, was so intimidated and threatened by the in-person voting environment that she reasonably concluded her only safe option to exercise the franchise was to vote absentee. *Id*. ¶¶ 5-8, 10, 11; *see* Swenson Decl. ¶¶ 5-8.

179. Plaintiffs Swenson and Nelson have health conditions that will continue to place them at high risk for complications, serious illness and death if they contract COVID-19 in November. *See* Swenson Decl. ¶¶ 5-6; Nelson Decl. ¶¶ 3, 5.

180. Ms. Nelson intends to request an absentee ballot in this year's coming elections because she is afraid to risk her health or the security of her children to vote in person. However, she has no confidence that her ballot will arrive and that her vote will actually be counted. Nelson Decl. ¶ 12.

*Black Leaders Organizing for Communities*

181. In the run-up to the April 7 election, Plaintiff Black Leaders Organizing for Communities ("BLOC") was forced to divert significant time and resources in response to the failure of Wisconsin's election officials to ensure that every voter in the communities BLOC serves had a safe and accessible way to participate. This hurt BLOC's ability to fulfill its

mission and serve its community. Declaration of Angela Lang in Supp. of Pls.' Mot. for Prelim. Inj. ¶ 7.

182. BLOC is a civic engagement project based in Milwaukee, Wisconsin, and is fiscally sponsored by Tides Advocacy, a California nonprofit. *Id.* ¶ 2.

183. BLOC's mission is to mobilize Black Wisconsinites to participate at all levels of government, including by educating voters about the importance of voting and rules for casting a ballot and by operating a robust field operation ahead of elections. *Id.* ¶¶ 3, 4.

184. To do this during the pandemic, BLOC created a phone- and text-banking operation to encourage voters to vote and to talk to voters about their issues and endorsed candidates. *Id.* ¶ 6.

185. Staff were at reduced time, given the pandemic. *Id.* ¶ 8.

186. In the run-up to the April 7 election, BLOC was forced to divert significant time and resources in response to the lack of clear information about safely voting. *Id.* ¶ 7.

187. As Defendants' policies and deadlines rapidly shifted, BLOC had to repeatedly push out new training to its staff and ensure that updated messages were sent to constituents who had received now-outdated language. *Id.* ¶ 8.

188. This required BLOC's staff to devote their limited time, which they had planned to use for efforts to contact voters, to instead address the Commission's rapidly changing rules. *Id.*

189. When BLOC's staff did reach out to voters, they had to spend more time than usual and had to provide case management-type services for many voters, helping with online registration and absentee ballot request issues, navigating photo ID uploading, and discussing how to safely vote. *Id.* ¶ 9.

190. Because of this, BLOC staff were able to have very few, if any, substantive conversations focused on BLOC's issues or candidates. *Id.*

191. In order to ensure their constituents were receiving accurate information, BLOC also had to create new, single-use digital and social media materials. *Id.* ¶ 10.

192. Due to Defendants' failures administering the April 7 election, much of BLOC's work to empower the community has been eroded. *Id.* ¶ 13.

193. BLOC's efforts to build constituents' trust in the democratic system were squandered by how the state treated voters generally and BLOC's constituents specifically. *Id.*

194. As a result, BLOC's work is now harder because it not only has to continue its usual educational and outreach efforts, but it also must convince members of the Black community in Milwaukee that there is a safe way to cast their ballots—when BLOC staff is not currently sure whether that is true. *Id.*

195. This is a significant setback for BLOC's mission and work. *Id.*

196. BLOC's diversion of resources has continued and will continue through the fall if statewide changes are not implemented. *Id.* ¶¶ 11, 12, 14.

### *Disability Rights Wisconsin*

197. Plaintiff Disability Rights Wisconsin ("DRW") was likewise forced to divert significant time and resources to keeping its constituents—including individual voters with disabilities and disability-services organizations across the state—updated with accurate, comprehensive election information in advance of the April 7 election. Kerschensteiner Decl. ¶¶ 9-26.

198. DRW is a statewide nonpartisan, nonprofit, non-stock corporation organized under the laws of Wisconsin. DRW is based in Madison, and maintains offices across the state, including in Menasha, Milwaukee, Green Bay, and Rice Lake. *Id.* ¶ 2.

