# Exhibit 1

2020 WL 4882696
Only the Westlaw citation is currently available.
United States District Court, S.D.
Indiana, Indianapolis Division.

Mary J. FREDERICK, et al., Plaintiffs,
v.
Connie LAWSON, in her official capacity as Secretary of State of Indiana, Defendant.

No. 1:19-cv-01959-SEB-MJD
|
Signed 8/20/2020

**Synopsis**
**Background:** Non-partisan voter advocacy organization and registered voters who were eligible to vote by mail-in absentee ballot, but had their ballots rejected because the signature was determined to be not genuine, brought § 1983 action against Secretary of State of Indiana, challenging Indiana's signature-match requirement for mail-in absentee ballots under Due Process and Equal Protection Clauses. Defendant moved for summary judgment and plaintiffs filed cross-motion for summary judgment.

**Holdings:** The District Court, Sarah Evans Barker, Senior District Judge, held that:

voters had legally protected interest in being free from reasonable, nondiscriminatory, state-imposed restrictions on absentee voting;

voters' alleged injury was fairly traceable to and redressable by Secretary of State;

voters had cognizable liberty interest in voting by mail;

signature-match requirement for mail-in absentee ballots violated Due Process Clause; and

signature-match requirement for mail-in absentee ballots violated equal protection rights.

Plaintiffs' motion granted and defendant's motion denied.

**West Codenotes**

**Held Unconstitutional**
Ind. Code Ann. §§ 3-11.5-4-4, 3-11.5-4-13(a)(2), 3-11-10-4

**Attorneys and Law Firms**

Mark W. Sniderman, Findling Park Conyers Woody & Sniderman, PC, William R. Groth, Macey Swanson LLP, Indianapolis, IN, for Plaintiffs.

Aleksandrina Penkova Pratt, Jefferson S. Garn, Parvinder Kaur Nijjar, Rebecca L. McClain, Robert Austin Rowlett, Indiana Attorney General, Courtney Lyn Abshire, Indianapolis, IN, for Defendant.

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

SARAH EVANS BARKER, JUDGE

*1 This lawsuit is one of several actions[1] recently filed in our district challenging various Indiana election laws and voting regulations in advance of the upcoming November 3, 2020 general election. The specific issue presented in this case is whether Indiana's signature-match requirement for mail-in absentee ballots violates the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because affected voters are not given notice or an opportunity to cure before their ballots are rejected based on a perceived signature mismatch.

Now before the Court are Defendant's Motion for Summary Judgment [Dkt. 63] and Plaintiffs' Cross Motion for Summary Judgment [Dkt. 67], filed on February 4, 2020 and March 3, 2020, respectively. Plaintiffs, Mary J. Frederick, John Justin Collier, William L. Marks, Jr., Minnie Lee Clark, and Common Cause Indiana, have brought this action against Defendant, Connie Lawson, in her official capacity as Secretary of State of Indiana, seeking both declaratory and injunctive relief, alleging that Indiana Code §§ 3-11-10-4, 3-11.5-4-4, and 3-11.5-4-13(a)(2), which set forth Indiana's signature-match requirement for mail-in absentee ballots, violate the Fourteenth Amendment's Due Process Clause and Equal Protection Clause, both facially and as-applied to the individual Plaintiffs. For the reasons detailed below, we DENY Defendant's Motion and GRANT Plaintiffs' Motion.

## Factual Background

**I. Indiana Mail-In Absentee Voting Procedures**

This case involves the provisions of Indiana law setting forth the signature verification process for mail-in absentee voting. *See generally*, Ind. Code § 3-11-10-1 *et seq.* Under Indiana law, a person who cannot be physically present to vote at the polls or is age 65 or older on election day and is otherwise qualified to vote may participate in the electoral process by, among other methods, submitting an absentee ballot by mail. Specifically, a registered voter has a statutory right to vote by mail-in absentee ballot if the voter meets one of several statutory qualifications, including if:

> 1) The voter has a specific, reasonable expectation of being absent from the county on election day during the entire twelve (12) hours that the polls are open.
>
> ...
>
> 4) The voter is a voter with disabilities.
>
> 5) The voter is an elderly voter [elsewhere defined as being a voter at least 65 years of age, Ind. Code § 3-5-2-16.5].
>
> ...
>
> 7) The voter is scheduled to work at the person's regular place of employment during the entire twelve (12) hours that the polls are open.

Ind. Code § 3-11-10-24(a); *see also id.* § 3-11-10-25.[2]

 **\*2**  A voter who wishes to submit an absentee ballot by mail must first make a timely application on a state-approved form for a mail-in absentee ballot, which application must be received by the circuit court clerk or other designated office not earlier than the date the registration period resumes following an election, and, if the application is mailed, emailed, faxed, or hand-delivered, not later than 11:59 p.m. (prevailing local time) twelve (12) days before election day. Ind. Code § 3-11-4-3(a)(4). An application for an absentee ballot received by the election division in compliance with these deadlines "is considered to have been timely received for purposes of processing by the county" and the election division is then required to "immediately transmit the application to the circuit court clerk, or the director of the board of elections and registration, of the county where the applicant resides." *Id.* § 3-11-4-3(b).

In the absentee-ballot application, the voter must identify the reason the individual is qualified to vote by absentee ballot as well as provide basic biographical information, including name, voting registration address, mailing address, and date of birth. *See id.* § 3-11-4-2. Except in cases of disability, "the voter must sign the absentee ballot application." *Id.* § 3-11-4-2(a). If a voter with disabilities is unable to sign the absentee ballot application, "the voter may designate an individual eligible to assist the voter ... to sign the application on behalf of the voter and add the individual's name to the application." *Id.* § 3-11-4-2(b). There is also a section on the application for the designated individual assisting the voter to sign their own name.

Upon receipt of an application for absentee ballot, the county election board or the absentee voter board in the office of the circuit court clerk is required to review the application to ensure it has been properly executed, including whether "the signature of the voter on the application substantially conforms with the signature of the voter on the voter registration record, or that any substantial difference between the signatures can be accounted for by age or disability of the voter ...." Ind. Code § 3-11-4-17.5(a). If the members of the absentee voter board, which is comprised of two voters of each political party who are appointed and trained by the county election board, are unable to agree about this determination, the issue is referred to the county election board for resolution. *Id.* The statute is silent regarding the applicable procedure(s) if the members of the county election board cannot agree whether the voter's signature on the application substantially conforms with the voter's signature on the voter registration record, but in other circumstances in which the approval or denial of an absentee ballot application is referred to the county election board, the applicant must be provided due notice and an opportunity for a hearing. *Id.* § 3-11-4-18.5; § 3-6-5-31.

Upon receipt of a properly executed application for a mail-in absentee ballot, the voter is provided an absentee ballot, an affidavit envelope, and a return envelope. Ind. Code § 3-11-4-20. Voters whose absentee ballot applications are approved also receive a copy of what is known as the Absentee Voter's Bill of Rights. *Id.* § 3-5-8-2.5. That document does not inform a voter who is eligible to cast a mail-in absentee ballot that election officials are required to perform a signature comparison or that an absentee ballot may be rejected because election officials find that the voter's signature on the application or in the State's voter database

does not match the signature on the absentee ballot affidavit. *See* Dkt. 67-9.

Upon receipt of the absentee ballot, the voter is required to mark the ballot in the presence of no other person, fold the ballot so the markings are concealed, and enclose the ballot in the provided envelope. The voter must execute the affidavit printed on the face of the affidavit envelope, which requires the voter to affirm that they personally marked the ballot and that they are a qualified voter and then to sign and date the form under the penalties of perjury. Ind. Code § 3-11-4-21. Once securely sealed in the return envelope, the mail-in ballot must then be delivered to the county election board.

