# Exhibit A

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| THE NEW GEORGIA PROJECT, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | 1:20-CV-01986-ELR |
| | * | |
| BRAD RAFFENSPERGER, *in his* | * | |
| *official capacity as the Georgia Secretary* | * | |
| *of State and the Chair of the Georgia* | * | |
| *State Election Board*, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

_____

**O R D E R**

_____

Presently before the Court is Plaintiffs' Motion for Preliminary Injunction.

[Doc. 57].  For the reasons below, the Court grants in part and denies in part

Plaintiffs' motion.

**I.      Background**

This case concerns Plaintiffs The New Georgia Project, Reagan Jennings,

Candace Woodall, and Beverly Pyne's challenge to five (5) aspects of Georgia's

absentee voting system (hereinafter "the Challenged Policies").   Am. Compl.

[Doc. 33].  Plaintiffs bring these challenges in light of the dangers presented by

COVID-19 in relation to the upcoming November 2020 general election.  Id.  The

Challenged Polices are:

1. O.C.G.A. § 21-2-381(b)(4) (labeled by Plaintiffs as "the Notification Process") — This statute governs Georgia's notification process to voters when the relevant election official is unable to determine the identity of the elector from the information given on an absentee ballot application.  O.C.G.A. § 21-2-381(b)(4).  Specifically, the statute states: "[i]f the registrar or clerk is unable to determine the identity of the elector from information given on the application, the registrar or clerk should promptly write [to the elector] to request additional information."  Id.  Plaintiffs claim that the term "promptly" fails to provide a uniform standard to govern the process for notifying voters about any "errors" in their ballot applications.

2. O.C.G.A. § 21-2-381(a)(1)(G) (labeled by Plaintiffs as "Absentee Age Restriction") — This statute allows electors sixty-five (65) years of age or older, voters with disabilities, and Uniformed Overseas Citizens Absentee Voting Act voters to submit one application absentee ballot application for an entire election cycle.  O.C.G.A. § 21-2-381(a)(1)(G).[1]  All other voters must submit a separate, distinct absentee application for each

---

[1] The full text reads:

Any elector meeting criteria of advanced age or disability specified by rule or regulation of the State Election Board or any elector who is entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. Section 1973ff, *et seq.*, as amended, may request in writing on one application a ballot for a presidential preference primary held pursuant to Article 5 of this chapter and for a primary as well as for any runoffs resulting therefrom and for the election for which such primary shall nominate candidates as well as any runoffs resulting therefrom. If not so requested by such person, a separate and distinct application shall be required for each primary, run-off primary, election, and run-off election.  Except as otherwise provided in this subparagraph, a separate and distinct application for an absentee ballot shall always be required for any special election or special primary.

O.C.G.A. § 21-2-381(a)(1)(G).  According to the Official Compilation of Rules and Regulations of the State of Georgia, "[f]or purposes of applying O.C.G.A. § 21-2-381(a)(1)(G), 'advanced age' shall mean any elector who is 65 years of age or older at the time of the absentee ballot request." Ga. Comp. R. & Regs. 183-1-14-.01(1).

election (primary, general, etc.).  <u>Id.</u>  Plaintiffs claim that this statute discriminates against younger voters by creating an unconstitutional age restriction on those who may submit a single application to vote by mail for an entire election cycle.

3. "Absentee Postage Tax" — There is no portion of the Georgia Code that addresses who must pay for postage for absentee ballot applications and absentee ballots being cast through the mail.  Plaintiffs claim that Georgia's failure to provide pre-paid postage for the return mailing of absentee ballots is an unconstitutional poll tax that severely burdens the right to vote in light of the dangers posed by COVID-19.

4. O.C.G.A. § 21-2-386(a)(1)(F) (labeled by Plaintiffs as "Receipt Deadline") — This statute requires that absentee ballots must be delivered to a county election official by 7:00 p.m. on Election Day.  O.C.G.A. § 21-2-386(a)(1)(F).[2]  Plaintiffs claim that this receipt deadline will disenfranchise voters whose absentee ballots arrive after that time through "no fault of their own."

5. O.C.G.A. § 21-2-385(a) (labeled by Plaintiffs as "Voter Assistance Ban") — This statute prohibits third-party assistance in mailing or delivering completed absentee ballots, subject to

---

[2] The relevant portion of the statute states:

All absentee ballots returned to the board or absentee ballot clerk after the closing of the polls on the day of the primary or election shall be safely kept unopened by the board or absentee ballot clerk and then transferred to the appropriate clerk for storage for the period of time required for the preservation of ballots used at the primary or election and shall then, without being opened, be destroyed in like manner as the used ballots of the primary or election.  The board of registrars or absentee ballot clerk shall promptly notify the elector by first-class mail that the elector's ballot was returned too late to be counted and that the elector will not receive credit for voting in the primary or election.

O.C.G.A. § 21-2-386(a)(1)(F).

certain defined exceptions.  O.C.G.A. § 21-2-385(a).[3]  Plaintiffs claim that this statute "significantly raises the risk that lawful, eligible voters will be disenfranchised," eliminates critical assistance to voters who are homebound, and "hamstrings the ability of organizations like The New Georgia Project to assist voters in making the transition to absentee voting."

See generally Am. Compl. at 10–14.  In sum, Plaintiffs allege that in the context of the public health emergency caused by COVID-19, the Challenged Policies will unconstitutionally burden and disenfranchise thousands of voters in the upcoming November 2020 election.  See generally id.

In accordance with these allegations, Plaintiffs seek declaratory and injunctive relief.  [Doc. 57].  Specifically, Plaintiffs request the Court to: (a) issue a declaratory judgment that the Challenged Policies are unconstitutional, and (b) preliminarily enjoin Defendants[4] from implementing and enforcing the Challenged Policies.  [Doc. 57-1 at 2].  Additionally, Plaintiffs ask the Court to:

---

[3] The relevant portion of the statute states:

> [M]ailing or delivery [of an absentee ballot] may be made by the elector's mother, father, grandparent, aunt, uncle, brother, sister, spouse, son, daughter, niece, nephew, grandchild, son-in-law, daughter-in-law, mother-in-law, father-in-law, brother-in-law, sister-in-law, or an individual residing in the household of such elector.  The absentee ballot of a disabled elector may be mailed or delivered by the caregiver of such disabled elector, regardless of whether such caregiver resides in such disabled elector's household.  The absentee ballot of an elector who is in custody in a jail or other detention facility may be mailed or delivered by any employee of such jail or facility having custody of such elector.

O.C.G.A. § 21-2-385(a).

[4] There are eighty-three (83) Defendants in this case, including various state election officials and members of seventeen (17) county boards of elections.  See Am. Compl.  For ease of reference, the Court refers to Defendants collectively, unless otherwise noted.

- order Defendants to "notify all voters of absentee application deficiencies within three (3) days of receiving the application, or by the next business day for applications received during the eleven (11) days before the election;"

- "permit voters of all ages to submit a single absentee ballot application per election cycle to vote by mail ballot in any election during that cycle;"

- "provide voters with prepaid postage on all absentee ballots;"

- "accept and count otherwise valid absentee ballots from qualified voters that are postmarked by Election Day and arrive at their respective county's office within, at a minimum, five (5) business days after Election Day;" and

- "allow voters to designate any third party to assist in the collection and submission of their absentee ballots."

[Id. at 2–4].

The Court first provides an overview of Georgia's absentee ballot system and other relevant context before addressing the substance of Plaintiffs' motion.

### A.     Georgia's Absentee Ballot System

In Georgia, the law permits a registered voter to vote via absentee ballot. See O.C.G.A. § 21-2-380.   To do so, a voter must submit an application with sufficient identifying information—i.e., name, date of birth, phone number, and registration address—"either by mail, by facsimile transmission, by electronic transmission, or in person in the registrar's or absentee ballot clerk's office[.]"

O.C.G.A. § 21-2-381(a)(1)(A).  Georgia law does not require a voter to provide a justifying reason to cast an absentee ballot.  O.C.G.A. § 21-2-380.  Additionally, voters of "advanced age" (sixty-five (65) or older at the time of the request), voters with disabilities, and citizens who are overseas may submit one (1) comprehensive application for an entire election cycle, including the presidential preference primary, primary, and resulting runoffs or general elections.  O.C.G.A. § 21-2-381(a)(1)(G).  All other voters may not make a single request, but instead must submit separate, distinct applications for each election (i.e. primary, general, runoff). Id.

Upon receipt of a timely application for an absentee ballot, the electoral official must determine if the applicant is eligible to vote in the relevant primary or election.  O.C.G.A. § 21-2-381(b)(1).  If the official is unable to determine the identity the voter, the official must "promptly write [to the voter] to request additional information."  O.C.G.A. § 21-2-381(b)(4).  However, "promptly" is not defined by the statute.  Id.

If the voter is determined to be eligible, then the relevant election official must provide the voter with an absentee ballot.  O.C.G.A. § 21-2-381(b)(2).  Specifically, the official:

> shall mail or issue official absentee ballots to all eligible applicants not more than 49 days but not less than 45 days prior to any presidential preference primary, general primary other than a municipal general primary, general election other than a municipal general election, or

6

special primary or special election in which there is a candidate for a federal office on the ballot.

O.C.G.A. § 21-2-384(a)(2).

Registered absentee voters are supposed to receive three (3) items by mail: (1) the ballot, (2) a small "secrecy" envelope in which to place the ballot, and (3) a larger envelope for mailing the envelope containing the ballot. O.C.G.A. §§ 21-2-384(b); 21-2-385(a). Voters must indicate their vote on the provided ballot, place the ballot inside the "secrecy" envelope, place the "secrecy" envelope inside the larger envelope, and then "fill out, subscribe and swear to the oath printed on" the back of the larger envelope.[5]   O.C.G.A. § 21-2-385(a). Once the larger mailing envelope is securely sealed and signed, "the elector shall then personally mail or personally deliver [the] same to the board of registrars or absentee ballot clerk[.]" Id. Georgia does not provide pre-paid postage for the return of the absentee ballot, and thus, voters must pay for their own return postage to vote by mail.[6]

The State of Georgia does not count mail ballots received after the closing of polls at 7:00 p.m. on Election Day. See O.C.G.A. § 21-2-386(a)(1)(F). This is true even if a ballot arrives late for reasons outside the voter's control, and even if the

---

[5] According to Plaintiffs' expert, Dr. Kenneth R. Mayer, the ballot design was changed for the 2020 primary election to eliminate the secrecy envelope. [Doc. 59-1 at 10]. Instead, the 2020 primary ballot included a "privacy sleeve," a change that was made to "allow faster processing of returned ballots by election officials." [Id.]

[6] O.C.G.A. § 21-2-389 provides that the postage for sending the ballot to absentee voters "shall be paid by the county or municipality," but no other portion of the Georgia Code addresses the payment for postage for absentee ballots and absentee ballot applications.

ballot was postmarked before or on Election Day. Id. Thus, as it now stands, for a mail-in ballot to be accepted and deemed valid for this year's November election, the respective county registrar must receive it no later than Tuesday, November 3, 2020, at 7:00 p.m. Id.

Finally, Georgia law prohibits third parties from assisting with the return of a signed, sealed absentee ballot unless the third party is the "elector's mother, father, grandparent, aunt, uncle, brother, sister, spouse, son, daughter, niece, nephew, grandchild, son-in-law, daughter-in-law, mother-in-law, father-in-law, brother-in-law, sister-in-law, or an individual residing in the household of such elector." O.C.G.A. § 21-2-385(a). Or, if the voter has a disability that qualifies her for an absentee ballot, then her absentee ballot may be mailed or delivered by her caregiver, "regardless of whether such caregiver resides in such disabled elector's household." Id.