199. DRW is a member of the National Disability Rights Network and is designated by the Governor of Wisconsin to act as the congressionally mandated protection and advocacy system for Wisconsin citizens with disabilities, pursuant to Wis. Stat. § 51.62; 29 U.S.C. § 794e; 42 U.S.C. §§ 15041, et seq.; and 42 U.S.C. §§ 10801, et seq. Accordingly, DRW has a state and federal mandate to protect and advocate for the rights of people with disabilities in Wisconsin. *Id.* ¶ 5.

200. As part of this mandate, DRW oversees self-advocacy training and other programs and services to assist people with disabilities, including to secure election access, registering to vote, accessing polling places, and casting their ballots. *Id.* ¶ 6.

201. DRW runs a voter hotline and leads a coalition of disability-services organizations from across the state. *Id*. ¶¶ 6, 7.

202. Voters and coalition members rely on DRW to provide updated and accurate information about how Wisconsin voters with disabilities can register to vote and vote. *Id.* ¶ 15.

203. In order to do so ahead of the April 7 election, DRW diverted staff time and resources to creating multiple Zoom trainings for voters and coalition partners, preparing for and attending emergency Commission meetings, and directly liaising with the Commission. *Id*. ¶¶ 10, 13.

204. DRW was forced to create new resources explaining how voters with disabilities could vote absentee, and had to rewrite existing resources multiple times, checking with the Commission each time to ensure accuracy. *Id*. ¶¶ 11, 12.

205. Through both DRW's hotline and its coalition partners, DRW staff fielded reports of significant barriers faced by voters with disabilities. *Id.* ¶¶ 14-22.

206. Voters with disabilities who tried to vote in person faced a lack of curbside voting, lack of assistance, and long lines in various locations, as well as significant trouble finding safe transportation to the polls. *Id.* ¶¶ 18-20.

207. Voters with disabilities who sought to vote safely at home faced trouble safely finding witnesses, and some voters, particularly those with visual impairment, were unable to vote privately due to Defendants' failure to provide accessible absentee voting. *Id.* ¶¶ 16, 17.

208. Absent Defendants' failures, DRW would not have had to divert resources to helping voters surmount these barriers. *See id.* ¶¶ 9-26.

209. This work took time and resources away from other DRW priorities, and negatively impacted its mission and constituents. *Id.* ¶¶ 9, 23.

210. Indeed, despite all of this work, DRW was not able to fully achieve its mission of empowering voters with disabilities to vote, because, as discussed above, Defendants' failures ensured that voters with disabilities struggled to, and in some cases could not, vote on April 7. *See e.g. id.* ¶¶ 16-22, 26.

211. Many disabled voters require assistive technology available only at in-person polling locations. *See id.* ¶¶ 17, 22.

212. Given the poll closings and lack of safety protocols, those voters had no safe or practical way to cast a ballot in some parts of Wisconsin. *Id.* ¶¶ 16-21.

213. DRW's diversion of resources has continued and will continue through the fall if statewide changes are not implemented. *Id.* ¶¶ 24-26.

**COVID-19's Trajectory in Wisconsin**

214. Since Wisconsin's first COVID-19 case on February 5, 2020, the number of cases has consistently increased, with more than 25,000 Wisconsinites testing positive for the disease. Goodman Decl., Ex. 19 (Wis. Dep't of Health Servs.*,*

*COVID-19: Wisconsin Summary Data*, https://www.dhs.wisconsin.gov/covid-19/data.htm (last updated June 22, 2020)).

215. The state continues to experience "community spread," meaning that there are too many COVID-19 cases to trace and isolate infections. Remington Report at 6.

216. According to a comprehensive model developed by the Institute for Health Metrics and Evaluation (IMHE) at the University of Washington, "the evolution of the epidemic depends on the balance between relaxed social distancing, increasing temperature, and rising rates of testing and contact tracing." Goodman Decl., Ex. 48 (Inst. for Health Metrics & Evaluation, *New IMHE Forecast Projects Nearly 135,000 COVID-19 Deaths in US* (May 4, 2020), http://www.healthdata.org/news-release/new-ihme-forecast-projects-nearly-135000-covid-19-deaths-us), at 1.