**\*3** A security envelope containing a mailed-in absentee ballot may be opened and the ballot removed only if the counters find, *inter alia*, that the "signature on the application corresponds to the signature on the absentee ballot affidavit." *Id.* § 3-11.5-4-12(b)(2). Indiana law provides that "[u]pon receipt of an absentee ballot, a county election board (or the absentee voter board in the office of the circuit court clerk) shall immediately examine the signature of the absentee voter to determine its genuineness." *Id.* § 3-11-10-4(a); *see also id.* § 3-11.5-4-11(a)(3) (absentee ballot counters in the presence of the county election board shall "compare the signature upon the application or electronic poll book with the signature upon the affidavit on the ballot envelope ... or voter registration record"). To do so, "[t]he board shall compare the signature as it appears upon the envelope containing the absentee ballot [or on the affidavit transmitted with the voter's absentee ballot] with the signature of the voter as it appears upon the application for the absentee ballot. The board may also compare the signature on the ballot envelope [or on the affidavit] with any other admittedly genuine signature of the voter." *Id.* § 3-11-10-4(b), (c). "[T]he signature review process ... may be conducted at any time after receipt of an absentee ballot by the county election board." *Id.* § 3-11.5-4-12(a).

If the county election board or absentee voter board performing the signature review immediately upon receipt of the absentee ballot "unanimously finds that the signature on a ballot envelope or transmitted affidavit is genuine, the board shall enclose immediately the accepted and unopened ballot envelope, together with the voter's application for the absentee ballot, in a large or carrier envelope" in which all absentee ballot envelopes and applications for the same precinct may be kept. Ind. Code § 3-11.5-4-5(a). The envelope is then "securely sealed and endorsed with the name and official title of the circuit court clerk and the following words: 'This envelope contains an absentee ballot and must be opened only on election day under IC 3-11.5.' " *Id.* § 3-11.5-4-5(b). Each circuit court clerk keeps all accepted ballot envelopes securely sealed in the clerk's office until the ballot envelopes are opened by absentee ballot counters on election day.[3] *Id.* § 3-11.5-4-6.

If, on the other hand, the county election board determines that a voter's signature is not genuine, the board must write on the envelope the words: "The county election board has rejected this ballot because the signature of this voter is not genuine." Ind. Code § 3-11.5-4-4. When an absentee ballot is rejected based on signature comparison, the county election board is required to issue a certificate allowing the voter to vote in person, but only "if the voter appears in person before the board not later than 5 p.m. on election day." *Id.* § 3-11.5-4-13(f). However, Indiana law does not require that voters be notified that their absentee ballot was rejected and for what reason; thus, such voters would have no notice that, in order for their votes to be counted, they would need to return to the polls to vote in person by 5:00 p.m. on election day. There is also no procedure by which a voter can contest the decision that two signatures do not match, nor is there a requirement that a formal notice of rejection be sent to the voter at any point after election day. By comparison, voters who cast a provisional ballot because, for example, they lacked the proper form of photographic identification for in-person voting, have ten (10) days to appear and present the required identification. *E.g.*, *Id.* § 3-11-8-25.1, § 3-11.7-5-2.5(a).

As noted above, Indiana law requires that, at the application stage, county election officials take into account whether any "substantial difference between the signatures can be accounted for by age or disability of the voter." Ind. Code § 3-11-4-17.5(a)(3). However, once the voter's application for a mail-in absentee ballot has been approved, the Indiana Code provides no standards or guidelines for election boards or absentee ballot counters to use in determining whether an absentee voter's signature on their absentee voting affidavit is "genuine" or whether the voter's signature on their application "corresponds" with the signature on the absentee ballot affidavit, nor do election board members or absentee ballot counters receive training in handwriting or signature analysis. The Election Division of the Office of the Secretary of State produces the Election Administrators' Manual, which contains instructions and advice for county election officials to aid them in interpreting and administering Indiana election

law, including the absentee balloting procedures. The Manual, while non-binding on county election officials, reflects the best efforts of the bipartisan co-directors of Indiana Election Division to interpret Indiana election law. The Manual's section on absentee voting, that serves as a "roadmap for the county election administrator to follow" in implementing Indiana's absentee voting procedures, includes two references to the signature verification requirement and advises that, in assessing a voter's signature on the absentee ballot affidavit, county election officials should give "[s]ome deference" in determining the genuineness of the voter's signature "to voters with disabilities." Dkt. 67-1 at 118. The Manual contains no further guidance regarding standards that county election officials should apply in making signature comparisons.

## II. Plaintiffs

**\*4** The individual Plaintiffs[4] are all registered voters who reside in St. Joseph County, Indiana, were eligible to vote by mail-in absentee ballot and chose to do so in the 2018 general election. Each individual Plaintiff had his or her ballot rejected because the signature on their ballot security envelopes was determined to be "not genuine" or was found not to match other signatures on file. Plaintiffs were never notified by any election official that their mail-in ballots could be rejected for these reasons and did not learn that their ballots were so rejected until February 2019. Each Plaintiff has testified that his or her signature varies and that the signature on their respective ballot security envelopes submitted in the 2018 general election was genuine. Ms. Frederick and Mr. Marks, both over the age of 65, have indicated they would like to vote by mail-in absentee ballot in the future, but are worried that their ballots will again be rejected, and their votes not counted due to a perceived signature mismatch.

Plaintiff Common Cause Indiana ("CCI") is the Indiana affiliate of Common Cause, a national non-profit, non-partisan grassroots organization that advocates in favor of ethics, good government, campaign finance reform, constitutional law, and the elimination of voting barriers. CCI works to expand and protect equal access to voting by lobbying for non-partisan redistricting, increasing the number of satellite voting locations, and partnering with community organizations to provide education and training to voting rights activists. The organization has more than 14,000 members who live and vote in Indiana.

Julia Vaughn, the sole employee of CCI, is responsible for policy development, lobbying, grassroots organizing, and coalition building. CCI has a limited budget and must make difficult decisions regarding the manner in which to use those resources. According to Ms. Vaughn, by increasing the risk that a mail-in absentee ballot will be erroneously rejected without notice to the voter or opportunity to contest that rejection, the Indiana statutes challenged in this case harm CCI's mission of expanding access and reducing barriers to voting and thus impose additional burdens on CCI that take time and resources away from the organization's lobbying and advocacy efforts on other issues, including, *inter alia*, nonpartisan gerrymandering and expanding early satellite and mail-in absentee voting.

Since learning that absentee voters were having their ballots rejected based on signature comparisons without notice or an opportunity to challenge the rejection, CCI has devoted time and resources to notifying its members of the risks of mailing in an absentee ballot. CCI also regularly conducts citizen advocacy trainings for members and the general public. Because of the challenged statutes, CCI will change its curriculum and presentation materials to educate voters and community activists about the increased risk of erroneous absentee ballot rejections due to a finding by election officials that a voter's signature is not "genuine" or does not correspond with the voter's signature on their absentee ballot application. By spending a greater portion of the fixed amount of time it has allocated for these educational sessions discussing concerns regarding the mail-in absentee ballot signature requirement, there will be less time to discuss other election-related issues on which CCI would otherwise focus.

CCI has a particular concern regarding the potential for wrongful rejections of absentee ballots based on signature comparisons because more than half of its members are 65 years of age or older who are thus entitled by Indiana law to vote by mail-in absentee ballot, and who may have had their absentee ballot erroneously rejected based on a signature comparison without ever being notified or given an opportunity to contest that rejection. Given the mature age of a majority of the members of CCI, Ms. Vaughn believes there to be at the very least a realistic likelihood that at least one member of CCI has had their mail-in absentee ballot rejected due to a perceived signature mismatch and that other members will have their mail-in absentee ballots rejected for that reason in the future.