### B.    The COVID-19 Pandemic

As all are no doubt aware, the ongoing global pandemic caused by COVID-19 has triggered mass social disruption. In the United States alone, there have been over 5.7 million documented cases and Georgia remains a national "hotspot."[7] Specifically, in Georgia, there have been over 260,000 confirmed cases of the virus

---

[7] Cases in the U.S., CENTERS FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Aug. 27, 2020).

with over 5,000 deaths.[8]  In response to the pandemic, Governor Brian Kemp issued

several executive orders regarding public safety.   Specifically, the Governor

declared a public health state of emergency for the State of Georgia due to the spread

of COVID-19, effective March 14, 2020, and subsequently extended it through and

until September 10, 2020.  See 2020 Executive Orders, OFFICE OF THE GOVERNOR,

https://gov.georgia.gov/executive-action/executive-orders/2020-executive-orders

(last visited Aug. 24, 2020).  Additionally, Governor Kemp ordered "all residents

and visitors in the State of Georgia" to practice social distancing and sanitation in

accordance with the guidelines published by the Centers for Disease Control and

Prevention and also encouraged residents and visitors to wear masks in public to

prevent the spread of COVID-19.  Id.  These restrictions were imposed to mitigate

the spread of the virus.

Similarly, Defendant Secretary of State Brad Raffensperger—in accordance

with his duty to oversee Georgia's elections—has taken several measures to adjust

the voting process due to the circumstances caused by COVID-19.  Am. Compl. at

8, 43; [Docs. 59-31, 59-32].  Such measures included the postponement of the

Georgia primary to June 9, 2020,[9] encouraging voting by mail, and sending absentee

---

[8] COVID-19 Daily Status Report, GA. DEP'T OF PUB. HEALTH, https://dph.georgia.gov/COVID-19-daily-status-report (last visited Aug. 27, 2020).

[9] Raffensperger Announces Postponement of Primary Election Until June 9, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/raffensperger_announces_postponement_of_primary_election_until_june_9 (last visited Aug. 24, 2020); [Docs. 59-31, 59-34].

ballot applications to approximately 6.9 million active voters.[10]  [Docs. 58 at 3; 59-31; 59-32; 59-33].

Due to the circumstances presented by the COVID-19 pandemic and the State's responsive measures, Georgia voters have utilized absentee voting in record numbers during recent elections.  [Doc. 59-34].  For example, during the June 2020 primary, over 1.9 million absentee ballots were issued to voters, and approximately 1.1 million absentee ballots were recorded as cast.  [Doc. 59-1 at 3, 9].  By comparison, in 2018, approximately 227,000 absentee ballots were returned to registrar's offices.  [Id. at 17].  The significant increase in absentee voting has led to well-documented strains on Georgia's election administration infrastructure, including delays in processing absentee ballot applications and delivering absentee ballots.  [See, e.g., Docs. 59-34, 59-38, 59-39, 59-40, 59-41, 59-43, 59-45].

## C.   Impact on Plaintiffs

Plaintiff The New Georgia Project ("NGP") is an non-partisan organization "dedicated to registering Georgians to vote and to helping them become more civically engaged citizens."  Am. Compl. at 16.  To that end, "NGP engages in voter education and registration activities in churches, college campuses, and neighborhoods across the state to reach voters and help them to register and,

---

[10] In addition, the State Election Board extended the emergency measure authorizing counties to utilize secured absentee ballot drop boxes for the November 2020 election.  [Doc. 90 at 19].

eventually, vote." Id.  According to the Amended Complaint, "NGP's goal is to register all eligible, unregistered citizens of color in Georgia, and as of September 2019, NGP had registered almost half a million Georgians in all 159 of Georgia's counties[.]" Id.

Plaintiffs Reagan Jennings, Candace Woodall, and Beverly Pyne (hereinafter "the Individual Voter Plaintiffs") are registered Georgia voters who plan on voting absentee in the November 2020 general election.[11] Id. at 19–23; [Docs. 59-4, 59-5, 59-6].  In the Amended Complaint, the Individual Voter Plaintiffs all claim that various aspects of the Challenged Policies either disenfranchise or unduly burden their right to vote.  Am. Compl. at 19–23.

For example, Plaintiff Reagan Jennings, a Fulton County voter, is seventy-two (72) years old, lives alone, and suffers from "conditions that place her at high risk for complications from COVID-19." Id. at 20; [see also Doc. 59-4 at 2].  Although she regularly votes in person, due to the ongoing pandemic, Ms. Jennings applied to vote absentee, and plans to do so for the November election.  [Doc. 59-4 at 2].  Given her health conditions and the absence of nearby relatives, Ms. Jennings claims she "would benefit from assistance with turning her ballot in to the election office." Am. Compl. at 21.  Moreover, Ms. Jennings does not regularly keep stamps in her

---

[11] Additionally, Plaintiffs submitted one hundred and fifteen (115) declarations from Georgia voters to support their Motion for Preliminary Injunction.  [See Docs. 59, 105, 106, 107].

home, is unsure how much postage to apply for her absentee ballot, and does not have a postage scale.  Id. at 20.  Since the onset of COVID-19's spread across Georgia, Ms. Jennings has attempted to purchase stamps, but was unable to do so due to long lines and lack of social distancing.  Id.  She claims the entire process is "confusing" and "and would be easier to manage if Georgia counted ballots that are postmarked on Election Day."  [Doc. 59-4 at 3, 4].

Next, Plaintiff Candace Woodall, a voter in Atlanta, claims that the Challenged Policies burden her right to vote.  Am. Compl. at 21.  Ms. Woodall is almost sixty (60) years old, lives in a senior facility, is unemployed due to the pandemic, and is currently recovering from an operation related to cancer.  Id.  Due to her restricted budget, Ms. Woodall states that purchasing a book of stamps would be a financial hardship.  [Doc. 59-5 ¶ 6].  In her declaration, she further states that "[i]f Georgia counted ballots that are postmarked by Election Day and allowed third parties such as The New Georgia Project to collect my ballot and assist me in making sure that I had prepared the ballot and envelope correctly, the voting process would be much less burdensome for me to accomplish."  [Id. ¶ 8].  Additionally, due to her age, Ms. Woodall may not submit one comprehensive absentee application for each election cycle.  Am. Compl. at 22.  Instead, she must submit a separate application for each election, which she claims is a burden.  Id.

Finally, Plaintiff Beverly Pyne is a sixty (60)-year-old nurse temporarily residing in Fort Lauderdale, Florida, for school.  Id. at 23.  She is registered to vote in Georgia and considers Georgia her home.  Id.  However, she claims Georgia's absentee voter system disenfranchised her in 2018.  Id.  Specifically, the Amended Complaint alleges:

> [d]espite requesting her ballot well in advance of the election and subsequently checking with election officials about the status of her ballot, Ms. Pyne's ballot did not arrive at her home in Florida until the day before Election Day.  Ms. Pyne's Florida home is a 9.5-hour drive from Gwinnett County.  Consequently, she could not turn the ballot in in person or otherwise cast her vote in-person.  Therefore, Ms. Pyne was forced to place her ballot in the mail the day before Election Day in the hopes that it would somehow arrive on time.  Ms. Pyne will also need to vote by absentee this year both because she is still temporarily living in Florida, and also because of concerns about exposing herself and others to COVID-19.

Id. at 23.  Moreover, in her supplemental declaration, Ms. Pyne states that although she applied for an absentee ballot for the June 2020 Primary Election, she never received her ballot.  [Doc. 105-3 ¶ 3].  After the June Primary occurred, she later received a notice explaining that her ballot application had been rejected because she did not select a political party on the application.  [Id. ¶ 4].

### D.   Procedural History

On June 3, 2020, Plaintiffs filed their Amended Complaint in this action.  Am. Compl.  In their Amended Complaint, Plaintiffs bring seven (7) counts against Defendants:

- Count I—Undue Burden on the Right to Vote, in violation of the First Amendment and Equal Protection Clause of the Fourteenth Amendment;

- Count II—Denial or Abridgment of the Right to Vote on Account of Age, in violation of the Twenty-Sixth Amendment;

- Count III—Poll Tax, in violation of the Fourteenth and Twenty-Fourth Amendments;

- Count IV—Denial of Procedural Due Process, in violation of the Due Process Clause of the Fourteenth Amendment;

- Count V—Arbitrary and Disparate Treatment, in violation of the Equal Protection Clause of the Fourteenth Amendment;

- Count VI—Infringement on Speech and Associational Rights, in violation of the First and Fourteenth Amendments; and

- Count VII—Violation of Section 208 of the Voting Rights Act of 1965.

Id. at 56–78.

On June 10, 2020, Plaintiffs filed the instant Motion for Preliminary Injunction, seeking to enjoin the Challenged Policies.[12]   [Doc. 57].   Having been

---

[12] Additionally, the County Defendants and the State Defendants have filed separate motions to dismiss. [Docs. 82, 83]. The Court will not reach Defendants' motions at this time and will instead issue a subsequent order addressing their arguments. But see n.16, infra.

fully briefed, and with the benefit of oral argument,[13] Plaintiffs' motion is ripe for the Court's review.

## II.   Preliminary Matter: Standing

Before turning to the merits of Plaintiffs' motion, the Court first address the threshold issue presented by Defendants—namely, their allegation that Plaintiffs lack standing to seek a preliminary injunction regarding their claims.  [See Docs. 82, 83, 91].

Article III of the Constitution permits federal courts to adjudicate only "actual cases and controversies."  U.S. CONST. art. III, § 2.  "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498 (1975).  To establish Article III standing:

> the party invoking the power of the court must show (1) injury in fact, which is an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) that the injury is likely to be redressed by a favorable decision.

Cochran v. City of Atlanta, 150 F. Supp. 3d 1305, 1315 (N.D. Ga. 2015) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)) (internal marks omitted).

---

[13] The undersigned held oral argument regarding Plaintiffs' motion on August 19, 2020, via Zoom. [Doc. 121].

Additionally, "[o]rganizations, like individuals, can establish standing to sue." Fair Fight Action, Inc. v. Raffensperger, 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019).

> In election law cases, an organization can establish standing by showing that it will need to divert resources from general voting initiatives or other missions of the organization to address the impacts of election laws or policies.  Organizations do not necessarily have to show that they have already diverted resources.  Reasonably anticipating the organization will need to divert resources in the future suffices to establish standing, particularly at the earliest stage of a case.

Id.

Here, Defendants argue that Plaintiffs lack Article III standing for various reasons.[14]  [See Docs. 82, 83, 91].  The Court will address the arguments regarding the Individual Voter Plaintiffs and Plaintiff NGP separately, beginning with the former.

### A.    Standing for Individual Voter Plaintiffs

First, Defendants claim the Individual Voter Plaintiffs lack standing because they do not adequately allege injury-in-fact, traceability (causation), or redressability.  [See Docs. 82-1 at 4–12, 83-1 at 4–6].  With regards to injury, Defendants argue that Plaintiffs' injuries are hypothetical and speculative. [Docs. 82-1 at 7–9; 83-1 at 4–5].  Additionally, the seventeen (17) County

---

[14] In their response to Plaintiffs' Motion for Preliminary Injunction, Defendants request that this Court address the standing arguments presented in their motions to dismiss [Docs. 82, 83] before addressing the merits of Plaintiffs' motion.  [Docs. 90, 91].  The Court grants Defendants' request to address their arguments with regards to standing and will address the other arguments from Defendants' motions to dismiss in a subsequent order.  See n.14, supra.

Defendants argue that Plaintiffs have not adequately alleged traceability and redressability because they failed to sue all one hundred and fifty-nine (159) counties in Georgia. [Doc. 82-1 at 10]. Finally, Defendants argue that because all the alleged harms are not directly caused by the Secretary of State's office, but by the respective county boards of elections or even COVID-19, Plaintiffs have failed to establish redressability. [Doc. 82-1 at 11].

Upon review, the Court finds Defendants' arguments unavailing. First, regarding injury, the Court disposes of Defendants' arguments that the alleged injuries are speculative and hypothetical. As set out in the Amended Complaint, the number of confirmed COVID-19 cases in Georgia has grown exponentially, and the Individual Voter Plaintiffs have alleged facts showing they are disadvantaged and burdened by the Challenged Policies. See Burdick v. Takushi, 504 U.S. 428, 433 (1992) ("Each provision of a[n election] code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects — at least to some degree — the individual's right to vote and his right to associate with others for political ends.'") (quoting Anderson v. Celebrezze, 460 U.S. 780, 788 (1983)); Baker v. Carr, 369 U.S. 186, 206 (1962) ("[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue.").