217. Because many states have begun to reopen, IMHE Director Dr. Christopher Murray "expects that the epidemic in many states will now extend through the summer." *Id*.

218. Indeed, in the week ending June 20, ten states saw all-time highs in their seven-day average number of new positive COVID-19 cases per day. Goodman Decl., Ex. 63 (Holly Yan & Medline Holcombe, *10 States are Seeing their Highest Average of Daily New Covid-19 Cases since the Pandemic Started*, CNN (June 17, 2020), https://www.cnn.com/2020/06/17/health/us-coronavirus-wednesday/index.html), at 1.

219. Social distancing metrics (*e.g.*, data from cell phones) indicate that social distancing in Wisconsin decreased from April to May. Goodman Decl., Ex. 49 (*Compare Your Community's Social Distancing Activity to Its Activity Prior to COVID-19*, Unacast, https://www.unacast.com/covid19/social-distancing-scoreboard?view=state&fips=55#scoreboard (last visited June 18, 2020)).

220. The "Safer at Home" Order was in effect during the April election, but was later overturned by the Wisconsin Supreme Court. *See* Goodman Decl., Ex. 11 (Wis. Dep't of Health Servs., *Emergency Order No. 12, Safer at Home Order* (Mar. 24, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Health%20Order%20%2312%20Safer%20At%20Home.pdf); *Wisc. Legis. v. Palm*, 942 N.W.2d 900, 918 (Wis. May 13, 2020).

221.  As a result, social distancing rates are likely to keep dropping. Remington Report at 7.

222. Even assuming that "warming seasonal temperatures . . . could help slow transmission" during the summer (which is far from clear), COVID-19 will not recede during the summer because of rising mobility. Remington Report at 10.

223. Experts including Dr. Anthony Fauci have warned of a "bad fall and a bad winter" that may result in the increased spread of COVID-19. Goodman Decl., Ex. 50 (Nicole Chavez, *Another Wave of Coronavirus Will Likely Hit the US in the Fall. Here's Why and What We Can Do to Stop It*, CNN (May 2, 2020), https://www.cnn.com/2020/05/02/health/coronavirus-second-wave-fall-season/index.html) at 1.

224. Wisconsin and national public health officials expect the pandemic will continue and might well intensify between now and November. Remington Report at 10-11.

**COVID-19's Impact on the November Election**

225. Based on the epidemiology of COVID-19 transmission in Wisconsin, there will accordingly be a significant risk of contracting and transmitting COVID-19 during the November 2020 election in Wisconsin. Remington Report at 8-11.

226. For some voters, including Plaintiffs Swenson and Nelson, voting absentee by mail is the only way to exercise the franchise without seriously jeopardizing their lives or health. *See* Remington Report at 12-14; Swenson Decl. ¶¶ 5-8, 11, 15; Nelson Decl. ¶¶ 3, 5, 6, 10.

227. For most others, mail-in absentee voting is far safer than voting in person on election day—both because of the risk to the voter's own health and the risk of viral transmission at the polls or afterwards. Remington Report at 12-17; McCurtis Decl. ¶¶ 3, 5, 8, 15.

228. In recent presidential elections, 200-300 percent more people have participated in the November general elections than in the April primaries. Goodman Decl., Ex. 51 (Wis. Elections Comm'n, *Voter Turnout Partisan-NonPartisan Through April 2018.xlsx*, https://elections.wi.gov/elections-voting/statistics/turnout (last visited May 27, 2020)).

229. Given the confined nature of many polling places, the need for additional space to accommodate additional voters in November, and the continued mandate that all absentee voters abide by the witnessing requirement, transmission risk in November will thus be significant, absent any changes. Remington Report at 9, 13.

230. Increased voter demand for absentee ballots and online registration—and possibly double the demand—will also continue to strain the MyVote platform. Kennedy Report ¶¶ 44, 47-48.

231. A higher demand for absentee ballots also means a high likelihood that problems encountered in April will be compounded, meaning that voters either fail to receive their

39

ballots or that those ballots themselves fail to make it back to their polling locations in time. *See, e.g.*, *id.*¶¶ 104-106, 110, 125.

232. Wisconsin statutes authorize voters to timely request an absentee ballot by mail up until five days before election day. Wis. Stat. § 6.86(1)(b).