## III. Statistics from the 2018 General Election

**\*5** Norma Blake, a volunteer for CCI, participated in a project sponsored by the organization in which she processed

public records requests for mail-in absentee ballots that were rejected for signature mismatch in the 2018 Indiana general election. Specifically, she contacted several county election boards in Indiana's most populous counties to request records related to signature mismatches, and received, logged, examined, analyzed, and quantified the resulting records. Records were requested from 19 counties (of which 18 responded) for all mail-in absentee ballots in the 2018 general election that were rejected based on the signature comparison requirement under Indiana law.

Ms. Blake determined, based on her review of the documents, that 10 of the counties—Bartholomew, Boone, Clark, Delaware, Floyd, Kosciusko, La Porte, Monroe, Porter, and Vanderburgh—reported zero ballots having been rejected for signature mismatch. The remaining 8 counties reported rejecting at least one ballot for signature mismatch, with the differential between the highest rate of rejection—0.7% for St. Joseph—and the lowest rate of rejection—0.1% for Allen, Howard, and Tippecanoe—being 700%. The specific numbers of rejected ballots for each of the 8 counties is reflected in the chart below:

| County | Total Absentee Voters by Mail | Ballots Rejected for Signature Mismatch | Ballots Rejected, as % of Total Absentee by Mail Voters |
|---|---|---|---|
| Allen | 8,328 | 8 | 0.1% |
| Elkhart | 3,381 | 10 | 0.3% |
| Howard | 1,843 | 1 | 0.1% |
| Lake | 8,078 | 32 | 0.4% |
| Madison | 3,897 | 13 | 0.3% |
| Marion | 17,944 | 73 | 0.4% |
| St. Joseph | 5,989 | 39 | 0.7% |
| Tippecanoe | 1,723 | 1 | 0.1% |

The parties have not indicated whether these numbers are thought to be in line with the rate of signature rejection in other elections, particularly in the most recent primary election that occurred on June 2, 2020, where an unprecedented number of Hoosiers voted by mail-in absentee ballot after state election officials offered no-excuse voting by mail due to the COVID-19 pandemic.

In reviewing the data she received, Ms. Blake noted that recordkeeping practices regarding the rejection of mail-in absentee ballots based on the signature requirement varied between counties. For example, some counties, including Howard and Lake, adhered strictly to Indiana Code § 3-11.5-4-4, and in almost every case clearly documented rejected absentee ballots and the reason for the rejection with the two decisionmakers' initials, while other counties did not. Lake County also assigns codes for the reasons for rejection, and, beginning in 2018, implemented a practice of informing voters by form letter, though not until after election day, if their absentee ballot was rejected and the reason for that rejection. After implementing this practice, Lake County reported a "substantial" reduction in the number of ballot rejections in the 2019 primary election. Lake County is the only county for which Ms. Blake collected data that puts forth a comprehensive effort to notify absentee voters that their ballot was rejected based on a perceived signature mismatch, but because any such notice is not provided until after election day, the voter still has no opportunity to challenge the decision or cure.

**IV. Senator Billie Breaux**
Senator Billie Breaux is a resident of Indianapolis, Indiana, and has been registered to vote at the same address since 2007. Breaux Decl. ¶ 1. Senator Breaux served in the Indiana State Senate from 1990 until 2006 and then served as Marion County Auditor from 2006 until 2014. *Id.* ¶¶ 4–5. Senator Breaux signed and submitted an application for a mail-in absentee ballot in September 2018 for the 2018 general

election. She was eligible to do so based on her age. Her application was approved and after receiving her absentee ballot, she marked it, placed it in the security envelope, and signed the affidavit on the security envelope. *Id.* ¶¶ 1, 7–8. Senator Breaux learned for the first time in January 2020 that her absentee ballot had been rejected in 2018 because election workers had determined one of her signatures was not genuine or did not match each other. She was never informed by Marion County election officials that her absentee ballot was rejected; if she had been so informed, she would have provided confirmation of her signature. *Id.* ¶¶ 9–11.

**V. Expert Testimony**

 **\*6**  Plaintiffs have retained an expert, Linton Mohammed, Ph.D., to support their claims. Dr. Mohammed is a certified Forensic Document Examiner ("FDE") whose research and professional experience focus upon handwriting, signature identification, and the scientific approach to analyzing questioned signatures. He opines that determining whether a signature is genuine is a difficult task for even a trained FDE, as signatures are written in different styles with varying levels of readability and variability. Laypersons have a significantly higher rate of error than trained examiners in determining whether signatures are genuine and are also more likely to err by wrongly determining that an authentic signature is not genuine or by making an incorrect signature-comparison (i.e., wrongly finding that the signatures do not "compare") than to err in favor of finding a signature genuine or two signatures comparable when they are not.[5] Signature-determination errors are further compounded for individuals with diminished eyesight or "form blindness," which impact an individual's ability to make accurate handwriting authenticity determinations, but election officials are not screened for these traits.

The high rate of error among laypersons generally results from an incorrect determination that "variations" between one individual's signatures are instead "differences" between multiple individuals' signatures. One person's signatures may vary for a number of reasons, including age, health, native language, and writing conditions. Laypersons' failure to properly account for signature variability leads to erroneous inauthenticity determinations, which are particularly pronounced in populations with greater variability, such as elderly, disabled, ill, and non-native English signatories. Generally, a minimum of ten signature samples are recommended for an accurate signature determination to account for an individual's signature variability and more sample signatures may be required for individuals who are impaired, elderly, or have difficulty signing documents.

Dr. Mohammed further opined that the challenged Indiana statutes, which require that lay election officials, without training, examination equipment, or functional standards for signature comparison, compare voter signatures to determine whether an absentee ballot will be counted, has resulted, and will result, in erroneous ballot rejections. Indiana law does not require that election officials spend a minimal amount of time in making a signature determination, which is likely to lead to additional erroneous determinations.

**VI. The Instant Litigation**
Plaintiffs filed their complaint in this litigation on May 16, 2019 and amended their complaint on June 27, 2019, alleging that the signature verification requirement, both facially and as-applied to the individual Plaintiffs, violates the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment. Plaintiffs originally named the Indiana Secretary of State in her official capacity as well as various county election boards and officials as defendants, but later voluntarily dismissed the local entities and individuals, leaving the Secretary as the sole defendant. Now before the Court are the parties' cross motions for summary judgment on Plaintiffs' § 1983 claims.

**Legal Analysis**

**I. Summary Judgment Standard**
Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, 106 S.Ct. 2505, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

**\*7** Because these are cross-motions for summary judgment and the same Rule 56 standards apply, our review of the record requires us to draw all inferences in favor of the party against whom a particular issue in the motion under consideration is asserted. *See O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## II. Standing

We turn first to address the issue of Plaintiffs' standing to bring these claims in this litigation. The Secretary argues that she is entitled to summary judgment on Plaintiffs' claims in this lawsuit because Plaintiffs lack standing. To establish standing, a plaintiff must show: "(1) an 'injury in fact,' that is, 'an invasion of a legally protected interest which is ... concrete and particularized, and ... actual or imminent'; (2) a causal connection between the injury and the challenged conduct, meaning that the injury is 'fairly traceable' to the challenged conduct; and (3) a likelihood 'that the injury will be redressed by a favorable decision.' " *Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Here, the Secretary argues that Plaintiffs cannot establish that they have suffered an actual or imminent injury or that any injury they may have suffered is either caused or redressable by the Secretary. We address these arguments in turn below.