Furthermore, in voting rights cases, "[a] plaintiff need not have the franchise wholly denied to suffer injury.  Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient."  <u>Charles H. Wesley Educ. Found., Inc. v. Cox</u>, 408 F.3d 1349, 1352 (11th Cir. 2005); <u>see also</u> <u>Common Cause/Georgia v. Billups</u>, 554 F.3d 1340, 1352 (11th Cir. 2009) ("The inability of a voter to pay a poll tax, for example, is not required to challenge a statute that imposes a tax on voting, and the lack of an acceptable photo identification is not necessary to challenge a statute that requires photo identification to vote in person."); <u>People First of Alabama v. Merrill</u>, No. 2:20-CV-00619-AKK, 2020 WL 3207824, at *6 (N.D. Ala. June 15, 2020) ("Simply put, a voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote.").

In fact, the Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.'"  <u>Gill v. Whitford</u>, 138 S. Ct. 1916, 1929 (2018) (quoting <u>Reynolds v. Sims</u>, 377 U.S. 533, 561 (1964)).  "Thus, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage."  <u>Id.</u>  Moreover, the Eleventh Circuit recently held that while "voters have no judicially enforceable interest in the *outcome* of an election," they do "have an interest in their ability to vote and in their vote being given the same weight as any other."  <u>Jacobson v. Fla. Sec'y of State</u>, 957 F.3d 1193, 1202 (11th Cir. 2020) (emphasis in original) (internal citations omitted).  Here, the

Individual Voter Plaintiffs have alleged facts showing disadvantage to themselves regarding each of the Challenged Policies. See supra I.C; Am. Compl. at 20–22. Thus, the injury prong is satisfied.

Next, Defendants argue that because all the alleged harms are not directly caused by the Secretary of State's office, the Individual Voter Plaintiffs fail to properly allege traceability and redressability. [Docs. 82-1 at 10–13; 83-1 at 4]. The Court finds this argument misguided. Pursuant to Georgia law, the Secretary of State is the chief election official for the State. O.C.G.A. § 21-2-50(b). As the chief election official, the Secretary has the power and authority to manage Georgia's election system, including the absentee voting system. Id. The Secretary exercised that authority, for example, right before the June 9, 2020 primary when he chose to send absentee ballot applications to all active registered voters. [See Doc. 59-33 at 2].

Additionally, the Secretary is the Chair of the State Election Board, whose members are also Defendants in this case. See Am. Compl. The State Election Board is the governmental body responsible for uniform election practice in Georgia. O.C.G.A. § 21-2-31. Both the Sectary and the State Election Board have significant

statutory authority to train local election officials and set election standards.[15]

See id.; O.C.G.A. § 21-2-50(b).  Thus, these Defendants have the ability to fully

redress Plaintiffs' injuries statewide.[16]  Accordingly, the Individual Voter Plaintiffs

have standing.

## B.  Standing for the Organizational Plaintiff

Because the Court has determined that the Individual Voter Plaintiffs have

established standing to bring their claims, the Court need not consider whether

Plaintiff NGP has standing.  See Vill. of Arlington Heights v. Metro. Hous. Dev.

Corp., 429 U.S. 252, 264 n.9 (1977) (explaining that if one plaintiff demonstrates

standing, the court "need not consider whether the other individual and corporate

plaintiffs have standing to maintain the suit").  However, for the benefit of the Parties

---

[15] Additionally, the County Defendants are in charge of the day-to-day operations of running elections in their respective counties.  See O.C.G.A. § 21-2-70.  The Georgia election code tasks the local election superintendents with the preparation, delivery, processing of absentee ballots. See O.C.G.A. § 21-2-381; O.C.G.A. § 21-2-383; O.C.G.A. § 21-2-386.  The County Defendants also have the authority under Georgia law to implement any instructions issued by the State Election Board and Secretary of State.  See O.C.G.A. § 21-2-70

[16] In support of the argument regarding redressability, the County Defendants specifically contend that Plaintiffs should have sued all one hundred and fifty-nine (159) counties in Georgia.  [Docs. 82-1 at 10–13; 90 at 21].  Because Plaintiffs did not do so, the County Defendants submit that Plaintiffs' injuries are not traceable to the Secretary, and thus, not redressable.  [Doc 82-1 at 13]. However, upon review, the Court finds that Jacobson, upon which the County Defendants rely in support of their argument, is distinguishable.  957 F.3d 1193 at 1208.  In Jacobson, the plaintiffs sued the Florida Secretary of State to challenge Florida's ballot order laws.  Id. at 1197.  On appeal, the Eleventh Circuit held that the plaintiffs lacked standing because, pursuant to Florida state law, the Florida Secretary of State did not have the power to redress the plaintiffs' injuries.  Id. at 1208. However, Georgia law differs from Florida law on this point.  See O.C.G.A. § 21-2-50(b).  As noted above, the Georgia Secretary of State and the State Election Board have broad powers to ensure the uniformity in the administration of election laws.  O.C.G.A. § 21-2-31; O.C.G.A. § 21-2-50(b).  Therefore, the County Defendants' reliance on Jacobson is inapposite.

and out of an abundance of caution, the Court will provide an organizational standing analysis.

As noted above, "[i]n election law cases, an organization can establish standing by showing that it will need to divert resources from general voting initiatives or other missions of the organization to address the impacts of election laws or policies." Fair Fight Action, 413 F. Supp. 3d at 1266. In this case, Defendants argue Plaintiff NGP lacks organizational standing because it has not sufficiently alleged a diversion of resources. [Doc. 91 at 13–14]. Specifically, Defendants argue that Plaintiff NGP has not precisely explained how its resources will be diverted or how that diversion is connected to any alleged wrongful conduct. [Docs. 83-1 at 5–6; 91 at 13–14].

Upon review, the Court finds that Plaintiff NGP has demonstrated it has organizational standing under a diversion of resources theory. Under the diversion of resources theory, "an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." Arcia v. Sec'y of Fla., 772 F.3d 1335, 1341 (11th Cir. 2014). Here, Nse Ufot, CEO of NGP, provided two (2) declarations that specifically explain how NGP's resources will be diverted. [Docs. 59-3; 105-5]. Ms. Ufot states that NGP "typically provides resources and assistances to its constituents to help them complete the process of voting in person." [Doc. 59-3 ¶ 6].

She explains that each of the Challenged Policies will force NGP to redirect its resources away from its typical activities to those centered on educating and assisting voters with Georgia's absentee voting system.[17]   [Id. ¶¶ 7–21].   These declarations along with the allegations in the Amended Complaint are sufficient to establish injury under a diversion of resources theory.   See Fla. State Conference of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1161–66 (11th Cir. 2008) (finding injury-in-fact for the plaintiff organizations which alleged that they anticipated the need to divert resources from registration, election-day education, and monitoring to educating voters on challenged law); Black Voters Matter Fund v. Raffensperger, No. 1:20-CV-01489-AT, 2020 WL 4597053, at *17 (N.D. Ga. Aug. 11, 2020) (finding the organizational plaintiff had standing based on "evidence that it has already and reasonably anticipates having to further divert resources to assisting socially and economically vulnerable voters obtain postage (or find transportation to deposit absentee ballots in available drop boxes) to avoid having to expose themselves to the potential health dangers associated with in-person voting").

---

[17] As just one example, with regards to the Absentee Age Restriction, Ms. Ufot states that: "if all voters regardless of age, were permitted to apply to vote absentee just once per election cycle and request that they receive absentee ballots automatically for all remaining elections in that cycle, NGP could save significant time and funding that it spends educating and assisting voters with the absentee application process.  The Absentee Application Age Restriction forces NGP to divert resources toward application outreach election after election and away from its core mission of registering voters and civic engagement."  [Doc. 59-3 ¶ 11].

In sum, the Court concludes all Plaintiffs have standing to pursue this case. As such, the Court now reaches the merits of Plaintiffs' motion.[18]

## III.    Motion for Preliminary Injunction

Having established that Plaintiffs possess Article III standing, the Court now turns to Plaintiffs' Motion for Preliminary Injunction.  [Doc. 57].  The Court first sets out the relevant legal standard before addressing the merits of Plaintiffs' arguments.

### A.    Legal Standard

A temporary restraining order or preliminary injunction is an "extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four" elements.  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal marks and citations omitted).  A plaintiff seeking a preliminary injunction must demonstrate that: (1) there is a substantial likelihood of

---

[18] Additionally, the Court notes that during oral arguments, Defendants argued that the Court should decline to grant Plaintiffs' motion due to the political question doctrine.  To support this position, Defendants cited to a recent order from this District: Coalition for Good Governance, et al. v. Raffensperger, et al., No. 1:20-CV-01677-TCB (N.D. Ga. May 14, 2020).  However, the Court notes that the instant matter is different in kind from Coalition.  As even more recently explained by the Fifth Circuit in Tex. Democratic Party v. Abbott, the "challenge [in Coalition] was directed at the specific procedures Georgia planned to use to conduct the election, such as whether to use electronic voting machines or paper ballots.  In other words, the suit challenged the wisdom of Georgia's policy choices."  961 F.3d 389, 398–99 (5th Cir. 2020).  Here, however, "the Court must decide only whether the challenged provisions of the [state] Election Code run afoul of the Constitution, not whether they offend the policy preferences of a federal district judge."  Id. at 399.  As the Fifth Circuit noted, "[t]he standards for resolving such claims are familiar and manageable, and federal courts routinely entertain suits to vindicate voting rights."  Id.  Thus, the Court finds that Plaintiffs' claims are justiciable.

success on the merits; (2) it will suffer irreparable injury if relief is not granted; (3) the threatened injury outweighs any harm the requested relief would inflict on the non-moving party; and (4) entry of relief would serve the public interest. See, e.g., KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1268 (11th Cir. 2006) (enumerating these well-established factors).  The decision as to whether a plaintiff carries this burden "is within the sound discretion of the district court and will not be disturbed absent a clear abuse of discretion."  Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc., 303 F.3d 1242, 1246 (11th Cir. 2002) (quoting Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002)) (internal quotation marks omitted).

Before addressing the merits of this case, the Court finds it necessary to define the nature of Plaintiffs' challenge.  A litigant may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both.  See Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1308 (11th Cir. 2009).  While a facial challenge asserts that the challenged statute "always operates unconstitutionally," an "as-applied challenge, by contrast, addresses whether 'a statute is unconstitutional on the facts of a particular case or to a particular party.'" Id. (internal citations omitted).  In this case, Plaintiffs contest the constitutionality of the Challenged Policies as they are applied during the November 2020 election cycle in light of the COVID-19 pandemic.  See generally Am. Compl.  As such, each of

their claims is an as-applied challenge.  With this context in mind, the Court turns to the four (4) preliminary injunction factors.

## B.   Substantial Likelihood of Success on the Merits

To meet the first element for an injunction, Plaintiffs must demonstrate that they are likely to succeed on their claims regarding each of the five (5) Challenged Policies.  The Court will address each of the Challenged Policies in this order: (i) Notification Process, (ii) Absentee Age Restriction, (iii) Absentee Postage Tax, (iv) Voter Assistance Ban, and (v) Receipt Deadline.

### i.   Notification Process: O.C.G.A. § 21-2-381(b)(4)

As mentioned above, Plaintiffs challenge O.C.G.A. § 21-2-381(b)(4), which states: "If the register or clerk is unable to determine the identity of the elector from information given on the application, the registrar or clerk should promptly write to request additional information."  O.C.G.A. § 21-2-381(b)(4).  Thus, this particular Challenged Policy has to do with the timeframe within which a county election official should inform an absentee ballot applicant that his or her identity cannot be determined from the absentee ballot application.  Id.  The statute says the official should so do "promptly," but provides no definition for this term (e.g., three (3) business days, five (5) business days, etc.).  Id.

Plaintiffs point to the unquantified term of "promptly" as an ambiguity that could result in different notification times by the various counties.  [Doc. 58 at 7].

Specifically, Plaintiffs contend that (1) this lack of a uniform notification standard severely burdens the right to vote, violating the First and Fourteenth Amendments; (2) the Notification Process, as it stands, does not provide adequate due process, in violation of the Fourteenth Amendment; and (3) the Notification Process violates the Equal Protection Clause of the Fourteenth Amendment.  [Id. at 16–17, 22–26].  The Court will address each argument in turn, beginning with Plaintiffs' right to vote claim.