233. The deadline for absentee ballot requests for the November election is the Thursday before election day. Kennedy Report ¶ 137.

234. Given the expected high demand, there is not enough time between Thursday and election day for ballots to be processed by a clerk, mailed to the voter, completed by the voter, witnessed, and then returned. *Id.*

235. Wisconsin clerks will again face unprecedented numbers of absentee ballot requests. Remington Report at 11-12; Goodman Decl., Ex. 18 (*WEC May 20 Meeting Materials*), at 13-14.

236. "[E]ven the most diligent voter may be unable to return his or her ballot in time to be counted." *DNC*, 2020 WL 1638374, at *17; Kennedy Report ¶¶ 15, 126-29.

237. There is again an anticipated shortage of poll workers for the November election, which experts fear will grow worse. Kennedy Report ¶ 67-69; *see also* Goodman Decl., Ex. 64 (Sam , *'We're Going to Have a Catastrophe': US Faces November Election Fiasco*, The Guardian (June 12, 2020), https://www.theguardian.com/us-news/2020/jun/12/us-presidential-election-fiasco-voter-suppression) at 2.

238. The problems in November are likely to be the same problems faced in April, only worse. Goodman Decl., Ex. 18 (*WEC May 20 Meeting Materials*) at 13-14.

**Defendants' Current Inadequate Plans**

239. Defendants have urged Wisconsinites to vote absentee. Goodman Decl., Ex. 52 (Wis. Elections Commission, "Wisconsin Elections Commission Urges Absentee Voting in 7th CD Special Election May 12 due to COVID-19" (Apr. 23, 2020), *available at* https://elections.wi.gov/index.php/node/6868).

240. Defendants have issued "recommendations" in varying degrees of specificity. Goodman Decl., Ex. 53 (Shawn Johnson, *Elections Commission Could Send Absentee Ballot Forms to All Wisconsin Voters*, Wis. Public Radio (May 20, 2020), https://www.wpr.org/elections-commission-could-send-absentee-ballot-forms-all-wisconsin-voters).

241. Although Defendant Wolfe acknowledged in her May 20 CARES Grant Planning Memorandum the need for "software development and consultation" and "system load testing," she made no specific mention of adding additional capacity. Goodman Decl., Ex. 18 (*WEC May 20 Meeting Materials*), at 40.

242. Defendants have reported data on thousands of disenfranchised voters. *Id.* at 30.

243. The Commission now intends to mail absentee ballot applications to nearly all registered voters who have not already requested one. Goodman Decl., Ex. 42 (Mitchell Schmidt, *Elections Commission Gives Final Approval to Sending Absentee Ballot Applications to 2.7 million Wisconsinites*, Wis. State Journal (June 18, 2020), https://madison.com/news/local/govt-and-politics/elections-commission-gives-final-approval-to-sending-absentee-ballot-applications-to-2-7-million-wisconsinites/article_ef20b423-1ebf-5f64-aecd-0c38cd758558.html).

244. Defendants have not taken the necessary concrete actions to *solve* the vast majority of the myriad problems they and Plaintiffs have identified, and that Wisconsin voters experienced in April. Kennedy Report ¶¶ 24-34.

245. The Commission may "conduct or prescribe requirements for educational programs to inform electors about voting procedures, voting rights, and voting technology." Wis. Stat. § 5.05(12).

246. Estimates suggest that more than 1.8 million Wisconsin voters will request an absentee ballot for the November election. Goodman Decl., Ex. 54 (Scott Bauer, *Wisconsin Agrees to Broad Mailing of Absentee Applications*, Associated Press (May 27, 2020), https://apnews.com/e738275687445170edf4a1fb54b3d6f0); Ex. 18 (WEC May 20 Meeting Materials), at 13.

247. Wisconsin statutes prevent Defendants from making some of the necessary changes to policies and practices, including (1) the requirement that each election official be an elector of the county in which the municipality is located, Wis. Stat. § 7.30(2); (2) that voters secure an in-person witness, Wis. Stat. § 6.87(2); (3) that absentee ballots must be delivered to the polling place no later than 8 p.m. on election day, Wis. Stat § 6.87(6); (4) that absentee ballots not be counted before election day, Wis. Stat. §§ 6.88, 7.51, 7.52; and (5) that locations for in-person absentee voting must have been determined already, by June 11, 2020, Wis. Stat. § 6.855(1), Goodman Decl., Ex. 62 (Wis. Elections Comm'n, *Calendar of Election Events, November 2019 - January 2021* (2019), https://elections.wi.gov/sites/elections.wi.gov/files/2020-01/2020%20Calendar%20of%20Election%20Events%20WORD%28rev%202020-01%29.pdf), at 11.