### A. Injury-In-Fact

**1. Individual Plaintiffs**

The Secretary first argues that the individual Plaintiffs have failed to establish that they have suffered a cognizable injury-in-fact because they cannot demonstrate that having their absentee ballots rejected in the circumstances presented here rises to the level of a constitutional infirmity. An "injury-in-fact" for standing purposes is "an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical." *DH2, Inc. v. U.S. S.E.C.*, 422 F.3d 591, 596 (7th Cir. 2005) (quoting *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003)). The Secretary claims that, because there is no fundamental right to vote via mail-in absentee ballot, Plaintiffs do not have any legally protected interest in being free from reasonable, nondiscriminatory State-imposed restrictions on absentee voting, such as the signature verification requirement, and therefore have suffered no injury-in-fact.

In support of her contention, the Secretary cites the Seventh Circuit's decision in *Hennings v. Grafton*, 523 F.2d 861 (7th Cir. 1975), for the proposition that "not every election irregularity ... will give rise to a constitutional claim and an action under § 1983," including "irregularities caused by mechanical or human error and lacking in invidious or fraudulent intent." *Id.* at 864. The Secretary maintains that Plaintiffs' injury here is comparable to that alleged in *Hennings* as their claims stem simply from their "dislike [of] the procedure by which an absentee ballot signature is verified." Dkt. 75 at 7. The Secretary argues that the purported misidentification of signatures on absentee ballots of which Plaintiffs complain is nothing more than a "garden variety election irregularit[y]" that does not implicate constitutional concerns. *See Dieckhoff v. Severson*, 915 F.2d 1145, 1150 (7th Cir. 1990). For the following reasons, we disagree with that characterization.

**\*8** The individual Plaintiffs, all of whom had their mail-in absentee ballots rejected for signature mismatch in the 2018 general election and some of whom will be eligible to and desire to vote by mail-in absentee ballot in the 2020 general election but fear having their ballots once again rejected for signature mismatch, certainly raise concerns regarding the manner in which county election officials review and render signature comparisons without training or clear standards. However, contrary to the Secretary's characterization, Plaintiffs' constitutional claims do not stem from those alleged deficiencies involving human error. Rather, as Plaintiffs argue, Indiana's failure to provide notice or an opportunity to cure before nullifying their statutorily-provided mail-in absentee voting privileges on grounds of signature mismatch is, both facially and as applied to them, violative of the Fourteenth Amendment's Due Process and Equal Protection Clauses. As such, their claims are clearly distinguishable from those raised by the plaintiffs in *Hennings* and *Dieckhoff*.

It is true that there is no constitutional right to vote by absentee ballot and therefore Indiana could, if it chose, eliminate entirely absentee voting privileges throughout the state. *See Griffin v. Roupas*, 385 F.3d 1128, 1130–31 (7th Cir. 2004). Thus, "state regulations or restrictions on absentee voting do not, as a general matter, violate a fundamental constitutional right." *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at \*6 (N.D. Ill. Mar. 13, 2006) (citations omitted). However, once a state creates an absentee voting regime, as Indiana has done, courts have found that it must be administered in

a manner that comports with the Constitution. *Id.*; *see also* One Wisconsin Inst., Inc. v. Thomsen, 198 F. Supp. 3d 896, 933 (W.D. Wis. 2016), *rev'd in part on other grounds, Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020).

In this lawsuit, Plaintiffs claim that the manner in which Indiana administers its absentee voting procedures is unconstitutional. Specifically, they argue that, once the State enacted Indiana Code § 3-11-10-24(a), which "entitles" thirteen (13) categories of voters, including those who are "elderly," have "disabilities," or are scheduled to work during the entire twelve hours the polls are open, to vote by mail-in absentee ballot, Indiana created a statutory entitlement to voting by mail for voters falling within those categories that cannot be deprived on grounds of signature mismatch without first providing such voters notice and an opportunity to cure. Plaintiffs argue that Indiana's failure to provide such protections violates the Fourteenth Amendment's Due Process Clause and also impermissibly burdens such voters' right to vote in violation of the Equal Protection Clause of the Fourteenth Amendment.

For standing purposes, Plaintiffs must show only that they are seeking to vindicate "the sort of interest that the law protects when it is *wrongfully* invaded. The cases simply require litigants to possess such an interest, which is quite different from requiring them to establish a *meritorious* legal claim." Aurora Loan Servs., Inc. v. Craddieth, 442 F.3d 1018, 1024 (7th Cir. 2006) (emphasis in original). Here, as we have noted, Indiana law extends the privilege of mail-in absentee voting to certain categories of voters, including Plaintiffs. Other courts addressing this issue have held that, once a state authorizes voters to vote absentee, although "absentee voting is a privilege and convenience to voters, this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege. While the state is able to regulate absentee voting, it cannot disqualify ballots, and thus disenfranchise voters, without affording the individual appropriate due process protection." Raetzel v. Parks/Bellemont Absentee Election Bd., 762 F. Supp. 1354, 1358 (D. Ariz. 1990); *accord* Democracy North Carolina v. North Carolina State Bd. of Elections, ––– F. Supp. 3d ––––, 2020 WL 4484063 (M.D.N.C. Aug. 4, 2020); *Self Advocacy Sols. N.D. v. Jaeger*, ––– F. Supp. 3d ––––, 2020 WL 2951012 (D.N.D. June 3, 2020); Martin v. Kemp, 341 F. Supp. 3d 1326 (N.D. Ga. 2018); Saucedo v. Gardner, 335 F. Supp. 3d 202 (D.N.H. 2018); Florida Democratic Party v. Detzner, No. 4:16cv607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016); Zessar, 2006 WL 642646 (each holding that an absentee voting scheme that does not afford adequate process to voters whose ballot is rejected violates the Fourteenth Amendment's due process clause).

**\*9** Likewise, courts have held that, where a state authorizes the use of absentee ballots, any restrictions it imposes on the use of those absentee ballots must comply with the Fourteenth Amendment's Equal Protection Clause. *E.g.*, Democratic Exec. Comm. of Florida v. Detzner, 347 F. Supp. 3d 1017 (N.D. Fla. 2018) (holding that plaintiffs had shown a likelihood of success in establishing that Florida's signature verification requirement for mail-in absentee ballots violated the Equal Protection Clause); Doe v. Walker, 746 F. Supp. 2d 667, 681 (D. Md. 2010) ("[W]here a state has authorized the use of absentee ballots, any restriction it imposes on the use of those absentee ballots which has the effect of severely burdening a group of voters must be narrowly tailored to further a compelling state interest.").

In line with these cases, we find that Plaintiffs have shown that they possess a state-created statutory entitlement to vote via mail-in absentee ballot justifying protection under the Fourteenth Amendment. For standing purposes, Plaintiffs need not establish that their rights have in fact been infringed by the signature verification requirement as "that would conflate the issue of standing with the merits of the suit." Aurora Loan Servs., Inc., 442 F.3d at 1024. Rather, to establish an injury-in-fact the Plaintiffs must show only that they "have a colorable *claim* to such a right." *Id.* The individual Plaintiffs have made such a showing here, and we therefore reject the Secretary's claim that they have not identified a cognizable injury-in-fact for standing purposes.