### a.  Anderson-Burdick Test

In their motion, Plaintiffs allege that O.C.G.A. § 21-2-381(b)(4), the Notification Process, unconstitutionally burdens the right to vote.  When considering the constitutionality of an election law, the Court applies the framework set out in Anderson, 460 U.S. at 780, as later refined in Burdick, 504 U.S. at 428.  Pursuant to the Anderson-Burdick test,

> [w]hen deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary.

Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) (internal quotation marks omitted).

Stated differently, the Court:

> must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment."

[Anderson v. Celebrezze,] 460 U.S. 780, 789, 103 S. Ct. 1564 (1983). Then the court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Id. Finally, the court must "determine the legitimacy and strength of each of those interests," while also considering "the extent to which those interests make it necessary to burden the Plaintiff's rights." Id.

. . . .

[I]f the state election scheme imposes "severe burdens" on the plaintiffs' constitutional rights, it may survive only if it is "narrowly tailored and advance[s] a compelling state interest." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997). But when a state's election law imposes only "reasonable, nondiscriminatory restrictions" upon a plaintiff's First and Fourteenth Amendment rights, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." Id. (quotations omitted). In short, the level of the scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights—"Lesser burdens trigger less exacting review." Id.

Stein v. Alabama Sec'y of State, 774 F.3d 689, 694 (11th Cir. 2014).

"For [the] intermediate cases, where the burden on the right to vote is moderate," a court must "weigh that burden against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights."[19] Mays v. LaRose, 951 F.3d 775, 784 (6th Cir. 2020) (citing

---

[19] Put another way, "[r]egulations falling somewhere in between—i.e., regulations that impose a more-than-minimal but less-than-severe burden—require a flexible analysis, weighing the burden on the plaintiffs against the [s]tate's asserted interest and chosen means of pursuing it." Esshaki v. Whitmer, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *4 (E.D. Mich. Apr. 20, 2020) (citing Ohio Democratic Party v. Husted, 834 F.3d 620, 627 (6th Cir. 2016)) (internal marks omitted).

Burdick, 504 U.S. at 434) (internal quotation marks omitted); see also People First of Alabama v. Sec'y of State for Alabama, No. 20-12184, 2020 WL 3478093, at *6 (11th Cir. June 25, 2020) (Rosenbaum, J. & Pryor, J., concurring) ("But whatever the burden, no matter how slight, 'it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.'") (internal citations omitted). In sum, the "Supreme Court has rejected a litmus-paper test for constitutional challenges to specific provisions of a State's election laws and instead has applied a flexible standard." Billups, 554 F.3d at 1352 (quotation omitted).  The Court turns now to the analysis of the test.

### 1. Severity of the burden

Under the Anderson-Burdick test, the Court's first step is to determine the character and magnitude of the asserted burden (whether the burden is light, moderate, or severe).   Here, Plaintiffs argue that the burden imposed by the Notification Process is severe.  [Doc. 58 at 16].  Specifically, Plaintiffs contend that because the state lacks a uniform guideline, each county may apply its own standards and procedures, which Plaintiffs claim will lead to a delay in processing applications. [Id. at 16–17].

However, the Court disagrees.  As a preliminary matter, the Court notes that none of Plaintiffs' proffered authority or evidence links the notification statute with

any untimely delay in processing ballot applications or with disenfranchisement.[20]

Plaintiffs have submitted numerous declarations from voters who either did not

receive a ballot, experienced significant delay in receiving any update on the status

of their application, or whose ballot applications were rejected.  [See, e.g., 59-3 ¶¶ 8–

10; 59-9 ¶ 4; 59-11 ¶ 10; 59-13 ¶ 4; 59-14 ¶¶ 4–5; 59-16 ¶¶ 6–13; 59-17 ¶ 9; 59-68

¶¶ 5–8; 59-70 ¶ 5; 59-71 ¶¶ 3–4; 59-90 ¶ 3; 105-3; 105-4 ¶¶ 3–5; 105-7 ¶¶ 3–5; 105-

12 ¶¶ 3–5; 105-12 ¶ 3].  While these issues are troubling, they highlight injuries that

are different than that which this provision addresses—namely, the rejection of an

absentee ballot application because: (1) the election official could not ascertain the

voter's identity, *and* (2) the rejection happening without proper notice.  Put plainly,

none of the declarants contend they were disenfranchised because an election official

---

[20] As just one example, in her supplemental declaration, Plaintiff Pyne declared that she applied for an absentee ballot in May for the June 2020 election, but never received her ballot.  [Doc. 105-3 ¶ 3].  She later received a notice from the county during the week of June 29—three (3) weeks after Election Day—informing her that her absentee ballot application had been rejected because she did not select a political party on her application.  [Id. ¶ 4].  While the delay is concerning, as the declaration highlights, Plaintiff Pyne's application was rejected because she did not *select a political party*, not because the election official was unable to ascertain her *identity*.  [Id.]

could not ascertain their identity, the subject of the statute challenged herein (O.C.G.A. § 21-2-381(b)(4)).[21]

Thus, the Court finds that based on the record currently before it, the burden imposed by this statute on voters is, at most, minimal. There is no evidence on the record before the Court that the statute disenfranchises voters.[22] Additionally, the statute does not prohibit or preclude a voter from correcting the deficiency, utilizing early voting, or voting in person. See O.C.G.A. § 21-2-381(b)(4). Accordingly, the Court finds the burden is minimal.

---

[21] Additionally, in their sur-reply and during oral arguments, Defendants indicated that Plaintiffs' claim challenging the Notification Policy was mooted by the State Election Board Rule 183-1-14-.11, which provides:

> During early voting, as additional applicants for absentee ballots are determined to be eligible, the board of registrars or absentee ballot clerk shall mail or issue official absentee ballots or provisional absentee ballots, if appropriate, to such additional applicants immediately upon determining their eligibility. The board or clerk shall make such determination and mail or issue official absentee ballots; provisional absentee ballots, if appropriate, or notices of rejection of absentee ballot applications to such additional applicants within 3 business days after receiving the absentee ballot applications."

Ga. Comp. R. & Regs. 183-1-14-.11.

[22] In fact, the Court finds evidence on the record which seems to belie Plaintiffs' position. [See Doc. 59-7]. In her declaration, Ms. Carly Weikle, who was temporarily residing in Texas, explains that she applied for a Primary Election application. [Id. ¶ 6]. However, "[a]bout a week after applying," Ms. Weikle received an email informing her that her initial application was rejected because of a signature mismatch. [Id.] She was able to provide additional information, received her ballot in time, and cast a vote in the June 2020 primary. [Id.] Thus, contrary to Plaintiffs' contention, although there was a delay in processing Ms. Weikle's application, the Court finds that delay was not untimely because Ms. Weikle was able to vote absentee. Accordingly, the facts seem to suggest that any burden imposed by the statute on voters is minimal.

## 2. Identification and Evaluation of the State's Interest

The second and third steps in the <u>Anderson</u>-<u>Burdick</u> test require the Court to "identify the interests advanced by the State as justifications for the burdens" and then to "evaluate the legitimacy and strength of each asserted state interest and determine the extent to which those interests necessitate the burdening of the plaintiffs' rights." <u>Bergland v. Harris</u>, 767 F.2d 1551, 1553–54 (11th Cir. 1985). Defendants identify two (2) interests for Georgia's Notification Process: (1) preventing voter fraud; and (2) permitting county officials the flexibly necessary do their jobs. [Doc. 83-1 at 10–11]. Because the Court categorizes Plaintiffs' burden as minimal, the "State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." <u>Stein</u>, 774 F.3d at 694.

Here, the State's interests are reasonable, nondiscriminatory, and legitimate. <u>See</u> <u>Crawford v. Marion Cty. Election Bd.</u>, 553 U.S. 181, 185 (2008) ("There is no question about the legitimacy or importance of a State's interest in counting only eligible voters' votes."); <u>see also</u> <u>People First of Alabama</u>, 2020 WL 3478093, at *7 (noting that although infrequent in the state of Alabama, combatting voter fraud was certainly "a legitimate interest"). Thus, the Court finds that the State's interests outweigh the minimal burden on Plaintiffs.

Accordingly, the Court finds that Plaintiffs do not satisfy their burden to show a substantial likelihood of success on the merits of their right to vote claim regarding

the Notification Process.  Thus, the Court denies Plaintiffs' request for injunctive relief premised on this basis.

### b.   *Procedural Due Process*

Second, Plaintiffs raise a procedural due process argument regarding the Notification Process.  Specifically, Plaintiffs contend that the Notification Process "deprive[s] voters of their liberty interest in voting without adequate procedural safeguards."  [Doc. 58 at 22].  To determine what process is due to the public, courts must apply the test from <u>Mathews v. Eldridge</u>, which requires balancing three (3) considerations.  425 U.S. 319, 334–35 (1976).

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

<u>J.R. v. Hansen</u>, 736 F.3d 959, 966 (11th Cir. 2013) (quoting <u>Mathews</u>, 425 U.S. at 335).

Here, the private interest at issue implicates an individual's right to vote and is therefore entitled to substantial weight.  <u>See</u> <u>Martin v. Kemp</u>, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018) ("Given that the State has provided voters with the opportunity to vote by absentee ballot, the State must now recognize that the privilege of absentee voting is certainly deserving of due process.") (internal marks

omitted).   As to the second step, Plaintiffs argue that the risk of erroneous deprivation is high because there is no uniform standard defining the word "promptly."  [Doc. 58 at 23–24].  Elections officials may interpret "'promptly' in differing and arbitrary ways—which is neither fair no reliable." [Id. at 24].  Plaintiffs suggest that their proposed remedy—requiring county officials to notify voters within three (3) days of any "error"—would provide clarity.  [Id.]  As to the third step, Plaintiffs argue that this requirement is not burdensome because the procedure they suggest is nearly identical to the one already utilized by the State to notify voters of a rejected ballot for signature mismatch.  [Id. at 25].

The Court disagrees with Plaintiffs' conclusion.  After due consideration, the Court finds that while the first Mathews factor weighs in Plaintiffs' favor, the second and third factors weigh in Defendants' favor.  While the private interest at issue implicates an individual's right to vote and thus, shall be afforded substantial weight, Plaintiffs have not satisfied the second Mathews factor because they do not demonstrate a substantial risk of erroneous deprivation.  No evidence in the record demonstrates the procedures in the statute unconstitutionally deprived voters of their right to vote.  See supra III.B.i.a.1.  Although there is evidence to suggest that processing delays impaired voters' ability to cast an absentee ballot, again, Plaintiffs have not linked any processing delays to the challenged statute, which addresses the inability to *identify* a voter and subsequent notification.  Moreover, the statute

provides adequate notice and an opportunity to be heard, [23] which is what procedural due process requires.  See New Port Largo v. Monroe Cty., 873 F. Supp. 633, 644 (S.D. Fla. 1994) ("Procedural due process requires adequate notice and an opportunity to be heard at a meaningful time and in a meaningful manner.") (citing Boddie v. Connecticut, 401 U.S. 371, 378 (1971)).  Additionally, the Court finds that the probative value of any additional procedure is minimal, since the risk of erroneous deprivation is low.  Therefore, this factor weighs in favor of Defendants.

Finally, regarding the third Mathews factor, Defendants explain that the additional procedures suggested by Plaintiffs will be financially costly and administratively burdensome.  [See Docs. 83-1; 90 at 20, 24; 91 at 29].  Defendants provide evidence that suggests that the changes Plaintiffs seek would strain the State's already limited budget; thus, they argue the government's interest is strong. [Docs. 91 at 10, 18; 91-1 at 1–2].  The Court agrees with Defendants and finds that this factor weighs in their favor.  See Mathews, 424 U.S. at 348 ("[T]he Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed.").

In sum, although the first Mathews factor weighs in favor of Plaintiffs, the second and third factors weigh in Defendants' favor.  Thus, Plaintiffs have failed to

---

[23] If an official is unable to identify an elector, the elector is contacted and given an opportunity to provide additional information.  See O.C.G.A. § 21-2-381(b)(4).  Thus, this provision provides both notice and an opportunity to be heard.

establish a substantial likelihood of success on the merits on this issue and are not entitled to related injunctive relief.