248. The best available epidemiological evidence shows that administering ordinary in-person voting processes this fall would imperil most voters, a burden that will fall especially hard on immunocompromised individuals. Remington Report at 5-6, 9-11.

249. Defendants have still not taken "[s]ufficient measures to ensure that the significant failures of the April 7 election are not repeated in November." Kennedy Report ¶ 32; *see also id*. ¶¶ 31, 33-34.

250. There are specific measures that would ensure voters enjoy substantially safer conditions when voting in November. *Id*. ¶¶ 42-156

**Defendants**

251. Defendants Marge Bostelmann, Julie M. Glancey, Ann S. Jacobs, Dean Knudson, Robert F. Spindell, Jr., and Mark L. Thomsen are the six Commissioners of the Wisconsin Elections Commission, the body that administers and enforces Wisconsin's election laws other than those related to campaign finance. Wis. Stat. § 5.05(1), (2w).

252. Defendant Meagan Wolfe is the Administrator of the Commission and chief elections officer of the state. Wis. Stat. § 5.05(3g).

253. The Commission maintains wide-ranging authority over the architecture of Wisconsin's electoral system. The Commission retains authority to promulgate rules "applicable to all jurisdictions for the purposes of interpreting or implementing the laws regulating the conduct of elections or election campaigns, other than laws regulating campaign financing, or ensuring their proper administration." Wis. Stat. § 5.05(1)(f).

254. Defendants are state officials located in Madison, Wisconsin. *See, e.g.*, Goodman Decl., Ex. 61 (Wis. Elections Comm'n, *Absentee Witness Signature Requirement Guidance*

(Mar. 29, 2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Absentee%20Witness%20Guidance_0.pdf) at 1.

255. A substantial part of the events giving rise to these claims occurred and continues to occur in this district. *See, e.g.*, *id.*

Dated:  June 24, 2020

Respectfully submitted,

*/s/ Yaira Dubin*

Anton Metlitsky
Leah Godesky
Yaira Dubin
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 326-2000
ametlitsky@omm.com
lgodesky@omm.com
ydubin@omm.com

Molly M. Lens
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
(310) 553-6700
mlens@omm.com

Jason Zarrow
O'MELVENY & MYERS LLP
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
(213) 430-6000
jzarrow@omm.com

Jonathan Manes
RODERICK & SOLANGE MACARTHUR
JUSTICE CENTER
160 E Grand Ave, Sixth Floor
Chicago, IL 60611
(312) 503-0012
jonathan.manes@law.northwestern.edu

Rachel E. Goodman
THE PROTECT DEMOCRACY PROJECT
115 Broadway, 5th Fl.
New York, NY 10006
(202) 997-0599
rachel.goodman@protectdemocracy.org

Laurence M. Schwartztol
THE PROTECT DEMOCRACY PROJECT
15 Main St., Suite 312
Watertown, MA 02472
(202) 856-9191
larry.schwartztol@protectdemocracy.org

Jamila Benkato*
Farbod Kaycee Faraji*
Cameron Kistler
THE PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington, D.C. 20006
(202) 579-4582
jamila.benkato@protectdemocracy.org
farbod.faraji@protectdemocracy.org
cameron.kistler@protectdemocracy.org
*Admitted to practice in California, not D.C.;
practice consistent with D.C. App. R.
49(c)(3).

Douglas M. Poland
State Bar No. 1055189
RATHJE WOODWARD LLC
10 E Doty Street
Suite 507
Madison, WI 53703
(608) 960-7430
dpoland@rathjewoodward.com

45

Jeffrey A. Mandell
State Bar No. 1100406
STAFFORD ROSENBAUM LLP
222 West Washington Avenue
P.O. Box 1784
Madison, WI 53701-1784
(608) 256-0226
jmandell@staffordlaw.com

*Counsel for Plaintiffs*