### 2. CCI

The Secretary also challenges CCI's organizational standing on grounds that CCI has failed to show that it has suffered an injury-in-fact. Under Seventh Circuit law, "a voting law can injure an organization enough to give it standing 'by compelling [it] to devote resources' to combatting the effects of that law that are harmful to the organization's mission." Common Cause Indiana v. Lawson, 937 F.3d 944, 950 (7th Cir. 2019) (quoting Crawford v. Marion Cty. Election Bd., 472 F.3d 949, 951 (7th Cir. 2007), *aff'd on other grounds*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008)). An organization cannot, however, "convert [ ] ordinary program costs into an injury in fact." *Id.* at 955. (quoting Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1434

(D.C. Cir. 1995)). Rather, "[t]he question is what additional or new burdens are created by the law the organization is challenging." *Id.* (citing *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040–41 (9th Cir. 2015)). The organization must show that those burdens are "real and its response is warranted." *Id.*

Here, CCI's sole employee, Julia Vaughn, has testified that the statutes challenged in this litigation harm CCI's mission of expanding access and reducing barriers to voting by increasing the risk that a mail-in absentee ballot will be erroneously rejected without notice to the voter or opportunity to contest the rejection. According to Ms. Vaughn, these statutes impose additional burdens on CCI, given that the organization has since their enactment diverted, and will in the future continue to be required to divert its limited time and resources from advocacy efforts on other issues, such as nonpartisan gerrymandering and expanding satellite and mail-in absentee voting, to focus on educating its membership on the signature matching requirement and of the risk that their mail-in absentee ballots could be rejected because of a perceived signature mismatch without notice or opportunity to challenge the rejection. Ms. Vaughn further testified that CCI will be required to change its curriculum and the presentation materials used in its citizen advocacy training sessions to address the issues raised by the signature verification requirement, resulting in less time being available to devote to educating the public regarding other election-related topics on which the organization would otherwise focus.

**\*10** The Secretary contends that CCI's generalized references to additional burdens imposed by the challenged statutes are insufficient to support Article III standing because the organization has failed to point to specific facts supporting these claims and has shown only that it will alter the content of the training it is already providing, not that it will be required to organize and fund new and additional training sessions. It is true that Ms. Vaughn testified that CCI already provides several training sessions each year for its membership and the public and has not indicated that the organization will be required to organize any additional training sessions because of the challenged statutes. As noted above, however, she also testified that CCI has already devoted time and resources that it would not otherwise have expended to notifying its members of the risks of mailing in an absentee ballot, and that, as the lone employee of CCI, she spends considerable time developing a curriculum and presentation materials for the training sessions, which she will be required to change this year in order to address the challenged statutes, if those laws remain in effect.

As a result, the organization has stated that it already has diverted and expects to continue in the future diverting their limited resources, including money, time, or both, away from other tasks and toward educating voters about the challenged statutes. Although we would not characterize the additional burdens identified by CCI as overwhelming, we also cannot say that they are not real or that CCI's response is unwarranted, particularly given that the majority of CCI's members are over the age of 65 and therefore statutorily eligible to vote by mail-in absentee ballot. Thus, we find that the new expenditures and the diversion of resources cited by CCI are injuries sufficient to satisfy the injury-in-fact requirement for organizational standing. *See Common Cause Indiana*, 937 F.3d at 952 (holding that CCI had standing to challenge a voting law based on evidence that it had to "change its curriculum" and "spend a greater portion of the fixed amount of time [it] had for [training sessions] on discussing [the challenged law's] effects, which necessarily divert[ed] from the time [it] could spend talking about other issues").

### B. Causation and Redressability

Having found that Plaintiffs have alleged a sufficient injury-in-fact for standing purposes, we turn to address the remaining two requirements, to wit, causation and redressability. The causation prong of standing requires that the injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130 (citations and internal quotations omitted). The element of redressability requires that "it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (citation and internal citations omitted).

Here, the Secretary claims that, even if Plaintiffs have suffered a constitutional injury, they have not shown that any such injury was caused or is redressable by her and thus Plaintiffs cannot satisfy either of these requirements of standing. Specifically, the Secretary asserts that county election officials bear sole responsibility under Indiana law for performing the required signature comparisons and determining whether to accept or reject a mail-in absentee ballot based on their assessment of the genuineness of the voter's signature. Although the Secretary concedes that she issues guidance to county election officials on

Indiana election laws, including the signature verification requirement, she claims that because she does not hear appeals of the county election officials' decisions or otherwise personally enforce the challenged statutes, any injury Plaintiffs may have suffered is not fairly traceable to or redressable by her.

We are not persuaded by the Secretary's argument. It is true that "Title 3 of the Indiana Code reflects a delegation of authority from the state to the county level with respect to the administration and enforcement of Indiana election law." *Common Cause Indiana v. Indiana Secretary of State*, 1:12-cv-01603-RLY-DML, 2013 WL 12284648, at *3 (S.D. Ind. Sept. 6, 2013). That does not mean, however, that the county election boards are the "only entit[ies] that possess[ ] any power with respect to the administration and enforcement" of the absentee balloting procedures. *Id.* The Secretary is designated as Indiana's "chief election official," (Ind. Code § 3-6-3.7-1), and broadly tasked with "perform[ing] all ministerial duties related to the administration of elections by the state," (*id.* § 3-6-4.2-2), and with "certify[ing] to the governor the candidate receiving the highest number of votes for each office," (*id.* § 3-12-5-7). She also serves as the chair of the Indiana State Recount Commission, unless she, herself, is the subject of a recount petition. *Id.* § 3-12-10-2.1.

*11 The Office of the Secretary of State also contains the Indiana Election Division, which assists the Secretary of State in the administration of the Indiana election laws and is statutorily obligated to "instruct" county election boards as to "[t]heir duties under" Title 3 of the Indiana Code, which governs elections, including the absentee voting procedures. Ind. Code §§ 3-6-4.2-1, -2, -14. In line with these duties, the Election Division, via the Indiana Election Administrator's Manual ("the Manual"), which is used as "an interpretive resource" for "general election law provisions," routinely issues guidance to county election officials in each of Indiana's 92 counties, including on the signature verification process at issue in this litigation. Dkt. 67-1 at 5. While the guidance in the Manual is not binding on county election officials, it "provides a roadmap for the county election administrator to follow" in carrying out the absentee ballot procedures. *Id.* at 99. As such, we have no doubt that the Manual has a "powerful coercive effect" on county election officials. *Bennett v. Spear*, 520 U.S. 154, 169, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

Thus, although the Secretary does not personally review ballot signatures or make the comparisons herself, as the state official responsible for overseeing elections in Indiana and the administration of Indiana's election laws,[6] including heading the office that advises county election officials regarding the manner in which to implement the signature verification requirement, she is sufficiently connected with the duty of enforcement of the challenged provisions such that the alleged invalidity of those provisions is fairly traceable to and redressable by her. *See Common Cause Indiana v. Indiana Sec'y of State*, 2013 WL 12284648, at *2–*4 ("The idea that the Secretary [of State] is a proper party in a constitutional challenge to a state statute governing elections [even if primarily enforced at the local level] is supported by Indiana case law, at least at the motion to dismiss stage.") (citing *Indiana Democratic Party v. Rokita*, 375 F. Supp. 2d 788 (S.D. Ind. 2005); *League of Women Voters of Indiana, Inc. v. Rokita*, 929 N.E.2d 758 (Ind. 2010)). Accordingly, we hold that the Secretary is a proper defendant in this action challenging Indiana's signature verification requirement for mail-in absentee ballots, despite the fact that implementation of those procedures is carried out at the local level.[7]

### III. Fourteenth Amendment Claims

Having found that Plaintiffs have established their standing to bring this lawsuit against the Secretary, we turn (finally) to address the merits of Plaintiffs' legal claims. As discussed above, Plaintiffs challenge as unconstitutional Indiana's failure to provide notice or an opportunity to cure before nullifying their statutorily-provided mail-in absentee voting privileges based on a signature mismatch both on its face and as applied to them. This failure, they assert, violates the Fourteenth Amendment's Due Process and Equal Protection Clauses. We address each of these claims in turn below.

#### A. Procedural Due Process Claim

The Fourteenth Amendment forbids a state actor to "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due process includes both substantive and procedural components. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Plaintiffs contend that the signature verification requirement deprives them of their procedural due process rights because it nullifies their properly cast mail-in absentee ballots without notice to them or an opportunity to cure. To prevail on a procedural due process claim, a plaintiff must establish the "(1) deprivation of a protected interest and (2) insufficient procedural protections surrounding that deprivation." *Michalowicz v. Vill. of Bedford Park*, 528

F.3d 530, 534 (7th Cir. 2008) (citation omitted). Thus, in addressing Plaintiffs' claim under the Due Process clause, we examine first whether the right to vote by absentee ballot is a property or liberty interest protected by due process, and, if so, what process is due and when that process must be made available. *Bradley v. Vill. of Univ. Park, Ill.*, 929 F.3d 875, 882 (7th Cir. 2019) (citing *Simpson v. Brown Cty.*, 860 F.3d 1001, 1006 (7th Cir. 2017)).