### c.   Equal Protection

Finally, Plaintiffs assert that the Notification Process violates the Equal Protection Clause of the Fourteenth Amendment.   [Doc. 58 at 25–26].   The Constitution guarantees "equal protection of the laws." U.S. CONST. amend. XIV. The Equal Protection Clause applies when a state either classifies voters in disparate ways or places restrictions on the right to vote.   Dunn v. Blumstein, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction . . . [but this right] is not absolute.").   Where, as here, a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters, the court reviews the claim under the Anderson-Burdick flexible standard.   See Obama for Am. v. Husted, 697 F.3d 423, 429 (6th Cir. 2012); see also Fla. Democratic Party v. Detzner, No. 4:16CV607-MW/CAS, 2016 WL 6090943, at *6 (N.D. Fla. Oct. 16, 2016).

As noted above, the first step of the Anderson-Burdick analysis is to define the severity of the burden.   Here, Plaintiffs argue that because the timing and method of notification is determined by an individual's respective county board of election, "similarly situated voters are placed on unequal terms, and their right to vote is burdened without justification."   [Doc. 58 at 25].

However, the Court disagrees and finds any burden on Plaintiffs is minimal. Again, as noted above, the harm that Plaintiffs identify is not directly connected to this provision of Georgia law.[24]  See *supra*.  Additionally, the State Election Board Rule recently issued a rule which provides:

> During early voting, as additional applicants for absentee ballots are determined to be eligible, the board of registrars or absentee ballot clerk shall mail or issue official absentee ballots or provisional absentee ballots, if appropriate, to such additional applicants immediately upon determining their eligibility.  The board or clerk shall make such determination and mail or issue official absentee ballots; provisional absentee ballots, if appropriate, or notices of rejection of absentee ballot applications to such additional applicants within 3 business days after receiving the absentee ballot applications.

Ga. Comp. R. & Regs. 183-1-14-.11.  Thus, contrary to Plaintiffs' assertion, there is a specific rule in Georgia that ensures uniform treatment.

Because the burden on voters is minimal, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions."  Stein, 774 F.3d at 694.  As mentioned above, the State identifies its interests here as (1) preventing voter fraud and (2) permitting county officials the flexibly necessary do their jobs.  [Doc. 83-1 at 10–11].  Again, the Court finds that the State's interests are reasonable, nondiscriminatory, and legitimate.

---

[24] The statute states that if the election official "is unable to determine the identity of the elector from information given on the application, the registrar or clerk should promptly write to request additional information."  O.C.G.A. § 21-2-381(b)(4).  Simply put, there is nothing in the Challenged Policy's text that dictates the timeline for processing absentee ballot applications or the timely delivery of absentee ballots, which are the main problems Plaintiffs identify in their arguments.

See Crawford, 553 U.S. at 185 ("There is no question about the legitimacy or importance of a State's interest in counting only eligible voters' votes."); see also People First of Alabama, 2020 WL 3478093, at *7 (noting that although infrequent in the state of Alabama, combatting voter fraud was certainly "a legitimate interest"). Thus, the Court finds that the State's interests outweigh the minimal burden on Plaintiffs

In sum, the justifications proffered by the State sufficiently outweigh the minimal burden on Plaintiffs' voting rights.  Consequently, Plaintiffs have failed to establish a substantial likelihood of success on the merits of their equal protection claim.  Because Plaintiffs have not demonstrated a substantial likelihood of success on the merits of their claims regarding O.C.G.A. § 21-2-381(b)(4), the Notification Process, the Court declines to enter any related injunctive relief.

ii.    Absentee Age Restriction: O.C.G.A. § 21-2-381(a)(1)(G)

Next, the Court addresses Plaintiffs' arguments regarding the Absentee Age Restriction.  Pursuant to O.C.G.A. § 21-2-381(a)(1)(G), voters of "advanced age" (sixty-five (65) or older at the time of the request), voters with disabilities, and citizens who are overseas may submit one (1) application for presidential preference primary, primary, and resulting runoffs or general elections.  O.C.G.A. § 21-2-381(a)(1)(G).  However, other voters cannot make a single request and must submit a separate application for each election during an election cycle.  Id.  Here, Plaintiffs

assert two (2) theories regarding the unlawfulness of the Absentee Age Restriction. First, Plaintiffs claim the Absentee Age Restriction imposes a substantial burden on the right to vote for those under sixty-five (65). [Doc. 58 at 17]. Second, they claim that O.C.G.A. § 21-2-381(a)(1)(G) facially discriminates on the basis of age in violation of the Twenty-Sixth Amendment, thus invoking strict scrutiny review. [Id. at 27–28]. The Court addresses each theory in turn, beginning with Plaintiffs' right to vote argument.

### a.   Anderson-Burdick Test

Plaintiffs' argument that O.C.G.A. § 21-2-381(a)(1)(G) burdens the right to vote must be analyzed under the Anderson-Burdick test. See supra.

### 1.   Severity of Burden

Again, the first step of the Anderson-Burdick test is to define the severity of the burden. Here, Plaintiffs argue that the burden on younger voters is "substantial" because they are "forced to apply for absentee ballots each election" which increases "the risk of errors, substantial processing times, and late ballot returns." [Doc. 58 at 17]. Plaintiffs contend there is no justification for these substantial burdens. [Id.]

However, the Court disagrees. While it is a burden to fill out a new application for each election in an election cycle, the Court finds the burden to be minimal. Georgia voters have a variety of options to submit their absentee ballot applications: whether by mail, email, or through an online portal. [See Docs. 126 at

18–19; 126-3].  Moreover, In Plaintiffs' submitted declarations, voters claim that the application process is *inconvenient*, but they do not claim that they cannot vote at all due to the process.  [See, e.g., Docs. 59-6, 59-7].  As the Supreme Court noted in Crawford, nominal inconveniences do not qualify as a substantial burden on most voters' right to vote.  553 U.S. at 198; see also Texas Democratic Party v. Abbott, 961 F.3d 389, 405 (5th Cir. 2020) ("The Constitution is not offended simply because some groups find voting more convenient than [others].") (internal marks and citations omitted).

Because the burden is minimal, "the States' regulatory interest is generally enough to uphold a reasonable, nondiscriminatory restriction on voting rights." Timmons, 520 U.S. at 358.  Here, Defendants offer several reasons for the State's interest:

> First, there is a strong interest in helping the most vulnerable, including Georgia's aged population.  See Abbott, 961 F.3d at 404–05 (quoting [McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802, 810–811 (1969)]).  Second, the risk of fraud is reduced when unused absentee ballots are limited.  See Billups, 554 F.3d at 1352, (describing anti-fraud efforts as "relevant and legitimate").  Third, as demonstrated by Plaintiffs' own declarants, some voters are temporarily residing in other states due to education, familial, or other obligations.  See Docs. No. [59-6, 7, 12, 70, 90].  As personal circumstances change, these voters may return to Georgia[,] but their absentee ballot will be sent across the country.  From both an administrative and security standpoint, this potential outcome outweighs the de minimis harm of requesting another absentee ballot online or by mail.

[Doc. 91 at 29–21].

Upon review, the Court finds Defendants' reasons are legitimate and sufficient.  See Abbott, 961 F.3d at 402 (noting that the state has a legitimate interest "in giving older citizens special protection and in guarding against election fraud"). Thus, Plaintiffs have not demonstrated a likelihood of success on the merits on this argument challenging the Absentee Age Restriction Policy.

### b.    Twenty-Sixth Amendment

Next, the Court turns to Plaintiffs' Twenty-Sixth Amendment argument. Plaintiffs argue that the statute facially discriminates against younger voters because older voters only need to apply for an absentee ballot once during an election cycle while younger voters must apply for a new absentee ballot for each election; thus, Plaintiffs claim the statute violates the Twenty-Sixth Amendment.[25]  [Doc. 58 at 27–28].

Plaintiffs' theory for their Twenty-Sixth Amendment claim seems to be a novel issue of law, which has not been widely addressed.  Courts considering Twenty-Sixth Amendment claims have acknowledged "the dearth of guidance on what test applies."  League of Women Voters of Fla., Inc. v. Detzner, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018) (quoting N.C. State Conference of the NAACP v. McCrory, 182 F. Supp. 3d 320, 522 (M.D. N.C. 2016), rev'd on other grounds, 831

---

[25] The Twenty-Sixth Amendment states: "The right of citizens of the United States, who are eighteen years of age or older, to vote, shall not be denied or abridged by the United States or any state on account of age."  U.S. CONST. amend. XXVI.

F.3d 204 (4th Cir. 2016)); <u>Nashville Student Org. Comm. v. Hargett</u>, 155 F. Supp. 3d 749, 757 (M.D. Tenn. 2015) ("[T]here is no controlling caselaw . . . regarding the proper interpretation of the Twenty-Sixth Amendment or the standard to be used in deciding claims for Twenty-Sixth Amendment violations based on an alleged abridgment or denial of the right to vote."); <u>see also</u> <u>Middleton v. Andino</u>, No. 3:20-CV-01730-JMC, 2020 WL 4251401, at *4 (D.S.C. July 24, 2020) (noting the debate surrounding the Twenty-Sixth Amendment).

The only appellate case on point is <u>Abbott</u> from the Fifth Circuit. 961 F.3d 389. In <u>Abbott</u>, the Texas Democratic Party challenged Texas' law limiting absentee ballots to voters aged sixty-five (65) or older and voters with disabilities. No. CV SA-20-CA-438-FB, 2020 WL 2541971, at *2 (W.D. Tex. May 19, 2020). The district court held that the statute's limitation on absentee voting to voters over sixty-five (65) was unconstitutional age discrimination, and thus, "also violates the clear text of the Twenty-Sixth Amendment under a strict scrutiny analysis." <u>Id.</u> at *5.

On an application for stay to the Fifth Circuit, the motions panel unanimously granted a stay of the injunction. <u>Abbott</u>, 961 F.3d at 403. The panel disagreed with the district court about the applicable level of scrutiny and stated that rational basis, rather than strict scrutiny, would "probably" apply to an absentee ballot voter classification that does not "absolutely prohibit" some group from voting. <u>Id.</u> The

panel cited to the Supreme Court's decision in <u>McDonald</u>, to support its analysis. <u>Id.</u> at 403–04.  Specifically, the panel stated that <u>McDonald</u> stood for the proposition that unless voters "are in fact absolutely prohibited from voting by the State," the right to vote is not "at stake" and thus, "rational-basis review follows."  <u>Id.</u> at 404 (internal citations and marks omitted).

Defendants argue that the holding in <u>Abbott</u>—the only appellate court to address this issue—should inform the Court's decision on Plaintiffs' Twenty-Sixth Amendment argument.  [Doc. 83 at 15].  Plaintiffs disagree and point out that <u>McDonald</u> was decided two (2) years before the Twenty-Sixth Amendment was ratified and addressed an Equal Protection claim, not a Twenty-Sixth Amendment claim.  [Docs. 96 at 32; 97 at 15].  Thus, Plaintiffs contend the Fifth Circuit panel in <u>Abbott</u> was mistaken in relying on <u>McDonald</u> to apply rational basis review.

While there is some merit to Plaintiffs' argument, the Court notes that the Supreme Court denied the emergency application to vacate the stay of the injunction granted by the Fifth Circuit panel in <u>Abbott</u>.  <u>See</u> <u>Tex. Democratic Party v. Abbott</u>, 140 S. Ct. 2015, 2105 (2020).  Thus, for now, the Court finds it is appropriate to follow the Fifth Circuit panel's reasoning in <u>Abbott</u> and apply rational basis review to the analysis of O.C.G.A. § 21-2-381(a)(1)(G) rather than strict scrutiny.

Under rational basis review, "statutory classifications will be set aside only if no grounds can be conceived to justify them.  The law need only bear some rational

relationship to a legitimate state end." Abbott, 961 F.3d at 406 (internal citations omitted). Here, the law has a rational relationship to at least two legitimate state interests: (1) the state's interest in helping older citizens vote, see id. at 404–05, and (2) minimizing the risk of voter fraud. See Crawford, 553 U.S. at 185. Therefore, Plaintiffs have not demonstrated they are likely to succeed on the merits of their Twenty-Sixth Amendment argument.