### i. Cognizable Liberty Interest

**\*12** It is undisputed that the right to vote is a constitutionally protected liberty interest, but that the right to vote by mail-in absentee ballot, as we have previously noted, is not. *See Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) ("It is beyond cavil that voting is of the most fundamental significance under our constitutional structure. ... It does not follow, however, that the right to vote in any manner ... [is] absolute.") (internal citations and quotation marks omitted). It has long been recognized, however, that "there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either 'liberty' or 'property' as meant in the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 710, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Such interests "attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and ... the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status." *Id.* at 710–11, 96 S.Ct. 1155; *see also Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (holding that the State, by issuing drivers' licenses, recognized in its citizens a right to operate a vehicle on the State's highways that could not be withdrawn without due process).

Although there is no federal constitutional right to vote absentee, "[c]ourts around the country have recognized that '[w]hile it is true that absentee voting is a privilege and a convenience to voters, this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege.' " *Martin*, 341 F. Supp. 3d at 1338 (quoting *Raetzel*, 762 F. Supp. at 1358). In other words, while "[t]he right to vote by absentee ballot is not, in and of itself, a fundamental right," once a state creates an absentee voting regime, "the state has enabled a qualified individual to exercise her fundamental right to vote in a way that she was previously unable to do" and then "must administer [that regime] in accordance with the Constitution" and "afford appropriate due process protections, including notice and a hearing, before rejecting an absentee ballot." *Zessar*, 2006 WL 642646, at \*5, \*6.

Here, there is no dispute that Indiana law confers upon certain categories of voters, including the individual Plaintiffs, an explicit statutory right to vote by mail. *See* Ind. Code § 3-11-10-24(a). In so doing, Indiana "alter[ed] the rights of those electors who participate in the program," creating a sufficient liberty interest in exercising their right to vote in such a manner. *Zessar*, 2006 WL 642646, at \*6. We therefore hold, in line with the vast majority of courts addressing this issue, that, having extended the privilege of mail-in absentee voting to certain voters, the State "must afford appropriate due process protections to the use of [mail-in] absentee ballots." *Democracy North Carolina*, ––– F.Supp.3d at ––––, 2020 WL 4484063, at \*53; *accord, e.g.*, *Martin*, 341 F. Supp. 3d at 1338 ("Having created an absentee voter regime through which qualified voters can exercise their fundamental right to vote, the State must now provide absentee voters with constitutionally adequate due process protection."); *Saucedo*, 335 F. Supp. 3d at 217 ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted."); *Raetzel*, 762 F. Supp. at 1358 (holding that the privilege of absentee voting, while not a fundamental right, is "deserving of due process"); *Zessar*, 2006 WL 642646, at \*6.

### ii. Deprivation of the Protected Interest Without Due Process

Having found that voters eligible under Indiana law to vote by mail-in absentee ballot are entitled to due process protection, we next address whether the challenged statutes facially, or as applied to the individual Plaintiffs, effect a deprivation of the right to vote without due process. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quotation marks and citation omitted). Because "there is no possibility of meaningful postdeprivation process when a voter's ballot is rejected (there is no way to vote after an election is over, after all), sufficient predeprivation process is the constitutional imperative." *Self Advocacy Sols. N.D.*, ––– F.Supp.3d at ––––, 2020 WL 2951012, at \*9; *accord Zessar*, 2006 WL 642646, at \*9 ("Once rejected, the ballot cannot

be rehabilitated and cast after a post-deprivation hearing. The voter's right to vote would have been irremediably denied.").

**\*13** The challenged statutes under review here fail to provide notice to the voter at *any* stage in the process[8] or a meaningful opportunity to cure before a mail-in absentee ballot is rejected based on a perceived signature mismatch. For example, there is no requirement that voters eligible to vote by mail-in absentee ballot be informed, either before submitting their application for a mail-in ballot or before completing their ballot, that their ballot may be rejected if election officials determine there is a signature mismatch. After a voter's mail-in absentee ballot is submitted and reviewed, the challenged statutes on their face do not require that the voter be given notice if their ballot is rejected for a signature mismatch nor is the voter given a meaningful opportunity to oppose the rejection or demonstrate that it was erroneous; the ballot is simply tossed out and not counted. Finally, there is also no provision in the challenged statutes requiring post-deprivation notice to the voter that their mail-in absentee ballot was rejected and for what purpose so that the voter would be put on notice before the next election of a potential issue regarding their signature.[9]

Due process is "flexible and calls for such procedural safeguards as the situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). In determining what process is constitutionally adequate, courts "are required to consider 'three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *Bradley*, 929 F.3d at 882 (quoting *Matthews*, 424 U.S. at 335, 96 S.Ct. 893). Because the challenged statutes here do not require that voters whose mail-in absentee ballots are rejected for a signature mismatch—a curable deficiency—be given notice or an opportunity to respond *at any point* either before or after their ballots are rejected, "[t]his all but ends the inquiry." *Self Advocacy Sols. N.D.*, ––– F.Supp.3d at ––––, 2020 WL 2951012, at \*9. Nevertheless, we will proceed to address the three *Mathews* factors below.

**1. Private Interest**

With regard to the first factor, as discussed above, we agree with Plaintiffs that the private interest at issue implicates the individual's fundamental right to vote; as such, it is "entitled to substantial weight." *Martin*, 341 F. Supp. 3d at 1338. Having permitted voting by mail-in absentee ballot, the State must recognize that the "privilege of absentee voting is certainly 'deserving of due process.' " *Saucedo*, 335 F. Supp. 3d at 217.

**2. Risk of Erroneous Deprivation and Probable Value of Other Procedures**

The Secretary argues that Plaintiffs have failed to show that the risk of an erroneous deprivation of the right to vote for mail-in absentee voters is significant. Although Plaintiffs have submitted data from only 18 out of Indiana's 92 counties, the Secretary is correct that, based on this limited sample, the overall rates of rejection due to a signature mismatch in the 2018 general election are quite low. For example, 10 of the 18 counties that responded reported having rejected no ballots for signature mismatch. The remaining 8 counties reported rejecting at least one ballot for signature mismatch, with rates of rejection ranging from 0.1% to 0.7%. The specific number of ballots rejected ranged from 1 to 73, for a total of 177 votes that were rejected in these counties in the 2018 general election based on a signature mismatch. However, given that these numbers reflect responses from only approximately 20% of Indiana counties, we note that they do not provide a complete picture of the extent of the deprivation.[10]

**\*14** Additionally, as Plaintiffs' expert, Dr. Mohammed, opines, determining whether a signature is genuine is difficult even for a trained expert, as signatures are written in different styles with varying levels of readability and variability. One person's signatures may vary depending on a variety of intentional and unintentional factors, including age, health, native language, and writing conditions. Untrained laypersons, like the county election officials performing the signature comparisons, have a higher rate of error than trained examiners in determining whether signatures are genuine, and, when they err, are more likely to err in favor of finding that an authentic signature is not genuine or by wrongly determining that signatures do not compare than to make the opposite error. According to Dr. Mohammed, the rate of error among laypersons is generally attributable to an incorrect determination that "variations" between one

individual's signatures are instead "differences" between multiple individuals' signatures.