In sum, Plaintiffs have not demonstrated they are likely to succeed on the merits of their claims regarding O.C.G.A. § 21-2-381(a)(1)(G), the Absentee Age Restriction. Therefore, they are not entitled to the requested injunctive relief.

### iii.   Absentee Postage Tax

The Court now turns to Plaintiffs' argument regarding postage for absentee ballots. As mentioned previously, the Georgia Code does not address who must pay for return postage on absentee ballots. Plaintiffs argue that Georgia's failure to provide pre-paid postage: (1) severely burdens the right to vote, and (2) is an unconstitutional poll tax in violation of the Twenty-Fourth Amendment. [Doc. 58 at 17–18, 28–30]. The Court will discuss each argument in turn, beginning with Plaintiffs' right to vote argument, before turning to Plaintiffs' argument that the failure to provide pre-paid postage acts as a *de facto* poll tax.

>           a.    *Anderson-Burdick*

The Court begins with its assessment of the <u>Anderson</u>-<u>Burdick</u> test, outlined *supra*.  As a reminder, the test first mandates that the Court determine the character and magnitude of the asserted burden (whether the burden is light, moderate or severe).  <u>Bergland</u>, 767 F.2d at 1553.  Then, the Court must "identify the interests advanced by the State as justifications for the burdens" and "evaluate the legitimacy and strength of each asserted state interest and determine the extent to which those interests necessitate the burdening of the plaintiffs' rights."  <u>Id.</u> at 1553–54.

>           1.  *Severity of Burden*

The first step of the <u>Anderson</u>-<u>Burdick</u> test is to characterize the severity of the burden.  Here, Plaintiffs characterize the burden as "severe."  [Doc. 58 at 17].  They maintain that the monetary costs are particularly burdensome in a health pandemic, when the ability to obtain postage is curtailed.  [<u>Id.</u> at 17–18].  Defendants argue that the burden is merely incidental and minimal.  [Doc. 91 at 23–24].

Judge Amy Totenberg, a fellow judge in this District, recently rejected a similar argument to that of Plaintiffs' in <u>Black Voters Matter Fund</u>.  <u>See</u> 2020 WL 4597053 at *25.  In that case, the plaintiffs asserted that buying postage was a severe burden on the right to vote, especially during the COVID-19 public health crisis.  <u>Id.</u>  However, Judge Totenberg disagreed and instead characterized the burden on the plaintiffs' right to vote as moderate.  <u>Id.</u> at *34.  Specifically, she stated due to "the

potential alternatives to purchasing stamps available to many (though not all) voters, the Court cannot say the burden of obtaining postage is severe, and instead characterizes it as moderate for present purposes."[26] Id.

The Court finds this reasoning persuasive. As Defendants noted, there are widely available alternatives to voting by mail, including use of drop boxes or hand delivery. [Docs. 90 at 19; 90-10 ¶¶ 4–5]. Additionally, the Secretary and the State Election Board have taken several steps to address the challenges posed by COVID-19. [See Doc. 90-1 ¶ 4]. Based on this evidence, in light of the specific facts of this case, the Court cannot say the burden of obtaining postage is severe. Instead, after considering the hardships of the COVID-19 pandemic and Defendants' responsive measures thus far, the Court finds that the postage requirement poses a moderate burden on Plaintiffs. See Black Voters Matter Fund, 2020 WL 4597053, at *34.

## 2. Identification and Balance of State Interest

Because the Court categorizes Plaintiffs' burden as moderate, the undersigned must weigh the "burden on [Plaintiffs] against the State's asserted interest and chosen means of pursuing it." Esshaki, 2020 WL 1910154, at *4. Defendants' interest is mainly fiscal. [Doc. 91 at 24]. Specifically, Defendants provide evidence

---

[26] The alternatives include voting in person, dropping off the ballot at a secure drop-off location, or hand delivering the ballot to the registrar's office. See Black Voters Matter Fund, 2020 WL 4597053, at *26.

that due to a decrease in tax revenue, the State's budget is strained. [Doc. 91-1 ¶¶ 8–10]. "Fiscal responsibility, even if only incrementally served, is undeniably a legitimate and reasonable legislative purpose." Ohio Democratic Party v. Husted, 834 F.3d 620, 634 n.8 (6th Cir. 2016). Defendants maintain that Plaintiffs' requested relief regarding postage would cost anywhere between $800,000–$4.2 million (depending on voter participation and the cost per ballot) during a time when the budget is already strained. [Doc. 91 at 11–12; see also Docs. 90-16 ¶ 6; 91-1 at 1–2]. The State has a limited amount of resources (particularly scarce during the current pandemic) and has already allocated funds and resources to addressing burdens on the right to vote. [See Doc. 91 at 10]; see also Ga. Comp. R. & Regs. 183-1-14-0.6-.14.

Additionally, Plaintiffs have failed to present sufficient evidence at this time to show their burden outweighs the State's interest. Although Plaintiffs presented declarations from voters who claim they could not afford a stamp, the Court notes there are alternative to purchasing a postage stamp including utilizing drop boxes, hand delivery, and voting in person. See supra. In light of these alternatives, Plaintiffs have not demonstrated a likelihood of success on the merits of their argument regarding the Absentee Postage Tax as it relates to their right to vote claim. Accordingly, the Court denies preliminary injunctive relief on this basis.

> b.     *Twenty-Fourth Amendment*

Next, Plaintiffs argue that by failing to provide postage, Georgia has imposed a fee on voting, which violates the Twenty-Fourth Amendment.[27]  [Doc. 58 at 28–29].  Again, Judge Totenberg rejected an identical argument in Black Voters Matter Fund.  See 2020 WL 4597053 at *25.  There, the plaintiffs argued that requiring voters to buy postage was an unconstitutional poll tax.  Id. at *26.  But Judge Totenberg disagreed and held that the plaintiffs' argument failed.  Id. at *27.

In her order, Judge Totenberg discussed at length the case law as it relates to poll tax cases.  Id. at *21–25 (collecting cases).  Ultimately, these cases stood for "the narrow proposition that payments to the government 'in connection' with voting can be considered poll taxes under [Harper v. Virginia State Bd. of Elections, 383 U.S. 663 (1966)], and [Harman v. Forssenius, 380 U.S. 528, 529 (1965)], even if not designated as such."  Id. at *25.  Judge Totenberg further stated that "incidental payments to a government agency may in some circumstances be sufficiently 'connected' with voting if such payments are a necessary condition of accessing the

---

[27] The Twenty-Fourth Amendment states:

> The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

U.S. CONST. amend. XXIV.

polls generally applicable to all voters, such as payments for required documentation

in order to establish eligibility to vote." Id. (internal citations omitted).

However, upon reviewing the facts, Judge Totenberg held that the State of

Georgia has not imposed an unconstitutional de facto poll tax by failing to provide

pre-paid return postage for absentee ballots.   Id. at *27.   As Judge Totenberg

observed:

> The fact that any registered voter may vote in Georgia on election day
> without purchasing a stamp, and without undertaking any "extra steps"
> besides showing up at the voting precinct and complying with generally
> applicable election regulations, necessitates a conclusion that stamps
> are not poll taxes under the Twenty-Fourth Amendment prism.
> In-person voting theoretically remains an option for voters in Georgia,
> though potentially a difficult one for many voters, particularly during a
> pandemic. The Court recognizes that voting in person is materially
> burdensome for a sizable segment of the population, both due to the
> COVID-19 pandemic and for the elderly, disabled, or those out-of-
> town. But these concerns—while completely justifiable and
> pragmatically solvable—are not the specific evils the Twenty-Fourth
> Amendment was meant to address.

Id.

The same reasoning applies here.  As noted above, there are alternative means

by which to vote absentee besides voting by mail.   These other options include

delivering any completed ballot at the registrar's office or depositing the ballot at a

secure drop-box location.  Of course, voting in person also remains an option.  While

the public health concerns related to voting during a global pandemic are valid, they

are "not the specific evils the Twenty-Fourth Amendment was meant to address."

Id.  For the foregoing reasons, Plaintiffs have not shown a substantial likelihood of success on the merits as to their poll tax claim.  Thus, the Court denies any related injunctive relief.

### iv.    Voter Assistance Ban: O.C.G.A. § 21-2-385(a)

The Court now turns to Plaintiffs' arguments challenging O.C.G.A. § 21-2-385(a), the statute they label as the Voter Assistance Ban.  As discussed *supra*, Georgia law prohibits third parties from assisting with returning a signed, sealed absentee ballot unless the third party is the "elector's mother, father, grandparent, aunt, uncle, brother, sister, spouse, son, daughter, niece, nephew, grandchild, son-in-law, daughter-in-law, mother-in-law, father-in-law, brother-in-law, sister-in-law, or an individual residing in the household of such elector."  O.C.G.A. § 21-2-385(a).  Plaintiffs make three (3) arguments regarding the invalidity of O.C.G.A., § 21-2-385(a).  Plaintiffs claim the ban: (1) unreasonably burdens the right to vote, (2) violates the First Amendment, and (3) is preempted by Section 208 of the Voting Rights Act.  The Court discusses each argument in turn.

### a.    *Anderson-Burdick*

### 1. *Severity of Burden*

The Court begins with Plaintiffs' right to vote argument, which is analyzed pursuant to the Anderson-Burdick framework.  See *supra*.  The Court's first task under Anderson-Burdick is to determine the character and magnitude of the asserted

burden.  In their motion, Plaintiffs characterize the burden as severe, especially for voters with disabilities, voters with health conditions, low-income voters, voters who lack easy access to reliable transportation, and young voters.  [Doc. 58 at 13, 21–22].  While Plaintiffs' arguments are compelling, the Court finds that based on the evidence before the Court, the burden is, at most, moderate rather than severe.  Mays, 951 F.3d at 786 (finding that the burden on the right to vote for jailed voters was moderate given the alternative voting opportunities that the state provided); League of Women Voters v. LaRose, No. 2:20-CV-1638, 2020 U.S. Dist. LEXIS 91631, at *20 (S.D. Ohio Apr. 3, 2020) (finding that the burden on the right to vote was not severe, even in the midst of challenges posed by COVID-19, because voters had various means by which to vote, both by mail and in person).

The Court recognizes that due to the current COVID-19 pandemic, voters may face difficulty, and there are voters who either must or prefer to remain homebound. But Defendants have taken steps to address the challenges of voting during the COVID-19 public health emergency, and these same voters still have the option of filling out an absentee ballot and mailing their vote.  See supra.  Thus, the Court finds that although a burden does exist, it is only moderate.

### 2.  Identification and Balance of State Interest

Having determined that the burden imposed is moderate, the Court must weigh the "burden on [Plaintiffs] against the State's asserted interest and chosen

means of pursuing it." Esshaki, 2020 WL 1910154, at *4.  Here, Defendants identify

three (3) interests: (1) the State's interest in preventing voter fraud, (2) the State's

interest in promoting voter confidence, and (3) the State's generalized interest in the

orderly administration of elections.   [Docs. 83-1 at 31; 91 at 21; 126 at 19–21].

Defendants' method to achieve those goals is to limit those who can collect voters'

absentee ballots to family members, with certain statutory exceptions.  See O.C.G.A.

§ 21-2-385(a).

   In balancing the State's interest with its chosen means, based on the current

record, the Court cannot say that the State's means are unreasonable or unduly

burdensome.[28]  See Crawford, 553 U.S. at 192–97 (holding that deterring voter fraud

is a legitimate policy on which to enact an election law); Burdick, 504 U.S. at 433

(explaining that states have a role in ensuring their elections are fair, honest, and

orderly); Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) ("Confidence in the election

process is essential to the functioning of our participatory democracy."); Eu v. San

Francisco Cty. Democratic Central Comm., 489 U.S. 214, 231 (1989) ("A State

indisputably has a compelling interest in preserving the integrity of its election

process."); Greater Birmingham Ministries v. Sec'y of State for Alabama, 966 F.3d

1202, 1238 (11th Cir. 2020) (finding Alabama's policy justification of combatting

---

[28] The Court notes that discovery and factual development may potentially fortify Plaintiffs' claim
for permanent injunctive relief.

voter fraud was a valid policy justification for enacting the voter ID law at issue).  In sum, Defendants have demonstrated that their interests and methods outweigh the burden suffered by Plaintiffs.  Thus, Plaintiffs are unlikely to succeed on the merits of their right to vote claim as it relates to the Voter Assistance Ban.  Accordingly, the Court denies any related injunctive relief.