As highlighted by Dr. Mohammed, the challenged Indiana statutes impose no safeguards to help county election officials account for such variables, such as training, examination equipment, or functional standards for signature comparison, beyond the Manual's instruction that "some deference in determining the genuineness of a voter's signature should be given to voters with disabilities." Dkt. 67-1 at 116. Election officials performing the signature reviews are not required to take a minimum amount of time to conduct each comparison, nor are they screened for disabilities that may impair their ability to make signature comparisons. Dr. Mohammed concludes that, as a result, election officials applying Indiana's signature verification requirement are "likely" to make erroneous signature-comparisons.

While the Secretary has presented no testimony to contravene Dr. Mohammed's conclusions, she seeks the exclusion of the entirety of his testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Secretary does not question that Plaintiffs have established Dr. Mohammed's credibility as an expert on handwriting analysis, but she objects to his testimony on grounds that Plaintiffs have not demonstrated the reliability of the method underlying handwriting analysis. In assessing the admissibility of expert testimony under Federal Rule of Evidence 702 and the *Daubert* principles, we must consider "reliability in light of the particular facts and circumstances of the particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The portions of Dr. Mohammed's testimony that we have found relevant to our procedural due process analysis are not his conclusions that Plaintiffs' signatures are genuine based on his analysis of their handwriting, conclusions which could potentially implicate the Secretary's objection. Rather, we have relied only on his conclusions regarding the basic fact that signatures vary, the myriad of potential reasons for such signature variations, and the tools that are important to aid in the assessment of the genuineness of a signature and the performance of signature comparisons. These topics are all clearly within his expertise and are supported by scientific principles. Accordingly, Dr. Mohammed's testimony on these issues is admissible.[11]

Based on this evidence, we find that, while the overall number of voters disenfranchised by the signature verification is not overwhelmingly large, there is nonetheless a real risk of erroneous rejection, particularly given the natural variations in a person's handwriting as testified to by Dr. Mohammed, many of which might result from uncontrollable factors such as age or mental or physical condition, coupled with the absence of safeguards built into the review procedures, such as functional standards, training, or significant oversight. Although Indiana law permits individuals with disabilities that prevent them from writing their signature to designate an individual to sign for them, this procedure does not protect those whose signatures vary for reasons unrelated to disability. Thus, we find that the probative value of additional procedures, such as marking mail-in absentee ballots provisional where a signature mismatch is perceived, and then providing pre-rejection notice to the voter along with an opportunity to cure the signature discrepancy, is high, particularly considering that "permitting an absentee voter to resolve an alleged signature discrepancy ... has the very tangible benefit of avoiding disenfranchisement." *Martin*, 341 F. Supp. 3d at 1339 (internal citation omitted); *accord Zessar*, 2006 WL 642646, at *9 ("It is apparent that the risk of erroneous deprivation of the protected interest in absentee voting is not enormous, but the probable value of an additional procedure is likewise great in that it serve to protect the fundamental right to vote.").

### c. Government's Interests

**\*15** The third factor in the *Mathews* balancing test examines the government's interests, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335, 96 S.Ct. 893 (citation omitted). The State's claimed interests here, to wit, in preventing voter fraud and maintaining election integrity, are undeniably compelling interests. As Plaintiffs point out, however, providing mail-in absentee voters notice and the opportunity to cure a perceived signature mismatch by confirming their identity in fact *promotes* these important governmental interests. *See Saucedo*, 335 F. Supp. 3d at 220 ("[I]f anything, additional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised."); *Self Advocacy Sols. N.D.*, ––– F.Supp.3d at ––––, 2020 WL 2951012, at *10 ("[A]llowing voters to verify the validity of their ballots demonstrably advances— rather than hinders—these goals [of preventing voter fraud and upholding the integrity of elections].").

**Frederick v. Lawson, --- F.Supp.3d ---- (2020)**
2020 WL 4882696

The Secretary notes that Indiana counties would bear the financial cost of the additional administrative procedures and, because there are no county defendants remaining in the litigation, the exact cost and burden of such procedures is "not knowable." Dkt. 75 at 23. Plaintiffs rejoin that the burden of additional procedure on the government in this case would be minimal, given that the State already employs post-election but pre-certification procedures for voters who cast a provisional ballot in-person due to, for example, the voter being unable to produce the required form of identification at the polls on election day. *See* Ind. Code § 3-11.7-5-2.5. Requiring a similar provisional ballot process for mail-in absentee ballots with a perceived signature mismatch therefore would not, Plaintiffs contend, impose any undue fiscal or administrative burdens on Indiana election officials.

In response, the Secretary does not contradict Plaintiffs' assertion, arguing instead only that similar process is not required for mail-in absentee voters because absentee voting is not a fundamental right, and further, that the signature verification requirement is the corollary to the identification requirement for in-person voters, "[a]nd since the Supreme Court has pronounced Indiana's proof of identification requirement constitutional in *Crawford* [*v. Marion Cty. Election Bd.*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008)*]*, the requirement for signature match similarly passes constitutional muster." Dkt. 75 at 23. This rejoinder falls short, however, given that we have already rejected, for the reasons detailed above, the Secretary's contention that mail-in absentee voting is not a protected interest and, in any event, unlike the identification requirement upheld in *Crawford*, which provides pre-deprivation notice and opportunity to cure, the challenged statutes here do not provide similar process before disenfranchisement. *See* Ind. Code §§ 3-11.7-5-2.5; 3-11-8-23; 3-11-8-25.1.

In summary, although the State clearly has an important interest in preventing voter fraud and ensuring the integrity of elections, we find that instituting a process similar to the provisional ballot procedures currently employed by election authorities in connection with the in-person voter identification requirement would not pose an undue administrative and fiscal burden on election authorities such that it would outweigh mail-in absentee voters' interest in protecting their votes, particularly given the data showing the relatively modest numbers of voters affected. Moreover, as noted above, such additional procedures will, in fact, promote Indiana's stated interests, further justifying the burden.

For these reasons, we hold that Plaintiffs have established that the signature verification requirement, both facially and as applied to the individual Plaintiffs, is violative of the Fourteenth Amendment Due Process Clause for lack of any notification of the ballot rejection to the affected voter or opportunity to challenge the rejection. Accordingly, Plaintiffs are entitled to summary judgment in their favor on this claim and the Secretary's cross-motion for summary judgment is denied. We therefore grant Plaintiffs' request for declaratory relief as Indiana's signature verification requirement is unconstitutional under the Fourteenth Amendment of the United States Constitution insofar as it fails to provide any notice or cure procedures before rejecting mail-in absentee ballots for signature mismatch. Plaintiffs' request for permanent injunctive relief is also granted since, outside of her arguments on the merits, the Secretary does not argue that the elements for a permanent injunction are not satisfied.

### B. Equal Protection

**\*16** Plaintiffs have been afforded complete relief by virtue of their success on their procedural due process claim. Nonetheless, we will briefly address their alternative theory for relief under the Fourteenth Amendment's Equal Protection Clause. Plaintiffs claim that Indiana's signature verification requirement for mail-in absentee ballots imposes an unconstitutional burden on the fundamental right to vote and deprives them of equal protection of the law. The Secretary rejoins that Plaintiffs' equal protection claim must fail because there is no fundamental right to vote by mail-in absentee ballot and Plaintiffs have failed to show either discriminatory intent or that they are a protected class.

Our assessment of Plaintiffs' equal protection claim is governed by the two-step analysis set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), which the Supreme Court has stated applies to all First and Fourteenth Amendment challenges to state election laws. *Burdick v. Takushi*, 504 U.S. 428, 432–34, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); *see also Acevedo v. Cook Cty. Officers Electoral Bd.*, 925 F.3d 944, 948 (2019) (recognizing that the Supreme Court in *Burdick* emphasized that the standard set forth in *Anderson* "applies to *all* First and Fourteenth Amendment challenges to state election laws") (emphasis in original). Under the *Anderson-Burdick* standard, a court addressing a challenge to a state election law "must weigh the character and magnitude of the asserted injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the precise interests put forward by the State

as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.' " *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059 (citing *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564.