### b.    *First Amendment*

Next, Plaintiffs claim the Voter Assistance Ban prevents them from engaging in election related speech and associational activities, in violation of the First Amendment.  [Doc. 58 at 30–31].  However, several courts have determined that collecting ballots does not qualify as expressive conduct protected by the First Amendment.  See Knox v. Brnovich, 907 F.3d 1167, 1181 (9th Cir. 2018) (finding the collection of absentee ballots is not expressive conduct); Feldman v. Ariz. Sec'y. of State's Office, 843 F.3d 366, 372 (9th Cir. 2016) (holding that collecting ballots is not expressive conduct "[e]ven if ballot collectors intend to communicate that voting is important"); Voting for Am. Inc. v. Steen, 732 F.3d 382, 391 (5th Cir. 2013) (finding the collection and delivering of voter-registration applications are not expressive conduct); Democracy N. Carolina v. N. Carolina State Bd. of Elections, No. 1:20CV457, 2020 WL 4484063, at *50 (M.D. N.C. Aug. 4, 2020) ("Regarding the delivering of the absentee ballot requests, however, the court will follow the Fifth and Ninth Circuits in finding that the collecting and delivering of absentee ballot

request forms is not expressive conduct and therefore does not implicate the First Amendment.").  In accordance with this persuasive authority, the Court finds that collecting ballots is not expressive conduct.

Because delivering absentee ballot requests is not expressive conduct, it is subject only to rational basis review.  See Johnson v. Robison, 415 U.S. 361, 375 n.14 (1974) ("[S]ince we hold . . . that the Act does not violate appellee's right of free exercise of religion, we have no occasion to apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test."); Voting for Am., 732 F.3d at 392 ("Because the Non-Resident and County provisions regulate conduct only and do not implicate the First Amendment, rational basis scrutiny is appropriate.").  Again, rational basis review only requires that legislative action, "[a]t a minimum, . . . be rationally related to a legitimate governmental purpose." Clark v. Jeter, 486 U.S. 456, 461 (1988).  There is a "strong presumption of validity" under rational basis review, so long as "there is any reasonably conceivable state of facts that could provide a rational basis for the [statute.]" FCC v. Beach Commc'ns, 508 U.S. 307, 314 (1993).  The burden is on the challenging party to establish that the statute is unconstitutional. Id. at 315.

Here, Defendants contend the limitations on who may deliver absentee ballots is a rational means of combating election fraud and verifying the eligibility of voters. [Doc. 91 at 32].  Upon rational basis review, the Court finds that this restriction is

reasonably related to a legitimate governmental purpose and Plaintiffs have not carried their burden to demonstrate the law is unconstitutional.  See Crawford, 553 U.S. at 185; Democracy N. Carolina, 2020 WL 4484063, at *52 (finding that North Carolina's limitation on delivery of absentee ballot requests "is a rational means of promoting the government's legitimate interest combating election fraud").  The State wants to guard against voter fraud, and the Court defers to the legislature's chosen method to pursue that goal.  Williams v. Pryor, 240 F.3d 944, 948 (11th Cir. 2001) ("Rational basis scrutiny is a highly deferential standard that proscribes only the very outer limits of a legislature's power.").  Accordingly, the Court finds that Plaintiffs do not demonstrate a substantial likelihood of success on the merits of their First Amendment argument regarding the Voter Assistance Ban.  Thus, the Court denies injunctive relief on this basis.

> c.   *Section 208 Preemption Claim*

Finally, Plaintiffs maintain that O.C.G.A. § 21-2-385(a), the Voter Assistance Ban, is at odds with Section 208 of the Voting Rights Act ("VRA") because it prohibits voters with a disability from receiving assistance from persons of their choice.  [Doc. 58 at 32].  Thus, Plaintiffs present an argument of conflict preemption. [Id.]  Conflict preemption occurs "where [1] compliance with both federal and state regulations is a physical impossibility, or where [2] state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress."  Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992) (internal marks and citations omitted).  Plaintiffs argue that both are true here.

Section 208 provides: "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union."  52 U.S.C. § 10508.  Thus, the VRA promises freedom of choice for voters with disabilities or who lack literacy.  Id.  The VRA defines the terms "vote" and "voting" to include:

> [A]ll action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

52 U.S.C. § 10310.

Here, Plaintiffs argue that "voting" in the context of the VRA includes delivery of ballots.  They argue that because the ban restricts the delivery of ballots, it cannot co-exist with the VRA.  However, at this juncture, the Court finds that Plaintiffs have not demonstrated a substantial likelihood of success on the merits because this issue presents a question too close to call.[29]  See Stockstill v. City of

---

[29]  Plaintiffs fail to cite to any authority from the Eleventh Circuit on this issue, and the authority that Plaintiffs do present to the Court address state laws that are distinguishable from O.C.G.A. § 21-2-385(a).  [See Doc. 58 at 31–32].

Picayune, No. 1:16CV4-LG-RHW, 2017 WL 3037431, at *10-11 (S.D. Miss. July 18, 2017) ("But at the end of the day, a close question, in the Court's view, means that the plaintiff has not shown a substantial likelihood of success on the merits, which is the high burden he must carry at a preliminary injunction hearing."). The Court finds that further briefing and discovery are necessary to determine whether Plaintiffs' argument will ultimately be successful. Thus, Plaintiffs have not demonstrated a likelihood of success with regards to their Section 208 preemption claim at this stage of the proceedings.

For the foregoing reasons, the Court finds that Plaintiffs have not shown a substantial likelihood of success on the merits of their claims with regards to O.C.G.A. § 21-2-385(a), the Voter Assistance Ban. Accordingly, the Court denies any related injunctive relief.

> ### v.  Receipt Deadline: O.C.G.A. § 21-2-386(a)(1)(F)

The Court now turns to the Parties' arguments regarding O.C.G.A. § 21-2-386(a)(1)(F), the Receipt Deadline. As a refresher, the State of Georgia does not count absentee ballots received after the closing of polls on Election Day, which this year will be November 3, 2020, at 7:00 p.m. See O.C.G.A. § 21-2-386(a)(1)(F). This is true regardless of whether the late arrival was outside the voter's control and even if the ballot was postmarked on Election Day. Id. Plaintiffs argue that in light of COVID-19, the Receipt Deadline: (1) imposes severe burdens on the right to vote

and (2) deprives voters of their liberty interest without adequate procedural safeguards (that is to say, violates procedural due process). [Doc. 58 at 18–20; 22–25]. The Court address each argument in turn.

> ### a. *Anderson-Burdick*

The Court begins with Plaintiffs' right to vote argument, which must be analyzed under the Anderson-Burdick test. See *supra*.

> ### 1. *Severity of Burden*

The first step is to characterize the severity of the burden. Plaintiffs argue that the burden is severe and proffer compelling evidence in support of this position. Their evidence demonstrates that there were a record number of absentee ballot requests for the Georgia June 2020 Primary Election, and there will likely be even more requests for November 2020 election. [See Doc. 59-1 at 3]. As mentioned above, the State issued over 1.9 million absentee ballots to voters for the June 2020 Primary. [Id. at 3, 9]. Ultimately, 1.1 million absentee ballots were recorded as cast. [Id.] This surge of absentee voting applications has led to well-documented delays concerning the delivery of absentee ballot applications. [See, e.g., Docs. 59-38, 59-39, 59-40, 59-41, 59-43, 59-44, 59-45].

Additionally, Plaintiffs have shown that Georgia voters can be and have been disenfranchised by the current receipt deadline through no fault of their own. [See, e.g., Doc. 59-6 ¶ 6] (Plaintiff voter received her absentee ballot on the day

before Election Day).  In 2018—a time free from the current complications of the COVID-19 pandemic and related strains on voting infrastructure—over 3,500 absentee ballots were rejected in Georgia for arriving after the Election Day receipt deadline.  [Doc. 59-1 at 4].  During the June 2020 Primary Election, the number of rejected-as-late ballots doubled to 7,281.  [Doc. 105-1 at 13].  This evidence suggests the burden on many voters will be severe.

A Wisconsin district court addressed this very issue in Democratic Nat'l Comm. v. Bostelmann, No. 20-CV-249-WMC, 2020 WL 1638374, at *3 (W.D. Wis. Apr. 2, 2020).  In that case, the plaintiffs sought an injunction postponing the election and prohibiting enforcement of several aspects of Wisconsin's election regulations, including the requirement that "absentee ballots must be received by 8:00 p.m. on election day to be counted."  Id. at *2.  The district court noted the plaintiffs would experience a severe burden in the upcoming election due to the backlog of absentee voting requests and the dangers posed by COVID-19.  Id. at *5.  While the state's interests in that case were strong (maintaining order and preventing confusion), the district court held these interests were not so compelling as to overcome the severe burden the state's receipt deadline imposed on its citizens' right to vote via absentee ballot.  Id. at *13.  Therefore, the court held that plaintiffs demonstrated a likelihood of success on the merits on this issue.  Id.  As a result, the district court issued an injunction that, in part, extended the deadline for receipt of absentee ballots from

election day, April 7, 2020, to April 13, 2020. <u>Id.</u> at *16–18. However, the district court did not impose a postmarked-by date requirement; thus, ballots would be accepted until 4:00 p.m. on April 13, 2020, regardless of the postmark date. <u>Id.</u> The Seventh Circuit affirmed that portion of the injunction. <u>Democratic Nat'l Comm. V. Bostelmann</u>, No. 20-1538, 2020 WL 3619499, at *1 (7th Cir. Apr. 3, 2020).

However, the United States Supreme Court granted a partial stay on the injunction a day before the election. <u>Republican Nat'l Comm. v. Democratic Nat'l Comm.</u>, 140 S. Ct. 1205, 1206 (Apr. 6, 2020). The Court's primary issue with the district court's injunction was that it did not impose a postmarked-by date requirement. <u>Id.</u> By failing to require that ballots be postmarked by the election date (April 7, 2020), the Court felt that the injunction improperly extended the length of the voting period, which "fundamentally alters the nature of the election." <u>Id.</u> at 1207. Consequently, the Court upheld the district court's ruling in requiring the state to count ballots received by April 13, 2020, but also added the requirement that the absentee ballots had to be postmarked by election day, which was April 7, 2020, to be counted. <u>Id.</u> at 1208. This new postmarked-by deadline resulted in 79,054 absentee ballots being counted. [Doc. 59-54 at 7].

The situation here is similar to that of <u>Bostelmann</u>. As in Wisconsin, there is evidence that a record number of absentee ballot requests in Georgia will lead to a potentially substantial backlog, increasing the possibility that voters will receive

their ballots on a later date.  [See generally Doc. 59-1].  It has been established that more than 7,000 voters were disenfranchised by Georgia's June 2020 Primary Election ballot receipt deadline.  [Doc. 105-1 at 13].  According to Plaintiffs, these voters were disenfranchised for no error of their own, but due to Georgia's poor administration of absentee ballots and the policy they now challenge, the Receipt Deadline.  [Doc. 103 at 15–16].  Based on this evidence, the Court finds that burden imposed on voters by Georgia's current absentee ballot receipt deadline is severe. See Bostelmann, 2020 WL 1638374, at *17; accord Doe v. Walker, 746 F. Supp. 2d 667, 679–80 (D. Md. 2010) ("By imposing a deadline which does not allow sufficient time for absent uniformed services and overseas voters to receive, fill out, and return their absentee ballots, the state imposes a severe burden on absent uniformed services and overseas voters' fundamental right to vote.").

### 2.  Identification and Balance of State Interest

Because the burden is severe, O.C.G.A. § 21-2-386(a)(1)(F) may survive only if it is "narrowly tailored and advance[s] a compelling state interest." Timmons, 520 U.S. at 358.  Defendants claim that a postmarked-by deadline and/or extension will frustrate the State's interests in conducting an efficient election, maintaining order, quickly certifying election results, and preventing voter fraud.  [Docs. 90 at 24–25; 91 at 26].  While these interests are strong, the Court finds that Defendants' chosen means of pursing them is not justified by the severe burden faced by certain voters.