Under this standard, the level of scrutiny applied to the challenged restriction "depends on the extent of its imposition: 'the more severely it burdens constitutional rights, the more rigorous the inquiry into its justifications.' " *Acevedo*, 925 F.3d at 948 (quoting *Libertarian Party of Ill. v. Scholz*, 872 F.3d 518, 523–24 (7th Cir. 2017)). " 'Nondiscriminatory restrictions that impose only slight burdens are generally justified by the need for orderly and fair elections,' whereas severe burdens must be 'narrowly tailored to serve a compelling state interest.' " *Id.* (quoting *Scholz*, 872 F.3d at 524). Nevertheless, "[h]owever slight [the] burden may appear, ... it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (quoting *Crawford*, 553 U.S. at 191, 128 S.Ct. 1610). Contrary to the Secretary's claim, "*Anderson*-*Burdick* does not require Plaintiffs to allege discriminatory intent or a suspect classification." *Lewis v. Hughs*, ––– F. Supp. 3d ––––, 2020 WL 4344432, at *14 (W.D. Tex. July 28, 2020).

Applying this framework to the statutes challenged here, we first find that Plaintiffs' injury—the deprivation of the right to vote without notice or an opportunity to cure based on a determination made by county election officials that the signature on a voter's mail-in absentee ballot does not match the signature on that voter's absentee application—is a significant burden. This is so even though, as discussed above, the limited data before us shows that a comparatively small number of voters are likely to be disenfranchised based on a signature mismatch each election cycle. As has long been recognized, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Thus, although only a narrow class of voters are affected, the magnitude of the burden on those voters is substantial.

**\*17** Regarding the State's interests, the Secretary argues that the signature verification requirement is a reasonable, nondiscriminatory restriction intended to confirm the identity of mail-in absentee voters and clearly furthers the State's interests in preventing election fraud, ensuring the orderly administration of elections, and maintaining accurate records. While these interests, as recognized above, are clearly compelling and significant, they are not sufficient to justify the State's failure to provide voters with notice and an ability to cure before rejecting their mail-in absentee ballots based on a perceived signature mismatch. In fact, without such procedural safeguards, the signature verification requirement actually threatens to undermine the State's interests in correctly validating the identity of voters casting mail-in absentee ballots. Thus, "[t]he only way such a scheme can be reasonable is if there are mechanisms in place to protect against arbitrary and unreasonable decisions by canvassing boards to reject ballots based on signature mismatches." *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d. 1017, 1030 (N.D. Fla. 2018) (granting the plaintiffs' motion for preliminary injunction on equal protection grounds). For these reasons, we hold that the State's reasons for the signature verification requirement do not outweigh the burden the challenged statutes place on the fundamental right to vote of Indiana voters entitled to vote by mail-in absentee ballot. Accordingly, under *Anderson*-*Burdick*, the challenged statutes are violative of the Equal Protection Clause of the Fourteenth Amendment.

### IV. Conclusion

For the reasons detailed above, Plaintiffs' Motion for Summary Judgment [Dkt. 67] is GRANTED and Defendant's Motion for Summary Judgment [Dkt. 63] is DENIED. We hold that Indiana Code §§ 3-11-10-4, 3-11.5-4-4, and 3-11.5-4-13(a)(2), which statutes govern the casting of mail-in absentee ballots, violate the due process and equal protection rights of voters entitled under Indiana law to vote by mail-in absentee ballot insofar as the challenged statutes fail to provide such voters notice and an opportunity to cure before their ballots are rejected for a perceived signature mismatch. The Court hereby orders as follows:

(1) The Secretary and all Indiana election officials acting in concert with her are hereby PERMANENTLY ENJOINED from rejecting any mail-in absentee ballot on the basis of a signature mismatch absent adequate notice and cure procedures to the affected voter.

(2) The Secretary is HEREBY FURTHER ORDERED to inform forthwith all affected Indiana election officials of this injunction and to instruct such officials regarding the implementation of notice and cure procedures in time for the upcoming general election on November 3, 2020.

**Frederick v. Lawson, --- F.Supp.3d ---- (2020)**
Case: 3:20-cv-00459-wmc   Document #: 358-1   Filed: 08/25/20   Page 17 of 17

2020 WL 4882696

Final judgment shall be entered accordingly.

IT IS SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2020 WL 4882696

Footnotes

1 These cases include: *Common Cause Indiana v. Lawson*, 1:20-cv-02007-SEB-TAB; *Common Cause Indiana v. Lawson*, 1:20-cv-01825-RLY-TAB; *Tully v. Okeson*, 1:20-cv-01271-JPH-DLP. Two additional cases filed in 2017 are still pending. *See Common Cause Indiana v. Lawson*, 1:17-cv-03936-TWP-MPB; *Indiana State Conference of the National Association for the Advancement of Colored People v. Lawson*, 1:17-cv-02897-TWP-MPB.

2 We take judicial notice of the fact that, due to the COVID-19 pandemic, state election officials offered no-excuse mail-in absentee voting in the June 2, 2020 primary election, resulting in an unprecedented number of registered voters in Indiana voting by mail-in absentee ballot. The parties' cross motions for summary judgment in this matter were fully briefed before that decision was made and they have not requested updated briefing based on those developments. State election officials have recently indicated that a similar privilege will not be extended for the 2020 general election.

3 As of July 1, 2019, all Indiana counties are required to count absentee ballots at a central location. Ind. Code § 3-11.5-1-1.1; § 3-11.5-2-2. Counting of mailed-in absentee ballots must begin no later than noon on election day and in certain counties using electronic poll books, the county election board may adopt a unanimous resolution to permit absentee ballot counting at any time after 6:00 a.m. on election day. *Id.* § 3-11.5-4-11(d).

4 These facts pertain to Plaintiffs Frederick, Collier, and Marks. Plaintiff Clark has experienced considerable health issues over the past several months preventing her from testifying as a witness in this proceeding as attested to by her power-of-attorney. Dkt. 67-2.

5 According to Dr. Mohammed, in a 2001 study, laypersons were noted to make Type II errors—declaring an authentic signature non-genuine—in 26.1% of cases. The FDEs tested in the study made such errors in 7.05% of cases.

6 The Secretary of State's website provides that among the Secretary's statutory duties is the "oversight of state elections." Indiana Sec'y of State, About the Office, https://www.in.gov/sos/2362.htm (last visited Aug. 17, 2020).

7 And, in any event, we know of no other state official more substantially or significantly entrusted by law with election-based responsibilities; tellingly, the Secretary has not identified any alternative state governmental official either.

8 Although not required to do so by statute, Lake County is the only county of which we have been made aware that provides notice to mail-in absentee voters that their ballots have been rejected for signature mismatch. However, that notice is sent after election day, at which point the rejected ballot(s) cannot be rehabilitated.

9 If a voter whose absentee ballot has been rejected for a signature mismatch "appears in person before the [county election] board not later than 5 p.m. on election day," Ind. Code § 3-11.5-4-13(f), the board must issue a certificate allowing the voter to vote in person. However, because the challenged statutes do not require a voter to be notified if their mail-in absentee ballot has been so rejected, the voter will not know to do so.

10 The limited number of affected voters cuts both ways, however, because it suggests that the requested notification procedure would be both reasonable and manageable by election officials.

11 We note the irony in the Secretary's argument regarding the unreliability of handwriting analysis, which is precisely the judgment required of untrained poll workers by existing law. The Secretary's own position in this regard highlights the importance of and need for providing due process protections before disenfranchising voters based on a signature comparison.

**End of Document**                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.