"More to the point, the state's general interest in the absentee receipt deadline is not so compelling as to overcome the burden faced by voters who, through no fault of their own, will be disenfranchised by the enforcement of the law." Bostelmann, 2020 WL 1638374 at *17. In other words, while the Court recognizes the State's important interests, the statutorily imposed deadline acts as an undue burden on the right to vote.

For these reasons, as applied to Plaintiffs for the upcoming November 2020 general election, the Court concludes the State's asserted interests do not justify or outweigh the severe burden imposed on Plaintiffs by the Receipt Deadline. As such, Plaintiffs show a substantial likelihood of success, satisfying the first of the preliminary injunction factors. See KH Outdoor, 458 F.3d at 1268.

b. *Due Process*

Plaintiffs also argue that the Receipt Deadline violates procedural due process. As set forth above, to determine the adequacy of procedural protections, courts must apply the Mathews balancing test. The Court must balance three factors: (1) the private interest that will be affected by the official action; (2) the risk that the procedures used will cause an erroneous deprivation, and the probative value of any additional or substitute procedural safeguards; and (3) the government's interest, including any fiscal and administrate burdens. Mathews, 425 U.S. at 334–35.

61

Upon review, the Court finds the <u>Mathews</u> balancing test tips in Plaintiffs' favor.  Here, like before, the private interest at issue implicates an individual's right to vote and is therefore entitled to substantial weight.  <u>See</u> <u>Martin</u>, 341 F. Supp. 3d at 1338 ("Given that the State has provided voters with the opportunity to vote by absentee ballot, the State must now recognize that the privilege of absentee voting is certainly deserving of due process.") (internal marks and citation omitted).  As for the second <u>Mathews</u> factor, the Court finds that risk of erroneous deprivation is high due to massive delays and exigent circumstances caused by COVID-19.  [<u>See, e.g.</u>, Docs. 59-38, 59-39, 59-40, 59-41, 59-43, 59-44, 59-45].

Even before the pandemic, thousands of mailed absentee ballots have been rejected in Georgia for arriving after the receipt deadline during recent election cycles.  [<u>See</u> Doc. 103 at 15].  For example, in 2018, at least 3,045 of the 3,581 absentee ballots arrived within seven (7) days of Election Day, implying that many were mailed either before or on Election Day.[30]  [Doc. 59-1 at 18].  Plaintiffs' proposed remedy—extending the deadline for receiving absentee ballots—would be a valuable measure to address the risk of absentee voter disenfranchisement.  [<u>See</u> Doc. 58 at 24].  Extending the deadline would ensure that voters who receive their ballots shortly before Election Day are able to mail their ballots without fear that

---

[30] In fact, the majority of the rejected ballots (2,427) were received within three (3) days of Election Day.  [Doc. 59-1 at 18].

their vote will not count.[31]   [See Doc. 59-1 at 18] (demonstrating that in the 2018 General Election, around 67% percent of late ballots arrived within three (3) business days after the election).   As to the third <u>Mathews</u> factor, the Court acknowledges that Defendants have a strong interest in certifying election results and maintaining the integrity of elections.   But the Court also finds that any additional procedures impose a minimal burden on Defendants, because they already have an extended deadline for Uniformed Overseas Citizens Absentee Voting Act voters.[32]

In light of the foregoing, the Court finds that Plaintiffs have established a substantial likelihood of success on the merits of their procedural due process claim regarding O.C.G.A. 21-2-386(a)(1)(F), the Receipt Deadline.

---

[31] Indeed, even the United States Postal Service "recommends that voters mail their marked return ballots at least 1 week before the due date to account for any unforeseen events or weather issue[s,]" acknowledging the potential for delay even under non-exigent circumstances.  [See Doc. 59-1 at 18].

[32] The Georgia law addressing the receipt deadline for overseas citizens reads as follows:

> [A]bsentee ballots cast in a primary, election, or runoff by eligible absentee electors who reside outside the county or municipality in which the primary, election, or runoff is held and are members of the armed forces of the United States, members of the merchant marine of the United States, spouses or dependents of members of the armed forces or merchant marine residing with or accompanying such members, or overseas citizens that are postmarked by the date of such primary, election, or runoff and are received within the three-day period following such primary, election, or runoff, if proper in all other respects, shall be valid ballots and shall be counted and included in the certified election results.

O.C.G.A. § 21-2-386(a)(1)(G).

### vi.    Summary

In sum, the Court finds that Plaintiffs have not demonstrated that they are likely to succeed on the merits of their claims regarding O.C.G.A. § 21-2-381(b)(4), the Notification Process; O.C.G.A. § 21-2-381(a)(1)(G), the Absentee Age Restriction; the Absentee Postage Tax; or O.C.G.A. § 21-2-385(a), the Voter Assistance Ban. However, the Court finds that Plaintiffs have demonstrated they are likely to succeed on the merits of their claims regarding O.C.G.A. § 21-2-386(a)(1)(F), the Receipt Deadline. Having made this determination, the Court discusses the remaining preliminary injunction factors in light of the relief requested related to the Receipt Deadline. Again, Plaintiffs must satisfy all four (4) factors in order to be entitled to injunctive relief. Siegel, 234 F.3d at 1176.

### C.    Irreparable Injury

The Court turns to its assessment of the second element of the preliminary injunction standard: irreparable harm. Id. It is well-settled that an infringement on the fundamental right to vote amounts in an irreparable injury. See Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion) (The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Thus, when a plaintiff has alleged her fundamental right to vote has been infringed, irreparable injury is generally presumed. See id.; Martin, 341 F. Supp. 3d at 1340 ("The Court finds that [p]laintiffs have established irreparable injury as a

violation of the right to vote cannot be undone through monetary relief and, once the election results are tallied, the rejected electors will have been disenfranchised without a future opportunity to cast their votes."); see also League of Women Voters v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury . . . [because] once the election occurs, there can be no do-over and no redress.  The injury to these voters is real and completely irreparable if nothing is done to enjoin the law.").

In light of the constitutional rights at stake, as well as the Court's determination regarding Plaintiffs' likelihood of success on the merits with regards to the Receipt Deadline, the undersigned finds that Plaintiffs will suffer irreparable harm absent an injunction.  Thus, the Court finds Plaintiffs satisfy the second element necessary to obtain a preliminary injunction.

## D. Balance of the Harms and Public Interest

The remaining two (2) factors of the four-part preliminary injunction test, "harm to the opposing party and weighing the public interest[,] . . . merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).  The Court must consider each factor in view of Plaintiffs' proposed relief.

Here, the Court finds Plaintiffs satisfy both factors.  First, the balance of the harms weighs in Plaintiffs' favor.  Plaintiffs will be forever harmed if they are unconstitutionally deprived of their right to vote.  See Martin, 341 F. Supp. 3d at

1340. Defendants, on the other hand, argue that changing the deadline this close to the election will be burdensome on election officials, disrupt the State's statutory scheme for certifying elections, and undermine the integrity of the election process. [Docs. 90 at 20-22; 91 at 23–25]. As an initial response to Defendants' arguments, as Judge May stated in Martin, this Court "does not understand how assuring that all eligible voters are permitted to vote undermines [the] integrity of the election process. To the contrary, it strengthens it." Martin, 341 F. Supp. 3d at 1340. Additionally, extending the deadline would only impose a minimal burden on Defendants because the State already has an extended absentee ballot receipt deadline for Uniformed Overseas Citizens Absentee Voting Act voters. See id. at 1339–40 ("Because many of the procedures Plaintiffs request are already in place, the Court finds that additional procedures would involve minimal administrative burdens while still furthering the State's asserted interest in maintaining the integrity of its elections."). As for any delay in certification, the Court notes that the burden on voters outweighs the State's interest. See Doe, 746 F. Supp. 2d at 678–80 (finding that Maryland's statutory deadline for the receipt of absentee ballots imposed a severe burden on the absent uniformed services and overseas voters that was not justified by the state's interest in certifying election results).

Second, the public will be served by this injunction. Georgia voters have an interest in ensuring their votes are counted. Jones v. Governor of Fla., 950 F.3d 795,

831 (11th Cir. 2020) ("The public, of course, has every interest in ensuring that their peers who are eligible to vote are able to do so in every election."); <u>Husted</u>, 697 F.3d at 437 ("The public interest therefore favors permitting as many qualified voters to vote as possible."); <u>see also</u> <u>Madera v. Detzner</u>, 325 F. Supp. 3d 1269, 1283 (N.D. Fla. 2018) ("The public interest is always served by more equitable, easier access to the ballot.").

Accordingly, Plaintiffs have carried their burden as to each of the four (4) preliminary injunction factors as they relate to the Receipt Deadline.  <u>See</u> <u>KH Outdoor</u>, 458 F.3d at 1283.  Thus, the Court turns now to its remedy.[33]

## IV.   Remedy

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." <u>Trump v. Int'l Refugee Assistance Project</u>, 137 S. Ct. 2080, 2087 (2017) (per curiam).  In formulating the appropriate remedy, "a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case."  <u>Id.</u> (citation omitted).

---

[33] Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  While Plaintiffs do mention the bond requirement, the Court, in its discretion, waives it.  <u>See</u> <u>BellSouth Telecoms., Inc. v. MCIMetro Access Transmission Serv., LLC</u>, 425 F.3d 964, 971 (11th Cir. 2005) ("[I]t is well-established that the amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court, and the court may elect to require no security at all.") (internal citation and punctuation omitted).

Here, Plaintiffs request the Court extend the absentee ballot receipt deadline by five (5) business days.  [Doc. 57-1].  However, the Court declines to grant Plaintiffs' specific request and instead directs that Defendants accept as otherwise valid, absentee ballots from qualified voters that are postmarked by Election Day and arrive at their respective county's office within three (3) business days after Election Day.

In crafting this remedy, the Court by no means discounts the challenges absentee voters face amid the COVID-19 pandemic.  However, the Court must balance these difficulties with the need to honor the State's legitimate interest in certifying the election.  Accordingly, the Court finds that extending the receipt deadline by three (3) business days balances the interests of all Parties.  Thus, the Court directs Defendants to accept otherwise valid absentee ballots from qualified voters that are postmarked by Election Day and arrive at their respective county's office within three (3) business days after Election Day.  In other words, valid absentee ballots postmarked on or before November 3, 2020, must be counted if received by 7:00 p.m. on November 6, 2020.

The Court notes it is reluctant to interfere with Georgia's statutory election machinery.  However, where the risk of disenfranchisement is great, as is the case here, narrowly tailored injunctive relief is appropriate.  Consequently, the Court finds that extending the absentee ballot receipt deadline by three (3) business days

is appropriate.  The Court emphasizes that the equitable relief it provides is limited to the November 2020 election during these extraordinary times.

## V.  Conclusion

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Preliminary Injunction.  [Doc. 57].  Specifically, the Court denies Plaintiffs' request to enjoin Defendants from implementing or enforcing O.C.G.A. § 21-2-381(b)(4); O.C.G.A. § 21-2-381(a)(1)(G); the Absentee Postage requirement; and O.C.G.A. § 21-2-385(a).  However, the Court grants Plaintiffs' request to enjoin Defendants from enforcing O.C.G.A. § 21-2-386(a)(1)(F) and **EXTENDS** the receipt deadline for absentee ballots as detailed below.

The Court **PRELIMINARY ENJOINS** Defendants, their officers, employees, and agents, all persons acting in active concert or participation with Defendants, or under Defendants' supervision, direction, or control from enforcing O.C.G.A. § 21-2-386(a)(1)(F), which requires absentee ballots to be received by 7:00 p.m. on Election Day to be counted.  The Court **ORDERS** that Defendants, their officers, employees, and agents, all persons acting in active concert or participation with Defendants, or under Defendants' supervision, direction, or control shall accept and count otherwise valid absentee ballots from qualified voters

that are postmarked by Election Day, and arrive at their respective county's office

within three (3) business days of Election Day by 7:00 p.m.[34]

**SO ORDERED**, this 31st day of August, 2020.


_Eleanor L. Ross_
Eleanor L. Ross
United States District Judge
Northern District of Georgia

---

[34] The term "postmark" as used herein refers to any type of imprint applied by the postal service to indicate the location and date the postal service accepts custody of a piece of mail, including bar codes, circular stamps, or other tracking marks.